**IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ANTHONY BARASKY,<br>        *Plaintiff*<br><br>v.<br><br>KEVIN DENT et al.<br>        *Defendants*. | CIVIL ACTION<br><br>CASE NO. 4:21-cv-02041<br><br><u>ELECTRONICALLY FILED</u> |

## <u>STATEMENT OF UNCONTESTED MATERIAL FACTS</u>

Plaintiff, Anthony Barasky, by and through his attorney, Leonard Gryskewicz, Jr., hereby submits his Statement of Uncontested Material Facts in support of his Motion for Summary Judgment pursuant to Local Rule 56.1.

A. *<u>Defendants are persons and acting under color of law within the meaning of 42 U.S.C. § 1983.</u>*

1. Kevin Dent ("Dent") was at all relevant times employed as and acting as a detective for the Lycoming County District Attorney's Office Narcotic Enforcement Unit ("NEU"). Appendix 5, 5:7–6:16.

2. Tyson Havens ("Havens") was at all relevant times employed as and acting as a detective for the NEU. Appendix 10, 5:8–6:2.

3. Joshua Bell ("Bell") was at all relevant times employed and acting as a police officer for the City of Williamsport and was working on loan as a police

1

officer for the NEU. Appendix 4, ¶ 10; Appendix 5, 7:19–24; Appendix 6, 5:10–6:8.

4. Clinton Gardner ("Gardner") was at all relevant times employed and acting as a police officer for the City of Williamsport and was working on loan as a police officer for the NEU. Appendix 4, ¶ 11; Appendix 7, 5:16–7:18.

5. Joseph Hope ("Hope") was at all relevant times employed and acting as the Chief of Police of Old Lycoming Township and was working in cooperation with the NEU. Appendix 3, ¶¶ 12, 24; Appendix 8, 5:6–25.

B. *Pre-Arrest Facts*

6. Bell was the acting supervisor of Dent, Gardner, and Havens at the NEU at all times relevant to this action. Appendix 4, ¶ 26; Appendix 5, 6:17–22; Appendix 6, 7:24–9:18; Appendix 7, 7:21–23; Appendix 10, 6:6–11.

7. Dent was the lead officer for the investigation into Anthony Barasky ("Barasky"). Appendix 6, 28:13–16.

8. Dent's investigation into Barasky began with a separate investigation into Matthew Thomas Sumpter ("Sumpter").

9. Dent first became aware of Sumpter on April 15, 2020. Appendix 5, 7:25–8:6. On April 15, 2020, Sumpter sold eight (8) suspected Gabapentin pills and three (3) suspected Suboxone pills to a confidential informant.

Appendix 5, 8:4–11. After the sale, the confidential informant dropped Sumpter off at Sumpter's residence. Appendix 5, 8:16–20.

10.      Sumpter had four (4) *crimen falsi* convictions prior to the events relevant to this case. Appendix 2, ¶ 46; Appendix 5, 11:22–12:9.

11.      All Defendants knew that Sumpter had four (4) prior *crimen falsi* convictions at all times relevant to this case. Appendix 2, ¶ 46; Appendix 5, 13:1–10; Appendix 6, 10:10–12, 11:22–12:1.

12.      At all times relevant to this action, Sumpter lived at 416 Brentwood Drive, Cogan Station, Pennsylvania. Appendix 5, 8:16–20; 11:9–15; 21:2–4; 62:12–15.

13.      Between April 15, 2020 and September 24, 2020, members of the NEU had no contact with Sumpter. Appendix 5, 8:21–9:4.

14.      On September 23, 2020, Dent interviewed a confidential informant ("the Reliable Informant") that provided him information on Sumpter. Appendix 5, 9:5–10:5.

15.      The Reliable Informant was the same person that purchased eight (8) suspected Gabapentin pills and three (3) suspected Suboxone pills from Sumpter on April 15, 2020. Appendix 5, 9:5–10:5.

16.      The Reliable Informant "was probably our most reliable [confidential informant] we've had - - with the NEU." Appendix 5, 9:18–10:5.

The Reliable Informant provided accurate and reliable information that let to "Hundreds" of controlled buys. Appendix 5, 9:18–10:5.

17.    The Reliable Informant told Dent on September 23, 2020 that Sumpter informed him that Sumpter made several trips to Philadelphia in the past few weeks to purchase Fentanyl. Appendix 5, 10:10–11:15; Appendix 5, Exhibit 1 (PDF pgs. 125–127). According to the Reliable Informant, Sumpter's most recent trip to Philadelphia to purchase Fentanyl was on September 23, 2020 wherein Sumpter paid $1,600.00 for a quantity of Fentanyl. *Id.* The Reliable Informant took pictures of the Fentanyl Sumpter purchased in Philadelphia and provided the pictures to Dent. *Id.*

18.    Dent used the Reliable Informant's information to obtain a search warrant for Sumpter's residence at 416 Brentwood Drive, Cogan Station. Appendix 5, 11:12–21.

19.    Dent, Bell, Havens, Gardner, other members of the NEU, and members of the Old Lycoming Township Police Department arrived at 416 Brentwood Drive to serve the search warrant on September 24, 2020. Appendix 5, 11:19–13:14; Appendix 6, 9:21–12:21; Appendix 7, 9:1–22, 10:19–23; Appendix 10, 10:3–15:25.

20.    Dent briefed Bell, Havens, Gardner, and the other NEU members on the information he learned from the Reliable Informant and the information

he learned from his investigation into Sumpter prior to the execution of the search warrant on September 24, 2020. Appendix 5, 13:1–10.

21.    Sumpter was arrested during the execution of the search warrant on September 24, 2020 and interviewed by Dent. Appendix 2, ¶ 35; Appendix 5, 13:11–14.

22.    Sumpter informed Dent where Fentanyl and marijuana was hidden inside of 416 Brentwood Drive. Appendix 5, 13:11–18.

23.    Dent did not remember questioning Sumpter about the information he was given by the Reliable Informant regarding Sumpter purchasing Fentanyl from Philadelphia. Appendix 5, 13:19–22.

24.    During Dent's interview of Sumpter on September 24, 2020 after his arrest, Sumpter for the first time brought up Barasky's name as a source for Sumpter's Fentanyl. Appendix 5, 13:23–14:5.

25.    Dent did not conduct an investigation to verify Sumpter's statements about Barasky on September 24, 2020. Appendix 5, 14:2–15:10.

26.    Dent informed the other NEU members present at Sumpter's house on September 24, 2020 what he learned from his interview with Sumpter. Appendix 5, 14:19–22; Appendix 6, 13:14–14:1, 15:11–16:16; Appendix 7, 12:19–13:6,

5

27.     Dent released Sumpter without filing criminal charges on September 24, 2020 with the intention of using Sumpter as a confidential informant in the future. Appendix 5, 15:2–16.

28.     Between September 24, 2020 and October 2, 2020, Dent only had phone conversations with Sumpter to try to get Sumpter to execute the necessary paperwork to become a confidential informant. Appendix 5, 19:4–20:9.

29.     Ultimately, Sumpter refused to cooperate as a confidential informant. Appendix 5, 20:1–9.

30.     In response, Dent obtained an arrest warrant for Sumpter and went to Sumpter's home at 416 Brentwood Drive on October 2, 2020 to arrest him. Appendix 2, ¶ 34; Appendix 5, 20:1–21:7.

31.     When Dent arrived and arrested Sumpter, Sumpter decided to provide information to Dent. Appendix 2, ¶ 38; Appendix 5, 20:1–21:7.

32.     Dent arrested Sumpter and physically removed Sumpter from his home prior to Sumpter deciding to provide information. Appendix 5, 24:8–12.

33.     Sumpter used heroin and was under the influence of heroin on October 2, 2020 prior to Dent's arrival to serve the arrest warrant. Appendix 5, 92:4–93:3.

34.     Dent described Sumpter's condition as "he wasn't falling over himself. He could - - he could function, but you could see it in his eyes that he had possibly used, yes." Appendix 5, 92:4–93:3.

35.     Despite Sumpter's impairment, Dent did not terminate his plan to use Sumpter as an informant. Appendix 5, 92:4–93:3.

36.     Previously, Dent has only terminated a drug investigation because an informant was impaired when the informant is actively overdosing, too impaired to walk, or too impaired to speak. Appendix 5, 103:23–105:20.

37.     Dent made Sumpter a confidential source rather than a confidential informant after he decided to provide information. Appendix 5, 21:8–22:10.

38.     Under NEU policy, a confidential informant must execute specific paperwork and is then permitted to make controlled buys on behalf of law enforcement. Appendix 5, 21:8–22:10; Appendix 7, 38:3–39:2.

39.     A confidential source only provides information to police. Appendix 5, 21:8–22:10; Appendix 7, 38:3–39:2.

40.     Prior to arresting Plaintiff on October 2, 2020, a meeting at NEU headquarters between Dent, Bell, Gardner, and Havens occurred ("the First

Meeting"). Appendix 2, ¶ 51; Appendix 5, 24:8–27:11; Appendix 6, 15:11–22:21; Appendix 7, 13:23–15:9.

41.     During this meeting, Dent, Bell, Gardner, and Havens discussed the information Sumpter provided and the details of the investigation into Sumpter. Appendix 2, ¶ 51; Appendix 5, 24:8–27:11; Appendix 6, 15:11–22:21; Appendix 7, 13:23–15:9.

42.     Then, a plan was formulated to use Sumpter as a confidential informant and/or source in order to arrest Barasky if Sumpter was willing to cooperate. Appendix 2, ¶ 51; Appendix 5, 24:8–27:11; Appendix 6, 15:11–22:21; Appendix 7, 13:23–15:9.

43.     During this meeting, Havens would have also informed the NEU members that he had a prior interaction with Barasky in 2016 wherein Barasky fled from a traffic stop and ultimately crashed into Kmart in Williamsport. Appendix 5, 25:11–26:12; Appendix 6, 15:11–22:21.

44.     October 2, 2020 was the first time Sumpter had acted as a confidential source for police. Appendix 2, ¶ 39; Appendix 5, 22:11–13; Appendix 6, 15:11–22:21.

45.     Sumpter had never provided reliable or accurate information to police prior to October 2, 2020. Appendix 2, ¶ 39; Appendix 5, 22:11–13; Appendix 6, 15:11–22:21.

46. A confidential source must build reliability before police use the information to establish probable cause. Appendix 10, 49:8–50:13.

47. The only reason Dent believed Sumpter was reliable was Dent's belief that Sumpter was a user rather than a dealer of illegal controlled substances. Appendix 5, 97:2–98:7.

48. However, this information was directly contradicted by the information the Reliable Informant provided Dent, the drugs for sale rather than personal use that were discovered in Sumpter's residence, and the criminal charges for selling drugs that Dent himself filed against Sumpter in October 2020. Appendix 5, 8:7–20; 10:2–18:9; 107:2–108:15; Appendix 5, Exhibit 1 & 2.

49. Sumpter informed Dent that he purchased heroin from Barasky over one hundred (100) times in the past. Appendix 5, 57:15–58:20.

50. However, Dent asked no follow up questions to see when these alleged purchases began, how often they occurred, what dates they occurred on, or any other questions to see if Sumpter was providing reliable information. Appendix 5, 57:15–58:20.

51. Sumpter informed Dent that the normal meeting location he had with Barasky was about one hundred (100) yards from his home at 416 Brentwood Drive. Appendix 5, 62:2–18; Appendix 5, Exhibit 9.

52.     Dent marked that location on a map with a dot during his deposition. Appendix 5, 62:2–18; Appendix 5, Exhibit 9.

53.     When Sumpter decided to provide information on October 2, 2020, Dent contacted Bell by telephone to devise a plan based on the information Sumpter provided. Appendix 5, 24:8–25:10.

54.     Bell contacted Christopher Kriner of the Old Lycoming Township Police Department who then contacted Hope in order to obtain the assistance of the Old Lycoming Township Police ("OLTP"). Appendix 8, 7:12–17, 9:8–17; Appendix 9, 7:12–8:6.

55.     Bell then organized a briefing at the OLTP department between Bell, Gardner, Dent, Havens, Hope, and other members of the NEU and OLTP ("the Second Meeting"). Appendix 5, 27:3–28:9; Appendix 6, 22:24–35:10.

56.     During the Second Meeting, the plan to arrest Barasky was further organized, including who would take what actions. Appendix 5, 28:10–30:12; 59:23–60:2; Appendix 6, 22:24–35:10; Appendix 7, 17:5–15; Appendix 8, 10:4–19:4; Appendix 9, 11:5–22:17; Appendix 10, 24:7–26:8, 28:10–29:21.

57.     Sumpter's name would have been disclosed as the source of the information being used to arrest Barasky and other elements of the

investigation would have been reported during the Second Meeting. Appendix 5, 28:10–30:12; Appendix 6, 22:24–35:10; Appendix 8, 10:4–19:4; Appendix 9, 11:5–22:17.

58.    Everyone present at the Second Meeting would have been aware of Sumpter's prior criminal record. Appendix 5, 11:19–12:19; 29:12–30:2; Appendix 5, Exhibits 1, 3, and 8; Appendix 6, 10:2–12:8; Appendix 8, 16:19–17:15; Appendix 9, 11:5–18:6.

59.    The plan to stop Barasky before he reached any alleged meeting location near 416 Brentwood Drive was developed during the Second Meeting. Appendix 5, 60:16–61:15, 64:11–65:21; Appendix 6, 22:24–35:10, 36:22–37:2; Appendix 8, 10:4–19:4; Appendix 9, 31:8–12.

60.    The general plan came from the NEU Officers, Bell, Havens, Dent, and Gardner, but the OLTP, including Hope, lent their local experience to further develop the plan. Appendix 8, 26:23–28:7.

61.    The plan to stop Barasky prior to any alleged meeting location was a collective plan that all Defendants had input in. Appendix 5, 60:16–61:15, 64:11–65:21; Appendix 6, 22:24–35:10: Appendix 7, 5–19; Appendix 8, 10:4–19:4.

62.     This plan was approved by Bell as the supervisor of the NEU. Appendix 5, 60:16–61:15, 64:11–65:21; Appendix 6, 22:24–35:10; Appendix 8, 10:4–19:4.

63.     Dent specifically agreed with the plan to stop Barasky prior to any meeting location. Appendix 5, 66:24–67:2; Appendix 5, Exhibit 9.

64.     According to the plan, Barasky would be stopped on Eckard Road after turning off Lycoming Creek Road. Appendix 5, 82:7–83:6; Appendix 6, 36:22–37:2; Appendix 8, 10:4–19:4; Appendix 9, 31:8–12.

65.      Defendants specifically wanted to prevent Barasky from turning onto Miller Road, which lead into the development where Sumpter's house at 416 Brentwood Drive was located. Appendix 5, 82:7–83:6; Appendix 8, 10:4–19:4; Appendix 9, 31:8–12.

66.     Bell believed the decision to stop Barasky on Eckard Road, before Barasky reached any meeting location or turned onto Miller Road, was made because it was more rural and was safer for possible bystanders. Appendix 6, 51:12–53:5.

67.     Dent agreed that without Barasky turning on Miller Road he did not know if Barasky was going to the alleged meeting location by Sumpter's residence at 416 Brentwood Drive. Appendix 5, 82:23–83:6; Appendix 5, Exhibit 9.

68.     Dent acknowledged that there are many cases wherein a police officer will view a drug transaction occur and then arrest the drug dealer at a later date. Appendix 5, 83:8–20.

69.     However, this option was not selected for the Barasky investigation "Because we knew Mr. Sumpter was intending on going to rehab and we wanted to - - again, we used him as a confidential source and not a confidential informant. And it was kind of - - that afternoon we acted on it and went from there." Appendix 5, 83:8–20.

70.     The normal way the NEU conducts an arrest when they believe a sale of narcotics is going to occur is the NEU allows the sale to happen and then they stop the seller's vehicle after the transaction. Appendix 10, 24:7–25:9.

71.     Bell testified Dent wished to arrest Barasky on October 2, 2020 rather than conduct a controlled buy and he accepted Dent's decision. Appendix 6, 53:21–54:10.

72.     Dent instructed Sumpter to reach out to Barasky on October 2, 2020. Appendix 5, 30:14–16.

73.     Dent did not recall if he searched Sumpter's phone prior to Sumpter initiating contact with who he alleged was Barasky. Appendix 5, 30:17–20.

74.     Sumpter first reached out to who he alleged was Barasky via phone call at 1529 hours on October 2, 2020. Appendix 5, 31:21–32:8. During this call, the person alleged to be Barasky only told Sumpter he was on his way. Appendix 5, 31:21–32:8. No discussion of drugs or delivering drugs occurred during this phone call. Appendix 5, 31:21–32:8.

75.     At 1546 hours on October 2, 2020, Sumpter received a call from the person whom he alleged was Barasky instructing Sumpter to head out. Appendix 5, 32:9–15. Again, no discussion of drugs or delivering drugs occurred during this phone call. Appendix 5, 32:9–15.

76.     Dent had never heard Barasky's voice prior to Barasky's arrest on October 2, 2020 and had no way to verify if Barasky was the person speaking on the other end of these phone calls. Appendix 2, ¶ 44; Appendix 5, 34:3–15.

77.     Dent reviewed the text messages between Sumpter and who he alleged was Barasky on October 2, 2020. Appendix 5, 34:16–35:21.

78.     Sumpter told Dent that he had Barasky as a contact in his phone under the name "Plug". Appendix 5, 36:3–23.

79.     "Plug" can be slang for drug dealer. Appendix 5, 105:21–24.

80.     However, since Dent did not search Sumpter's phone to view the text message conversations between Sumpter and who he alleged was

14

Barasky on September 24, 2020, Dent did not know if Sumpter changed the contact to Plug between September 24, 2020 and October 2, 2020. Appendix 5, 105:21–107:5.

81.    On September 24, 2020, Sumpter texted Plug at 10:47a.m. stating "okay, I got you plus some". Appendix 5, 37:8–13; Appendix 5, Exhibit 4.

82.    Dent believed that this was Sumpter telling Barasky that Sumpter has something to give Barasky plus more. Appendix 5, 37:8–13.

83.    In Dent's opinion, since the Reliable Informant told Dent that Sumpter purchased Fentanyl to sell from Philadelphia on September 23, 2020, this text message could have been Sumpter trying to sell Fentanyl to Barasky. Appendix 5, 37:8–39:19.

84.    On September 30, 2020, Sumpter texted Plug "Listen bro, that's fine if you don't want to fuck with me anymore but I at least want to take care of the balance." Appendix 5, 39:20–40:4; Appendix 5, Exhibit 4.

85.    Sumpter sent this message without Dent's permission. Appendix 5, 40:2–12.

86.    Dent agreed that this message indicated that Sumpter owed Plug something, but Dent did not know what was owed. Appendix 5, 40:25–42:14.

87.    Dent admitted that some text messages between Plug and Sumpter from prior to September 24, 2020 could have been Sumpter selling drugs to Plug rather than Sumpter purchasing drugs from Plug as Sumpter alleged. Appendix 5, 42:16–45:6, 45:7–49:1; Appendix 5, Exhibit 5; Appendix 5, Exhibit 6.

88.    Dent did review the text messages prior to Barasky's arrest on October 2, 2020. Appendix 5, 43:22–25.

89.    Dent could not be sure who was selling drugs to who in these messages between Sumpter and Plug. Appendix 5, 48:22–49:1.

90.    Sumpter also sent text messages to Plug at Dent's direction on October 2, 2020. At 3:08, Sumpter texted Plug "yo,bro". Appendix 5, 51:12–20; Appendix 5, Exhibit 7. Plug responded "sup, bro" at 3:11. Appendix 5, 51:21–22; Appendix 5, Exhibit 7. Sumpter then texted "got your bread, bro, plus money three" at 3:19. Appendix 5, 51:23–25; Appendix 5, Exhibit 7.

91.    Bread means money in drug parlance. Appendix 5, 52:13–15.

92.    Since bread means money in drug parlance, Dent agreed that the message sent at 3:19 could have meant Sumpter had money he owed Plug plus more money. Appendix 5, 52:16–25.

16

93.    In the alternative, this message could have meant that Sumpter had the money he owed Plug plus he wants three grams. Appendix 5, 52:16–25.

94.    However, Dent did not know which of these two scenarios occurred. Appendix 5, 52:16–25.

95.    Bell believed that the statement "I got your bread plus money three" would indicate that Barasky was purchasing drugs from Sumpter. Appendix 6, 70:15–71:3.

96.    Sumpter also told Dent that he owed Barasky money as of October 2, 2020. Appendix 5, 53:5–9.

97.    Plug never responded to Sumpter on October 2, 2020 after the 3:19 text message. Appendix 5, 53:17–54:6.

98.    Plug never stated or confirmed he had drugs on his person or was bringing drugs to Sumpter on October 2, 2020. Appendix 5, 54:3–6.

C. *NEU Regulations*

99.     The NEU has specific regulations governing the use of informants in NEU investigations. Appendix 5, 54:15–55:10; Appendix 5, Exhibit 8; Appendix 6, 60:14–61:13; Appendix 6, Exhibit 2.

100.    NEU regulations specifically prohibit a person from being a source of information in an NEU investigation if any criminal charges are pending against them. Appendix 5, 55:11–56:10; Appendix 5, Exhibit 8.

101.    Dent agreed that criminal charges would have been pending against Sumpter on October 2, 2020 when he was used as a confidential source. Appendix 5, 55:11–56:13; Appendix 5, Exhibit 8.

102.    Dent explained that he believed a confidential source is different than a source of information as defined by the NEU regulations. Appendix 5, 55:11–56:13; Appendix 5, Exhibit 8.

103.    If a person is a confidential informant, a comprehensive interview of the confidential informant must be completed by an NEU member. Appendix 5, 56:14–21.

104.    NEU regulations require officers to conduct a broad line of questioning to prospective informants. Appendix 6, 61:24–62:4; Appendix 6, Exhibit 2.

105.     This broad line of questioning is designed to ensure the prospective informant is reliable and to assess the value of the information. Appendix 6, 61:24–62:19.

106.     The NEU regulations require all of the information gained by NEU members to be documented in a written report. Appendix 6, 61:14–23, 65:8–20; Appendix 6, Exhibit 2.

107.     A comprehensive interview of Sumpter was never completed since Dent did not intend to use him as a confidential informant. Appendix 5, 56:14–21.

108.     NEU regulations also require that a background check be run on a prospective confidential source or confidential informant. Appendix 5, 58:21–25; Appendix 5, Exhibit 8.

109.     The NEU did run a background check on Sumpter in April 2020. Appendix 5, 59:1–3.

110.     NEU regulations require a confidential informant to sign an informant condition statement. Appendix 5, 59:4–10; Appendix 5, Exhibit 8.

111.     Sumpter was never required to sign the informant condition statement. Appendix 5, 59:11–13.

D. *Officer Training*

112.    Dent was trained to independently corroborate a confidential source or informant's information to ensure they are reliable. Appendix 5, 85:12–86:23.

113.    Gardner was trained to independently corroborate an informant's information to ensure they are reliable if they have never provided accurate information previously. Appendix 7, 33:20–34:25.

114.    Havens was also trained to corroborate whether a confidential informant is reliable by independently corroborating information and successful controlled buys. Appendix 10, 46:8–47:11.

115.    Dent, Gardner, and Hope were also trained that they must confirm that another officer has probable cause prior to making an arrest at another officer's direction. Appendix 5, 86:24–88:2; Appendix 7, 36:7–37:5; Appendix 8, 44:17–45:21.

116.    Gardner was trained that when vetting a confidential informant, crimes of dishonesty, such as perjury and false identification, would be red flags if they appeared on an informant's criminal record. Appendix 7, 31:20–32:19.

117.    Hope was trained to know it was important to learn if an informant provided accurate information in the past. Appendix 8, 21:24–22:10.

### E. *The Arrest*

118.    After the Second Meeting, Dent stayed in the parking lot of the OLTP department with Sumpter. Appendix 5, 60:2–12.

119.    All Defendants were communicating with each other on October 2, 2020 as the plan to arrest Barasky was carried out via radio and cell phone. Appendix 5, 60:13–15; Appendix 6, 34:21–35:10.

120.    Barasky was driving his vehicle in Old Lycoming Township on October 2, 2020. Appendix 2, ¶ 53; Appendix 6, 35:11–36:11.

121.    On October 2, 2020, Bell, Gardner, and Hope, stationed themselves in the gravel lot of Roan's RV off of Eckard Road waiting for Barasky. Appendix 6, 33:21–34:11; Appendix 7, 21:12–25; Appendix 8, 19:5–20.

122.    Gardner was positioned in one of the vehicles with Bell that would be initiating the traffic stop on Barasky's vehicle. Appendix 7, 17:5–8, 19:3–15.

123.    Hope was in a different police vehicle and was also tasked with initiating the traffic stop on Barasky's vehicle. Appendix 7, 19:3–15. Appendix 8, 19:5–20.

124.     Havens was in a different vehicle and position to alert the other officers when he first observed Barasky. Appendix 4, ¶ 55; Appendix 8, 19:5–20; Appendix 10, 26:9–20; Appendix 10, Exhibit 1.

125.     Bell, Gardner, Hope, and Havens observed Barasky turn off Old Lycoming Creek Road and onto Eckard Road. Appendix 6, 35:11–36:11; Appendix 8, 29:5–25.

126.     At this point, the traffic stop on Barsky's vehicle was initiated. Appendix 4, ¶¶ 32, 57; Appendix 6, 35:11–37:2.

127.     Bell activated the emergency lights and sirens on his police vehicle to initiate the traffic stop. Appendix 6, 36:25–38:8.

128.     Hope "immediately" activated the emergency lights and sirens on his police vehicle to initiate the traffic stop when he pulled out from the gravel lot. Appendix 7, 20:2–13; Appendix 8, 30:1–18.

129.     Barasky stopped his vehicle in his lane on Eckard Road prior to arriving at Miller Road. Appendix 6, 39:6–41:13; Appendix 7, 22:20–23:11.

130.     Hope believed Barasky slightly pulled onto Miller Road before immediately turning onto Eckard Road and stopping his vehicle. Appendix 8, 38:5–39:15; Appendix 8, Exhibit 1.

131.    However, Hope did not know if Barasky made this maneuver to stop his vehicle because he saw the police presence immediately ahead or was going to Sumpter's house. Appendix 8, 41:1–20.

132.    There are two turns and approximately six tenths of one mile from Miller Road to Brentwood Drive where Sumpter lived. Appendix 8, 40:1–23.

133.    Barasky's vehicle stopped prior to the entrance to Sumpter's development according to the plan created by Defendants. Appendix 6, 51:22–25; Appendix 7, 22:20–24:4.

134.    Barasky's vehicle was stopped prior to his arrival at any alleged meeting location. Appendix 2, ¶ 54; Appendix 4, ¶ 54.

135.    Barasky did not attempt to flee the traffic stop once Hope activated his emergency lights. Appendix 7, 24:22–25.

136.    The only reason Bell had to believe Barasky was headed to Sumpter's house at the time of the traffic stop was based entirely on what Sumpter told Dent, the phone call made in Dent's presence, and the text messages Dent observed on Sumpter's phone. Appendix 6, 53:15–20.

137.    Bell thought his police vehicle was the first vehicle behind Barasky's during the traffic stop. Appendix 6, 42:5–18.

138.   Hope's vehicle stopped slightly offset to Bell's vehicle behind Barasky's vehicle. Appendix 6, 42:5–21.

139.   Hope believed his vehicle was first behind Barasky's vehicle and was the lead vehicle making the traffic stop. Appendix 8, 29:23–31:14.

140.   Havens also came to the scene of the traffic stop with his vehicle. Appendix 2, ¶ 55; Appendix 6, 42:22–43:5; Appendix 8, 31:9–14.

141.   Bell exited his police vehicle, drew his firearm, and began shouting orders at Barasky. Appendix 6, 41:11–42:4; Appendix 8, 31:16–32:9.

142.   Since this was a felony traffic stop, Bell, Gardner, and Hope had their firearms drawn and were shouting commands at Barasky to exit his vehicle. Appendix 7, 25:1–26:19.

143.   Hope participated in the arrest of Barasky. Appendix 6, 42:19–21.

144.   Havens physically pulled Barasky out of his vehicle. Appendix 2, ¶ 55; Appendix 6, 43:17–23; Appendix 8, 32:19–34:1.

145.   Barasky did not fight or resist Havens' force. Appendix 6, 43:17–23, 44:2–4; Appendix 7, 26:20–21.

146.   Havens placed handcuffs on Barasky. Appendix 2, ¶ 55; Appendix 6, 44:5–7; Appendix 8, 32:19–34:1.

147.    Barasky was searched when he was removed from his vehicle. Appendix 2, ¶ 69; Appendix 6, 45:5–11; Appendix 8, 35:3–11. No drugs or other contraband were found during this search. Appendix 6, 45:5–11.

148.    Barasky's vehicle was also searched at the scene of the traffic stop. Appendix 2, ¶ 69; Appendix 4, ¶ 69; Appendix 6, 45:5–22. No drugs or other contraband were found during this search. Appendix 2, ¶ 70; Appendix 6, 45:5–22; Appendix 7, 29:9–12.

149.    Barasky's vehicle was towed from the scene of the traffic stop by police. Appendix 6, 45:23–46:3.

150.    Barasky was transported by Bell and Gardner to the OLTP department after he was arrested. Appendix 6, 47:20–48:1; Appendix 7, 28:9–22.

151.    Barasky was subsequently strip searched by Bell and Gardner at the OLTP department. Appendix 4, ¶¶ 71–72; Appendix 6, 45:5–11, 46:4–10. No drugs or other contraband were found during this search. Appendix 2, ¶ 72; Appendix 4, ¶¶ 71–72; Appendix 6, 45:5–11, 46:4–10.

152.    When Barasky was ultimately transferred to the Lycoming County Prison, Bell called the Lycoming County Prison at Dent's request to make sure Barasky was placed in a dry cell at the prison so that his

excrements could be searched to ensure he did not hide any contraband inside his body. Appendix 6, 46:11–47:19.

153.    No controlled substances or other contraband were found as a result of Barasky being placed in a dry cell at the Lycoming County Prison. Appendix 2, ¶ 81.

154.    No controlled substances or other contraband were ever discovered as a result of Barasky's October 2, 2020 arrest. Appendix 2, ¶ 70.

155.    Although Dent was not physically present for the searches of Barasky after he was arrested, he was specifically informed that no drugs or contraband were found as a result of the searches. Appendix 5, 67:14–68:1.

156.    Police also thoroughly searched the "flight path", which they defined as all the areas where Barasky could have possibly discarded any controlled substances and found no contraband. Appendix 5, 79:7–16.

157.    Dent never brought Sumpter to identify Barasky as the person he supposedly purchased drugs from after Barasky was arrested. Appendix 5, 67:6–13.

158.    Gardner believed the probable cause to arrest Barasky was "[w]e were told that it was - - he was bringing narcotics to conduct a . . . a buy." Appendix 7, 40:1–15.

159.    Gardner deferred to Dent as the lead investigator to determine if there was probable cause to maintain Barasky's arrest after no drugs were found. Appendix 7, 40:2–18.

160.    No warrant existed to arrest Barasky on October 2, 2020. Appendix 2, ¶ 118.

F. *Post Arrest Facts*

161.    Barasky was lodged at the Lycoming County Prison on October 2, 2020 after his arrest. Appendix 2, ¶ 78; Appendix 4, ¶ 78.

162.    Barasky was forced into a dry cell at the Lycoming County Prison at Bell's direction so that his excrement could be searched and Barasky could be monitored. Appendix 4, ¶ 80.

163.    The decision for Bell to ensure Barasky was placed in a dry cell at the Lycoming County prison was a group decision by all of the NEU members including, Dent, Bell, Gardner, and Havens. Appendix 5, 69:5–70:10.

164.    No controlled substances or other contraband were ever recovered from the dry cell Barasky was placed in. Appendix 5, 70:11–17.

165.    Dent subsequently obtained a search warrant to search Barasky's vehicle. Appendix 2, ¶¶ 75–76.

27

166.    No controlled substances or other contraband were found during a search of the vehicle Barasky was driving on October 2, 2020. Appendix 2, ¶¶ 75–76; Appendix 5, 68:8–69:4; 70:18–20.

167.    This search was an exhaustive search that included all panels inside the vehicle. Appendix 5, 70:18–71:1.

168.    Dent charged Barasky with Criminal Use of a Communication Facility, 75 Pa.C.S. § 7512(a), graded as a felony of the third degree by filing a criminal complaint with Magisterial District Court 29-3-04. Appendix 5, 71:2–19; Appendix 5, Exhibit 10.

169.    Dent initiated criminal proceedings against Plaintiff on October 2, 2020 by filing a criminal complaint. Appendix 2, ¶ 128.

170.    At the time the criminal complaint was filed, Dent believed his probable cause to charge Barasky was "That he was bringing three grams of Fentanyl to Mr. Sumpter, to deliver it to him." Appendix 5, 78:22–79:5.

171.    Dent believed that Barasky was engaging in the attempted delivery of a controlled substance and that attempted delivery supported the charge of Criminal Use of a Communication Facility. Appendix 5, 84:6–20.

172.    However, despite making over three hundred (300) arrests as a member of the NEU, Dent has never previously charged an individual with

only Criminal Use of a Communication Facility as he did to Barasky on October 2, 2020. Appendix 5, 83:21–85:4.

173.    In the criminal complaint, Dent wrote that "It should be noted Barasky is a known narcotics dealer in the Williamsport area". Appendix 5, 72:8–73:15. However, Dent said this was only based upon Havens arresting Barasky previously for a drug crime, the last of which was in 2016, four (4) years prior to the arrest. Appendix 5, 72:8–73:15. Dent did not write in the affidavit that the information on Barasky being a well-known narcotics dealer in the Williamsport area was four (4) years old in the affidavit. Appendix 5, 72:8–73:15; Appendix 5, Exhibit 10.

174.    Dent also claimed that he had information that Barasky was an active drug dealer in 2020. Appendix 5, 109:6–110:11. However, this information only came from a drug tip line and were not verified. Appendix 5, 109:6–110:11. Dent did not know who the sources were or if they were anonymous. Appendix 5, 109:6–110:11.

175.    Dent did not write in the criminal complaint the full context of the text message conversations between Plug and Sumpter or acknowledge that he could not tell from the text message conversations if Sumpter was selling drugs or if Plug was selling drugs. Appendix 5, 73:17–74:7; Appendix 5, Exhibit 10.

29

176.    Dent did not write in the criminal complaint that no drugs or other contraband was found on Barasky or in Barasky's vehicle. Appendix 5, Exhibit 10.

177.    Dent did not write in the criminal complaint that Sumpter had a lengthy criminal record of *crimen falsi* crimes. Appendix 5, 74:8–11; Appendix 5, Exhibit 10.

178.    Dent did not write in the criminal complaint that Sumpter had never provided information to the police previously. Appendix 5, 74:12–20; Appendix 5, Exhibit 10.

179.    Dent did not write in the criminal complaint that Sumpter was arrested on September 24, 2020 for selling drugs and that Sumpter was arrested and arrested on October 2, 2020 for selling drugs after he refused to provide information to Dent. Appendix 5, 75:5–8; Appendix 5, Exhibit 10.

180.    Dent did not explain the difference between a confidential source and a confidential informant in the criminal complaint. Appendix 5, 75:1–4; Appendix 5, Exhibit 10.

181.    Dent believed he did not need to disclose information favorable to a defendant in an affidavit of probable cause. Appendix 5, 101:12–22.

182.    Dent knew that the Magisterial District Justice that was tasked with setting Barasky's bail would rely, at least in part, on the incomplete criminal complaint he filed. Appendix 5, 75:13–7.

183.    Dent also knew that the Magisterial District Justice tasked with setting Barasky's bail would also rely upon the bail recommendation made by police. Appendix 5, 76:1–7.

184.    Dent directed the police officer who was present for Barasky's preliminary arraignment to request a secured bail from the Magisterial District Justice. Appendix 5, 18:10–19:3, 76:5–19.

185.    Barasky's bail was set at $85,000.00 secured. Appendix 2, ¶ 84.

186.    Barasky was incarcerated as a result of the criminal action Dent filed from October 2, 2020 until May 19, 2021.

187.    Dent arrested Sumpter for possession with intent to distribute a controlled substance, criminal use of a communication facility, and simple possession on October 5, 2020. Appendix 5, 15:20–18:9.

188.    Dent recommended to the Magisterial District Justice that Sumpter's bail be set in an unsecured amount, so he could leave without posting any monetary bail, because he cooperated with his investigation into Barasky. Appendix 5, 15:20–18:9.

189.    Dent appeared at the preliminary hearing before the Magisterial District Justice for Barasky's criminal case. Appendix 5, 77:10–23.

190.    By the time of the preliminary hearing, Dent knew no drugs were found when a search warrant was executed on Barasky's vehicle and no drugs were found in the dry cell at the Lycoming County Prison. Appendix 5, 77:10–23.

191.    On June 25, 2021, the Honorable President Judge Nancy L. Butts of the Lycoming County Court of Common Pleas dismissed the single count of Criminal Use of a Communication Facility filed against Barasky. Appendix 5, 81:12–16.

Respectfully Submitted,

s/ Leonard Gryskewicz, Jr.
Leonard Gryskewicz, Jr.
Attorney for Plaintiff
PA321467
Lampman Law
2 Public Sq.
Wilkes-Barre, PA 18701
Phone: (570) 371-3737
Fax: (570) 371-3838