# EXHIBIT B

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ANTHONY BARASKY,                    :
        Plaintiff            :
                    :
   vs.                              :
                    :
KEVIN DENT, TYSON HAVENS,   CASE NO. 4:21-CV-02041
JOSHUA BELL, CLINTON        :
GARDNER, CHRISTOPHER
KRINER, JOSEPH HOPE,        :
LYCOMING COUNTY, OLD
LYCOMING TOWNSHIP; and       :
CITY OF WILLIAMSPORT,
        Defendants   :

Deposition of:    KEVIN DENT

Taken by      :   Plaintiff

Before        :   Ervin S. Blank
              Reporter-Notary Public

Beginning     :   March 22, 2024; 8:59 a.m.

Place         :   McCormick Law Firm
              835 West Fourth Street
              Williamsport, Pennsylvania

COUNSEL PRESENT:

LEONARD GRYSKEWICZ, JR., ESQUIRE
Lampman Law
2 Public Square
Wilkes-Barre, Pennsylvania  18701
    For - Plaintiff

**Page 2**

COUNSEL PRESENT: (CONTINUED)

AUSTIN WHITE, ESQUIRE
McCormick Law Firm
835 West Fourth Street
Williamsport, Pennsylvania 17701
    For - Defendants Kevin Dent and Tyson Havens

SHAWNA R. LAUGHLIN, ESQUIRE
William J. Ferren & Associates
P.O. Box 2903
Hartford, Connecticut  06104-2903
    For - Defendants Joshua Bell, Clinton Gardner
       and City of Williamsport

MARK J. KOZLOWSKI, ESQUIRE
Marshall Dennehey
P.O. Box 3118
Moosic, Pennsylvania  18507
    For - Defendants Old Lycoming Township,
       Joseph Hope and Christopher Kriner

**Page 3**

INDEX TO WITNESSES

| KEVIN DENT | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Examination by: | | | | |
| Mr. Gryskewicz | 4 | -- | 103,118,120 | -- |
| Ms. Laughlin | -- | 89 | 118 | -- |
| Mr. White | -- | 93 | 114, 119 | -- |

INDEX TO EXHIBITS

| FOR - PLAINTIFF | MARKED | ADMITTED |
|---|---|---|
| Plaintiff's Exhibit No. 1 | 10 | -- |
| Plaintiff's Exhibit No. 2 | 17 | -- |
| Plaintiff's Exhibit No. 3 | 31 | -- |
| Plaintiff's Exhibit No. 4 | 35 | -- |
| Plaintiff's Exhibit No. 5 | 42 | -- |
| Plaintiff's Exhibit No. 6 | 45 | -- |
| Plaintiff's Exhibit No. 7 | 49 | -- |
| Plaintiff's Exhibit No. 8 | 54 | -- |
| Plaintiff's Exhibit No. 9 | 62 | -- |
| Plaintiff's Exhibit No. 10 | 71 | -- |
| Plaintiff's Exhibit No. 11 | 90 | -- |
| Plaintiff's Exhibit No. 12 | 114 | -- |

**Page 4**

STIPULATION

    It is hereby stipulated by and between

counsel for the respective parties that signing,

sealing, certification and filing are hereby waived;

and that all objections except as to the form of the

question are reserved to the time of trial.

              *   *   *

    KEVIN DENT, called as a witness, having been

duly sworn or affirmed, testified as follows:

DIRECT EXAMINATION

BY MR. GRYSKEWICZ:

    Q    Detective Dent, have you ever been deposed

before?

    A    I have not.

    Q    I'm going to give you a couple ground rules.

Your attorney probably already told you some.  If you

don't understand a question I ask, just tell me.  I

can rephrase it.  If you don't know an answer to a

question or don't remember, those are also fine

answers. I don't want you to speculate.  I will not

cut you off when you're giving an answer and provide

you the courtesy of answering the full question.  I

would ask you to do the same when I'm asking questions

5

1  to you. And if you need a break or anything during
2  the deposition, just let us know.
3      A     Okay.
4      Q     Okay? Could you state and spell your name
5  for the record?
6      A     Kevin Dent. K-E-V-I-N, D-E-N-T.
7      Q     Where are you currently employed?
8      A     I'm a detective for the Lycoming County
9  District Attorney's Office, specifically the Narcotics
10 Enforcement Unit.
11     Q     And the Lycoming County Narcotics Enforcement
12 Unit is often referred to as the NEU?
13     A     Correct.
14     Q     Is that right?
15     A     Yes.
16     Q     And you can feel to refer to it as the NEU
17 during this deposition.
18     A     Okay.
19     Q     How old are you today?
20     A     I'm 42.
21     Q     And how were you employed in October of 2020?
22     A     I was a detective for the Lycoming County
23 NEU.
24     Q     So the same job you have now?
25     A     The same job, yes.

6

1      Q     How long have you been a police officer as of
2  today?
3      A     I've been a police officer since September of
4  2009. Prior to that I was a military police officer,
5  active duty from 2004, and I just retired from the
6  Reserves as of last month.
7      Q     Okay. I believe you said this already, but
8  your rank with the NEU is detective?
9      A     Correct, yes.
10     Q     And when did you obtain the rank of detective
11 with the NEU?
12     A     The minute I was employed there.
13     Q     So 2009 you would have been a detective?
14     A     No, no, no. 2017.
15     Q     2017.
16     A     October of 2017 I started with the NEU.
17     Q     Okay. Yeah. Who was your immediate
18 supervisor in the NEU in October of 2020?
19     A     Josh Bell.
20     Q     And did you have any subordinates under you
21 in October, 2020?
22     A     I did not.
23     Q     Can you describe for me how you would involve
24 a local police department, such as Old Lycoming
25 Township, in an NEU investigation typically?

7

1      A     We would -- if we need more manpower or a
2  uniform presence to make a traffic stop, if we need
3  assistance with a search warrant, we'll contact the
4  Township where we anticipate it's going to happen, and
5  they -- as long as they're willing to help, they'll
6  help us.
7      Q     Okay. So it's more of a, you're asking them
8  for assistance with manpower versus assistance with
9  your investigation?
10     A     Correct.
11     Q     How often would you involve a local police
12 department in your investigations?
13     A     More so Williamsport City than anywhere else.
14 Most of our stuff happens in Williamsport City. Just
15 so happened the day in October was in Old Lycoming
16 Township. But typically most times we do a search
17 warrant or something like that, we enlist the help
18 with the local agency as well.
19     Q     Okay. And I know you mentioned Joshua Bell
20 was your immediate supervisor in October of 2020. Was
21 he a full-time member of the NEU at that time?
22     A     Yes, specially assigned -- he's a
23 Williamsport City police officer specially assigned to
24 the NEU.
25     Q     Okay. Now, at some point did you come into

8

1  contact with a Matthew Sumpter through your duties as
2  a police officer?
3      A     I did.
4      Q     And would the first time you became aware of
5  Matthew Sumpter have been April 15th of 2020?
6      A     Yes.
7      Q     And on April 15th you were involved in a
8  controlled buy where Matthew Sumpter sold eight
9  suspected Gabapentin pills, three suspected Suboxone
10 pills to a confidential informant?
11     A     Yes.
12     Q     Did you have any personal, you know,
13 face-to-face contact with Mr. Sumpter during that
14 April 15th, 2020 controlled buy?
15     A     I did not.
16     Q     And then would you agree with me that the
17 confidential informant you used on April 15th, 2020,
18 dropped Matthew Sumpter off at his house at 416
19 Brentwood Drive in Cogan Station?
20     A     Yes.
21     Q     Between April 15th of 2020 when that
22 controlled buy happened, and September 24th, 2020 when
23 you searched Mr. Sumpter's house, did you have any
24 contact with Matthew Sumpter?
25     A     I did not.

9

1    Q   To the best of your knowledge, did anybody
2  from the NEU have contact with Mr. Sumpter during that
3  time?
4    A   Not that I'm aware.
5    Q   Did you do anything to further your
6  investigation into Mr. Sumpter between April 15th,
7  2020 and September 24th, 2020?
8    A   No.  That investigation was actually
9  Detective Anderson's at the time, so I didn't -- I did
10 surveillance on that and that was it.
11   Q   Okay.  And would you agree with me that on
12 September 23rd of 2020 you interviewed an informant
13 who provided you with information regarding Matthew
14 Sumpter?
15   A   Yes, the same -- same informant that
16 purchased from Matthew Sumpter on April -- I'm sorry,
17 15th, I think it was.
18   Q   Okay.  And, you know, you don't have to give
19 me the names of the people he was giving you
20 information on, but was that informant giving you
21 information on other people beside Matthew Sumpter
22 between April 15th and September 24th?
23   A   Yes, that CI was probably our most reliable
24 CI we've had --
25   Q   Okay.

10

1    A   -- with the NEU.
2    Q   So you trusted that CI.  He did -- strike
3  that.  That CI did, you know, multiple buys for you
4  that you turned out to be accurate and reliable?
5    A   Hundreds.
6        (Whereupon, a document was produced and
7  marked as Plaintiff's Exhibit No. 1 for
8  identification.)
9  BY MR. GRYSKEWICZ:
10   Q   I'm going to show you a copy of your report
11 from September 24th of 2020.  And take a look through
12 to and let me know when you're done.
13   A   Okay.
14   Q   Is that a true and accurate copy of the
15 report you wrote regarding your investigation to Mr.
16 Sumpter in September of 2020?
17   A   Yes.
18   Q   Is everything you wrote in your report in
19 that document true and accurate, to the best of your
20 recollection?
21   A   Yes.
22   Q   So this informant told you that Sumpter
23 claimed he made several trips to Philadelphia in the
24 past few weeks to purchase Fentanyl, right?
25   A   Correct.

11

1    Q   And the informant told you that Sumpter was
2  in Philadelphia to purchase Fentanyl as recently as
3  September 23rd, 2020?
4    A   Yes.
5    Q   And this informant actually was able to take
6  pictures of the drugs Sumpter said he bought from
7  Philadelphia and send them to you?
8    A   Yes.
9    Q   And Sumpter also claimed to have just spent
10 $1,600 on Fentanyl in Philadelphia the day before?
11   A   Yes.
12   Q   You then took this information you were given
13 by this informant and obtained a search warrant for
14 Sumpter's home at 416 Brentwood Drive, is that right?
15   A   Yes.
16   Q   So you would have got this information from
17 the informant on September 23rd of 2020?
18   A   Yes.
19   Q   Okay.  And then you got the search warrant on
20 September 24th of 2020?
21   A   Yes.
22   Q   And prior to getting the search warrant,
23 would you have ran Sumpter's criminal record?
24   A   It would have been ran from the investigation
25 in April.

12

1    Q   Okay.  So you would have been aware of it
2  from April on, Sumpter's criminal record?
3    A   Anything -- April and prior to that.  I
4  hadn't ran it since then.
5    Q   Okay.  And to the best of your knowledge,
6  there was no reason to run it because, to the best of
7  your knowledge, Mr. Sumpter wasn't arrested since
8  April?
9    A   That's correct.
10   Q   What police officers went with you when you
11 served the warrant at Mr. Sumpter's house on September
12 24th of 2020?
13   A   It would have been members of the NEU.  I
14 don't recall -- I mean, it would have been Josh Bell,
15 myself, Tyson Havens.  I believe Clint Gardner was
16 there.  Rob Anderson.  To my best recollection, every
17 member of the NEU was there, and I believe -- I don't
18 know the exact members of Old Lycoming, but they came
19 along as a uniform present.
20   Q   Did the members of Old Lycoming ever go into
21 Mr. Sumpter's house?
22   A   Not that I recall.
23   Q   Okay.
24   A   I think they were just there as a marked
25 patrol unit there.

13

1    Q    Okay.  So they stayed outside as backup,
2  essentially --
3    A    Yes.
4    Q    -- in case you had a problem?  Did you brief
5  the other officers from the NEU on what you learned of
6  Mr. Sumpter that was listed in your report?
7    A    Yes.
8    Q    And then you served the warrant at
9  approximately 1430 hours on September 24th?
10   A    Yes.
11   Q    And then at approximately 1438 hours on
12 September 24th, Mr. Sumpter was in custody and being
13 interviewed by yourself?
14   A    Yes.
15   Q    During that interview, would you agree that
16 Sumpter told you where he hid his Fentanyl and
17 marihuana inside of his home you were searching?
18   A    Yes.
19   Q    Did you ask Mr. Sumpter if he obtained that
20 Fentanyl from Philadelphia as the informant told you
21 the day before?
22   A    I don't recall if I asked that question.
23   Q    Sumpter also brought up Anthony Barasky's
24 name as a source of his Fentanyl during that
25 conversation.  Is that right?

14

1    A    Yes.
2    Q    Do you remember specifically what Mr. Sumpter
3  said about Anthony Barasky during that conversation?
4    A    Not specifically, no, I don't -- I don't
5  recall.
6    Q    So this report would be the best recollection
7  you would have of what Mr. Sumpter said about Mr.
8  Barasky?
9    A    Right.  I don't -- it wouldn't have -- I
10 don't believe that we recorded the interview, so I
11 wrote the report off of memory of what I said to him.
12   Q    Okay.  Did you search Mr. Sumpter's phone at
13 that point for any proof of his conversations with
14 Barasky?
15   A    Not at that point.
16   Q    Did you ask Mr. Sumpter when the last time he
17 purchased Fentanyl from Mr. Barasky was at that point?
18   A    Not at that point.
19   Q    On September 24th, did you relay to the other
20 officers in the NEU what Mr. Sumpter would have told
21 you?
22   A    Yes.
23   Q    And you discovered, you know, roughly in
24 total about three grams of Fentanyl in Mr. Sumpter's
25 house that day?

15

1    A    Yes.
2    Q    And then you released Mr. Sumpter that day
3  without filing criminal charges against him
4  immediately?
5    A    Correct, with the intention of him
6  cooperating as a confidential informant.
7    Q    And the reason you released him without
8  filing charges was because you wanted to use him as an
9  informant?
10   A    Correct.
11   Q    And, you know, correct me if I'm wrong, but
12 if you file criminal charges against him, he likely
13 would not have been useful to you as an informant?
14   A    Yeah, because his docket would be released
15 and then somebody could figure out that he was
16 working.
17   Q    You can keep that in front of you if you
18 needed to.  I just want to make sure it stays, you
19 know, with the court reporter.
20        On October 5th of 2020, then, you would have
21 filed criminal charges against Sumpter and arrested
22 him?
23   A    Yes.
24   Q    And you took him to get arraigned at that
25 time with the magistrate judge?

16

1    A    I took him to get arraigned following the --
2  if -- the thing we do would have done with your
3  client, with Anthony Barasky.
4    Q    So Barasky, his arrest happened on October
5  2nd of 2020.  Do you agree with that?
6    A    Oh, yes.  I'm sorry.  Yes.
7    Q    Nope.  That's okay.
8    A    Yes.
9    Q    And October 5th, then, three days later is
10 when you filed the charges again Mr. Sumpter?
11   A    Yes.
12   Q    Did you take Mr. Sumpter to the magistrate
13 yourself to have him arraigned?
14   A    We did it via -- via video at the
15 Williamsport Bureau of Police.
16   Q    Okay.  And according to your report, I
17 believe Mr. Sumpter was given $25,000 signature bail,
18 is that right?
19   A    Yes.
20   Q    And by signature bail in your report, did you
21 mean that he was released on unsecured bail without
22 posting any money?
23   A    Yes.
24   Q    And you charged Mr. Sumpter on October 5th
25 with three crimes.  I believe possession with intent

17

1  to distribute under Section 780-113(a)(30) of the Drug
2  and Cosmetic Act, criminal use of a communication
3  facility under Section 7512(a) of the Crimes Code, and
4  simple possession of a controlled substance under the
5  Drug and Cosmetic Act; is that right?
6      A   Correct.
7      Q   Okay.  I'm going to show you this document
8  that we'll be marking as Plaintiff's Exhibit 2.
9          (Whereupon, a document was produced and
10  marked as Plaintiff's Exhibit No. 2 for
11  identification.)
12  BY MR. GRYSKEWICZ:
13     Q   Just so the record's clear, I don't think I
14  said it, but the report from September 24th, 2020, I
15  would mark as Plaintiff's Exhibit 1.
16         Take a look at that, let me know when you're
17  done.
18     A   Okay.
19     Q   Would you agree that that's a true and
20  accurate copy of the criminal complaint you filed
21  against Matthew Sumpter?
22     A   Yes.
23     Q   During his preliminary arraignment, did you
24  provide a bail recommendation to MDJ Lepley to set Mr.
25  Sumpter's bail in an unsecured amount?

18

1      A   Yes.
2      Q   And why did you make that recommendation to
3  Magistrate Lepley?
4      A   Because he had cooperated with us for the
5  investigation into Anthony Barasky, and it was his
6  intention to go to rehab as well.
7      Q   Do you know if Mr. Sumpter ever did go to
8  rehab after that day?
9      A   He did.
10     Q   Then on October 2nd you charged Anthony
11  Barasky with criminal use of communication facility
12  under Section 7512(a) of the Crimes Code, is that
13  right?
14     A   Yes.
15     Q   That would be a felony of the third degree in
16  Pennsylvania?
17     A   I believe so, yes.
18     Q   And would you agree that that's the same as
19  one of the charges you filed against Mr. Sumpter?
20     A   Yes.
21     Q   And you would agree you took Mr. Barasky to
22  Magistrate William Solomon to be arraigned in that
23  case?
24     A   Yes.
25     Q   And would you agree with me that you

19

1  recommended Magistrate Solomon set Barasky's bail in a
2  secured amount for that charge?
3      A   Yes.
4      Q   After September 24th, 2020, when you served a
5  search warrant on Mr. Sumpter's house, did you have
6  any contact with Mr. Sumpter between that date and
7  October 2nd, 2020?
8      A   I believe just phone communication.
9      Q   And what would those communications have
10  consisted of?
11     A   Just trying to get him to meet up so we can
12  go over confidential informant paperwork, things like
13  that.
14     Q   Okay.  So you would not have gone over that
15  confidential informant paperwork on September 24th
16  with him?
17     A   No.
18     Q   Okay.
19     A   Our intention was to have him come to our
20  office and meet up that way.
21     Q   Okay.  Do you know if that happened on
22  October 2nd or sometime before then?
23     A   The meet up?
24     Q   Yes.
25     A   It did not happen.

20

1      Q   Okay.  So to the best of your memory, Mr.
2  Sumpter didn't meet with you at all except for a few
3  phone conversations between September 24th and October
4  2nd?
5      A   Correct.  There was several phone
6  conversations, the last being that he said he wanted
7  to just go to rehab and take his charges.  So I got
8  his arrest warrant to go to his house, and then he
9  indicated he wanted to cooperate.
10     Q   Okay.  At his house on -- was that on -- let
11  me just strike that whole question.  Did you take that
12  arrest warrant to his house on October 2nd and that's
13  when he decided to cooperate?
14     A   Yes.
15     Q   So your intention, when you first came into
16  contact with Mr. Sumpter on October 2nd, was to arrest
17  him because he was no longer cooperating?
18     A   Correct.  Give him some motivation to
19  cooperate, yes.
20     Q   Okay.  And I'm sure that's always part of it.
21  You hope he changes his mind when you go there with
22  the arrest warrant?
23     A   Yes.
24     Q   And -- but if he didn't change his mind, he
25  was going to be arraigned?

21

1    A    Correct.

2    Q    Where did you first meet Mr. Sumpter then on

3    October 2nd?

4    A    At his house at 416 Brentwood Drive.

5    Q    Did he know you were coming to his house or

6    did you show up unannounced?

7    A    I just showed up.

8    Q    Did you complete any of the confidential

9    informant paperwork with Mr. Sumpter then on October

10   2nd?

11   A    No.  Given what we were going to do with --

12   with that day, we made him a confidential source and

13   not a confidential informant, meaning he wouldn't have

14   been handling any drugs.

15   Q    And could you -- could you explain the

16   difference between a confidential informant and a

17   confidential source for me?

18   A    Confidential informant, he filled out all the

19   paperwork.  I mean, we already ran his background

20   through.  But a confidential informant would be able

21   to make controlled buys.  You would give them

22   pre-recorded US currency.  They could go, purchase

23   narcotics for you and bring it back to you.  A

24   confidential source just gives you information leading

25   to an investigation or to an arrest.  We utilized him

22

1    as a confidential source so he could make a phone call

2    in my presence and not handle any drugs.

3    Q    Is there a reason you chose to make him a

4    confidential source versus a confidential informant?

5    A    Yes.  We knew Anthony Barasky to have a

6    propensity to flee, so we decided to not even make the

7    control buy happen.  We wanted to stop him prior to

8    that -- prior to him even coming in contact with Mr.

9    Sumpter, so we felt there was no reason to make him a

10   confidential informant.

11   Q    Would you agree that this is the first time

12   you used Mr. Sumpter as a source for police?

13   A    Yes.

14   Q    After you served that arrest warrant on Mr.

15   Sumpter and it turned out you weren't going to arrest

16   him that day, what did you do next?

17   A    That's when we decided -- or that's when we

18   made phone calls to set up the deal with Mr. Barasky.

19   Q    And I know Captain Bell described for me a

20   meeting that happened at the NEU where you would have

21   briefed the other NEU members on your investigation

22   into Mr. Sumpter and developed a plan to arrest

23   Barasky.  Do you recall that meeting?

24   A    I don't recall.  I feel like I was with

25   Sumpter the entire time.  I don't think I -- I think

23

1    once I had Mr. Sumpter, he stayed with me, if I recall

2    correctly.

3    Q    So your normal process, when you're, you

4    know, setting somebody up to be arrested, do you meet

5    with the other NEU members to kind of brief them on

6    your plan and your investigation?

7    A    When we do buy busts and when we do search

8    warrants, yes, we have a brief prior to doing that.

9    Q    Okay.  But I guess not in every

10   investigation, is that right?

11   A    I'm not saying a brief didn't happen.  I'm

12   saying I don't recall being present for it.

13   Q    I understand.  And sometimes circumstances of

14   the investigation might necessitate no briefing

15   happening; is that correct, or am I wrong with that?

16   A    I'm not understanding.

17   Q    So for example, sometimes you might get a

18   rapid development in a case, for example, where you

19   just don't have time to do a briefing.  Is that right

20   or is that incorrect?

21   A    There could be times like that.

22   Q    Okay.  So to the best of your knowledge, you

23   don't remember being at the NEU office briefing, NEU

24   members, like Joshua Bell or Tyson Havens about your

25   investigation into Mr. Sumpter?

24

1    A    You originally said Mr. Barasky.  I'm sorry.

2    Q    I'm sorry.  I might have said it wrong --

3    A    Yes.

4    Q    -- if that the case.  Yep.

5    A    Yes, I had briefed them about what was going

6    on with Mr. Sumpter.

7    Q    Okay.

8    A    I went out to Mr. Sumpter's residence and

9    took him into custody, if you will.

10   Q    Um-hum.

11   A    And then he chose to cooperate, at which

12   point I contacted, I believe, Josh Bell.

13   Q    Okay.

14   A    Who then we devised a plan over the phone,

15   because I was with Mr. Sumpter the rest of the

16   afternoon.

17   Q    I understand.  So that meeting to brief them

18   on Mr. Sumpter, would that have happened on October

19   2nd before you went to Mr. Sumpter's house?

20   A    Yes.

21   Q    Okay.  And at that meeting would you have

22   disclosed -- I guess strike that.  At that meeting

23   what would you have told Joshua Bell and the other NEU

24   members about your investigation into Mr. Sumpter?

25   A    Basically I had charges for him.  I was going

25

1  to go let him know that he can cooperate with us or I
2  was going to arraign him. And I would have gone
3  probably with at least one other person. I can't
4  recall who would have gone with me at that point.
5      Q    Okay. And would you have told those officers
6  as well that you hoped he was still going to
7  cooperate --
8      A    Yes.
9      Q    -- and set up something with Barasky?
10     A    Yes.
11     Q    And I know just from a prior testimony I had
12 of Tyson Havens, he seemed to have some specialized
13 knowledge of Anthony Barasky. Would you agree with
14 that?
15     A    Yes.
16     Q    Did Tyson Havens share that knowledge with
17 you then prior to you going to Mr. Sumpter's house on
18 October 2nd?
19     A    Yes.
20         MR. WHITE: Objection to form. You can
21 answer.
22 BY MR. GRYSKEWICZ:
23     Q    What did Tyson Havens specifically tell you
24 about Mr. Barasky?
25     A    That while he was a trooper with the

26

1  Pennsylvania State Police, he had at least one
2  incident where Mr. Barasky fleed for them, resulting
3  in a crash into Kmart, and then him fleeing on foot.
4  Multiple forms of narcotics were located, I believe,
5  in his vehicle --
6      Q    Okay.
7      A    -- during that.
8      Q    Would he have told you what year that
9  happened in?
10     A    He would have. I don't recall what year.
11     Q    Okay. If I said 2016, would that --
12     A    That sounds correct. Yeah.
13     Q    At that meeting at the NEU prior to you going
14 to Mr. Sumpter's house, would you have developed the
15 plan to use Mr. Sumpter as just a confidential source
16 versus an informant?
17     A    If Mr. Sumpter was going to work and, indeed,
18 was going to be with Mr. Barasky, yes, that would have
19 been the reason.
20     Q    So the plan to not do a controlled buy was
21 developed prior to you going to Mr. Sumpter's house?
22     A    I believe so, yes.
23     Q    Okay. Then you said after you went and met
24 with Mr. Sumpter, he changes his mind, you then called
25 Joshua Bell to tell him that you were going to set up

27

1  a deal with Anthony Barasky?
2      A    Yes.
3      Q    And what happened on that phone call with
4  Joshua Bell, to the best of your knowledge?
5      A    They -- I believe he got ahold of at least
6  Old Lycoming Township and everybody with the Narcotics
7  Enforcement Unit, and they met at the Old Lycoming
8  Township Police Department to do a brief -- a
9  collective brief as to how everything was going to
10 happen. I stayed with the confidential source, Mr.
11 Sumpter.
12     Q    So you never went personally to the Old
13 Lycoming Township Police Department then?
14     A    I was there. I was in the parking lot in my
15 vehicle the entire time.
16     Q    Okay. And was Mr. Sumpter with you then?
17     A    The entire time, yes.
18     Q    Were you on the phone with anybody in that
19 briefing?
20     A    I would have -- I would have called Joshua
21 Bell or -- forgive me. Somebody might have come out
22 and stayed with Mr. Sumpter while I went in and just
23 said here -- relayed information, but --
24     Q    Okay.
25     A    -- I wasn't actually inside when the brief

28

1  was happening.
2      Q    Okay. Who would you have went inside and
3  relayed information to?
4      A    Josh Bell.
5      Q    Josh Bell. And then so you would have used
6  Josh Bell as an intermediary, essentially, to relay
7  your knowledge to the team at the briefing in Old
8  Lycoming Township?
9      A    Yes.
10     Q    And to the best of your memory, what were you
11 telling Joshua Bell to tell to the other members of
12 that team?
13     A    It would have been just that, you know, Mr.
14 Sumpter was going to set up this control purchase that
15 wasn't going to happen and we were going to -- my
16 intention was to have him stopped. He would have
17 relayed that to the team in there, and then had -- he
18 would have set up where people were going to be
19 stationed and how the traffic stop and things were
20 going to happen.
21     Q    Okay. At that point when your -- when that
22 meeting's happening at the Old Lycoming Township
23 police station, did you have Mr. Sumpter reach out to
24 Anthony Barasky at all at that point?
25     A    Yes.

29

1    Q.    Okay.  So -- I know the one text message --

2  I'll show it to you in a minute -- is the I got your

3  bread plus money three.  Was that already sent when

4  you were sitting at the Old Lycoming Township police

5  station or did that happen afterwards?

6    A.    I believe we did it prior to meeting -- to

7  heading to Old Lycoming Township.

8    Q.    Did any phone calls between Mr. Sumpter and

9  Mr. Barasky happen before going to Old Lycoming

10  Township?

11    A.    I don't recall.

12    Q.    Okay.  For that briefing at the Old Lycoming

13  Township police station, would you have disclosed to

14  the other officers in that briefing the contents of

15  Mr. Sumpter's criminal record?

16    A.    To -- I'm sorry.  Could you repeat that?

17    Q.    Sure.  So to the other members at the

18  briefing at the Old Lycoming Township police station,

19  would you have told them about Mr. Sumpter's criminal

20  record?

21    A.    Mr. Sumpter lived within the jurisdiction of

22  Old Lycoming, so they were aware of his criminal

23  record.

24    Q.    Okay.  And -- so you would have disclosed

25  Matthew Sumpter's name to the people at the Old

30

1  Lycoming Township police station?

2    A.    Yes.

3    Q.    Did you disclose to those other officers that

4  this was the first time Mr. Sumpter was working with

5  you as a confidential source?

6    A.    I don't recall.

7    Q.    Do you recall if anybody at that briefing

8  asked you if this was the first time Mr. Sumpter

9  worked for you?

10    MR. WHITE:  Objection to form.  You can

11  answer.

12    THE WITNESS:  I don't recall.

13  BY MR. GRYSKEWICZ:

14    Q.    Then you were the one who instructed Mr.

15  Sumpter to reach out to Barasky on October 2nd, 2020?

16    A.    Yes.

17    Q.    Prior to reaching out to Mr. Barasky, did you

18  search through Mr. Sumpter's phone?

19    A.    I don't know if I did prior to.  I don't

20  recall.

21    Q.    Were you present the entire time with Mr.

22  Sumpter while he was reaching out to Anthony Barasky

23  on October 2nd, 2020?

24    A.    Yes.

25    Q.    And you wrote a report regarding your

31

1  investigation on October 2nd, 2020.  Is that right?

2    A.    Yes.

3    Q.    I will give you a copy of that report.

4  Please review through that, let me know when you're

5  ready.

6    (Whereupon, a document was produced and

7  marked as Plaintiff's Exhibit No. 3 for

8  identification.)

9    THE WITNESS:  Okay.

10  BY MR. GRYSKEWICZ:

11    Q.    Would you agree with me that this is a true

12  and accurate copy of at least one page in the

13  narrative from your report into Mr. Barasky?

14    A.    Yes.

15    Q.    And there would have been other pages, like

16  Mr. Barasky's criminal record, included in your full

17  report?

18    A.    Yes.

19    Q.    For the record, I would identify this as

20  Plaintiff's Exhibit 3.

21    In your report about your interactions with

22  Sumpter and Barasky's arrest from October 2nd of 2020,

23  you indicated that Sumpter reached out to Barasky via

24  telephone at approximately 1529 hours?

25    A.    Yes.

32

1    Q.    And during this phone call, you would agree

2  that you wrote, Barasky only instructed Sumpter that

3  he was on his way?

4    A.    Yes.

5    Q.    And you never documented in your report that

6  Barasky said he had drugs on his person and he was on

7  his way?

8    A.    No.

9    Q.    Also in your report you note that Barasky

10  contacted Sumpter via phone at 1546 hours?

11    A.    Yes.

12    Q.    Is that right?  And you wrote that Barasky

13  instructed Sumpter to head out during this phone call.

14  Is that right?

15    A.    Yes.

16    Q.    And you would agree that Barasky only said

17  during this phone call that Sumpter should head out?

18    A.    Yes.

19    Q.    You would agree that during that 1546 hours

20  phone call, Barasky never said he had drugs on his

21  person during that phone call?

22    A.    He did not.

23    Q.    You would agree with me that Barasky never

24  said he was going to deliver drugs to Sumpter during

25  either of the two phone calls?

33

1   MR. WHITE:  Objection to form.

2  BY MR. GRYSKEWICZ:

3      Q      Let me withdraw the question and re-ask it.

4  You would agree with me that the phone call at 1529

5  hours, Barasky never said he was going to deliver

6  drugs to Mr. Sumpter?

7      MR. WHITE:  Objection to form.  You can

8  answer.

9      THE WITNESS:  He did not say that he was

10 going to deliver drugs.  However, through years and

11 hundreds of control buys, nobody ever comes out and

12 just says I'm bringing drugs to you to deliver.

13 BY MR. GRYSKEWICZ:

14     Q      And the same question for the 1546 phone

15 call, you would agree that Mr. Barasky never said he

16 was going to deliver drugs during that phone call?

17     MR. WHITE:  Same objection.  Yeah, you can

18 answer.

19     THE WITNESS:  I'm sorry.  Correct.  And

20 again, hundreds of control buys, nobody ever says I'm

21 specifically bringing drugs to you.

22 BY MR. GRYSKEWICZ:

23     Q      Aside from what's documented in your report

24 here, do you remember Anthony Barasky stating anything

25 in addition to what's documented here during those

34

1  phone calls?

2      A      Not that I recall.

3      Q      And you would agree with me that during those

4  two phone calls, the only reason you thought Anthony

5  Barasky was on the other end of the phone was because

6  Mr. Sumpter told you he was?

7      MR. WHITE:  Same objection.  You can answer.

8      THE WITNESS:  At that point, yes.

9  BY MR. GRYSKEWICZ:

10     Q      You never heard Anthony Barasky's voice prior

11 to October 2nd, 2020?

12     A      I had never, no.

13     Q      Did you ever personally interact with Anthony

14 Barasky before October 2nd, 2020?

15     A      No, I did not.

16     Q      Now, I know at least in discovery in this

17 case and from the District Attorney's Office in Mr.

18 Barasky's criminal case, I was given numerous text

19 messages from Mr. Sumpter's phone.  When did you

20 review the text messages on Mr. Sumpter's phone?

21     A      During the time frame while we were in

22 communication with Mr. Barasky, and then immediately

23 after is when I took the pictures of -- of the -- or

24 he screen shoted them in my presence.

25     Q      So definitely the text messages from October

35

1  2nd, you would have seen them as they happened?

2      A      Yes.

3      Q      The text messages from before October 2nd,

4  would you have looked through them prior to Mr.

5  Barasky showing up on October 2nd?

6      A      Are you saying the date before or time on --

7      Q      Let me rephrase the question.

8      A      Yeah, please.

9      Q      Yeah.  So the text message is from September

10 30th, 2020 between Mr. Sumpter and Mr. Barasky.  Did

11 you look at those before October 2nd, 2020?

12     A      No.

13     Q      Did you look at those prior to Anthony

14 Barasky being arrested on October 2nd, 2020?

15     A      I would have looked at them while we were

16 waiting for Mr. Barasky to show up or -- or, you

17 know --

18     Q      So while you were waiting for Mr. Barasky to

19 show up, you would have scrolled through Mr. Sumpter's

20 text messages with him?

21     A      Yes.

22     Q      I'm going to show you what I will identify as

23 Plaintiff's Exhibit 4.

24     (Whereupon, a document was produced and

25 marked as Plaintiff's Exhibit No. 4 for

36

1  identification.)

2  BY MR. GRYSKEWICZ:

3      Q      Is this a true and accurate copy of some of

4  the text messages you retrieved from Mr. Sumpter's

5  phone?

6      A      Yes.

7      Q      And there were more text messages beyond

8  this, to be clear, right?

9      A      Yes.

10     Q      This message -- some of these messages are

11 from September 24th of 2020, right?

12     A      Yes.

13     Q      And at the top left-hand corner it says Plug?

14     A      Yes.

15     Q      And would you agree, Sumpter told you that

16 Plug was his code word for Barasky?

17     A      Yes.

18     Q      And would you agree that Sumpter is the

19 greenish blue messages in this?

20     A      Yes.

21     Q      And would you agree that the white message is

22 who Sumpter alleged was Barasky?

23     A      Yes.

24     Q      In this would you agree with me that Sumpter

25 has a slice of bread with a face on it next to his

37

1  text messages?

2     A    I would say that's a Lego character, but I'm

3  not sure.

4     Q    Okay.  Would you agree with me that the term

5  bread man in drug parlance is a term for a drug

6  dealer?

7     A    I've never heard that, to be honest with you.

8     Q    Okay.  The September 24th messages, Sumpter

9  says at 10:47 a.m., okay, I got you plus some?

10    A    Yes.

11    Q    Is that right?  That would mean that Mr.

12 Sumpter has something to give Barasky plus more?

13    A    Yes.

14    Q    And we know from your investigation into Mr.

15 Sumpter previously, that your confidential informant

16 relayed on September 23rd of 2020 that Sumpter

17 obtained Fentanyl from a supplier in Philadelphia.  Is

18 that right?

19    A    According to the confidential informant, yes.

20    Q    So this message between Mr. Barasky and Mr.

21 Sumpter on September 24th, 2020, could have been

22 Sumpter selling Fentanyl that he purchased in

23 Philadelphia to Mr. Barasky?

24    A    Possibility.

25    Q    And you arrested Sumpter then on September

38

1  24th during the service of the search warrant?

2     A    Yes.

3     Q    So the September 24th, 2020 text conversation

4  between Sumpter and who he believed was Barasky,

5  occurred on that same day?

6     A    Yes.

7     Q    And would you agree that during that

8  September 24th conversation with Mr. Sumpter, he

9  didn't tell you that he just purchased drugs from Mr.

10 Barasky that day at his house?

11    A    I believe -- if I can look at my report

12 again.

13    Q    Please.

14    A    I have 1438, Sumpter indicated that he gets

15 Fentanyl from a black male in Williamsport named

16 Anthony Barasky.  So he would have indicated, when I

17 interviewed him on September 24th, that he gets

18 Fentanyl from Mr. Barasky.

19    Q    But he didn't tell you when he got the

20 Fentanyl from Mr. Barasky.  Would you agree with that?

21    A    He wouldn't -- he didn't say the most recent

22 time, no.

23    Q    Okay.

24    A    If that's what you're indicating.

25    Q    Yes, yes.  That's what I was asking.

39

1     A    No.

2     Q    And you would also agree with me that you

3  knew the Fentanyl that was seized from Mr. Sumpter's

4  house on September 24th was there on September 23rd,

5  based on the pictures your informant sent you?

6     A    Yes.

7     Q    Because the Fentanyl you seized on September

8  24th from Mr. Sumpter's house was the same Fentanyl in

9  the pictures your informant sent you?

10    A    That I'm not sure.

11    Q    Would you agree that it was at least packaged

12 the same way that the pictures your informant sent you

13 demonstrated?

14    A    Yes.

15    Q    So when Mr. Sumpter says he purchases

16 Fentanyl from Barasky on September 24th of 2020, did

17 you confront him with the fact that you knew he

18 purchased drugs in Philadelphia, not Williamsport?

19    A    I don't recall.

20    Q    So then I'll direct your attention to the

21 bottom of that exhibit to the September 30th text.

22 You would agree in that text Sumpter texts Barasky,

23 "Listen bro, that's fine if you don't want to fuck

24 with me anymore but I at least want to take care of

25 the balance".  Would you agree with that?

40

1     A    Yep.

2     Q    Did you direct Mr. Sumpter to send that

3  message?

4     A    No.

5     Q    And did you direct Mr. Sumpter to send any

6  messages to Anthony Barasky between September 24th and

7  prior to your arrival with the arrest warrant for Mr.

8  Sumpter on October 2nd?

9     A    No.  During that time frame he was still

10 actively using.  So if he was buying from Mr. Barasky,

11 he probably wanted to take care of his balance before

12 he left to go to rehab, like he wanted to do.

13    Q    Would you have told Mr. Sumpter on September

14 24th, not to contact Barasky without you being

15 present?

16    A    At the time he wasn't officially a

17 confidential informant, so, no, I wouldn't have.

18 Again, we wanted to bring him to sign him up, and at

19 that point we would've told him not to make

20 communication without us being present.

21    Q    And that would have happened -- I guess that

22 never happened because he never came in to interview

23 with you guys.

24    A    Correct.

25    Q    Would you agree that the September 30th

41

1  message would indicate that Sumpter owed Barasky
2  something?
3      A    Yes.
4      Q    And you would agree that you don't know what
5  the balance Sumpter referred to in this text messages
6  was?
7           MR. WHITE:  Objection.  Form.  You can
8  answer.
9           THE WITNESS:  I don't.  I mean, a lot of
10  times they front -- dealers front their users or maybe
11  somebody that's middle manning for him, so he --
12  Sumpter could have been fronted drugs from Barasky and
13  then he owed him what -- you know, the balance of what
14  he was fronted, so he could make good before he went
15  to rehab.
16  BY MR. GRYSKEWICZ:
17      Q    So the balance could have been drugs, from
18  your knowledge?
19           MR. WHITE:  Objection to form.  You can
20  answer.
21           THE WITNESS:  I'm -- are you asking if he
22  would owe Barasky drugs or if he owned him money for
23  drugs.
24  BY MR. GRYSKEWICZ:
25      Q    So let me -- let me ask it this way.  So

42

1  sitting here today, you're not sure what the balance
2  specifically was that Mr. Sumpter referred to in this
3  message?
4           MR. WHITE:  Objection.  Form.  Can you just
5  clarify, because I think he's not sure if you're
6  asking about balance, meaning the amount, or balance
7  meaning the character, and I think you might want to
8  clarify that.
9  BY MR. GRYSKEWICZ:
10      Q    Okay.  So this text on September 30th --
11      A    Um-hum.
12      Q    -- do you know what the words, the balance
13  means in this text message?
14      A    No.
15      Q    Okay.
16           (Whereupon, a document was produced and
17  marked as Plaintiff's Exhibit No. 5 for
18  identification.)
19           MR. GRYSKEWICZ:  That's a little bit harder
20  to read.  I apologize.  This will be marked --
21  identified as Plaintiff's Exhibit 5.
22           MR. WHITE:  Off the record for one second.
23           (Whereupon, a discussion was held off the
24  record.)
25  BY MR. GRYSKEWICZ:

43

1      Q    Were you able to read it?
2      A    I can -- I can't read the glare portion.
3      Q    Okay.
4      A    I think --
5      Q    And I would agree with you, I can't read
6  that, either.
7      A    It think the top one says O-M-W, which means
8  on my way. I can't read that one.  And then the next
9  ones says hit -- HMU, hit me up.  I got you plus some.
10      Q    Okay.
11      A    Give me a half hour.  That's cool, bro, I got
12  you. On my way.  Okay.  Head out pro.  K.  And then,
13  yeah, bro for the Thursday, September 24th.
14      Q    Okay.  And you would agree with me that
15  there's likely a date towards the top, but that's
16  covered by the glare and you can't tell what it is?
17      A    Yes.
18      Q    Is this a true and accurate depiction of
19  the -- one of the pictures you took of the text
20  messages from Mr. Sumpter's phone?
21      A    Yes.
22      Q    And would this have been one of the messages
23  you reviewed, waiting with Mr. Sumpter for Mr. Barasky
24  to show up on October 2nd?
25      A    Yes.

44

1      Q    Now, would you agree with me that we know
2  those text messages that you just read, minus the yo,
3  bro at the bottom, would have been before September
4  24th, based on the time stamp at the bottom of the
5  messages?
6      A    Yes.
7      Q    And, you know, the -- you did already state
8  this, but the first message sent at 11:02 a.m. or so
9  says, hit me up, I got you plus some?
10      A    I believe that's 11:42, but yes.
11      Q    Okay.  Maybe unsure of the time?
12      A    Yes.
13      Q    And H-M-U means hit me up?
14      A    Yes.
15      Q    And you would agree that, I got you plus
16  some, is often used in drug parlance to mean that I
17  have your drugs, plus some extra drugs?
18      A    Or it could mean I have your money plus what
19  I owe you from drugs before.
20      Q    Okay.  So it would be one of those two
21  things?
22      A    Yes.
23      Q    So you would agree with me that this message
24  could have been Mr. Sumpter selling drugs to who he
25  alleged was Barasky?

45

```
 1      A    Or he could have been buying drugs -- saying
 2  he has money to buy, plus what he owes from previous
 3  encounters with Barasky.
 4      Q    Okay.  So it would have been one of those two
 5  situations?
 6      A    Yes.
 7      Q    I'm going to show YOU the next message.  This
 8  one, unfortunately, has the same problem as that one.
 9           (Whereupon, a document was produced and
10  marked as Plaintiff's Exhibit No. 6 for
11  identification.)
12           THE WITNESS:  I can't read the top two.
13  BY MR. GRYSKEWICZ:
14      Q    Okay.
15      A    But I see you, bro.  I got -- hit me up, I got
16  you.  I can't read what Plug says.  Something bro.  K.
17  Yo, bro.  Sup, bro.  I think that says head out.  K.
18      Q    And would you agree, this is a true and
19  accurate depiction of one of the pictures you took
20  from Mr. Sumpter's phone --
21      A    Yes.
22      Q    -- on October 2nd?  And in this message at
23  the top, would you agree with me that the date says
24  there, September 14th of 2020?  It would be right
25  above the yo, bro text is where I'm looking.
```

46

```
 1      A    It's a Monday, so I --
 2      Q    Okay.
 3      A    I'm --
 4      Q    But you can't read the exact date?
 5      A    No.
 6      Q    That's okay.
 7      A    But maybe September 14th, but --
 8      Q    If you can't read it, you can say that.
 9  Yeah, that's fine --
10      A    Yeah, I'm not sure.
11      Q    Okay.  And then in these texts, it's a
12  similar conversation to the Plaintiff's Exhibit 5 you
13  just reviewed.  Sumpter texts, yo, bro, then hit me
14  up.  I got you.  Is that right?
15      A    Yep.
16      Q    And then the person who Sumpter's alleging is
17  Barasky says, head out, bro, maybe?
18      A    Yeah.
19      Q    And you would agree again, hit me -- H-M-U in
20  these messages means hit me up?
21      A    Yep.
22      Q    And then would you agree with that in drug
23  parlance, I got you means I have drugs to sell you?
24      A    Could also mean I have money for you, or I
25  have money for you to sell drugs to me.
```

47

```
 1      Q    Okay.  So again, one if those two situations?
 2      A    Yes.
 3      Q    And those two situations, just so the
 4  record's clear, either you would believe from these
 5  messages, Mr. Sumpter is selling drugs to Mr. Barasky
 6  or Mr. Barasky is selling drugs to Mr. Sumpter?
 7      A    It believe Mr. Barasky is selling drugs to
 8  Mr. Sumpter.
 9      Q    And that would be based on what Mr. Sumpter
10  told you?
11      A    Yes.
12      Q    Just --
13           MR. WHITE:  Hold on a second.  I pulled up
14  this picture on my computer, and if there's any
15  question about what it says --
16           MR. GRYSKEWICZ:  Oh, that's clearer.
17           MR. WHITE:  -- he might be able to see it a
18  little bit better.
19           MR. GRYSKEWICZ:  I agree with that.
20           MR. WHITE:  So there are any things that you
21  didn't know what it said, I mean --
22           MR. GRYSKEWICZ:  Yeah, please take a look at
23  it.
24           MR. WHITE:  It's the same -- it's just the
25  same picture, just a little bit clearer.
```

48

```
 1           MS. LAUGHLIN:  And this is for Exhibit 5?
 2           MR. GRYSKEWICZ:  This will be Exhibit 6.
 3           MS. LAUGHLIN:  Okay.
 4           MR. WHITE:  Yep.
 5           THE WITNESS:  I think that says good look --
 6  good looking.
 7           MR. WHITE:  You're talking about the second?
 8           THE WITNESS:  The one above yo, bro I still
 9  can't read.
10  BY MR. GRYSKEWICZ:
11      Q    And the glare kind of obstructs you somewhat.
12      A    It's all good, bro.  I can't read what the --
13  what Plug says.  Something good looking.  Yo, bro, hit
14  me up.  I got you.  Head out, bro.  Okay.  Oh, bro.
15  Sup bro.  Head out, bro.  K.  And, yes, Monday,
16  September 14th, Wednesday, September 16th.
17      Q    I can tell you I drafted my questions looking
18  at that picture on my computer.  That is clearer.  So
19  you would agree the picture on the computer Attorney
20  White just showed you is clearer?
21      A    Yes.
22      Q    Okay.  Now, putting aside what Mr. Sumpter
23  told you, would you agree with me that reading these
24  text messages standing alone, you wouldn't be sure who
25  was selling drugs to who in these messages?
```

49

1    A    Not off the text messages alone.

2    Q    I want to show you what's going to be

3 identified as Plaintiff's Exhibit 7.  This one is a

4 much better picture.

5         (Whereupon, a document was produced and

6 marked as Plaintiff's Exhibit No. 7 for

7 identification.)

8         THE WITNESS:  Okay.

9 BY MR. GRYSKEWICZ:

10    Q    Would you agree with me that this is a true

11 and accurate depiction of some of the messages you

12 took from Mr. Sumpter's phone on October 2nd, 2020?

13    A    Yes.

14    Q    And referring you to the top of this

15 document, you could see it saying, "Listen, bro,

16 that's fine if you don't want to fuck with me anymore,

17 but I at least want to take care of the balance"?

18    A    Yep.

19    Q    Would you agree with me that that's the text

20 we referred to earlier in an exhibit?

21    A    Yes.

22    Q    And then at the bottom that would have been

23 Plug's response to that text message from the previous

24 exhibit?

25    A    Yes.

50

1    Q    And that one says, "If you're up in the AM,

2 just give me a shout"?

3    A    Yes.

4    Q    And then Mr. Sumpter responds okay to that?

5    A    Yes.

6    Q    And you would agree on October 1st, Plug

7 texts Mr. Sumpter, I can get with you between twelve

8 and one today?

9    A    Yes.

10    Q    And then Mr. Sumpter says, "Okay, that works,

11 I'll take my break then"?

12    A    Yep.

13    Q    So what did you suspect from that October 1st

14 text?

15    A    That that's the time that Plug or Barasky can

16 meet with Sumpter to deal the drugs to him.

17    Q    So based on what Mr. Sumpter's telling you,

18 you believe a drug transaction may have occurred on

19 October 1st, 2020 --

20    A    Yes.

21    Q    -- between Mr. Barasky and Mr. Sumpter?

22    A    Yes.

23    Q    When you see Mr. Sumpter on October 2nd and

24 review this text message, do you ask him if he used

25 drugs on October 1st?

51

1    A    I did not ask him.

2    Q    Did you ask him if he used drugs on October

3 2nd?

4    A    I don't recall, but I believe -- I believe

5 that I did, and I believe he indicated he had.

6    Q    Okay.

7    A    But I'm not 100 percent sure that I recall.

8    Q    And this might be the same answer if you

9 don't recall.  Do you recall what time he said he used

10 drugs on October 2nd?

11    A    I don't recall.

12    Q    And then at the bottom of it, it's the text

13 from October 2nd.  Is that right?

14    A    Yes.

15    Q    And those three messages would have been the

16 ones sent in your presence?

17    A    Yes.

18    Q    So at 3:08 the yo, bro from Mr. Sumpter, that

19 would have been sent at your direction?

20    A    Yes.

21    Q    And then Plug respond at 3:11, sup, bro?

22    A    Correct.

23    Q    And at 3:19 Mr. Sumpter would have said, got

24 your bread, bro, plus money three?

25    A    Yes.

52

1    Q    And you directed Mr. Sumpter to send that

2 text message?

3    A    Not those exact words, but a message that

4 would elicit a response from Mr. Barasky to sell

5 drugs, yes.

6    Q    That was going to be my next question.  So

7 how -- how did this exact phrasing get created for the

8 text message?

9    A    It's just a -- some sort of phrase that drug

10 dealers use.  They all have their own little phrasing

11 but would have drug interactions -- would use to

12 elicit a response.

13    Q    Okay.  And would you agree with me that bread

14 means money in drug parlance?

15    A    Yes.

16    Q    And then plus money three would mean extra

17 money?

18    A    Yes.

19    Q    So knowing that there was a balance from two

20 days earlier, would you agree with me that this text

21 message could have meant I just have your money I owe

22 you?

23    A    Or it could mean I have the money I owe you

24 plus I want -- plus three, three grams.  That could

25 say plus money for three, three grams.

53

1    Q     Okay. Did Mr. Sumpter specifically tell you
2  that plus money three meant he was asking for drugs?
3    A     Yeah, he told me he was asking for three
4  grams of Fentanyl, yes.
5    Q     At this point on October 2nd, did you ask Mr.
6  Sumpter if he owed Barasky money from prior to that
7  day?
8    A     He indicated to me that he had owed him
9  money.
10   Q     Would you agree with me that three grams of
11 Fentanyl is a large quantity of Fentanyl?
12   A     I would agree, yes.
13   Q     And you would agree that would have been
14 the -- almost the exact quantity you took from Mr.
15 Sumpter's home on September 24th of 2020?
16   A     Yes.
17   Q     And you would agree with me that Mr. Barasky
18 never texted back in this conversation after the text
19 from 3:19 p.m.?
20   A     I don't -- I don't recall if he would have or
21 not. I would have taken pictures or screen shots,
22 so --
23   Q     Okay. So if he did respond, it would have
24 been in the documents either your attorney turned over
25 to me in this lawsuit or the District Attorney turned

54

1  over in the criminal case?
2    A     Yes.
3    Q     You would agree with me in the text messages
4  that Mr. Barasky never confirmed he had drugs on his
5  person?
6    A     Correct, he did not.
7    Q     Did you know where Mr. Barasky was living at
8  the time on October 2nd?
9    A     Not specifically. I just knew he lived in
10 the City of Williamsport somewhere.
11   Q     Okay. You would agree with me that the NEU
12 has specific regulations for handling confidential
13 informants and sources?
14   A     Yes.
15   Q     Show you a copy of the list of regulation.
16 Yeah, this will be identified as Plaintiff's Exhibit
17 8.
18         (Whereupon, a document was produced and
19 marked as Plaintiff's Exhibit No. 8 for
20 identification.)
21         THE WITNESS: Without reading through the
22 entire thing, is there a specific --
23 BY MR. GRYSKEWICZ:
24   Q     No. I was going to ask you is --
25   A     Okay.

55

1    Q     -- you know, to the best of your knowledge,
2  looking at that, does that appear to be a true and
3  accurate copy of Attachment H from the NEU's
4  regulation which would be for informant's and sources
5  of information?
6    A     Yes.
7    Q     And obviously you would have access to the
8  unredacted version of this versus this is a redacted
9  version?
10   A     Yes.
11   Q     So if you would look under the definition
12 section and subsection B, source of information. It's
13 on the first page.
14   A     Yes.
15   Q     The bottom paragraph there.
16   A     Yep.
17   Q     Would you agree with me that it says a person
18 cannot be a source of information if any criminal
19 charges are pending against that individual?
20         MR. WHITE: Objection to form. You can
21 answer.
22         THE WITNESS: Yes.
23 BY MR. GRYSKEWICZ:
24   Q     So you would agree with me that when you went
25 to Mr. Sumpter's house on October 2nd, criminal

56

1  charges would have been pending against him?
2    A     Correct. But I believe this is reading
3  source of information, where someone in the public is
4  just telling me, hey, crimes are committing over here,
5  where he was a confidential source, being with me the
6  entire time.
7    Q     Okay. So you would say the source of
8  information here is different than the confidential
9  source you described to us previously?
10   A     Correct.
11   Q     Would you agree with me that a confidential
12 source is not mentioned in these regulations?
13   A     I would agree, yes.
14   Q     Okay. So for confidential informants in
15 these regulations, you would agree you're supposed to
16 conduct a comprehensive interview of that confidential
17 informant?
18   A     Yes.
19   Q     But Mr. Sumpter was not a confidential
20 informant so you never conducted that interview?
21   A     Correct.
22   Q     Now, the NEU's regulations also require you
23 to document what you learned from an informant in a
24 written report. Is that right?
25   A     Yes.

57

1    Q    Based on you categorizing Mr. Sumpter as a
2  confidential source instead of an informant, do you
3  believe that regulation for you to document everything
4  in a report still applied?
5    A    It was documented in a report.
6    Q    Okay.
7    A    It's in the head of one of my reports that
8  you handed to me.
9    Q    So that was your documentation in compliance
10  with these regulations, those reports are written?
11        MR. WHITE:  Objection to form.  You can
12  answer.
13        THE WITNESS:  Yeah, it was documented.
14  BY MR. GRYSKEWICZ:
15    Q    So in that report you would have wrote all
16  your knowledge as was known to you at the time?
17    A    I believe so.  If I can review --
18    Q    Yeah, absolutely.  If you think something's
19  missing, let us know.
20    A    Yeah, I met with confidential source who
21  stated they bought suspected heroin/Fentanyl from
22  Anthony Barasky approximately a hundred times in the
23  past.  And then stated Barasky's phone number of
24  215-301-0606.
25    Q    Did you ask Sumpter when the hundred

58

1  purchases he alleged from Barasky occurred?
2    A    Just over his time of when he purchased from
3  Barasky.
4    Q    I'm not sure if I know what that means.
5  Could you describe that for me?
6    A    If you're asking from January 1st of a
7  certain year to October 2nd, 2020, no.
8    Q    Okay.
9    A    He only indicated that he had purchased over
10  a hundred times throughout his -- his purchasing from
11  Barasky.
12    Q    Okay.  Did he tell you when the first time he
13  purchased Fentanyl from Barasky was?
14    A    No.
15    Q    So we -- strike that.  Through your
16  investigation you weren't able to narrow down a
17  timeline when these hundred purchases occurred?
18    A    No, and that's not typically a question we
19  ask confidential informants or sources.  We just ask
20  how many times they've purchased.
21    Q    Okay.  And you would agree that these
22  regulations for confidential informants and sources
23  require you to run a criminal background check on the
24  prospective informant?
25    A    Yes.

59

1    Q    And you would have done that, or somebody in
2  the NEU would have done that in April of 2020?
3    A    Yes.
4    Q    And then I believe from your earlier
5  testimony there is an informant condition statement
6  on --
7    A    Correct.
8    Q    -- it would have been marked Dent and Havens
9  production 415, towards the end of that document?
10    A    Yep.
11    Q    You never had Mr. Sumpter review or sign this
12  document?
13    A    I did not.
14    Q    Now, I know you said earlier you believe Mr.
15  Sumpter was in active addiction in the time from
16  September 24th, 2020, through October 2nd, 2020?
17    A    Yes.
18    Q    Does someone being in active addiction raise
19  any concerns for you as a police officer about their
20  reliability?
21    A    I would say every confidential informant we
22  use are in some sort of active addiction, so no.
23    Q    Okay.  So I'm bringing back to October 2nd
24  here.  So the plan's created at the Old Lycoming
25  Township police station stop and arrest Barasky.

60

1    A    Yes.
2    Q    Would you agree with that?  Where did you go
3  after the briefing at the Old Lycoming Township police
4  station was finished?
5    A    I stayed in the parking lot with the
6  confidential -- with Mr. Sumpter entire time --
7    Q    Okay.
8    A    -- in my vehicle.
9    Q    So you didn't go back to Mr. Sumpter's house
10  or anything for it?
11    A    Not until afterwards where I dropped him off
12  there.
13    Q    Okay.  How were you communicating with the
14  other officers on the team to arrest Mr. Barasky?
15    A    Through a police communication style radio.
16    Q    How was it decided at what location Mr.
17  Barasky would have his vehicle stopped at?
18    A    We want it to be stopped in a spot where it
19  would be tough for him to flee.  So we figured if he
20  was on Lycoming Creek Road, it would give him an
21  avenue to flee -- sorry for the directions, I'm not a
22  hundred percent sure -- but I believe northbound.  He
23  was traveling northbound.  So he would have been able
24  to flee northbound.  So by him turning right onto --
25  and I would have to look at my report to -- for the

61

1  roads, and stop him prior to him getting into the

2  development would have been the best location.

3  Q    Okay.  I'll --

4  A    And again, I didn't -- I didn't come up with

5  that plan.  I just -- that was done by -- I believe

6  Josh Bell came up with that plan where to do the stop.

7  Q    Okay.  Did you have any input into the plan

8  on where to do the stop?

9  A    Just that I wanted to see him stopped before

10  he got into the development, because of his propensity

11  to flee.  I didn't want anybody in the development to

12  get injured.

13  Q    Okay.  And that was, I guess, a mutual

14  concern between every member of the NEU?

15  A    Yes.

16  Q    I show you the map.

17  A    Then forgive me.  At some point could we take

18  a restroom break then?

19  Q    Yeah, we can take a break now if you like.

20  A    I can finish this.

21  MR. GRYSKEWICZ:  No, no, go ahead.  Let's

22  take a break now because I'm doing this a bit out of

23  order, so I can rearrange my questions.

24  (Whereupon, a recess was taken from 10:08

25  a.m. until 10:14 a.m.)

62

1  AFTER RECESS

2  (Whereupon, a document was produced and

3  marked as Plaintiff's Exhibit No. 9 for

4  identification.)

5  BY MR. GRYSKEWICZ:

6  Q    Detective Dent, I put a map in front of you

7  marked as Plaintiff's Exhibit 9.  Does that appear to

8  be a general map of the area where Mr. Sumpter lived

9  and Mr. Barasky's vehicle was stopped on October

10  2nd --

11  A    Yes.

12  Q    -- 2020?  Okay.  Would you agree that the red

13  marker on that map is a general location for where 416

14  Brentwood Drive was where the informant lived?

15  A    Yes.

16  MR. WHITE:  Objection to form.

17  BY MR. GRYSKEWICZ:

18  Q    I'm going to pass you my pen, sir.  Now, was

19  the normal meet location between Barasky and the

20  informant at that house or someplace else?

21  MR. WHITE:  Objection to form.  You can

22  answer.

23  THE WITNESS:  Are you asking me to indicate

24  on the map where it would be or --

25  BY MR. GRYSKEWICZ:

63

1  Q    Well, was it at -- did Mr. Sumpter tell you

2  that Anthony Barasky would normally deliver drugs to

3  his home?

4  A    About a hundred yards from the house,

5  Q    Could you indicate on the map the spot Mr.

6  Sumpter indicated Anthony Barasky would normally meet

7  him at to deliver drugs?

8  A    Yeah.  So the house -- that this is Brent --

9  there's like a little bit of woods right around here.

10  He'd walk down to that wooded area and meet him.  Mr.

11  Barasky would stop at that wooded area and he'd do the

12  deal there and then they would split ways.

13  Q    Okay.  So that dot you put on the map there,

14  that would be that general area?

15  A    Roughly, yeah.  I mean --

16  Q    It's not exact?

17  A    It's not to scale, so -- but a hundred yards

18  in that general location.

19  Q    Could you indicate on the map where Barasky's

20  vehicle was actually stopped by police?

21  A    I wasn't at the traffic stop, but from what I

22  gather, it was -- from what I've been told, it was

23  like right here, right at the -- I think right at

24  where Miller Drive meets whatever road that is there.

25  Q    Do you know where the police officers were

64

1  stationed during Mr. Barasky's arrest?

2  A    I think -- I'm not 100 percent sure, but I

3  believe one was further up here (indicating).

4  Q    Um-hum.

5  A    And then one maybe in Taylor Trucking or

6  Roan's RV.  I'm not -- again, I wasn't there for that

7  so I don't know exactly.

8  Q    So all you remember is what you would have

9  been told four years ago essential?

10  A    Yes.  Yes.

11  Q    Okay.  Could you tell me, when was it decided

12  for Barasky to be stopped before he got to the meet

13  location?

14  A    That was in the preplanning stages.  We

15  were -- because of his propensity to flee, we decided

16  to stop him before he even got into the development.

17  Q    So that would have been decided at the

18  meeting at the NEU headquarters?

19  A    It would have been decided at the brief at

20  Old Lycoming Township.  But prior to getting to that

21  brief, we wanted to have him stopped and then Josh

22  Bell would have put that plan in motion with all the

23  marked vehicles.

24  Q    And you said you did that because you were

25  concerned Barasky might flee when you stopped him?

65

1    A    Yes.

2    Q    And who decided that was the right plan, to

3    stop Barasky before he got to the meet location?

4    A    It would have been a collective plan amongst

5    all of us.  Again, Josh Bell was the supervisor so he

6    would have signed off or okayed it.  But I believe

7    we're all seasoned detectives within the narcotics

8    unit and we came to a collective plan of how we would

9    do it.

10   Q    Would the Old Lycoming Township police

11   officers have been involved in that, you know,

12   collective plan?

13   A    I wasn't in that brief.  They may have gave

14   suggestions, but I'm not 100 percent sure on that.

15   Q    Would it be unusual for you to ask the local

16   police department to lend their expertise the area

17   to you?

18   A    No, not at all.  That wouldn't --

19   Q    That would be something you would want, in

20   fact, right?

21   A    Correct.  Yes.

22   Q    Did you ever go to the location of the

23   traffic stop?

24   A    I drove past it to drop Mr. Sumpter back off

25   at his house, but at this point I think the traffic

66

1    stop was cleared up.

2    Q    Okay.  So you never saw Mr. Barasky being

3    arrested?

4    A    I did not.

5    Q    Okay.  And you never saw him, you know, at

6    the scene of the traffic stop?

7    A    I did not.

8    Q    And that would mean you never questioned

9    about the scene of the traffic stop as well?

10   A    I did not.

11   Q    Would you agree with me, though, that

12   Barasky's vehicle was stopped at your general

13   direction?

14        MR. WHITE:  Objection to form.  You can

15   answer.

16        THE WITNESS:  I didn't direct him to be

17   stopped.  I just explained the text communication that

18   was coming through and as to where -- when he got the

19   head on out text was the last thing I would have said.

20   And shortly thereafter they saw him and they would

21   have indicated -- they would have decided when to make

22   the traffic stop.

23   BY MR. GRYSKEWICZ:

24   Q    Okay.  You would agree you were in agreement

25   with the plan to stop Mr. Barasky before he got to the

67

1    normal meet location?

2    A    Yes.

3        MR. WHITE:  Objection to form.  You can

4    answer.

5    BY MR. GRYSKEWICZ:

6    Q    Did you ever bring Mr. Sumpter to identify

7    that the Anthony Barasky that was arrested was the

8    person he believed to be Anthony Barasky?

9    A    I'm sorry.  Could you repeat that?

10   Q    Yes.  Did you ever bring Mr. Sumpter to look

11   at Anthony Barasky who was arrested on October 2nd and

12   say, yeah, that's the guy I was buying drugs from?

13   A    No.

14   Q    Were you present when Mr. Barasky was

15   searched when he was arrested?

16   A    I was not.

17   Q    Do you know the results of that search,

18   though, when Mr. Barasky was arrested?

19   A    Nothing was located.

20   Q    And then I believe Captain Bell described for

21   us Mr. Barasky was strip searched at the Old Lycoming

22   Township Police Department.  Were you present for

23   that?

24   A    I was not.

25   Q    Do you know the results of any strip search?

68

1    A    I believe nothing was found.

2    Q    Did you see Mr. Barasky at any point on

3    October 2nd, 2020?

4    A    I did not.  Well, arraignment, I would

5    have -- no, I'm sorry, I wasn't even there for

6    arraignment.  They arraigned -- somebody else

7    arraigned me for him, so my apologies.

8    Q    Okay.  And you ended up searching Anthony

9    Barasky's vehicle?

10   A    I did.

11   Q    Is that right?  Would you have -- you filed a

12   search warrant for that?

13   A    I did.

14   Q    And you carried out that search on October

15   6th?

16   A    I believe so.  Yes.

17   Q    Well, would you agree they did -- you carried

18   out that search in the, you know, three or four days

19   after his arrest on October 2nd?

20   A    Yes.  It -- the arrest was on a Friday.  It

21   was either a Monday or Tuesday I did that.

22   Q    Okay.  And is there a reason you waited to

23   search Mr. Barasky's vehicle?

24   A    It was in impound.  There was -- there was

25   no, you know, reason to stress getting it done right

69

1  away.

2      Q    Okay.  And you would agree, you didn't have

3  Mr. Barasky's consent to search his vehicle?

4      A    Correct.

5      Q    Did you direct Joshua Bell to call ahead to

6  the Lycoming County Prison to ensure that Mr. Barasky

7  was placed in a dry cell?

8      A    I don't know if I directed him to.  I think

9  we all came to an agreeance and he -- he made the

10 phone call.

11     Q    And when you say we all came to agreeance,

12 who do you mean by all?

13     A    Like we all discussed as to why there could

14 possibly have been nothing found on him and it could

15 possibly be inside him, so we thought maybe it would

16 be a good idea to have him placed in a dry cell.

17     Q    And who --

18     A    And I think Josh Bell just took it upon

19 himself to make that phone call, if I recall.

20     Q    Let me rephrase.  So by all, do you mean the

21 NEU members specifically?

22     A    Yes.

23     Q    So that would have included Joshua Bell and

24 Tyson Havens?

25     A    Yes.

70

1      Q    And would it have included Clinton Gardner as

2  well?

3      A    I don't recall.

4      Q    Okay.  Did it include the Old Lycoming

5  Township police officers at all?

6      A    I don't believe so, no.

7      Q    And you said you all came to the conclusion

8  that you wanted him placed in a dry cell because you

9  thought the drugs might have been inside him?

10     A    Yes.

11     Q    And would you agree with me that you

12 contacted the Lycoming County Prison to see if any

13 contraband was recovered from Barasky's dry cell?

14     A    Yes.

15     Q    And you would agree that no contraband was

16 ever recovered?

17     A    Correct.

18     Q    And you would agree you never found

19 contraband when you searched Mr. Barasky's vehicle?

20     A    I did not.

21     Q    And I'm sure you did a thorough search of his

22 vehicle?

23     A    I did.

24     Q    That would have included the panels of the

25 vehicle inside?

71

1      A    Yes.

2      Q    And would you agree that you drafted the

3  criminal complaint on October 2nd, 2020, charging

4  Anthony Barasky with criminal use of a communication

5  facility?

6      A    Yes.

7      Q    I'm going to show you what will be Exhibit 10

8  now.

9           (Whereupon, a document was produced and

10 marked as Plaintiff's Exhibit No. 10 for

11 identification.)

12 BY MR. GRYSKEWICZ:

13     Q    Take a look at that and let me know when

14 you're finished.

15     A    Okay.

16     Q    Is this a true and accurate copy of the

17 criminal complaint you filed against Mr. Barasky on

18 October 2nd, 2020?

19     A    Yes.

20     Q    And you filed this complaint with Magistrate

21 William Solomon on October 2nd, 2020?

22     A    Yes.

23     Q    And you would agree in this complaint, you

24 listed Anthony Barasky's address as 1534 Louisa Street

25 in Williamsport?

72

1      A    Yes.  That's probably what was on his triple

2  I.

3      Q    What do you mean by triple I?

4      A    His rap sheet.

5      Q    Okay.  Did you ever get like a driver's

6  license from Anthony Barasky that day?

7      A    Not that I recall.

8      Q    Okay.  You would agree that you wrote in the

9  affidavit of probable cause that, "It should be noted

10 Barasky is a known narcotics dealer in the

11 Williamsport area"?

12     A    Yes.

13     Q    What was that statement based on?

14     A    Based on Detective Havens having previous

15 drug interactions with Barasky being a dealer in the

16 Williamsport area, to include the time that he fled

17 from Mr. -- or Detective Havens.

18     Q    Do you know if Detective Havens had any

19 contacts with Mr. Barasky that could be considered

20 drug related between that fleeing case in 2016 and

21 when he was arrested on October 2nd, 2020?

22     A    Not that I -- not that I'm aware of.  I'm not

23 sure.

24     Q    Okay.  Would you agree that any of those drug

25 interactions with Detective Havens would have resulted

73

1  in something ending up on Anthony's criminal record?

2      A    I believe he had arrested him for the 2016.

3      Q    And you would agree that you didn't list in

4  this affidavit that the last known drug interaction

5  with Mr. Barasky was from four years prior?

6      A    I didn't think that would be necessary for

7  probable cause, no.

8      Q    You would agree that that statement makes it

9  sound like you have current knowledge that Mr. Barasky

10  was an active drug dealer in Williamsport?

11          MR. WHITE:  Objection to form.  You can

12  answer.

13          THE WITNESS:  Yeah, we -- we had intel from

14  sources throughout Williamsport that he was dealing.

15  We just didn't have a way into him.

16  BY MR. GRYSKEWICZ:

17      Q    And you would agree in the affidavit you

18  wrote, "In my presence the CS contacted Barasky on

19  telephone number 215-301-0606"?

20      A    Yes.

21      Q    "And asked Barasky for three, meaning three

22  grams of Fentanyl."

23      A    Yes.

24      Q    You would agree that that was not the full

25  text messages that was sent by Mr. Sumpter to Mr.

74

1  Barasky?

2      A    No, there was more.

3      Q    And the full text message would have been the

4  Plaintiff's Exhibit 7 that we previously discussed?

5  If you need to look at the number, feel free to look

6  through.

7      A    Yes.

8      Q    You would agree that you did not write in

9  this affidavit that Mr. Sumpter had a lengthy criminal

10  record?

11      A    No.

12      Q    And you would agree that you did not write in

13  this affidavit that Sumpter never provided information

14  to police previously?

15      A    I'm sorry.  Say that one more time.

16      Q    Would you agree with me that you did not

17  write in this affidavit that Mr. Sumpter never

18  provided information to police before October 2nd,

19  2020?

20      A    I did not list that, no.

21      Q    And you agree you listed a confidential

22  source in this affidavit, is that right?

23      A    Correct.

24      Q    And that would have referred to Mr. Sumpter?

25      A    Yes.

75

1      Q    And you would agree that you did not explain

2  the difference between a confidential source and a

3  confidential informant in this affidavit?

4      A    I would agree.

5      Q    And you would agree you did not write in this

6  affidavit that Mr. Sumpter was just arrested for

7  selling Fentanyl?

8      A    I did not.

9      Q    And you would agree that you would have filed

10  this document with Magistrate Solomon's court prior to

11  Barasky being arraigned by the judge?

12      A    Yes.

13      Q    So you would agree that Magistrate Solomon

14  would have based his bail decision, at least in part,

15  on what you wrote in this affidavit?

16          MR. WHITE:  Objection to form.  You can

17  answer.

18          THE WITNESS:  Could you repeat that for me

19  again?

20  BY MR. GRYSKEWICZ:

21      Q    Sure.  Would you agree with me that

22  Magistrate Solomon would have based his decision on

23  what amount to set Mr. Barasky's bail at, at least in

24  the part, based on your affidavit of probable cause?

25          MR. WHITE:  Same objection.

76

1          THE WITNESS:  Yes.  And outside factors

2  from -- that we would have told him during

3  arraignment.

4  BY MR. GRYSKEWICZ:

5      Q    And one of those outside factors would have

6  been your bail recommendation that it be secured bail?

7      A    Yes.

8      Q    Now, I know you said you weren't physically

9  present at the arraignment for Mr. Barasky.  Is that

10  right?

11      A    Correct.

12      Q    Okay.  Did you relay to the judge that you

13  wanted it to be secured bail outside of that

14  arraignment then?

15      A    I did not.  I wasn't -- I wasn't there for

16  it.

17      Q    So did you direct the officer who was present

18  for it to relay to the judge you wanted secure bail?

19      A    Yes.

20      Q    Is October 2nd, 2020, the last time you would

21  have saw Anthony Barasky, except for court

22  appearances?

23      A    The last time was -- again, I didn't see him

24  on October 2nd, so --

25      Q    Okay.  Yeah, I'm sorry.  Did you see him when

77

1  you drove by with Mr. Sumpter past the traffic stop or
2  he was gone at that point?
3      A    It was cleared up at that point.
4      Q    So you never saw Mr. Barasky at all on
5  October 2nd?
6      A    I did not.
7      Q    Have you -- aside from court appearances,
8  have you ever seen Mr. Barasky then?
9      A    No.
10     Q    You would agree with me that you attended the
11 preliminary hearing for Mr. Barasky on these charges
12 that occurred on October 14th, 2020?
13     A    Yes.
14     Q    And at that point you would agree you knew no
15 drugs were found in relation to the traffic stop from
16 October 2nd, 2020?
17     A    Correct.
18     Q    And that would have included the search of
19 the car?
20     A    Yes.
21     Q    And the dry cell information from the
22 Lycoming County Prison?
23     A    Yes.
24     Q    Why didn't you request that the charge be
25 dismissed at the preliminary hearing then since no

78

1  drugs were found?
2          MR. WHITE:  Objection to form.  You can
3  answer.
4          THE WITNESS:  Because in my -- to the
5  attempted delivery, he still -- there was still a
6  felony that had occurred, so I wasn't going to drop
7  that.
8  BY MR. GRYSKEWICZ:
9      Q    So your belief, the crime of criminal
10 communication -- excuse me.  It was your belief that
11 the crime of criminal use of a communication facility
12 still occurred?
13     A    Yes.
14     Q    Okay.  And that was true even absent finding
15 any drugs?
16     A    Yes.
17     Q    Would you agree with me that after your
18 testimony at the preliminary hearing, Magistrate
19 Solomon bound the charge over to the Court of Common
20 Pleas?
21     A    Yes.
22     Q    At the time you filed the criminal complaint
23 in front of you, what did you believe your probable
24 cause was for charging Mr. Barasky with criminal use
25 of a communication facility?

79

1          MR. WHITE:  Objection to form.  You can
2  answer.
3          THE WITNESS:  That he was bringing three
4  grams of Fentanyl to Mr. Sumpter, to deliver it to
5  him.
6  BY MR. GRYSKEWICZ:
7      Q    After Barasky was arrested, did you ever ask
8  Matthew Sumpter why Barasky didn't have drugs on him?
9      A    I did.  He said he always brought drugs to
10 him, so the only thing we could think of is that it
11 was tossed out the window before the traffic stop was
12 actually completely conducted.  And when we walked the
13 flight path -- I didn't walk the flight path.  When
14 the flight path was walked, nothing was found so --
15 but three grams of Fentanyl isn't a big bag.  It could
16 have been anywhere in there on the road.
17     Q    And I know you said Mr. Sumpter said Mr.
18 Barasky always brought drugs with him previously?
19     A    Um-hum.
20     Q    Did he tell you that --
21     A    Yes.  Sorry.
22     Q    That's okay.  Did he tell you that before you
23 arrested Mr. Barasky on October 2nd or after?
24     A    Before.
25     Q    Did you ever use Mr. Sumpter as an informant

80

1  or source for another case after arresting Mr.
2  Barasky?
3      A    I did not.  He went to rehab.
4      Q    Was Mr. Sumpter going to rehab the only
5  reason you didn't use him as a source again?
6      A    Yes.
7      Q    To the best of your knowledge, did Joshua
8  Bell have any involvement in the Barasky investigation
9  after he asked the Lycoming County Prison to place
10 Barasky in the dry cell?
11     A    He did not.  No.
12     Q    Again, to the best of your knowledge, did
13 Detective Tyson Havens have any involvement in the
14 Barasky investigation after Barasky was arrested on
15 October 2nd?
16     A    I think other than -- I believe he testified
17 at suppression, but --
18     Q    Okay.
19     A    -- I'm not sure of anything else.
20     Q    So other than testimony in court, you're not
21 sure of anything else?
22     A    No.
23     Q    Did Chief Hope from the Old Lycoming Township
24 police have any involvement in the Barasky
25 investigation after Barasky was arrested?

81

1     A     No.

2     Q     Did Sergeant, now Captain Kriner, of the Old

3   Lycoming Township Police Department, have any

4   involvement in the Barasky investigation after he was

5   arrested on October 2nd?

6     A     No.

7     Q     Same question for Clinton Gardner.  Did

8   Clinton Gardner have any involvement in the Anthony

9   Barasky investigation after he was arrested on October

10   2nd?

11     A     No.

12     Q     And would you agree with me that the criminal

13   use of a communicate facility charge you filed against

14   Mr. Barasky was ultimately dismissed by President

15   Judge Butts?

16     A     Yes.

17     Q     You know, we talked about the briefing

18   previously at the Old Lycoming Township Police

19   Department prior to Mr. Barasky's arrest.  Did that

20   briefing happen at your direction?

21     A     If I recall, it happened at Josh Bell's

22   direction.

23     Q     And you said that would have been standard

24   procedure for the NEU at the time to hold such a

25   briefing?

82

1     A     Yes.

2     Q     And what was the overall purpose of that

3   briefing?

4     A     To assign everybody their jobs of what they

5   were going to be doing within the mission, if you

6   will.

7     Q     I'm going to bring you back to that map, if

8   you would take a look at that.  So the plan that was

9   created was to stop Barasky on Eckard Road after

10   turning off Lycoming Creek Road.  Is that right?

11     A     Yes, I believe that was where they were going

12   to make the stop.  Yes.

13     Q     Okay.  Would you agree with me that if you

14   allowed Barasky to turn onto Miller Road, there would

15   have been no other way for Barasky to exit that area

16   besides from Miller Road?

17           MR. WHITE:  Objection to form.  You can

18   answer.

19           THE WITNESS:  That would have allowed him to

20   flee up into the -- the development, which was exactly

21   what we were trying to prevent.

22   BY MR. GRYSKEWICZ:

23     Q     Would you agree with me that since Barasky

24   was stopped on Eckard Road, you don't know if Barasky

25   was going to turn onto Miller Road to head toward the

83

1   informant's house or continue straight onto Eckard

2   Road?

3           MR. WHITE:  Same objection.  Go ahead.

4           THE WITNESS:  Other than the text messages

5   telling -- telling Mr. Sumpter to head out, I don't

6   know.

7   BY MR. GRYSKEWICZ:

8     Q     Okay.  As part of your drug investigations as

9   a police officer, would you agree with me that

10   oftentimes you will view a drug transaction occur and

11   then arrest the drug dealer at a later date?

12     A     Yes.  That's primarily what a control buy is,

13   yes.

14     Q     Why didn't you select that option for Anthony

15   Barasky in this case?

16     A     Because we knew Mr. Sumpter was intending on

17   going to rehab and we wanted to -- again, we used him

18   as a confidential source and not a confidential

19   informant.  And it was kind of -- that afternoon we

20   acted on it and went from there.

21     Q     In your experience as a police officer, how

22   many arrests do you estimate you made in total?

23     A     I've made over 300 within a NEU.  In total,

24   I'm not 100 percent sure, but -- within the NEU I've

25   made over 300.

84

1     Q     And how many of those 300 arrests or so in

2   the NEU have been for drug crimes?

3     A     290.

4     Q     Almost all of them?

5     A     Almost all of them, yeah.

6     Q     Okay.  So you would be familiar with the

7   charge criminal use of a communication facility under

8   Section 7512 of the Crimes Code?

9     A     Yes.

10     Q     Can you explain when you as a police officer

11   would believe that charge should be filed against a

12   person?

13     A     When a felony under the Drug Act has been

14   committed.  Attempted delivery is a felony under the

15   Drug Act.

16     Q     And you would agree with me that your

17   reasoning for filing that charge against Anthony

18   Barasky is because you believe that attempted delivery

19   of a controlled substance occurred?

20     A     Yes.

21     Q     When you were charging Anthony Barasky, why

22   didn't you charge him with attempted delivery of a

23   controlled substance?

24     A     I believe that would have been amended at a

25   later date, is why we didn't do it at that time.

85

1    Q    Okay.  Besides Mr. Barasky's case, in your
2  career have you ever charged somebody with criminal
3  use of communication facility and no other crime?
4    A    No.
5    Q    Have you ever charged someone with the
6  attempted delivery of a controlled substance in your
7  career?
8    A    Yes.
9    Q    How many times would you estimate you did
10  that?  If you don't know, you don't know.
11    A    I don't know.
12    Q    You've received specific training for using
13  confidential informants through your career as a
14  police officer, is that right?
15    A    Yes.
16    Q    And you also have, you know, extensive
17  experience using confidential informants in drug
18  cases?
19    A    Yes.
20    Q    You said you made about 300 arrests through
21  the NEU.  How many of those arrests do you -- would
22  you estimate came from confidential informants?
23    A    200.
24    Q    I know you described for us earlier the
25  difference between a confidential source and a

86

1  confidential informant.  Through your training and
2  experience, what do you do to make sure a confidential
3  source is reliable?
4    A    I mean, we -- in the specific -- are you
5  talking about specifically this one or just in
6  general?
7    Q    Just in general.
8    A    You know, we still run their -- their rap
9  sheet.  We try and -- we interview them, but -- and
10  try and deem that the information they're giving is
11  correct or is reliable through individual -- or
12  independent corroboration.
13    Q    And if a confidential source has never
14  provided you with accurate information previously, do
15  you do anything additional to determine if they're
16  reliable for not?  This is again in general, not
17  specific to Mr. Barasky.
18    A    Sure.  If the individual that they're giving
19  information on has been arrested prior to for drug
20  related incidents, if we have knowledge outside of the
21  confidential source, from another source that
22  there's -- the individual is selling or using drugs
23  within the area.
24    Q    If you're requested for assistance with an
25  arrest from another police officer, what are you

87

1  trained to do in response to that?
2    A    I'm not sure I understand the question.
3    Q    Let me try to rephrase it.  So if another
4  police officer requests your assistance with an arrest
5  in their investigation, you've had no part in their
6  investigation.
7    A    Um-hum.
8    Q    What are you trained to do to make sure you
9  have the authority under the law to arrest them?
10    A    I'm sorry, I still don't understand what
11  you're trying to get at with this question.  I
12  don't --
13    Q    So -- yeah, let me ask it a different way.
14  So if another police officer requests your assistance
15  with arresting somebody from their investigation --
16    A    Um-hum.
17    Q    -- you have no part in that investigation --
18    A    Yes.
19    Q    -- would you be trained to do anything to
20  verify that that officer has probable cause to arrest
21  that person?
22    A    Yes, I would review their reports and --
23  and -- I mean, most times I don't make an arrest from
24  other officers unless they're within my unit, so I'm
25  not sure.

88

1    Q    So with them being in your unit, you would
2  talk about, at least, and ask what's going on?
3    A    Yes.
4    Q    The last two questions.  Was your employment
5  as a police officer in 2000 your only source of
6  income?
7    A    Navy Reserves.
8    Q    Navy Reserve.  Okay.  Excluding the Navy
9  Reserve income, what was your annual pay for
10  employment as a police officer in 2020?
11    A    I don't recall.  I don't recall my hourly
12  rate at that time.
13    Q    Okay.  What is it now?
14    A    30 -- I can look it up on my phone, if you're
15  willing to let me look in my phone.  I don't know --
16    Q    I'm fine with that, as long as Mr. White is.
17    MR. WHITE:  If you want to look it up, that's
18  fine with me.
19    THE WITNESS:  It is $33.43 an hour.
20  BY MR. GRYSKEWICZ:
21    Q    Is it fair to say you work more than 40 hours
22  a week oftentimes?
23    A    Yeah.
24    Q    How much do you estimate you -- how many
25  hours a week do you think you work?

1    A    Average between 40 and 45, probably.

2         MR. GRYSKEWICZ:   Okay.  That's all the

3    questions I have.  Thank you for your cooperation,

4    Detective Dent.

5         MR. WHITE:  I have some questions.  It's a

6    matter of whether or not --

7         MS. LAUGHLIN:  Yeah, go ahead.  Do you want

8    me to go first?

9         MR. WHITE:  Yeah, go ahead.

10                  CROSS-EXAMINATION

11   BY MS. LAUGHLIN:

12   Q    Good morning, Detective Dent.

13   A    Good morning.

14   Q    By name is Shawna Laughlin and I represent

15   Gardner and Bell with regard to this lawsuit.

16   A    Okay.

17   Q    I just have a few questions.  I believe

18   Captain Bell had testified that you were, I think, the

19   case officer related to this investigation.  Would

20   that be correct?

21   A    Sure.  Yes.

22   Q    So you were the one who filled out the NEU

23   report, the criminal complaint, the search warrant,

24   things like that to --

25   A    Yes.

---

1    Q    -- complete the investigation?

2    A    Yes.

3    Q    And the vehicle that Barasky was driving,

4    that was towed to the Wilkes-Barre Bureau of Police

5    Department impound lot?

6    A    Williamsport Bureau of Police.

7    Q    The impound lot?

8    A    Yeah.  You said Wilkes-Barre.  Williamsport

9    Bureau --

10   Q    Oh, Williamsport.

11   A    Yes.

12   Q    I'm sorry.  And the paperwork that had to be

13   filled out for that, that had your name on it as well?

14   A    There wouldn't have been any paperwork filled

15   out.  There might have been a tow receipt, but I don't

16   think it had my name on it, no.

17        MS. LAUGHLIN:  Are we at 11?

18        (Whereupon, a document was produced and

19   marked as Plaintiff's Exhibit No. 11 for

20   identification.)

21        THE WITNESS:  If you're asking the report

22   writing system, if my name was attached to it, then

23   yes.

24   BY MS. LAUGHLIN:

25   Q    Okay.

---

1    A    I thought you meant on the scene, if I had to

2    fill out paperwork to have it towed.

3    Q    No.

4    A    Okay.  Then yes.

5    Q    Just after.

6    A    Yes.

7    Q    And this report also indicates on Page 3 of 8

8    that it's an NEU case, so all records would be

9    maintained by the NEU?

10   A    Correct.

11   Q    Do you have any information as to when the

12   vehicle was released?

13   A    It would have been released -- so I would

14   have done the search warrant and then I would have

15   immediately made it releasable following the search

16   warrant because it was a rental vehicle.  We would

17   have had no intention of seizing it or anything like

18   that.

19   Q    Do you know when it was picked up from the

20   impound lot?

21   A    I do not, no.

22   Q    Do you have any records or would the NEU have

23   any records as to when it was picked up?

24   A    Those records, I believe, would have been

25   maintained by Williamsport police because it was their

---

1    impound.

2    Q    Do you know who picked up the vehicle?

3    A    I do not.

4    Q    There had been some questions or testimony

5    about Sumpter being -- having used drugs on October

6    2nd of 2020 when the arrest of Barasky happened.

7    A    Yes.

8    Q    And at the time that you met with Sumpter,

9    did he appear to be under the influence of drugs?

10   A    He would have -- he -- to a state, yes.

11   To -- but not -- I don't know how to put it.

12   Q    Right.

13   A    Like he wasn't falling over himself.  He

14   could -- he could function, but you could see it in

15   his eyes that he had possibly used, yes.

16   Q    Did he appear that his reliability with

17   regard to texting Barasky would be affected by the

18   fact that he may have been under the influence of

19   drugs at the time?

20   A    No.

21   Q    Have you had an occasion to call off an

22   investigation or a controlled buy because your CI or

23   CS was impaired and you questioned the reliability of

24   the information?

25   A    Yes.

93

1    Q    And you didn't have to do that here with

2  this --

3    A    I did not.

4        MS. LAUGHLIN:  I don't have any other

5  questions.  Thank you.

6        MR. KOZLOWSKI:  I don't have any questions

7  for him.

8            CROSS-EXAMINATION

9  BY MR. WHITE:

10    Q    Detective Dent, I'm going to ask you a few

11  questions about some of the things that you went over,

12  and I want to start with the text messages, really any

13  of them.  I think you've already confirmed that the

14  person who is -- or is texting with Mr. Sumpter in

15  these -- and the name in the phone is Plug, is that

16  right?

17    A    Correct.

18    Q    What does Plug mean?

19    A    Plug is a common term used for somebody who's

20  selling somebody drugs.  That's where they're getting

21  their -- their source of drugs from.

22    Q    So with Mr. Barasky's name being in this

23  phone as Plug, what does that tell you?

24    A    That tells me that Mr. Barasky's the one

25  selling the Fentanyl or heroin or whatever drugs to

94

1  Mr. Sumpter.

2    Q    Do you on occasion run into other -- whether

3  they're sources -- confidential sources or CI's or

4  other people who you come across in your industry,

5  that use that nomenclature, Plug?

6    A    It's used almost daily with us, you know,

7  when we talk to confidential informants or whoever,

8  they'll say my plug is or -- you know, I'm going to

9  hit my plug up to get -- get -- to buy, to --

10    Q    Have you run into other people who have their

11  source in their phone named Plug?

12    A    Yes.  I couldn't tell you when.  It's

13  happened several times.  I couldn't tell you the last

14  time, but it has happened, yes.

15    Q    When you -- I think you testified that you

16  started -- prior to October 2nd, to consider using

17  Sumpter as a source of information.  Is that right?

18    A    Yes.

19    Q    And at the time you started considering using

20  him, he didn't have charges against him, did he?

21    A    He did not.  No.

22    Q    And those -- because those charges were filed

23  when?

24    A    I believe October 2nd is when I filed the

25  charges.

95

1    Q    And so -- and I think you testified that the

2  decision to actually use him was something that was a

3  decision that you made when you were speaking with him

4  at his residence on the 2nd, is that right?

5    A    Yes.

6    Q    Because he changed his mind at that point.

7  Is that a fair characterization?

8    A    Yes.  At that point when I went up to -- with

9  the charges, he then decided that he wanted to do

10  something before he went away to rehab to help -- to

11  help himself out.

12    Q    You testified a little bit about a plan to

13  stop Mr. Barasky prior to getting into the residential

14  development at Brentwood Drive.  Can you explain from

15  your perspective some of the risks that would have

16  been subjected to the public, the officers, anyone

17  else, had Mr. Barasky entered into that development?

18    A    Yeah.  At the time it would have been after

19  school hours and potential for buses to be coming

20  through.  There could have been kids playing in the

21  neighborhood.  We took that into consideration.  A kid

22  could have been injured.  It's a -- from me driving

23  through there, it's not a very busy area so there's

24  potential for -- I know my kids would feel safe

25  playing in the street, so there could have been kids

96

1  playing in the street.  If a pursuit ensued, there

2  would have been a potential for a child to get hit.

3    Q    Were you familiar -- you had been in that

4  Brent Drive development?

5    A    I had been, yes.

6    Q    Were the houses close or far away from the

7  road?

8    A    They're -- I would say they sit back maybe 50

9  yards.  No, not 50 yards.  20 yards from the road,

10  give or take.  They're -- they seem to be -- you know,

11  they're typical quarter to half acre lot type place.

12    Q    Was the area on -- I think it's Eckard Road,

13  is that the correct road, prior to Miller Road?

14    A    Right here (indicating).

15    Q    This one that -- the road that Mr. Barasky

16  was --

17    A    Yes.

18    Q    -- stopped on.

19    A    Yes.

20    Q    Tell me, how would you characterize that area

21  as far as the residences?

22    A    I don't recall any residence being on that

23  road.  It was -- if I remember correctly, there's an

24  embankment on one side and a field and guard rail on

25  the other side before you made the right-hand turn to

1  go up into -- onto Miller Road.

2       Q    Now, as far as when you were with Mr. Sumpter

3  on October 2nd, tell me the things that you were

4  considering as you assessed whether or not he was a

5  reliable source?

6       A    Could you repeat that one more time, please?

7       Q    Sure.  So he went to meet with Mr. Sumpter on

8  October 2nd.

9       A    Yeah.

10      Q    Right?

11      A    Yes.

12      Q    Tell me the things that were going on in your

13 head as far as your analysis of him as being a

14 reliable source that you could use to set up the buy

15 with Mr. Barasky.

16      A    I had previous knowledge of Mr. Sumpter being

17 just a user.  I think Old Lycoming Township had had

18 contacts with him, and they had indicated that he was

19 a user and they didn't believe he was selling, if I

20 recall.  In my opinion, him selling Suboxone to my --

21 the previous confidential informant indicated he

22 wasn't a big-time dealer.  He was selling a

23 prescription to get money so he could go and then in

24 turn buy for himself.

25      So that -- those are the time of things we

1  take into consideration, where we don't think that

2  they're a dealer and they're a user and we could work

3  our way up the ladder to the actual dealer that

4  they're getting from.

5       Q    Is there anything else you -- observations

6  you had of Mr. Sumpter that led you to believe that he

7  was a reliable source?

8       A    I'm not -- not that I'm aware.  I mean, he --

9  he -- no.  Not that I'm aware of.  Sorry.

10      Q    Let me ask a little bit more specifically of

11 a question.

12      A    Yeah, please.

13      Q    How about as far as with respect to Mr.

14 Barasky, when Mr. -- Mr. Sumpter told you or reported

15 back in April that -- or excuse me.  Reported back in

16 September that he was able to call Barasky at any time

17 and meet him shortly after to purchase Fentanyl.  Does

18 that sound correct?

19      A    Yes.

20      Q    And so what did you -- when you were meeting

21 with Mr. Sumpter on the 2nd, what did you know about

22 Mr. Barasky at that time as far as him being -- I

23 think you characterized it as a known drug dealer.

24      A    Like -- so from the meeting on the 24th, he

25 was able to contact him whenever, and then when I met

1  with him on the 2nd, he placed a text message and

2  almost immediately got a response from Mr. Barasky

3  regarding that I -- regarding what I felt was going to

4  be Mr. Barasky bringing drugs to him.

5       Q    So let me change the question or ask a little

6  different question.  I want to know not what you knew

7  about Mr. Barasky based on what Mr. Sumpter told you

8  and what you saw on Mr. Sumpter's phone, but what

9  else -- because you alluded to it a little bit that

10 you knew other things about Mr. Barasky.  What else

11 did you know about Mr. Barasky relative to him being a

12 suspected drug dealer?

13      A    Again, we had information from other law

14 enforcement officers within the area, coupled with

15 what Detective Havens had encountered with him in his

16 prior dealings as a trooper, which, you know, led me

17 to -- with the totality of all that, led me to

18 believe that Mr. Barasky was, in fact, a drug dealer

19 and would bring Fentanyl to Mr. Sumpter.

20      Q    As you testified, there were no -- no drugs

21 were found on Mr. Barasky, to your knowledge, after --

22 as a result of this stop.  Do you have any idea why

23 that may be the case?

24      A    Again, the area where the traffic stop

25 happened, he would have turned off of old -- I'm

1  sorry, Lycoming Creek Road onto -- again, this road

2  name -- I forget the actual road name.  But in that

3  area there's no real -- it's a field and a bank.  And

4  if somebody wasn't right behind him at the -- like

5  right on him, if he opened the window and tossed it

6  out, even though walking that flight path, it could

7  have been hard to find three grams of Fentanyl, which

8  is -- you know, could be just the size of my

9  thumbnail.

10      Q    And in your experience with the NEU, have on

11 occasion a person who's going to sell drugs thrown it

12 out the window?

13      A    Yes.

14      Q    Is that common?

15      A    I don't know how common -- it has happened.

16 I mean, I wouldn't say it's a daily thing, but it

17 definitely has happened, especially with somebody who

18 would have gone through this type of thing in their

19 previous -- you know, previous -- I don't know how to

20 put it.  Not previous life, but previous -- you know.

21 Again, he had been stopped or attempted to be stopped

22 by Detective Havens when he was a trooper, so he --

23 Mr. Barasky would have known what was going on and saw

24 the signs and could have tossed it out.

25      Q    Is that your belief, that he tossed it out

101

```
1   the window?
2       A       That's my belief, yes.
3       Q       And the terrain in that area on Eckard
4   Road --
5       A       Um-hum.
6       Q       -- it's heavily wooded?
7       A       Yes.
8       Q       Would it be difficult for a small -- would it
9   be difficult to find a bag of that size of Fentanyl in
10  that area?
11      A       It would be, yes.
12      Q       The -- or you were asked questions about the
13  criminal complaint that you filed against Mr. Barasky
14  and about secured bail and things of that nature.  As
15  far as what you put in the criminal complaint, are you
16  required to list in there potential defenses that
17  could be raised in response to your probable cause
18  allegations?
19      A       No.
20      Q       Would that be unusual to put something of
21  that nature in an affidavit of probable cause?
22      A       Yes.
23      Q       And as far as the actual approval of the
24  criminal complaint, that's performed by the District
25  Attorney's Office.  Is that correct?
```

102

```
1       A       Yes.
2       Q       And in this case for Mr. Barasky, it reflects
3   on the criminal complaint Ryan Gardner, the District
4   Attorney, approved these charges.  Is that right?
5       A       Yes.
6       Q       So he would have reviewed these and said yes
7   or no?
8       A       Yes.
9       Q       And he said yes in this case?
10      A       He did, yes.
11      Q       And in terms of the bail sought, you were
12  asked questions about the recommendation of secured
13  bail versus some other type of bail.  As far as what
14  the bail is set as, is that your decision or is that
15  the judge's decision?
16      A       It's the judge's decision.
17      Q       And have you on occasion recommended
18  something that was not accepted by the judge?
19      A       Yes.
20      Q       And you were also testifying a little bit
21  about Mr. Sumpter, and I think you said that you did
22  not use him again because he went to rehab.  Can you
23  explain why that's significant in terms of your
24  ability or inability to use Mr. Sumpter as a source in
25  the future?
```

103

```
1       A       Well, a lot of times, one, if they go to
2   rehab, that then drug dealers won't deal with them
3   outside because they think that they're then
4   cooperating with the authorities.  Two, a lot of times
5   they don't -- they don't want to continue because they
6   don't want to put themselves -- Mr. Sumpter being a
7   heavy drug user, put themselves into that lifestyle
8   against for fear that they're going to relapse.
9               And at that time, if I remember correctly, we
10  spoke with -- I believe I spoke with the DA and they
11  said that if he went to treatment, it would be part of
12  his conditions for -- for his cooperation.
13      Q       So someone who's in rehab and not trying to
14  use drugs any more is not really an ideal source of
15  information or informant, is that right?
16      A       Correct.
17              MR. WHITE:  I don't have any further
18  question.
19              REDIRECT EXAMINATION
20  BY MR. GRYSKEWICZ:
21      Q       I have some follow-up questions for you.
22      A       Um-hum.
23      Q       So you said Mr. Sumpter was under the
24  influence, but not to an extreme degree where he was
25  falling over.  Is that accurate?
```

104

```
1       A       Correct.
2       Q       Now, you said like in the past you called off
3   investigations because an informant might be impaired?
4       A       We've gone to houses where an informant
5   was -- we were supposed to meet with them and they
6   were overdosing when we got there and we had to call
7   the ambulance, so yes.
8       Q       So are those on only occasions where you
9   called off a controlled buy or other investigation
10  because the informant's impaired?
11      A       You mean if they're overdosing or just in
12  general?  Like --
13      Q       Yeah, let me re-ask it.  So, you know, we
14  know you said that you called off investigations
15  before because an informant might be impaired.
16      A       Um-hum.
17      Q       Is the only time you've called off
18  investigations because an informant's impaired when an
19  informant is overdosing?
20      A       No.
21      Q       So could you describe the other situations
22  where you've called off an investigation where an
23  informant's too impaired to do it, not overdosing?
24      A       Like where we feel they're unsafe to function
25  outside of our -- our supervision, because ultimate an
```

105

1  informant's going to basically walk away from us to
2  buy drugs then come back to us.
3      Q    So could you describe that?  You know, for us
4  laypersons, what would a person do if they were unsafe
5  to function because they're too impaired by drugs?
6      A    Falling over as they're walking.  They can't
7  formulate sentences, things like that.  Mr. Sumpter,
8  however, could formulate a sentence and I knew that he
9  was going to be sitting next to me throughout the
10  entire investigation, which is what I brought -- took
11  into my consideration when doing it.
12      Q    Okay.  So a person would really have to be
13  too impaired to conduct normal functions, like talking
14  or walking, for you to be able to call off an
15  investigation because of that impairment?
16      A    I mean, most -- most people we deal with
17  are -- almost walk around impaired, so it's hard to
18  say that.  But like, yes, if they can't function as a
19  human being, then we're not going to use them as a
20  confidential informant on that specific time.
21      Q    Okay.  And you discussed the Plug as -- Mr.
22  Sumpter had Mr. Barasky entered into his phone as
23  Plug, and Plug means drug dealer; right?
24      A    Yes.
25      Q    You would agree with me, you testified that

106

1  you did not look through Mr. Sumpter's phone on
2  September 24th, 2020, right?
3      A    Yes.
4      Q    And then on October 2nd, 2020, after Mr.
5  Sumpter already accused Mr. Barasky of being a drug
6  dealer on September 24th, 2020, is when you looked
7  through his phone?
8      A    Yes.
9      Q    So for all you know, Mr. Sumpter could have
10  entered Barasky as Plug in his phone after September
11  24th, 2020, but prior to you viewing his phone on
12  October 2nd, 2020.
13      MR. WHITE:  Objection to form.  You can
14  answer.
15      THE WITNESS:  I guess he could have.  Yes.  I
16  mean, anybody can change a name at some point in their
17  phone.
18  BY MR. GRYSKEWICZ:
19      Q    And you would agree with me that Mr. Sumpter
20  would have had to put Plug in his phone for that
21  contact?
22      A    Yes.
23      Q    And you would also agree with me that Mr.
24  Sumpter would be aware of what Plug meant in drug
25  parlance?

107

1      A    He would be, yes.
2      Q    You know, you stated that you believed Mr.
3  Sumpter was a user and not a seller of drugs.  Is that
4  right?
5      A    Yes.
6      Q    Wouldn't that opinion be contradicted by what
7  your informant told you on September 23rd, 2020?
8      MR. WHITE:  Objection to form.  You can
9  answer.
10      THE WITNESS:  Yes.  However, a lot of users
11  go to Kensington and Philadelphia and will spend a lot
12  of money on Fentanyl to come back because it's cheaper
13  to buy large amounts of -- or it's cheaper to get
14  Fentanyl wholesale in Kensington than it is to buy it
15  up here.
16  BY MR. GRYSKEWICZ:
17      Q    You would agree with me that your informant
18  on September 23rd told you that Mr. Sumpter was
19  looking for customers to sell his Fentanyl to?
20      A    I don't recall saying that.  Is it my
21  report?
22      Q    I forget what exhibit this is.  I start on
23  this page.  I direct you to that second page there.
24      A    Okay.
25      Q    So would you agree with me that your

108

1  informant on September 23rd, told you Mr. Sumpter was
2  actively looking for customers to buy his Fentanyl?
3      A    That informant did, yeah.
4      Q    And you said that was the most reliable
5  informant the NEU ever had?
6      A    Yes, throughout the years.  Although, I mean,
7  informants can go -- informants can be reliable for
8  years on end and then -- and then change on the flip
9  of a dime, so --
10      Q    Do you have any reason to believe that
11  informant was unreliable on September 23rd, 2020?
12      A    I hadn't used that informant for a while.
13  That was just information.  But given his pedigree
14  that he had, there was -- the District Attorney
15  allowed me to do the search warrant that way.
16      Q    Okay.  You also said that you had information
17  from other officers in the area that Mr. Barasky was
18  involved in drug activity.  Is that right?
19      A    And using -- using drugs, yes.
20      Q    So you -- so was the information --
21      A    I'm sorry.  Did you say Sumpter or Barasky?
22      Q    Barasky.  Yes.
23      A    Oh, yes.  I'm sorry.
24      Q    No, that's okay.
25      A    Yes.

109

1   Q   So that previous answer was referring to Mr.
2   Sumpter you thought was a user?
3   A   Yes.
4   Q   Not Mr. Barasky?
5   A   Yes.
6   Q   Okay. So you said that you had information
7   in the area from other law enforcement agencies or
8   police officers that Mr. Barasky was actively selling
9   drugs in 2020.
10  A   Yes.
11  Q   Is that right? Where did that information
12  come from?
13  A   We have a drug tip line, along with patrol
14  officers within Williamsport would have -- would have
15  got information from people on the street telling
16  them.
17  Q   Okay. Did you keep track of those tips in
18  any way?
19  A   Not documented, no. We just keep it in the
20  back of our mind.
21  Q   Okay. So it's not something that you would
22  take a tip from the Williamsport police, for example,
23  that Mr. Barasky's selling drugs and then go
24  investigate it immediately?
25  A   No. We keep it in the back of our mind, see

110

1   if we can -- see if an informant then says the same
2   thing, and then we try and send that informant in to
3   an individual, that individual being Mr. Barasky.
4   Q   So for all you know, that information could
5   have been from anonymous sources?
6   A   Could have been, yeah.
7   Q   Okay. And it could have also been from a
8   named citizen?
9   A   Could have been, yeah.
10  Q   Okay. You just don't know?
11  A   I don't.
12  Q   Okay. Now, you also stated that you think
13  Mr. Barasky might have thrown the drugs out of the
14  window of the vehicle on Eckard Road?
15  A   I suspect that, yes.
16  Q   Okay. You also said you had officers canvas
17  that area to search for it?
18  A   They did a walk. I mean, they didn't spend
19  more than 15 minutes making the walk. Again, it's a
20  pretty wooded area. Could have taken hours on end to
21  locate something like that.
22  Q   Okay. But they did look, they didn't find
23  anything?
24  A   Yes.
25  Q   The road that -- or I'm sorry. You stated

111

1   that it was unusual to put a defense for a person into
2   an affidavit of probable cause attached to a criminal
3   complaint. Is that right?
4   A   Yes.
5   Q   This might be the lawyer in me making a
6   distinction between a defense and a fact in the case.
7   Would you agree with me that a person not being found
8   with drugs, that's a fact a judge would want to know
9   as part of their bail decision?
10          MR. WHITE: Objection to form. You can
11  answer.
12          THE WITNESS: I mean, there's also factors of
13  him -- I think one of the main factors was him being a
14  flight risk is why we -- we asked for bail on him.
15  BY MR. GRYSKEWICZ:
16  Q   I'm not saying Mr. Barasky, you know,
17  specifically in this case, just in general. Would you
18  believe a judge would want to know if drugs were found
19  or not if you're charging somebody with a crime?
20          MR. WHITE: Same objection. Go ahead and
21  answer.
22          THE WITNESS: Yeah, but I didn't charge him
23  with the drugs, I charged him with the phone.
24  BY MR. GRYSKEWICZ:
25  Q   Okay.

112

1   A   So my probable cause -- my affidavit
2   reflected that.
3   Q   Okay. Now, you also said District Attorney
4   Ryan Gardner would have approved that criminal
5   complaint?
6   A   Yes.
7   Q   Did you speak with Ryan Gardner on the phone
8   personally to do it?
9   A   Yes.
10  Q   Would you -- would you have read Mr. Gardner
11  the affidavit of probable cause?
12  A   Verbatim, yes.
13  Q   Would you have give him any information
14  outside of that affidavit?
15  A   We -- we indicated what was going on and what
16  the intention was for the search warrant on the
17  vehicle and the dry cell and everything like that.
18  Q   And did you tell Mr. Gardner that no drugs
19  were found?
20  A   Yes.
21  Q   Did you tell Mr. Gardner that Mr. Sumpter
22  never acted as a confidential source before?
23  A   I don't know that I would have said that, no.
24  Q   Did you tell Mr. Gardner that Mr. Sumpter
25  might have been under the influence?

113

1    MR. WHITE: Objection to form on privilege.
2    I let it go a little bit, but I can't let it go any
3    more. Don't answer.
4        THE WITNESS: Okay.
5    BY MR. GRYSKEWICZ:
6    Q    You also said that you did not use Mr.
7    Sumpter as an informant again because he went to
8    rehab?
9    A    Correct.
10    Q    So would you also agree with me that you
11    didn't use him as an informant because the NEU
12    regulations would have prohibited a person with
13    criminal charges from acting as an informant?
14    A    As a -- as a -- not an informant,
15    Q    No, I mean, as an informant in this case, not
16    a source. So let me re-ask the question. So -- I
17    guess, let me back up and get a distinction to your
18    prior answer, too. You never used Mr. Sumpter again
19    as a confidential source, right?
20    A    Or an informant, no.
21    Q    Or a informant. So it was both. And the
22    reason for not using him as both is because he went to
23    rehab?
24    A    Yes.
25    Q    Okay. Would you agree with me that a second

114

1    reason to not use him as both would be because he had
2    criminal charges pending against him?
3    A    Had I used -- had I decided to use him, I
4    would have officially signed him up then and he would
5    have been allowed to.
6    Q    Okay. Despite the NEU regulations saying
7    someone with pending criminal charges can't be an
8    informant?
9    A    They say he can't be a source, not a informant.
10       MR. GRYSKEWICZ: Okay. That's all the
11    question I have.
12           RECROSS-EXAMINATION
13    BY MR. WHITE:
14    Q    I want to show you what we'll call -- what
15    number are we at?
16       MR. BLANK: 12.
17       MR. WHITE: Number 12, call this.
18       (Whereupon, a document was produced and
19    marked as Plaintiff's Exhibit No. 12 for
20    identification.)
21    BY MR. WHITE:
22    Q    I guess it's Exhibit 12. Do you recognize
23    what this satellite image reflects, Detective Dent?
24    A    Yes.
25    Q    Is this the development at Brentwood Drive in

115

1    the -- what I'll say -- call the bottom right corner?
2    A    Yes.
3    Q    And the entry at Miller Road and Eckard Road?
4    A    Yes.
5    Q    Could you with a -- do you have a pen?
6    A    I don't have one.
7    Q    Could you circle -- as far as your testimony
8    that the -- or actually, strike that.
9        Can you identify Mr. Sumpter's residence on
10    this satellite image?
11    A    I believe it's this one (indicating). Do you
12    want me to circle it?
13    Q    Yes, if you could.
14    A    I believe it's this one right here
15    (indicating).
16    Q    Could you just put an S in there?
17    A    Do you want it on top of it or --
18    Q    Or to the side, whatever you prefer.
19    A    Okay.
20    Q    And the area that Mr. Barasky was traveling
21    through --
22    A    Um-hum.
23    Q    -- can you circle that area?
24    A    Like before -- prior to being stopped?
25    Q    Yes, the path that you believe he was on.

116

1    A    (Witness complied.)
2    Q    And you've circled the section of road -- of
3    Eckard Road which -- and it looks like from a little
4    bit north of the National Tank and Equipment up to
5    about Miller Road. Does that sound fair?
6    A    Yes.
7    Q    Now, the -- the wooded area that appears in
8    that circle, is that the area that you believe the
9    drugs could have been tossed?
10    A    Yes.
11    Q    Would you call that -- how would you
12    characterize that area as far as topography?
13    A    Heavily wooded forest area.
14    Q    And do you know when the walk through
15    occurred to search that area or to check that area for
16    drugs?
17    A    I would say probably within 10 to 15 minutes
18    after the stop, after Barasky was in custody and he
19    was read Miranda and things like that.
20    Q    And so when the officers walked that road,
21    was that before -- was that before the vehicle had
22    been searched for the search warrant?
23    A    Oh, yes. It was the day of the stop, yes.
24    Q    So at the time that they would have walked
25    that section of road, they wouldn't have known whether

117

1  or not something could be recovered in the dry cell,
2  right?
3      A    Correct.
4      Q    And they also wouldn't have known whether or
5  not there could be something recovered in the vehicle
6  search?
7      A    Correct.
8      Q    So the search -- the walk through of that
9  section, what does that tell you about -- or what does
10 all that tell you about the way that section would
11 have been walked through and searched at the time it
12 occurred?
13     A    It wouldn't have been as extensive.  They
14 would've done that because they would have searched
15 Mr. Barasky, nothing on him, and maybe where he can
16 reach within the vehicle, but that would have been all
17 that would have been searched in the vehicle prior to
18 having a search warrant.  And then we wouldn't have
19 had knowledge of the dry cell at that point, so it
20 would have just been a -- a quick walk through,
21 nothing extensive.  Just to make sure -- just to see
22 if anything had been tossed out.
23          MR. WHITE:  All right.  I have no further
24 questions.
25          THE WITNESS:  Is this one going in?

118

1          MR. WHITE:  Yeah.
2              REDIRECT EXAMINATION
3  BY MR. GRYSKEWICZ:
4      Q    I have one more question just based on that
5  map.
6      A    Yep.
7      Q    Could you also mark on that map the area
8  where Sumpter told you he would normally meet Mr.
9  Barasky?  I think that's a bit of a better depiction.
10     A    Yep.  Do you want an X or how do want it
11 marked?
12     Q    If you want to put an X, that would be fine.
13     A    And just like M for meet up?
14     Q    That would be fine?
15     A    (Witness complied.)
16          MR. GRYSKEWICZ:  Thank you.  That's all I
17 have.
18              RECROSS-EXAMINATION
19 BY MS. LAUGHLIN:
20     Q    Detective Dent --
21     A    Yes.
22     Q    -- did you make a phone call to the cell
23 phone number that was in Mr. Sumpter's phone as Plug?
24     A    Yes.
25     Q    And what phone number did you make that call

119

1  from?
2      A    Which phone -- I made it from my --
3      Q    Correct.
4      A    My work cell phone number.
5      Q    And what phone number is that?
6      A    570-560-0574.
7      Q    And that would have been after the arrest of
8  Mr. Barasky that you made the call?
9      A    Yes.
10          MS. LAUGHLIN:  I don't have any other
11 question.  Thank you.
12          MR. WHITE:  I do, just on that, but --
13          MR. GRYSKEWICZ:  Yeah, I have just on that.
14 You can go -- go ahead if you like, ask my question.
15              RECROSS-EXAMINATION
16 BY MR. WHITE:
17     Q    So you -- I think you said that that -- you
18 made that call.  Did anyone answer that phone when you
19 called it?
20     A    No one answered it.  A picture was taken of
21 the phone that Detective Havens had in his custody.
22     Q    What were you -- did you talk with Detective
23 Havens when you were making that phone call?
24     A    I did.  I used my personal cell phone to talk
25 to Detective Havens, indicating that I was calling the

120

1  phone number that was Plug, and to see if the phone
2  that he had taken off Mr. Barasky would ring.  And it
3  did.
4      Q    Did he tell you it rang?
5      A    He did, and he took a picture of my -- my
6  phone number on the screen of that phone.
7      Q    So what does that tell you?
8      A    That the phone that Mr. Barasky had on him
9  was the cell phone used to set up the drug deal that
10 was supposed to have happened.
11          MR. WHITE:  I don't have any further
12 question.
13              REDIRECT EXAMINATION
14 BY MR. GRYSKEWICZ:
15     Q    That phone call to -- that Detective Havens
16 received on the phone seized from Mr. Barasky, do you
17 know where Detective Havens was when that phone call
18 would have happened?
19     A    Either in route to the police station or at
20 the police station.  I'm not 100 percent sure.
21     Q    Okay.  So that would have been after Mr.
22 Barasky was transported from the scene of the traffic
23 stop to the Old Lycoming Township police station?
24     A    Yes.
25     Q    Did you ever issue a search warrant to search

THE

121

1 that phone recovered from Mr. Barasky?

2     A    I did not.

3     Q    And why didn't you?

4     A    I don't know. I just -- I just did not.

5     Q    Okay. And did you ever obtain the subscriber

6 information from that phone to determine who owned

7 that number?

8     A    I did not.

9     Q    And any particular reason you didn't do that?

10     A    Because when I made the phone call to the

11 phone that was on Mr. Barasky, my number showed up

12 on -- on the screen, so I took that as it was his

13 phone and he was in control of it.

14     Q    And you would agree, since you reference that

15 phone call in the affidavit of probable cause, you

16 knew about that, the phone call that Detective Havens

17 took a picture of prior to filing criminal charges?

18     A    Yes.

19     Q    But it was after arresting Mr. Barasky?

20     A    After taking Mr. Barasky into custody is when

21 I made that phone call, and then -- and then did the

22 affidavit of probable cause, yes.

23     MR. GRYSKEWICZ: Okay. Thank you.

24     MS. LAUGHLIN: No other questions.

25     MR. WHITE: Nothing else.

122

1     MR. GRYSKEWICZ: I think that's it.

2     MR. WHITE: All right. You're done.

3     (Whereupon, the deposition was concluded at

4 11:23 a.m.)

---

123

1 COUNTY OF UNION         :

2 COMMONWEALTH OF PENNSYLVANIA

3

4     I, Ervin S. Blank, the undersigned Notary

5 Public, do hereby certify that personally appeared

6 before me, KEVIN DENT; the witness, being by me first

7 duly sworn to testify the truth, the whole truth and

8 nothing but the truth, in answer to the oral questions

9 propounded to him by the attorneys for the respective

10 parties, testified as set forth in the foregoing

11 deposition.

12     I further certify that before the taking of

13 said deposition, the above witness was duly sworn,

14 that the questions and answers were taken down

15 stenographically by the said Ervin S. Blank, Court

16 Reporter, Lewisburg, Pennsylvania, approved and agreed

17 to, and afterwards reduced to typewriting under the

18 direction of the said Reporter.

19     In testimony whereof, I have hereunto

20 subscribed my hand this 28th day of March, 2024.

21

22

23

24 Ervin S. Blank
    Reporter-Notary Public
25     My Commission Expires
    January 28, 2025

**- 0 -**

**06104-2903** [1]
2:6

**- 1 -**

**1,600** [1]  11:10
**103,118,120** [1]
3:4
**1430** [1]  13:9
**1438** [2]  13:11;
38:14
**14th** [4]  45:24;
46:7;   48:16;
77:12
**1529** [2]  31:24;
33:4
**1534** [1]  71:24
**1546** [3]  32:10,
19;  33:14
**15th** [8]  8:5, 7,
14,   17,   21;
9:6, 17, 22
**16th** [1]  48:16
**17701** [1]  2:3
**18507** [1]  2:10
**18701** [1]  1:24

**- 2 -**

**2000** [1]  88:5
**2004** [1]  6:5
**2009** [2]   6:4,
13
**2016** [3]  26:11;
72:20;  73:2
**2017** [3]  6:14,
15, 16
**2020** [65]  5:21;
6:18, 21;  7:20;
8:5, 14, 17, 21,
22;   9:7,  12;
10:11,    16;
11:3,  17,  20;
12:12;   15:20;
16:5;   17:14;
19:4, 7;  30:15,
23;   31:1,  22;

34:11,    14;
35:10, 11, 14;
36:11;   37:16,
21;    38:3;
39:16;   45:24;
49:12;   50:19;
53:15;    58:7;
59:2,    16;
62:12;    68:3;
71:3, 18,  21;
72:21;   74:19;
76:20;   77:12,
16;   88:10;
92:6;  106:2, 4,
6,  11,  12;
107:7;  108:11;
109:9
**2024** [2]  1:16;
123:20
**2025**    [1]
123:25
**21-cv-02041** [1]
1:6
**215-301-0606**
[2]    57:24;
73:19
**23rd** [9]  9:12;
11:3,    17;
37:16;   39:4;
107:7,    18;
108:1, 11
**24th** [33]  8:22;
9:7, 22;  10:11;
11:20;   12:12;
13:9,    12;
14:19;   17:14;
19:4, 15;  20:3;
36:11;   37:8,
21;  38:1, 3, 8,
17;   39:4, 8,
16;   40:6, 14;
43:13;   44:4;
53:15;   59:16;
98:24;   106:2,
6, 11
**25,000**    [1]
16:17
**28th** [1]  123:20
**2903** [1]  2:6

**- 3 -**

**30th** [4]  35:10;
39:21;   40:25;
42:10
**3118** [1]  2:9
**33.43** [1]  88:19

**- 5 -**

**570-560-0574**
[1]  119:6

**- 7 -**

**7512** [3]  17:3;
18:12;  84:8
**780-113**   [1]
17:1

**- A -**

**a.m.** [6]   1:16;
37:9;    44:8;
61:25;  122:4
**ability**    [1]
102:24
**able** [9]   11:5;
21:20;   43:1;
47:17;   58:16;
60:23;   98:16,
25;  105:14
**above**    [3]
45:25;    48:8;
123:13
**absent**    [1]
78:14
**absolutely** [1]
57:18
**accepted**   [1]
102:18
**access**    [1]
55:7
**according**  [2]
16:16;  37:19
**accurate**  [13]
10:4,  14,  19;
17:20;   31:12;
36:3;   43:18;

45:19;   49:11;
55:3;    71:16;
86:14;  103:25
**accused**   [1]
106:5
**acre** [1]  96:11
**acted**    [2]
83:20;  112:22
**acting**    [1]
113:13
**active** [5]   6:5;
59:15, 18, 22;
73:10
**actively**   [3]
40:10;   108:2;
109:8
**activity**   [1]
108:18
**actual**    [3]
98:3;   100:2;
101:23
**addiction**  [3]
59:15, 18, 22
**addition**   [1]
33:25
**additional**  [1]
86:15
**address**   [1]
71:24
**admitted**   [1]
3:13
**affected**   [1]
92:17
**affidavit**  [18]
72:9;  73:4, 17;
74:9,  13,  17,
22;   75:3,  6,
15, 24;  101:21;
111:2;   112:1,
11, 14;  121:15,
22
**affirmed**   [1]
4:11
**afternoon**  [2]
24:16;  83:19
**afterwards**  [3]
29:5;   60:11;
123:17
**again**    [23]
16:10;   33:20;

38:12; 40:18; 46:19; 47:1; 61:4; 64:6; 65:5; 75:19; 76:23; 80:5, 12; 83:17; 86:16; 99:13, 24; 100:1, 21; 102:22; 110:19; 113:7, 18

**against** [15] 15:3, 12, 21; 17:21; 18:19; 55:19; 56:1; 71:17; 81:13; 84:11, 17; 94:20; 101:13; 103:8; 114:2

**agencies** [1] 109:7

**agency** [1] 7:18

**agree** [104] 8:16; 9:11; 13:15; 16:5; 17:19; 18:18, 21, 25; 22:11; 25:13; 31:11; 32:1, 16, 19, 23; 33:4, 15; 34:3; 36:15, 18, 21, 24; 37:4; 38:7, 20; 39:2, 11, 22, 25; 40:25; 41:4; 43:5, 14; 44:1, 15, 23; 45:18, 23; 46:19, 22; 47:19; 48:19, 23; 49:10, 19; 50:6; 52:13, 20; 53:10, 12, 13, 17; 54:3, 11; 55:17, 24; 56:11, 13, 15; 58:21; 60:2; 62:12; 66:11, 24; 68:17;

69:2; 70:11, 15, 18; 71:2, 23; 72:8, 24; 73:3, 8, 17, 24; 74:8, 12, 16, 21; 75:1, 4, 5, 9, 13, 21; 77:10, 14; 78:17; 81:12; 82:13, 23; 83:9; 84:16; 105:25; 106:19, 23; 107:17, 25; 111:7; 113:10, 25; 121:14

**agreeance** [2] 69:9, 11

**agreed** [1] 123:16

**agreement** [1] 66:24

**ahead** [7] 61:21; 69:5; 83:3; 89:7, 9; 111:20; 119:14

**ahold** [1] 27:5

**allegations** [1] 101:18

**alleged** [3] 36:22; 44:25; 58:1

**alleging** [1] 46:16

**allowed** [4] 82:14, 19; 108:15; 114:5

**alluded** [1] 99:9

**almost** [6] 53:14; 84:4, 5; 94:6; 99:2; 105:17

**alone** [2] 48:24; 49:1

**along** [2] 12:19; 109:13

**always** [3] 20:20; 79:9, 18

**ambulance** [1] 104:7

**amended** [1] 84:24

**amongst** [1] 65:4

**amount** [4] 17:25; 19:2; 42:6; 75:23

**amounts** [1] 107:13

**analysis** [1] 97:13

**anderson** [1] 12:16

**anderson's** [1] 9:9

**annual** [1] 88:9

**anonymous** [1] 110:5

**answer** [29] 4:20, 23; 25:21; 30:11; 33:8, 18; 34:7; 41:8, 20; 51:8; 55:21; 57:12; 62:22; 66:15; 67:4; 73:12; 75:17; 78:3; 79:2; 82:18; 106:14; 107:9; 109:1; 111:11, 21; 113:3, 18; 119:18; 123:8

**answered** [1] 119:20

**answering** [1] 4:24

**answers** [2] 4:22; 123:14

**anthony** [33] 1:2; 13:23; 14:3; 16:3; 18:5, 10; 22:5; 25:13; 27:1; 28:24; 30:22; 33:24; 34:4, 10, 13; 35:13; 38:16; 40:6;

57:22; 63:2, 6; 67:7, 8, 11; 68:8; 71:4, 24; 72:6; 76:21; 81:8; 83:14; 84:17, 21

**anthony's** [1] 73:1

**anticipate** [1] 7:4

**apologies** [1] 68:7

**apologize** [1] 42:20

**appear** [4] 55:2; 62:7; 92:9, 16

**appearances** [2] 76:22; 77:7

**appeared** [1] 123:5

**applied** [1] 57:4

**approval** [1] 101:23

**approved** [3] 102:4; 112:4; 123:16

**april** [14] 8:5, 7, 14, 17, 21; 9:6, 16, 22; 11:25; 12:2, 3, 8; 59:2; 98:15

**area** [30] 62:8; 63:10, 11, 14; 65:16; 72:11, 16; 82:15; 86:23; 95:23; 96:12, 20; 99:14, 24; 100:3; 101:3, 10; 108:17; 109:7; 110:17, 20; 115:20, 23; 116:7, 8, 12, 13, 15; 118:7

**arraign** [1] 25:2

**arraigned** [8]
15:24;    16:1,
13;    18:22;
20:25; 68:6, 7;
75:11
**arraignment** [6]
17:23; 68:4, 6;
76:3, 9, 14
**arrest** [25]
16:4; 20:8, 12,
16, 22; 21:25;
22:14, 15, 22;
31:22;    40:7;
59:25;  60:14;
64:1;    68:19,
20;    81:19;
83:11;  86:25;
87:4, 9, 20, 23;
92:6; 119:7
**arrested** [20]
12:7;    15:21;
23:4;    35:14;
37:25;    66:3;
67:7,  11,  15,
18;    72:21;
73:2;    75:6;
79:7,    23;
80:14,    25;
81:5, 9; 86:19
**arresting** [3]
80:1;    87:15;
121:19
**arrests** [4]
83:22;    84:1;
85:20, 21
**arrival** [1]
40:7
**aside** [3]
33:23;  48:22;
77:7
**assessed** [1]
97:4
**assign** [1] 82:4
**assigned** [2]
7:22, 23
**assistance** [6]
7:3, 8;  86:24;
87:4, 14
**associates** [1]
2:5

**attached** [2]
90:22; 111:2
**attachment** [1]
55:3
**attempted** [6]
78:5;    84:14,
18, 22; 85:6;
100:21
**attended** [1]
77:10
**attention** [1]
39:20
**attorney** [7]
4:18;    48:19;
53:24,    25;
102:4; 108:14;
112:3
**attorney's** [3]
5:9;    34:17;
101:25
**attorneys** [1]
123:9
**austin** [1] 2:2
**authorities** [1]
103:4
**authority** [1]
87:9
**avenue** [1]
60:21
**average** [1]
89:1
**aware** [8]  8:4;
9:4;    12:1;
29:22;  72:22;
98:8, 9; 106:24
**away** [4]  69:1;
95:10;   96:6;
105:1

———————

- B -

**background** [2]
21:19;  58:23
**backup** [1]
13:1
**bail** [19]
16:17, 20, 21;
17:24,    25;
19:1;    75:14,
23;   76:6, 13,

18;    101:14;
102:11, 13, 14;
111:9, 14
**balance** [11]
39:25;  40:11;
41:5, 13, 17;
42:1,  6,  12;
49:17; 52:19
**bank** [1] 100:3
**barasky** [187]
1:2;   14:3, 8,
14, 17;  16:3,
4;    18:5, 11,
21;    22:5, 18,
23;    24:1;
25:9, 13, 24;
26:2, 18; 27:1;
28:24;   29:9;
30:15, 17, 22;
31:13,    23;
32:2, 6, 9, 12,
16,  20,  23;
33:5, 15, 24;
34:5,  14,  22;
35:5,  10,  14,
16, 18;  36:16,
22;  37:12, 20,
23;    38:4, 10,
16,  18,  20;
39:16,    22;
40:6,  10,  14;
41:1,  12,  22;
43:23;  44:25;
45:3;    46:17;
47:5,  6,  7;
50:15,    21;
52:4;  53:6, 17;
54:4, 7;  57:22;
58:1,  11,  13;
59:25;  60:14,
17;    62:19;
63:2,  6,  11;
64:12,    25;
65:3;  66:2, 25;
67:7, 8, 11, 14,
18, 21;  68:2;
69:6;  71:4, 17;
72:6,  10,  15,
19;   73:5,  9,
18, 21;  74:1;

75:11,    76:9,
21;    77:4,  8,
11;    78:24;
79:7, 8, 18, 23;
80:2, 8, 10, 14,
24,  25;   81:4,
9,  14;   82:9,
14, 15, 23, 24;
83:15;   84:18,
21;    86:17;
90:3;  92:6, 17;
95:13,    17;
96:15;   97:15;
98:14, 16, 22;
99:2, 4, 7, 10,
11,  18,  21;
100:23;
101:13;  102:2;
105:22;  106:5,
10; 108:17, 21,
22;   109:4, 8;
110:3,    13;
111:16;
115:20;
116:18;
117:15;  118:9;
119:8;   120:2,
8,  16,  22;
121:1,  11,  19,
20
**barasky's** [23]
13:23;    19:1;
31:16,    22;
34:10,    18;
57:23;    62:9;
63:19;    64:1;
66:12;    68:9,
23;    69:3;
70:13,    19;
71:24;  75:23;
81:19;   85:1;
93:22,    24;
109:23
**based** [12]
39:5;    44:4;
47:9;   50:17;
57:1;   72:13,
14;   75:14, 22,
24;    99:7;
118:4

**became** [1]  8:4

**beginning** [1] 1:16

**behind** [1] 100:4

**belief** [4] 78:9, 10;    100:25; 101:2

**bell** [26]   1:6; 2:7;      6:19; 7:19;   12:14; 22:19;   23:24; 24:12,    23; 26:25,      27:4, 21;  28:4, 5, 6, 11;    61:6; 64:22;    65:5; 67:20,    69:5, 18, 23;   80:8; 89:15, 18

**bell's** [1] 81:21

**beside** [1] 9:21

**best** [14]   9:1; 10:19;  12:5, 6, 16;      14:6; 20:1;    23:22; 27:4;    28:10; 55:1;    61:2; 80:7, 12

**better** [3] 47:18;    49:4; 118:9

**between** [21] 4:2;  8:21;  9:6, 22;      19:6; 20:3;    21:16; 29:8;    35:10; 37:20;    38:4; 40:6;  50:7, 21; 61:14;    62:19; 72:20;    75:2; 85:25;    89:1; 111:6

**beyond** [1] 36:7

**big-time** [1] 97:22

**black** [1]  38:15

**blank** [5]  1:15; 114:16;   123:4, 15, 23

**blue** [1]  36:19

**bottom** [7] 39:21;  44:3, 4; 49:22;   51:12; 55:15;  115:1

**bought** [2] 11:6;  57:21

**bound** [1] 78:19

**bread** [5]  29:3; 36:25;    37:5; 51:24;  52:13

**break** [5]  5:1; 50:11;   61:18, 19, 22

**brent** [2]  63:8; 96:4

**brentwood** [6] 8:19;    11:14; 21:4;    62:14; 95:14;  114:25

**brief** [11] 13:4;  23:5, 8, 11;      24:17; 27:8,   9, 25; 64:19,    21; 65:13

**briefed** [2] 22:21;  24:5

**briefing** [14] 23:14,  19, 23; 27:19,    28:7; 29:12,  14, 18; 30:7;      60:3; 81:17,  20, 25; 82:3

**bring** [6] 21:23;   40:18; 67:6, 10;  82:7; 99:19

**bringing** [5] 33:12,    21; 59:23,    79:3; 99:4

**brought** [4] 13:23;    79:9, 18;  105:10

**bureau** [4] 16:15;  90:4, 6, 9

**buses** [1] 95:19

**busts** [1]  23:7

**busy** [1]  95:23

**butts** [1]  81:15

**buying** [3] 40:10;    45:1; 67:12

**buys** [4]  10:3; 21:21;    33:11, 20

─────────────

- C -

**calls** [5] 22:18;   29:8; 32:25;  34:1, 4

**cannot** [1] 55:18

**canvas** [1] 110:16

**captain** [4] 22:19;   67:20; 81:2;  89:18

**care** [3]  39:24; 40:11;  49:17

**career** [3] 85:2, 7, 13

**carried** [2] 68:14, 17

**case** [20]   1:6; 13:4;      18:23; 23:18,     24:4; 34:17,    18; 54:1;      72:20; 80:1;    83:15; 85:1;    89:19; 91:8;    99:23, 9,    17; 111:6,  13:15

**cases** [1] 85:18

**categorizing** [1]  57:1

**cell** [13]  69:7, 16;   70:8, 13;

**77:21;    80:10; 112:17;  117:1, 19;    118:22; 119:4,    24; 120:9

**certain** [1] 58:7

**certification** [1]  4:4

**certify** [2] 123:5, 12

**change** [4] 20:24;  99:5; 106:16;  108:8

**changed** [1] 95:6

**changes** [2] 20:21;  26:24

**character** [2] 37:2;  42:7

**characterization** [1]  95:7

**characterize** [2]    96:20; 116:12

**characterized** [1]  98:23

**charge** [9] 19:2;   77:24; 78:19;   81:13; 84:7,  11, 17, 22;  111:22

**charged** [5] 16:24;    18:10; 85:2, 5;  111:23

**charges** [20] 15:3,  8, 12, 21; 16:10;    18:19; 20:7,    24:25; 55:19;    56:1; 77:11;  94:20, 22, 25;  95:9; 102:4;  113:13; 114:2,    7; 121:17

**charging** [4] 71:3;   78:24; 84:21;  111:19

**cheaper** [2] 107:12, 13

**check** [2] 58:23; 116:15
**chief** [1] 80:23
**child** [1] 96:2
**chose** [2] 22:3; 24:11
**christopher** [2] 1:7; 2:11
**ci's** [1] 94:3
**circle** [4] 115:7, 12, 23; 116:8
**circled** [1] 116:2
**circumstances** [1] 23:13
**citizen** [1] 110:8
**city** [6] 1:9; 2:7; 7:13, 14, 23; 54:10
**claimed** [2] 10:23; 11:9
**clarify** [2] 42:5, 8
**clear** [3] 17:13; 36:8; 47:4
**cleared** [2] 66:1; 77:3
**clearer** [4] 47:16, 25; 48:18, 20
**client** [1] 16:3
**clint** [1] 12:15
**clinton** [5] 1:6; 2:7; 70:1; 81:7, 8
**close** [1] 96:6
**code** [4] 17:3; 18:12; 36:16; 84:8
**cogan** [1] 8:19
**collective** [4] 27:9; 65:4, 8, 12
**coming** [4] 21:5; 22:8; 66:18; 95:19

**commission** [1] 123:24
**committed** [1] 84:14
**committing** [1] 56:4
**common** [4] 78:19; 93:19; 100:14, 15
**commonwealth** [1] 123:2
**communicate** [1] 81:13
**communicating** [1] 60:13
**communication** [13] 17:2; 18:11; 19:8; 34:22; 40:20; 60:15; 66:17; 71:4; 78:10, 11, 25; 84:7; 85:3
**communications** [1] 19:9
**complaint** [13] 17:20; 71:3, 17, 20, 23; 78:22; 89:23; 101:13, 15, 24; 102:3; 111:3; 112:5
**complete** [2] 21:8; 90:1
**completely** [1] 79:12
**compliance** [1] 57:9
**complied** [2] 116:1; 118:15
**comprehensive** [1] 56:16
**computer** [3] 47:14; 48:18, 19
**concern** [1] 61:14
**concerned** [1] 64:25

**concerns** [1] 59:19
**concluded** [1] 122:3
**conclusion** [1] 70:7
**condition** [1] 59:5
**conditions** [1] 103:12
**conduct** [2] 56:16; 105:13
**conducted** [2] 56:20; 79:12
**confidential** [55] 8:10, 17; 15:6; 19:12, 15; 21:8, 12, 13, 16, 17, 18, 20, 24; 22:1, 4, 10; 26:15; 27:10; 30:5; 37:15, 19; 40:17; 54:12; 56:5, 8, 11, 14, 16, 19; 57:2, 20; 58:19, 22; 59:21; 60:6; 74:21; 75:2, 3; 83:18; 85:13, 17, 22, 25; 86:1, 13, 21; 94:3, 7; 97:21; 105:20; 112:22; 113:19
**confirmed** [2] 54:4; 93:13
**confront** [1] 39:17
**connecticut** [1] 2:6
**consent** [1] 69:3
**consider** [1] 94:16
**consideration** [3] 95:21; 98:1; 105:11
**considered** [1] 72:19

**considering** [2] 94:19; 97:4
**consisted** [1] 19:10
**contact** [11] 7:3; 8:1, 13, 24; 9:2; 19:6; 20:16; 22:8; 40:14; 98:25; 106:21
**contacted** [4] 24:12; 32:10; 70:12; 73:18
**contacts** [2] 72:19; 97:18
**contents** [1] 29:14
**continue** [2] 83:1; 103:5
**continued** [1] 2:1
**contraband** [3] 70:13, 15, 19
**contradicted** [1] 107:6
**control** [6] 22:7; 28:14; 33:11, 20; 83:12; 121:13
**controlled** [11] 8:8, 14, 22; 17:4; 21:21; 26:20; 84:19, 23; 85:6; 92:22; 104:9
**conversation** [6] 13:25; 14:3; 38:3, 8; 46:12; 53:18
**conversations** [3] 14:13; 20:3, 6
**cool** [1] 43:11
**cooperate** [6] 20:9, 13, 19; 24:11; 25:1, 7
**cooperated** [1] 18:4

**cooperating** [3] 15:6; 20:17; 103:4

**cooperation** [2] 89:3; 103:12

**copy** [9] 10:10, 14; 17:20; 31:3, 12; 36:3; 54:15; 55:3; 71:16

**corner** [2] 36:13; 115:1

**correct** [41] 5:13; 6:9; 7:10; 10:25; 12:9; 15:5, 10, 11; 17:6; 20:5, 18; 21:1; 23:15; 26:12; 33:19; 40:24; 51:22; 54:6; 56:2, 10, 21; 59:7; 65:21; 69:4; 70:17; 74:23; 76:11; 77:17; 86:11; 89:20; 91:10; 93:17; 96:13; 98:18; 101:25; 103:16; 104:1; 113:9; 117:3, 7; 119:3

**correctly** [3] 23:2; 96:23; 103:9

**corroboration** [1] 86:12

**cosmetic** [2] 17:2, 5

**counsel** [3] 1:22; 2:1; 4:3

**county** [9] 1:8; 5:8, 11, 22; 69:6; 70:12; 77:22; 80:9; 123:1

**couple** [1] 4:17

**coupled** [1] 99:14

**court** [8] 1:1; 15:19; 75:10; 76:21; 77:7; 78:19; 80:20; 123:15

**courtesy** [1] 4:24

**covered** [1] 43:16

**crash** [1] 26:3

**created** [3] 52:7; 59:24; 82:9

**creek** [3] 60:20; 82:10; 100:1

**crime** [4] 78:9, 11; 85:3; 111:19

**crimes** [6] 16:25; 17:3; 18:12; 56:4; 84:2, 8

**criminal** [40] 11:23; 12:2; 15:3, 12, 21; 17:2, 20; 18:11; 29:15, 19, 22; 31:16; 34:18; 54:1; 55:18, 25; 58:23; 71:3, 4, 17; 73:1; 74:9; 78:9, 11, 22, 24; 81:12; 84:7; 85:2; 89:23; 101:13, 15, 24; 102:3; 111:2; 112:4; 113:13; 114:2, 7; 121:17

**cross** [1] 3:2

**cross-examination** [2] 89:10; 93:8

**currency** [1] 21:22

**current** [1] 73:9

**custody** [5] 13:12; 24:9; 116:18; 119:21; 121:20

**customers** [2] 107:19; 108:2

— D —

**d-e-n-t** [1] 5:6

**daily** [2] 94:6; 100:16

**date** [7] 19:6; 35:6; 43:15; 45:23; 46:4; 83:11; 84:25

**days** [3] 16:9; 52:20; 68:18

**deal** [7] 22:18; 27:1; 50:16; 63:12; 103:2; 105:16; 120:9

**dealer** [13] 37:6; 72:10, 15; 73:10; 83:11; 97:22; 98:2, 3, 23; 99:12, 18; 105:23; 106:6

**dealers** [3] 41:10; 52:10; 103:2

**dealing** [1] 73:14

**dealings** [1] 99:16

**decided** [12] 20:13; 22:6, 17; 60:16; 64:11, 15, 17, 19; 65:2; 66:21; 95:9; 114:3

**decision** [8] 75:14; 22; 95:2, 3; 102:14, 15, 16; 111:9

**deem** [1] 86:10

**defendants** [4] 1:9; 2:4, 7, 10

**defense** [2] 111:1, 6

**defenses** [1] 101:16

**definitely** [2] 34:25; 100:17

**definition** [1] 55:11

**degree** [2] 18:15; 103:24

**deliver** [8] 32:24; 33:5, 10, 12, 16; 63:2, 7; 79:4

**delivery** [5] 78:5; 84:14, 18, 22; 85:6

**demonstrated** [1] 39:13

**dennehey** [1] 2:9

**dent** [15] 1:6, 13; 2:4; 3:2; 4:10, 14; 5:6; 59:8; 62:6; 89:4, 12; 93:10; 114:23; 118:20; 123:6

**department** [9] 6:24; 7:12; 27:8, 13; 65:16; 67:22; 81:3, 19; 90:5

**depiction** [4] 43:18; 45:19; 49:11; 118:9

**deposed** [1] 4:14

**deposition** [6] 1:13; 5:2, 17; 122:3; 123:11, 13

**describe** [4] 6:23; 58:5; 104:21; 105:3

**described** [4] 22:19; 56:9; 67:20; 85:24

**despite** [1] 114:6

**detective** [26] 4:14; 5:8, 22; 6:8, 10, 13; 9:9; 62:6; 72:14, 17, 18, 25; 80:13; 89:4, 12; 93:10; 99:15; 100:22; 114:23; 118:20; 119:21, 22, 25; 120:15, 17; 121:16

**detectives** [1] 65:7

**determine** [2] 86:15; 121:6

**developed** [3] 22:22; 26:14, 21

**development** [10] 23:18; 61:2, 10, 11; 64:16; 82:20; 95:14, 17; 96:4; 114:25

**devised** [1] 24:14

**difference** [3] 21:16; 75:2; 85:25

**different** [3] 56:8; 87:13; 99:6

**difficult** [2] 101:8, 9

**dime** [1] 108:9

**direct** [9] 3:2; 4:12; 39:20; 40:2, 5; 66:16; 69:5; 76:17; 107:23

**directed** [2] 52:1; 69:8

**direction** [5] 51:19; 66:13;

81:20, 22; 123:18

**directions** [1] 60:21

**disclose** [1] 30:3

**disclosed** [3] 24:22; 29:13, 24

**discovered** [1] 14:23

**discovery** [1] 34:16

**discussed** [3] 69:13; 74:4; 105:21

**discussion** [1] 42:23

**dismissed** [2] 77:25; 81:14

**distinction** [2] 111:6; 113:17

**distribute** [1] 17:1

**district** [9] 1:1; 5:9; 34:17; 53:25; 101:24; 102:3; 108:14; 112:3

**docket** [1] 15:14

**document** [20] 10:6, 19; 17:7, 9; 31:6; 35:24; 42:16; 45:9; 49:5, 15; 54:18; 56:23; 57:3; 59:9, 12; 62:2; 71:9; 75:10; 90:18; 114:18

**documentation** [1] 57:9

**documented** [6] 32:5; 33:23, 25; 57:5, 13; 109:19

**documents** [1] 53:24

**done** [10] 10:12; 16:2; 17:17; 59:1, 2; 61:5; 68:25; 91:14; 117:14; 122:2

**down** [3] 58:16; 63:10; 123:14

**drafted** [2] 48:17; 71:2

**drive** [7] 8:19; 11:14; 21:4; 62:14; 95:14; 96:4; 114:25

**driver's** [1] 72:5

**driving** [2] 90:3; 95:22

**drop** [2] 65:24; 78:6

**dropped** [2] 8:18; 60:11

**drove** [2] 65:24; 77:1

**drug** [34] 17:1, 5; 37:5; 44:16; 46:22; 50:18; 52:9, 11, 14; 72:15, 20, 24; 73:4, 10; 83:8, 10, 11; 84:2, 13, 15; 85:17; 86:19; 98:23; 99:12, 18; 103:2, 7; 105:23; 106:5, 24; 108:18; 109:13; 120:9

**drugs** [69] 11:6; 21:14; 22:2; 32:6, 20, 24; 33:6, 10, 12, 16, 21; 38:9; 39:18; 41:12, 17, 22, 23; 44:17, 19, 24; 45:1; 46:23, 25;

47:5, 6, 7; 48:25; 50:16, 25; 51:2, 10; 52:5; 53:2; 54:4; 63:2, 7; 67:12; 70:9; 77:15; 78:1, 15; 79:8, 9, 18; 86:22; 92:5, 9, 19; 93:20, 21, 25; 99:4, 20; 100:11; 103:14; 105:2, 5; 107:3; 108:19; 109:9, 23; 110:13; 111:8, 18, 23; 112:18; 116:9, 16

**duly** [3] 4:11; 123:7, 13

**during** [24] 5:1, 17; 8:13; 9:2; 13:15, 24; 14:3; 17:23; 26:7; 32:1, 13, 17, 19, 21, 24; 33:16, 25; 34:3, 21; 38:1, 7; 40:9; 64:1; 76:2

**duties** [1] 8:1

**duty** [1] 6:5

_____

- E -

**eckard** [8] 82:9, 24; 83:1; 96:12; 101:3; 110:14; 115:3; 116:3

**eight** [1] 8:8

**either** [6] 32:25; 43:6; 47:4; 53:24; 68:21; 120:19

**elicit** [2] 52:4, 12

**embankment** [1] 96:24

**employed** [3] 5:7, 21; 6:12

**employment** [2] 88:4, 10

**encountered** [1] 99:15

**encounters** [1] 45:3

**ended** [1] 68:8

**ending** [1] 73:1

**enforcement** [5] 5:10, 11; 27:7; 99:14; 109:7

**enlist** [1] 7:17

**ensued** [1] 96:1

**ensure** [1] 69:6

**entered** [3] 95:17; 105:22; 106:10

**entire** [8] 22:25; 27:15, 17; 30:21; 54:22; 56:6; 60:6; 105:10

**entry** [1] 115:3

**equipment** [1] 116:4

**ervin** [4] 1:15; 123:4, 15, 23

**especially** [1] 100:17

**esquire** [4] 1:23; 2:2, 5, 8

**essential** [1] 64:9

**essentially** [2] 13:2; 28:6

**estimate** [4] 83:22; 85:9, 22; 88:24

**everybody** [2] 27:6; 82:4

**exact** [6] 12:18; 46:4;

52:3, 7; 53:14; 63:16

**exactly** [2] 64:7; 82:20

**examination** [5] 3:3; 4:12; 103:19; 118:2; 120:13

**example** [3] 23:17, 18; 109:22

**except** [3] 4:5; 20:2; 76:21

**excluding** [1] 88:8

**excuse** [2] 78:10; 98:15

**exhibit** [42] 3:14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25; 10:7; 17:8, 10, 15; 31:7, 20; 35:23, 25; 39:21; 42:17, 21; 45:10; 46:12; 48:1, 2; 49:3, 6, 20, 24; 54:16, 19; 62:3, 7; 71:7, 10; 74:4; 90:19; 107:22; 114:19, 22

**exhibits** [1] 3:12

**exit** [1] 82:15

**experience** [4] 83:21; 85:17; 86:2; 100:10

**expertise** [1] 65:16

**expires** [1] 123:24

**explain** [5] 21:15; 75:1; 84:10; 95:14; 102:23

**explained** [1] 66:17

**extensive** [3] 85:16; 117:13, 21

**extra** [2] 44:17; 52:16

**extreme** [1] 103:24

**eyes** [1] 92:15

- F -

**face** [1] 36:25

**face-to-face** [1] 8:13

**facility** [8] 17:3; 18:11; 71:5; 78:11, 25; 81:13; 84:7; 85:3

**fact** [6] 39:17; 65:20; 92:18; 99:18; 111:6, 8

**factors** [4] 76:1, 5; 111:12, 13

**fair** [3] 88:21; 95:7; 116:5

**falling** [3] 92:13; 103:25; 105:6

**familiar** [2] 84:6; 96:3

**fear** [1] 103:8

**felony** [4] 18:15; 78:6; 84:13, 14

**felt** [2] 22:9; 99:3

**fentanyl** [35] 10:24; 11:2, 10; 13:16, 20, 24; 14:17, 24; 37:17, 22; 38:15, 18, 20; 39:3, 7, 8, 16; 53:4, 11; 57:21; 58:13; 73:22; 75:7; 79:4, 15; 93:25; 98:17;

99:19; 100:7; 101:9; 107:12, 14, 19; 108:2

**ferren** [1] 2:5

**field** [2] 96:24; 100:3

**figure** [1] 15:15

**figured** [1] 60:19

**file** [1] 15:12

**filed** [14] 15:21; 16:10; 17:20; 18:19; 68:11; 71:17, 20; 75:9; 78:22; 81:13; 84:11; 94:22, 24; 101:13

**filing** [5] 4:4; 15:3, 8; 84:17; 121:17

**fill** [1] 91:2

**filled** [4] 21:18; 89:22; 90:13, 14

**finding** [1] 78:14

**fine** [8] 4:21; 39:23; 46:9; 49:16; 88:16, 18; 118:12, 14

**finish** [1] 61:20

**finished** [2] 60:4; 71:14

**firm** [2] 1:17; 2:2

**first** [11] 8:4; 20:15; 21:2; 22:11; 30:4, 8; 44:8; 55:13; 58:12; 89:8; 123:6

**fled** [1] 72:16

**flee** [8] 22:6; 60:19, 21, 24; 61:11; 64:15, 25; 82:20

**fleed** [1] 26:2

**fleeing**    [2]
26:3;  72:20
**flight**    [5]
79:13,    14;
100:6;  111:14
**flip** [1] 108:8
**follow-up**    [1]
103:21
**following**    [2]
16:1;  91:15
**follows**    [1]
4:11
**foot** [1]  26:3
**foregoing**    [1]
123:10
**forest**    [1]
116:13
**forget**    [2]
100:2;  107:22
**forgive**    [2]
27:21;  61:17
**form** [23]  4:5;
25:20;    30:10;
33:1,  7;    41:7,
19;        42:4;
55:20;    57:11;
62:16,    21;
66:14;    67:3;
73:11;    75:16;
78:2;      79:1;
82:17;  106:13;
107:8;  111:10;
113:1
**forms** [1]  26:4
**formulate**    [2]
105:7, 8
**forth**    [1]
123:10
**found**    [10]
68:1;    69:14;
70:18;    77:15;
78:1;    79:14;
99:21;    111:7,
18;  112:19
**four** [3]    64:9;
68:18;  73:5
**fourth**    [2]
1:18;  2:3
**frame**    [2]
34:21;  40:9

**free** [1]  74:5
**friday**    [1]
68:20
**front**    [5]
15:17;    41:10;
62:6;  78:23
**fronted**    [2]
41:12, 14
**fuck** [2]  39:23;
49:16
**full** [4]    4:24;
31:16;    73:24;
74:3
**full-time**    [1]
7:21
**function**    [4]
92:14;  104:24;
105:5, 18
**functions**    [1]
105:13
**future**    [1]
102:25

- G -

**gabapentin** [1]
8:9
**gardner**    [14]
1:7;        2:7;
12:15;    70:1;
81:7;    89:15;
102:3;    112:4,
7,  10,  18,  21,
24
**gather**    [1]
63:22
**general**    [10]
62:8,      13;
63:14,      18;
66:12;  86:6, 7,
16;    104:12;
111:17
**given**    [5]
11:12;    16:17;
21:11;    34:18;
108:13
**giving**    [5]
4:23;  9:19, 20;
86:10, 18

**glare** [3]  43:2,
16;  48:11
**gone**    [6]
19:14;  25:2, 4;
77:2;    100:18;
104:4
**good**    [8]
41:14;  48:5, 6,
12,  13;  69:16;
89:12, 13
**grams**    [9]
14:24;    52:24,
25;    53:4,  10;
73:22;    79:4,
15;  100:7
**greenish**    [1]
36:19
**ground**    [1]
4:17
**gryskewicz** [57]
1:23;        3:4;
4:13;        10:9;
17:12;    25:22;
30:13;    31:10;
33:2,  13,  22;
34:9;      36:2;
41:16,    24;
42:9,  19,  25;
45:13;    47:16,
19,  22;    48:2,
10;      49:9;
54:23;    55:23;
57:14;    61:21;
62:5,  17,  25;
66:23;    67:5;
71:12;    73:16;
75:20;    76:4;
78:8;      79:6;
82:22;    83:7;
88:20;    89:2;
103:20;
106:18;
107:16;
111:15,    24;
113:5;  114:10;
118:3,    16;
119:13;
120:14;
121:23;  122:1

**guard**    [1]
96:24
**guess** [7]  23:9;
24:22;    40:21;
61:13;  106:15;
113:17;  114:22
**guys** [1]  40:23

_____

- H -

**h-m-u**    [2]
44:13;  46:19
**half** [2]  43:11;
96:11
**hand**    [1]
123:20
**handed**    [1]
57:8
**handle**    [1]
22:2
**handling**    [2]
21:14;  54:12
**happening**    [3]
23:15;  28:1, 22
**hard** [2]  100:7;
105:17
**harder**    [1]
42:19
**hartford**    [1]
2:6
**havens**    [22]
1:6;        2:4;
12:15;    23:24;
25:12,  16,  23;
59:8;    69:24;
72:14,  17,  18,
25;    80:13;
99:15;  100:22;
119:21, 23, 25;
120:15,    17;
121:16
**he'd** [2]  63:10,
11
**head**    [12]
32:13,    17;
43:12;    45:17;
46:17;    48:14,
15;      57:7;
66:19;    82:25;
83:5;  97:13

**heading** [1] 29:7

**headquarters** [1] 64:18

**heard** [2] 34:10; 37:7

**hearing** [3] 77:11, 25; 78:18

**heavily** [2] 101:6; 116:13

**heavy** [1] 103:7

**held** [1] 42:23

**help** [5] 7:5, 6, 17; 95:10, 11

**hereby** [3] 4:2, 4; 123:5

**hereunto** [1] 123:19

**heroin** [2] 57:21; 93:25

**himself** [4] 69:19; 92:13; 95:11; 97:24

**hold** [2] 47:13; 81:24

**home** [4] 11:14; 13:17; 53:15; 63:3

**honest** [1] 37:7

**hope** [4] 1:7; 2:11; 20:21; 80:23

**hoped** [1] 25:6

**hour** [2] 43:11; 88:19

**hourly** [1] 88:11

**hours** [10] 13:9, 11; 31:24; 32:10, 19; 33:5; 88:21, 25; 95:19; 110:20

**house** [25] 8:18, 23; 12:11, 21; 14:25; 19:5;

20:8, 10, 12; 21:4, 5; 24:19; 25:17; 26:14, 21; 38:10; 39:4, 8; 55:25; 60:9; 62:20; 63:4, 8; 65:25; 83:1

**houses** [2] 96:6; 104:4

**human** [1] 105:19

**hundred** [7] 57:22, 25; 58:10, 17; 60:22; 63:4, 17

**hundreds** [3] 10:5; 33:11, 20

- I -

**idea** [2] 69:16; 99:22

**ideal** [1] 103:14

**identification** [12] 10:8; 17:11; 31:8; 36:1; 42:18; 45:11; 49:7; 54:20; 62:4; 71:11; 90:20; 114:20

**identified** [3] 42:21; 49:3; 54:16

**identify** [4] 31:19; 35:22; 67:6; 115:9

**image** [2] 114:23; 115:10

**immediate** [2] 6:17; 7:20

**immediately** [5] 15:4; 34:22; 91:15; 99:2; 109:24

**impaired** [9] 92:23; 104:3,

10, 15, 18, 23; 105:5, 13, 17

**impairment** [1] 105:15

**impound** [5] 68:24; 90:5, 7; 91:20; 92:1

**inability** [1] 102:24

**incident** [1] 26:2

**incidents** [1] 86:20

**include** [2] 70:4; 72:16

**included** [5] 31:16; 69:23; 70:1, 24; 77:18

**income** [2] 88:6, 9

**incorrect** [1] 23:20

**indeed** [1] 26:17

**independent** [1] 86:12

**index** [2] 3:1, 12

**indicate** [4] 41:1; 62:23; 63:5, 19

**indicated** [12] 20:9; 31:23; 38:14, 16; 51:5; 53:8; 58:9; 63:6; 66:21; 97:18, 21; 112:15

**indicates** [1] 91:7

**indicating** [6] 38:24; 64:3; 96:14; 115:11, 15; 119:25

**individual** [6] 55:19; 86:11, 18, 22; 110:3

**industry** [1] 94:4

**influence** [4] 92:9, 18; 103:24; 112:25

**informant** [68] 8:10, 17; 9:12, 15, 20; 10:22; 11:1, 5, 13, 17; 13:20; 15:6, 9, 13; 19:12, 15; 21:9, 13, 16, 18, 20; 22:4, 10; 26:16; 37:15, 19; 39:5, 9, 12; 40:17; 56:17, 20, 23; 57:2; 58:24; 59:5, 21; 62:14, 20; 75:3; 79:25; 83:19; 86:1; 97:21; 103:15; 104:3, 4, 15, 19; 105:20; 107:7, 17; 108:1, 3, 5, 11, 12; 110:1, 2; 113:7, 13, 14, 15, 20, 21; 114:8, 9

**informant's** [6] 55:4; 83:1; 104:10, 18, 23; 105:1

**informants** [10] 54:13; 56:14; 58:19, 22; 85:13, 17, 22; 94:7; 108:7

**information** [33] 9:13, 20, 21; 11:12, 16; 21:24; 27:23; 28:3; 55:5, 12, 18; 56:3, 8; 74:13, 18; 77:21; 86:10, 14, 19; 91:11; 92:24; 94:17; 99:13; 103:15; 108:13, 16, 20;

109:6, 11, 15;
110:4; 112:13;
121:6
**injured** [2]
61:12; 95:22
**input** [1] 61:7
**inside** [6]
13:17; 27:25;
28:2; 69:15;
70:9, 25
**instead** [1]
57:2
**instructed** [3]
30:14; 32:2, 13
**intel** [1] 73:13
**intending** [1]
83:16
**intent** [1]
16:25
**intention** [7]
15:5; 18:6;
19:19; 20:15;
28:16; 91:17;
112:16
**interact** [1]
34:13
**interaction** [1]
73:4
**interactions** [4]
31:21; 52:11;
72:15, 25
**intermediary**
[1] 28:6
**interview** [6]
13:15; 14:10;
40:22; 56:16,
20; 86:9
**interviewed** [3]
9:12; 13:13;
38:17
**investigate** [1]
109:24
**investigation**
[33] 6:25; 7:9;
9:6, 8; 10:15;
11:24; 18:5;
21:25; 22:21;
23:6, 10, 14,
25; 24:24;
31:1; 37:14;

58:16; 80:8,
14, 25; 81:4,
9; 87:5, 6, 15,
17; 89:19;
90:1; 92:22;
104:9, 22;
105:10, 15
**investigations**
[5] 7:12; 83:8;
104:3, 14, 18
**involve** [2]
6:23; 7:11
**involved** [3]
8:7; 65:11;
108:18
**involvement** [5]
80:8, 13, 24;
81:4, 8
**issue** [1]
120:25

--- **- J -**

**january** [2]
58:6; 123:25
**jobs** [1] 82:4
**joseph** [2] 1:7;
2:11
**josh** [11] 6:19;
12:14; 24:12;
28:4, 5, 6;
61:6; 64:21;
65:5; 69:18;
81:21
**joshua** [12]
1:6; 2:7; 7:19;
23:24; 24:23;
26:25; 27:4,
20; 28:11;
69:5, 23; 80:7
**judge** [8]
15:25; 75:11;
76:12, 18;
81:15; 102:18;
111:8, 18
**judge's** [2]
102:15, 16
**jurisdiction** [1]
29:21

--- **- K -**

**k-e-v-i-n** [1]
5:6
**keep** [4] 15:17;
109:17, 19, 25
**kensington** [2]
107:11, 14
**kevin** [7] 1:6,
13; 2:4; 3:2;
4:10; 5:6;
123:6
**kids** [3] 95:20,
24, 25
**kind** [3] 23:5;
48:11; 83:19
**kmart** [1] 26:3
**knew** [10]
22:5; 39:3, 17;
54:9; 77:14;
83:16; 99:6,
10; 105:8;
121:16
**knowing** [1]
52:19
**knowledge** [18]
9:1; 12:5, 7;
23:22; 25:13,
16; 27:4;
28:7; 41:18;
55:1; 57:16;
73:9; 80:7, 12;
86:20; 97:16;
99:21; 117:19
**known** [7]
57:16; 72:10;
73:4; 98:23;
100:23;
116:25; 117:4
**kozlowski** [2]
2:8; 93:6
**kriner** [3] 1:7;
2:11; 81:2

--- **- L -**

**ladder** [1] 98:3
**lampman** [1]
1:23

**large** [2]
53:11; 107:13
**last** [9] 6:6;
14:16; 20:6;
66:19; 73:4;
76:20, 23;
88:4; 94:13
**laughlin** [13]
2:5; 3:5; 48:1,
3; 89:7, 11,
14; 90:17, 24;
93:4; 118:19;
119:10; 121:24
**lawsuit** [2]
53:25; 89:15
**lawyer** [1]
111:5
**laypersons** [1]
105:4
**leading** [1]
21:24
**learned** [2]
13:5; 56:23
**least** [11]
25:3; 26:1;
27:5; 31:12;
34:16; 39:11,
24; 49:17;
75:14, 23; 88:2
**left** [1] 40:12
**left-hand** [1]
36:13
**lego** [1] 37:2
**lend** [1] 65:16
**lengthy** [1]
74:9
**leonard** [1]
1:23
**lepley** [2]
17:24; 18:3
**lewisburg** [1]
123:16
**license** [1]
72:6
**life** [1] 100:20
**lifestyle** [1]
103:7
**likely** [2]
15:12; 43:15
**line** [1] 109:13

list [4]   54:15;
73:3;   74:20;
101:16
listed [3]  13:6;
71:24;  74:21
listen   [2]
39:23; 49:15
lived   [4]
29:21;   54:9;
62:8, 14
living [1]  54:7
local [4]   6:24;
7:11, 18;  65:15
locate   [1]
110:21
located   [2]
26:4; 67:19
location   [9]
60:16;   61:2;
62:13,   19;
63:18;   64:13;
65:3, 22;  67:1
longer   [1]
20:17
look   [19]
10:11;   17:16;
35:11,   13;
38:11;   47:22;
48:5;   55:11;
60:25;   67:10;
71:13;   74:5;
82:8;   88:14,
15, 17;  106:1;
110:22
looked   [3]
35:4, 15;  106:6
looking   [7]
45:25;   48:6,
13, 17;   55:2;
107:19;  108:2
looks [1]  116:3
louisa   [1]
71:24
lycoming  [40]
1:8;   2:10;   5:8,
11, 22;   6:24;
7:15;   12:18,
20;   27:6,  7,
13;   28:8, 22;
29:4, 9, 12, 18,

22;   30:1;
59:24;   60:3,
20;   64:20;
65:10;   67:21;
69:6;  70:4, 12;
77:22;   80:9,
23;   81:3, 18;
82:10;  97:17;
100:1;  120:23

- M -

magistrate [10]
15:25;   16:12;
18:3, 22;  19:1;
71:20;   75:10,
13, 22;  78:18
main   [1]
111:13
maintained [2]
91:9, 25
makes [1]  73:8
male [1]  38:15
manning   [1]
41:11
manpower [2]
7:1, 8
march   [2]
1:16; 123:20
marihuana [1]
13:17
mark [3]   2:8;
17:15; 118:7
marked   [19]
3:13;   10:7;
12:24;   17:10;
31:7;   35:25;
42:17,   20;
45:10;   49:6;
54:19;   59:8;
62:3, 7;  64:23;
71:10;  90:19;
114:19; 118:11
marker   [1]
62:13
marking   [1]
17:8
marshall   [1]
2:9
matter [1]  89:6

matthew   [11]
8:1, 5, 8, 18,
24;   9:13, 16,
21;   17:21;
29:25; 79:8
mccormick   [2]
1:17; 2:2
mean   [28]
12:14;   16:21;
21:19;   37:11;
41:9;   44:16,
18;   46:24;
47:21;   52:16,
23;   63:15;
66:8;   69:12,
20;   72:3;
86:4;   87:23;
93:18;   98:8;
100:16;
104:11;
105:16;
106:16;  108:6;
110:18;
111:12; 113:15
meaning   [4]
21:13;  42:6, 7;
73:21
means   [8]
42:13;   43:7;
44:13;   46:20,
23;   52:14;
58:4; 105:23
meant   [4]
52:21;   53:2;
91:1; 106:24
meet   [18]
19:11, 20, 23;
20:2;   21:2;
23:4;   50:16;
62:19;   63:6,
10;   64:12;
65:3;   67:1;
97:7;   98:17;
104:5;   118:8,
13
meeting   [10]
22:20,   23;
24:17, 21, 22;
26:13;   29:6;

64:18;   98:20,
24
meeting's  [1]
28:22
meets   [1]
63:24
member   [3]
7:21;   12:17;
61:14
members   [10]
12:13, 18, 20;
22:21;   23:5,
24;   24:24;
28:11;   29:17;
69:21
memory   [3]
14:11;   20:1;
28:10
mentioned  [2]
7:19; 56:12
message   [21]
29:1;   35:9;
36:10,   21;
37:20;   40:3;
41:1;  42:3, 13;
44:8, 23;  45:7,
22;   49:23;
50:24;  52:2, 3,
8, 21;   74:3;
99:1
messages  [28]
34:19, 20, 25;
35:3, 20;  36:4,
7,   10,   19;
37:1, 8;   40:6;
41:5;   43:20,
22;   44:2, 5;
46:20;   47:5;
48:24,   25;
49:1,   11;
51:15;   54:3;
73:25;   83:4;
93:12
middle [2]  1:1;
41:11
might   [15]
23:14,   17;
24:2;   27:21;
42:7;   47:17;
51:8;   64:25;

70:9;      90:15;
104:3,     15;
110:13;    111:5;
112:25
**military** [1]  6:4
**miller**    [8]
63:24;    82:14,
16, 25;   96:13;
97:1;     115:3;
116:5
**mind**      [6]
20:21,    24;
26:24;    95:6;
109:20, 25
**minus** [1] 44:2
**minute**    [2]
6:12;   29:2
**minutes**   [2]
110:19;  116:17
**miranda**   [1]
116:19
**missing**   [1]
57:19
**mission**   [1]
82:5
**monday**    [3]
46:1;    48:15;
68:21
**money**     [19]
16:22;    29:3;
41:22;   44:18;
45:2;     46:24,
25;     51:24;
52:14,  16,  17,
21,  23,  25;
53:2,   6,   9;
97:23;  107:12
**month** [1] 6:6
**moosic**    [1]
2:10
**morning**   [2]
89:12, 13
**most** [8]  7:14,
16;      9:23;
38:21;   87:23;
105:16; 108:4
**motion**    [1]
64:22
**motivation** [1]
20:18

**multiple** [2]
10:3; 26:4
**mutual**    [1]
61:13

- N -

**name** [12]  5:4;
13:24;   29:25;
89:14;    90:13,
16, 22;  93:15,
22;     100:2;
106:16
**named**     [3]
38:15;   94:11;
110:8
**names** [1] 9:19
**narcotics** [7]
5:9, 11;  21:23;
26:4;     27:6;
65:7; 72:10
**narrative** [1]
31:13
**narrow**    [1]
58:16
**national**  [1]
116:4
**nature**    [2]
101:14, 21
**navy** [3]  88:7,
8
**necessary** [1]
73:6
**necessitate** [1]
23:14
**need** [4]  5:1;
7:1, 2;  74:5
**needed**    [1]
15:18
**neighborhood**
[1] 95:21
**neu's** [2]  55:3;
56:22
**never**     [25]
27:12;     32:5,
20, 23;   33:5,
15; 34:10, 12;
37:7;    40:22;
53:18;    54:4;
56:20;   59:11;

66:2,   5,   8;
70:18;    74:13,
17;      77:4;
86:13;  112:22;
113:18
**next** [6]  22:16;
36:25;    43:8;
45:7;     52:6;
105:9
**nobody**    [2]
33:11, 20
**nomenclature**
[1] 94:5
**nope** [1] 16:7
**normal**    [4]
23:3;    62:19;
67:1; 105:13
**normally**  [3]
63:2, 6; 118:8
**north** [1] 116:4
**northbound** [3]
60:22, 23, 24
**notary**    [1]
123:4
**note** [1] 32:9
**noted** [1] 72:9
**nothing**   [8]
67:19;    68:1;
69:14;   79:14;
117:15,    21;
121:25; 123:8
**number**    [13]
57:23;   73:19;
74:5;    114:15,
17; 118:23, 25;
119:4,     5;
120:1,     6;
121:7, 11
**numerous**  [1]
34:18

- O -

**o-m-w** [1] 43:7
**objection** [27]
25:20;   30:10;
33:1,  7,  17;
34:7;  41:7, 19;
42:4;    55:20;
57:11;   62:16,

21;      66:14;
67:3;    73:11;
75:16,    25;
78:2;     79:1;
82:17;    83:3;
106:13;  107:8;
111:10,    20;
113:1
**objections** [1]
4:5
**observations**
[1] 98:5
**obstructs**  [1]
48:11
**obtain**    [2]
6:10; 121:5
**obtained**   [3]
11:13;    13:19;
37:17
**obviously**  [1]
55:7
**occasion**   [4]
92:21;    94:2;
100:11; 102:17
**occasions**  [1]
104:8
**occur**     [1]
83:10
**occurred**  [10]
38:5;    50:18;
58:1,     17;
77:12;    78:6,
12;     84:19;
116:15; 117:12
**october**   [75]
5:21;  6:16, 18,
21;   7:15, 20;
15:20;  16:4, 9,
24;     18:10;
19:7, 22;  20:3,
12, 16;   21:3,
9;       24:18;
25:18;   30:15,
23;   31:1, 22;
34:11, 14, 25;
35:3, 5, 11, 14;
40:8;    43:24;
45:22;   49:12;
50:6,  13,  19,
23, 25;   51:2,

10, 13;   53:5;
54:8;   55:25;
58:7;   59:16,
23;   62:9;
67:11;   68:3,
14, 19;   71:3,
18, 21;   72:21;
74:18;   76:20,
24;   77:5, 12,
16;   79:23;
80:15;   81:5, 9;
92:5;   94:16,
24;   97:3, 8;
106:4, 12
**office** [5]   5:9;
19:20;   23:23;
34:17;  101:25
**officer** [18]
6:1, 3, 4;  7:23;
8:2;   59:19;
76:17;   83:9,
21;   84:10;
85:14;   86:25;
87:4, 14, 20;
88:5, 10;  89:19
**officers** [18]
12:10;   13:5;
14:20;   25:5;
29:14;   30:3;
60:14;   63:25;
65:11;   70:5;
87:24;   95:16;
99:14;  108:17;
109:8,   14;
110:16; 116:20
**officially** [2]
40:16; 114:4
**often** [3]  5:12;
7:11;  44:16
**oftentimes** [2]
83:10;  88:22
**okayed** [1]
65:6
**once** [1]  23:1
**ones** [2]  43:9;
51:16
**onto** [6]  60:24;
82:14,   25;
83:1;   97:1;
100:1

**opened** [1]
100:5
**opinion** [2]
97:20; 107:6
**option** [1]
83:14
**oral** [1] 123:8
**order** [1] 61:23
**originally** [1]
24:1
**outside** [8]
13:1;  76:1, 5,
13;   86:20;
103:3;  104:25;
112:14
**overall** [1]
82:2
**overdosing** [4]
104:6, 11, 19,
23
**owed** [4]  41:1,
13;  53:6, 8
**owes** [1]  45:2
**owned** [2]
41:22; 121:6

─── - P - ───

**p.m.** [1] 53:19
**p.o.** [2] 2:6
**packaged** [1]
39:11
**page** [5] 31:12;
55:13;   91:7;
107:23
**pages** [1]
31:15
**panels** [1]
70:24
**paperwork** [7]
19:12,   15;
21:9,   19;
90:12, 14; 91:2
**paragraph** [1]
55:15
**parking** [2]
27:14; 60:5
**parlance** [5]
37:5;   44:16;

46:23;   52:14;
106:25
**part** [8] 20:20;
75:14,   24;
83:8;  87:5, 17;
103:11; 111:9
**particular** [1]
121:9
**parties** [2]
4:3; 123:10
**pass** [1] 62:18
**past** [5] 10:24;
57:23;   65:24;
77:1;  104:2
**path** [5] 79:13,
14;   100:6;
115:25
**patrol** [2]
12:25; 109:13
**pedigree** [1]
108:13
**pending** [4]
55:19;   56:1;
114:2, 7
**pennsylvania**
[9] 1:1, 18, 24;
2:3, 10;  18:16;
26:1; 123:2, 16
**people** [8]
9:19,   21;
28:18;   29:25;
94:4,   10;
105:16; 109:15
**percent** [6]
51:7;   60:22;
64:2;   65:14;
83:24; 120:20
**performed** [1]
101:24
**person** [16]
25:3;  32:6, 21;
46:16;   54:5;
55:17;   67:8;
84:12;   87:21;
93:14;  100:11;
105:4,   12;
111:1,   7;
113:12
**personal** [2]
8:12; 119:24

**personally** [4]
27:12;   34:13;
112:8; 123:5
**perspective** [1]
95:15
**philadelphia**
[9]   10:23;
11:2, 7, 10;
13:20;   37:17,
23;   39:18;
107:11
**phone** [76]
14:12;   19:8;
20:3, 5;   22:1,
18;   24:14;
27:3, 18;  29:8;
30:18;   32:1,
10, 13, 17, 20,
21, 25;   33:4,
14, 16;   34:1,
4, 5, 19, 20;
36:5;   43:20;
45:20;   49:12;
57:23;   69:10,
19;  88:14, 15;
93:15,   23;
94:11;   99:8;
105:22;  106:1,
7, 10, 11, 17,
20;   111:23;
112:7;  118:22,
23, 25;   119:2,
4, 5, 18, 21,
23, 24;   120:1,
6, 8, 9, 15, 16,
17;   121:1, 6,
10, 11, 13, 15,
16, 21
**phrase** [1]
52:9
**phrasing** [2]
52:7, 10
**physically** [1]
76:8
**picked** [3]
91:19, 23;  92:2
**picture** [8]
47:14,   25;
48:18,   19;

49:4;   119:20;
120:5;  121:17
**pictures**    [8]
11:6;     34:23;
39:5,      12;
43:19;    45:19;
53:21
**pills** [2]    8:9,
10
**place** [3]  1:17;
80:9;  96:11
**placed**     [4]
69:7, 16;  70:8;
99:1
**plaintiff**    [4]
1:3,   14,   25;
3:13
**plaintiff's** [34]
3:14,  15,   16,
17, 18, 19, 20,
21, 22, 23, 24,
25;       10:7;
17:8, 10, 15;
31:7,      20;
35:23,     25;
42:17,     21;
45:10;   46:12;
49:3, 6;  54:16,
19;    62:3, 7;
71:10;    74:4;
90:19;  114:19
**plan**      [16]
22:22;   23:6;
24:14;    26:15,
20;  61:5, 6, 7;
64:22;  65:2, 4,
8,  12;   66:25;
82:8;  95:12
**plan's**     [1]
59:24
**playing**    [3]
95:20, 25;  96:1
**pleas** [1] 78:20
**plug**     [23]
36:13,     16;
45:16;   48:13;
50:6,     15;
51:21;    93:15,
18,  19,   23;
94:5, 8, 9, 11;

105:21,    23;
106:10, 20, 24;
118:23;  120:1
**plug's**     [1]
49:23
**plus** [15]  29:3;
37:9, 12;  43:9;
44:9,  15,   17,
18;       45:2;
51:24;    52:16,
24, 25;  53:2
**point**     [22]
7:25;      14:13,
15,   17,   18;
24:12;    25:4;
28:21,     24;
34:8;    40:19;
53:5;    61:17;
65:25;   68:2;
77:2,  3,   14;
95:6,      8;
106:16;  117:19
**police**     [50]
6:1, 3, 4,  24;
7:11, 23;   8:2;
12:10;   16:15;
22:12;    26:1;
27:8,     13;
28:23;    29:4,
13, 18;   30:1;
59:19,     25;
60:3,     15;
63:20,     25;
65:10,     16;
67:22;    70:5;
74:14,     18;
80:24;     81:3,
18;  83:9, 21;
84:10;   85:14;
86:25;   87:4,
14;  88:5, 10,
90:4, 6;  91:25;
109:8,     22;
120:19, 20, 23
**portion**    [1]
43:2
**possession** [2]
16:25;  17:4
**possibility** [1]
37:24

**possibly**    [3]
69:14,    15;
92:15
**posting**    [1]
16:22
**potential**   [4]
95:19,     24;
96:2;  101:16
**pre-recorded**
[1]  21:22
**prefer**     [1]
115:18
**preliminary**  [4]
17:23;   77:11,
25;  78:18
**preplanning** [1]
64:14
**prescription**
[1]  97:23
**presence**    [5]
7:2;       22:2;
34:24;   51:16;
73:18
**present**    [11]
1:22,      2:1;
12:19;   23:12;
30:21;   40:15,
20;  67:14, 22;
76:9, 17
**president**   [1]
81:14
**pretty**     [1]
110:20
**prevent**    [1]
82:21
**previous**   [10]
45:2;     49:23;
72:14;   97:16,
21; 100:19, 20;
109:1
**previously**  [7]
37:15;    56:9;
74:4,      14;
79:18;   81:18;
86:14
**primarily**   [1]
83:12
**prison**     [4]
69:6;     70:12;
77:22;  80:9

**privilege**   [1]
113:1
**probable**   [12]
72:9;     73:7;
75:24;   78:23;
87:20;  101:17,
21;    111:2;
112:1,   11;
121:15, 22
**problem**    [2]
13:4;  45:8
**procedure**  [1]
81:24
**process**    [1]
23:3
**produced**   [12]
10:6;     17:9;
31:6;    35:24;
42:16;   45:9;
49:5;    54:18;
62:2;    71:9;
90:18; 114:18
**production** [1]
59:9
**prohibited** [1]
113:12
**proof** [1]  14:13
**propensity**  [3]
22:6;     61:10;
64:15
**propounded** [1]
123:9
**prospective** [1]
58:24
**provide**    [2]
4:23;  17:24
**provided**   [4]
9:13;      74:13,
18;  86:14
**public**     [6]
1:15, 24;  56:3;
95:16;    123:5,
24
**pulled**     [1]
47:13
**purchase**   [5]
10:24;    11:2;
21:22;   28:14;
98:17

**purchased** [9] 9:16; 14:17; 37:22; 38:9; 39:18; 58:2, 9, 13, 20
**purchases** [3] 39:15; 58:1, 17
**purchasing** [1] 58:10
**purpose** [1] 82:2
**pursuit** [1] 96:1
**putting** [1] 48:22

- Q -

**quantity** [2] 53:11, 14
**quarter** [1] 96:11
**questioned** [2] 66:8; 92:23
**questions** [18] 4:25; 48:17; 61:23; 88:4; 89:3, 5, 17; 92:4; 93:5, 6, 11; 101:12; 102:12; 103:21; 117:24; 121:24; 123:8, 14
**quick** [1] 117:20

- R -

**radio** [1] 60:15
**rail** [1] 96:24
**raise** [1] 59:18
**raised** [1] 101:17
**rang** [1] 120:4
**rank** [2] 6:8, 10
**rapid** [1] 23:18
**rate** [1] 88:12

**re-ask** [3] 33:3; 104:13; 113:16
**reach** [3] 28:23; 30:15; 117:16
**reached** [1] 31:23
**reaching** [2] 30:17, 22
**read** [14] 42:20; 43:1, 2, 5, 8; 44:2; 45:12, 16; 46:4, 8; 48:9, 12; 112:10; 116:19
**reading** [3] 48:23; 54:21; 56:2
**ready** [1] 31:5
**real** [1] 100:3
**really** [3] 93:12; 103:14; 105:12
**rearrange** [1] 61:23
**reason** [13] 12:6; 15:7; 22:3, 9; 26:19; 34:4; 68:22, 25; 80:5; 108:10; 113:22; 114:1; 121:9
**reasoning** [1] 84:17
**receipt** [1] 90:15
**received** [2] 85:12; 120:16
**recent** [1] 38:21
**recently** [1] 11:2
**recess** [2] 61:24; 62:1
**recognize** [1] 114:22

**recollection** [3] 10:20; 12:16; 14:6
**recommendatio n** [4] 17:24; 18:2; 76:6; 102:12
**recommended** [2] 19:1; 102:17
**record** [12] 5:5; 11:23; 12:2; 29:15, 20, 23; 31:16, 19; 42:22, 24; 73:1; 74:10
**record's** [2] 17:13; 47:4
**recorded** [1] 14:10
**records** [4] 91:8, 22, 23, 24
**recovered** [5] 70:13, 16; 117:1, 5; 121:1
**recross** [1] 3:2
**recross-examin ation** [3] 114:12; 118:18; 119:15
**redacted** [1] 55:8
**redirect** [4] 3:2; 103:19; 118:2; 120:13
**reduced** [1] 123:17
**refer** [1] 5:16
**reference** [1] 121:14
**referred** [5] 5:12; 41:5; 42:2; 49:20; 74:24
**referring** [2] 49:14; 109:1
**reflected** [1] 112:2
**reflects** [2] 102:2; 114:23

**regard** [2] 89:15; 92:17
**regarding** [5] 9:13; 10:15; 30:25; 99:3
**regulation** [3] 54:15; 55:4; 57:3
**regulations** [8] 54:12; 56:12, 15, 22; 57:10; 58:22; 113:12; 114:6
**rehab** [14] 18:6, 8; 20:7; 40:12; 41:15; 80:3, 4; 83:17; 95:10; 102:22; 103:2, 13; 113:8, 23
**relapse** [1] 103:8
**related** [3] 72:20; 86:20; 89:19
**relation** [1] 77:15
**relative** [1] 99:11
**relay** [4] 14:19; 28:6; 76:12, 18
**relayed** [4] 27:23; 28:3, 17; 37:16
**releasable** [1] 91:15
**released** [6] 15:2, 7, 14; 16:21; 91:12, 13
**reliability** [3] 59:20; 92:16, 23
**reliable** [10] 9:23; 10:4; 86:3, 11, 16; 97:5, 14; 98:7; 108:4, 7

**remember** [7] 4:21; 14:2; 23:23; 33:24; 64:8; 96:23; 103:9

**rental** [1] 91:16

**repeat** [4] 29:16; 67:9; 75:18; 97:6

**rephrase** [4] 4:20; 35:7; 69:20; 87:3

**report** [27] 10:10, 15, 18; 13:6; 14:6, 11; 16:16, 20; 17:14; 30:25; 31:3, 13, 17, 21; 32:5, 9; 33:23; 38:11; 56:24; 57:4, 5, 15; 60:25; 89:23; 90:21; 91:7; 107:21

**reported** [2] 98:14, 15

**reporter** [3] 15:19; 123:16, 18

**reporter-notary** [2] 1:15; 123:24

**reports** [3] 57:7, 10; 87:22

**represent** [1] 89:14

**request** [1] 77:24

**requested** [1] 86:24

**requests** [2] 87:4, 14

**require** [2] 56:22; 58:23

**required** [1] 101:16

**reserve** [2] 88:8, 9

**reserved** [1] 4:6

**reserves** [2] 6:6; 88:7

**residence** [4] 24:8; 95:4; 96:22; 115:9

**residences** [1] 96:21

**residential** [1] 95:13

**respect** [1] 98:13

**respective** [2] 4:3; 123:9

**respond** [2] 51:21; 53:23

**responds** [1] 50:4

**response** [6] 49:23; 52:4, 12; 87:1; 99:2; 101:17

**rest** [1] 24:15

**restroom** [1] 61:18

**result** [1] 99:22

**resulted** [1] 72:25

**resulting** [1] 26:2

**results** [2] 67:17, 25

**retired** [1] 6:5

**retrieved** [1] 36:4

**review** [6] 31:4; 34:20; 50:24; 57:17; 59:11; 87:22

**reviewed** [3] 43:23; 46:13; 102:6

**right** [56] 5:14; 10:24; 11:14; 13:25; 14:9; 16:18; 17:5; 18:13; 23:10, 19;

31:1; 32:12, 14; 36:8, 11; 37:11, 18; 45:24; 46:14; 51:13; 56:24; 60:24; 63:9, 23; 65:2, 20; 68:11, 25; 74:22; 76:10; 82:10; 85:14; 92:12; 93:16; 94:17; 95:4; 96:14; 97:10; 100:4, 5; 102:4; 103:15; 105:23; 106:2; 107:4; 108:18; 109:11; 111:3; 113:19; 115:1, 14; 117:2, 23; 122:2

**right-hand** [1] 96:25

**ring** [1] 120:2

**risk** [1] 111:14

**risks** [1] 95:15

**road** [32] 60:20; 63:24; 79:16; 82:9, 10, 14, 16, 24, 25; 83:2; 96:7, 9, 12, 13, 15, 23; 97:1; 100:1, 2; 101:4; 110:14, 25; 115:3; 116:2, 3, 5, 20, 25

**roads** [1] 61:1

**roan's** [1] 64:6

**roughly** [2] 14:23; 63:15

**route** [1] 120:19

**rules** [1] 4:17

**ryan** [3] 102:3; 112:4, 7

**safe** [1] 95:24

**satellite** [2] 114:23; 115:10

**says** [19] 33:12, 20; 36:13; 37:9; 39:15; 43:7, 9; 44:9; 45:16, 17, 23; 46:17; 47:15; 48:5, 13; 50:1, 10; 55:17; 110:1

**scale** [1] 63:17

**scene** [4] 66:6, 9; 91:1; 120:22

**school** [1] 95:19

**screen** [4] 34:24; 53:21; 120:6; 121:12

**scrolled** [1] 35:19

**sealing** [1] 4:4

**search** [32] 7:3, 16; 11:13, 19, 22; 14:12; 19:5; 23:7; 30:18; 38:1; 67:17, 25; 68:12, 14, 18, 23; 69:3; 70:21; 77:18; 89:23; 91:14, 15; 108:15; 110:17; 112:16; 116:15, 22; 117:6, 8, 18; 120:25

**searched** [8] 8:23; 67:15, 21; 70:19; 116:22; 117:11, 14, 17

**searching** [2] 13:17; 68:8

**seasoned** [1] 65:7

- S -

**second** [5] 42:22; 47:13; 48:7; 107:23; 113:25

**section** [9] 17:1, 3; 18:12; 55:12; 84:8; 116:2, 25; 117:9, 10

**secure** [1] 76:18

**secured** [5] 19:2; 76:6, 13; 101:14; 102:12

**seem** [1] 96:10

**seized** [3] 39:3, 7; 120:16

**seizing** [1] 91:17

**select** [1] 83:14

**sell** [5] 46:23, 25; 52:4; 100:11; 107:19

**seller** [1] 107:3

**selling** [15] 37:22; 44:24; 47:5, 6, 7; 48:25; 75:7; 86:22; 93:20, 25; 97:19, 20, 22; 109:8, 23

**send** [5] 11:7; 40:2, 5; 52:1; 110:2

**sent** [8] 29:3; 39:5, 9, 12; 44:8; 51:16, 19; 73:25

**sentence** [1] 105:8

**sentences** [1] 105:7

**september** [52] 6:3; 8:22; 9:7, 12, 22; 10:11, 16; 11:3, 17, 20; 12:11; 13:9, 12;

14:19; 17:14; 19:4, 15; 20:3; 35:9; 36:11; 37:8, 16, 21, 25; 38:3, 8, 17; 39:4, 7, 16, 21; 40:6, 13, 25; 42:10; 43:13; 44:3; 45:24; 46:7; 48:16; 53:15; 59:16; 98:16; 106:2, 6, 10; 107:7, 18; 108:1, 11

**sergeant** [1] 81:2

**served** [4] 12:11; 13:8; 19:4; 22:14

**service** [1] 38:1

**setting** [1] 23:4

**several** [3] 10:23; 20:5; 94:13

**share** [1] 25:16

**shawna** [2] 2:5; 89:14

**sheet** [2] 72:4; 86:9

**shortly** [2] 66:20; 98:17

**shoted** [1] 34:24

**shots** [1] 53:21

**shout** [1] 50:2

**show** [14] 10:10; 17:7; 21:6; 29:2; 35:16, 19, 22; 43:24; 45:7; 49:2; 54:15; 61:16; 71:7; 114:14

**showed** [3] 21:7; 48:20; 121:11

**showing** [1] 35:5

**side** [3] 96:24, 25; 115:18

**sign** [2] 40:18; 59:11

**signature** [2] 16:17, 20

**signed** [2] 65:6; 114:4

**significant** [1] 102:23

**signing** [1] 4:3

**signs** [1] 100:24

**similar** [1] 46:12

**simple** [1] 17:4

**sitting** [3] 29:4; 42:1; 105:9

**situations** [4] 45:5; 47:1, 3; 104:21

**size** [2] 100:8; 101:9

**slice** [1] 36:25

**small** [1] 101:8

**sold** [1] 8:8

**solomon** [6] 18:22; 19:1; 71:21; 75:13, 22; 78:19

**solomon's** [1] 75:10

**someone** [5] 56:3; 59:18; 85:5; 103:13; 114:7

**someplace** [1] 62:20

**something's** [1] 57:18

**sometime** [1] 19:22

**sometimes** [2] 23:13, 17

**somewhat** [1] 48:11

**somewhere** [1] 54:10

**sorry** [19] 9:16; 16:6; 24:1, 2; 29:16; 33:19; 60:21; 67:9; 68:5; 74:15; 76:25; 79:21; 87:10; 90:12; 98:9; 100:1; 108:21, 23; 110:25

**sort** [2] 52:9; 59:22

**sought** [1] 102:11

**sound** [3] 73:9; 98:18; 116:5

**sounds** [1] 26:12

**source** [42] 13:24; 21:12, 17, 24; 22:1, 4, 12; 26:15; 27:10; 30:5; 55:12, 18; 56:3, 5, 7, 9, 12; 57:2, 20; 74:22; 75:2; 80:1, 5; 83:18; 85:25; 86:3, 13, 21; 88:5; 93:21; 94:11, 17; 97:5, 14; 98:7; 102:24; 103:14; 112:22; 113:16, 19; 114:9

**sources** [8] 54:13; 55:4; 58:19, 22; 73:14; 94:3; 110:5

**speak** [1] 112:7

**speaking** [1] 95:3

**specialized** [1] 25:12

**specially** [2] 7:22, 23

**specific** [6] 54:12, 22; 85:12; 86:4, 17; 105:20

**specifically** [12] 5:9; 14:2, 4; 25:23; 33:21; 42:2; 53:1; 54:9; 69:21; 86:5; 98:10; 111:17

**speculate** [1] 4:22

**spell** [1] 5:4

**spend** [2] 107:11; 110:18

**spent** [1] 11:9

**split** [1] 63:12

**spoke** [2] 103:10

**spot** [2] 60:18; 63:5

**square** [1] 1:24

**stages** [1] 64:14

**stamp** [1] 44:4

**standard** [1] 81:23

**standing** [1] 48:24

**start** [2] 93:12; 107:22

**started** [3] 6:16; 94:16, 19

**state** [4] 5:4; 26:1; 44:7; 92:10

**statement** [3] 59:5; 72:13; 73:8

**states** [1] 1:1

**stating** [1] 33:24

**station** [11] 8:19; 28:23; 29:5, 13, 18; 30:1; 59:25; 60:4; 120:19, 20, 23

**stationed** [2] 28:19; 64:1

**stayed** [5] 13:1; 23:1; 27:10, 22; 60:5

**stays** [1] 15:18

**stenographical ly** [1] 123:15

**still** [9] 25:6; 40:9; 48:8; 57:4; 78:5, 12; 86:8; 87:10

**stipulated** [1] 4:2

**stipulation** [1] 4:1

**stop** [28] 7:2; 22:7; 28:19; 59:25; 61:1, 6, 8; 63:11, 21; 64:16; 65:3, 23; 66:1, 6, 9, 22, 25; 77:1, 15; 79:11; 82:9, 12; 95:13; 99:22, 24; 116:18, 23; 120:23

**stopped** [16] 28:16; 60:17, 18; 61:9; 62:9; 63:20; 64:12, 21, 25; 66:12, 17; 82:24; 96:18; 100:21; 115:24

**straight** [1] 83:1

**street** [6] 1:18; 2:3; 71:24; 95:25; 96:1; 109:15

**stress** [1] 68:25

**strike** [5] 10:2; 20:11; 24:22; 58:15; 115:8

**strip** [2] 67:21, 25

**stuff** [1] 7:14

**style** [1] 60:15

**subjected** [1] 95:16

**subordinates** [1] 6:20

**suboxone** [2] 8:9; 97:20

**subscribed** [1] 123:20

**subscriber** [1] 121:5

**subsection** [1] 55:12

**substance** [4] 17:4; 84:19, 23; 85:6

**such** [2] 6:24; 81:24

**suggestions** [1] 65:14

**sumpter** [177] 8:1, 5, 8, 13, 18, 24; 9:2, 6, 14, 16, 21; 10:16, 22; 11:1, 6, 9; 12:7; 13:6, 12, 16, 19, 23; 14:2, 16, 20; 15:2, 21; 16:10, 12, 17, 24; 17:21; 18:7, 19; 19:6; 20:2, 16; 21:2, 9; 22:9, 12, 15, 22, 25; 23:1, 25; 24:6, 15, 18, 24; 26:15, 17, 24; 27:11, 16, 22; 28:14, 23; 29:8, 21; 30:4, 8, 15, 22; 31:22, 23;

32:2, 10, 13, 17, 24; 33:6; 34:6; 35:10; 36:15, 18, 22, 24; 37:8, 12, 15, 16, 21, 22, 25; 38:4, 8, 14; 39:15, 22; 40:2, 5, 8, 13; 41:1, 5, 12; 42:2; 43:23; 44:24; 46:13; 47:5, 6, 8, 9; 48:22; 50:4, 7, 10, 16, 21, 23; 51:18, 23; 52:1; 53:1, 6; 56:19; 57:1, 25; 59:11, 15; 60:6; 62:8; 63:1, 6; 65:24; 67:6, 10; 73:25; 74:9, 13, 17, 24; 75:6; 77:1; 79:4, 8, 17, 25; 80:4; 83:5, 16; 92:5, 8; 93:14; 94:1, 17; 97:2, 7, 16; 98:6, 14, 21; 99:7, 19; 102:21, 24; 103:6, 23; 105:7, 22; 106:5, 9, 19, 24; 107:3, 18; 108:1, 21; 109:2; 112:21, 24; 113:7, 18; 118:8

**sumpter's** [37] 8:23; 11:14, 23; 12:2, 11, 21; 14:12, 24; 17:25; 19:5; 24:8, 19; 25:17; 26:14, 21; 29:15, 19, 25; 30:18; 34:19, 20;

35:19;      36:4;
39:3, 8;   43:20;
45:20;    46:16;
49:12;    50:17;
53:15;    55:25;
60:9;      99:8;
106:1;   115:9;
118:23

**supervision** [1]
104:25

**supervisor** [3]
6:18;      7:20;
65:5

**supplier** [1]
37:17

**supposed** [3]
56:15;   104:5;
120:10

**suppression** [1]
80:17

**surveillance**
[1]  9:10

**suspect** [2]
50:13;  110:15

**suspected** [4]
8:9;      57:21;
99:12

**sworn** [3]
4:11;  123:7, 13

**system** [1]
90:22

---

- T -

**taking** [2]
121:20;  123:12
**tank** [1]  116:4
**taylor** [1]  64:5
**team** [4]  28:7,
12, 17;  60:14
**telephone** [2]
31:24;  73:19
**telling** [6]
28:11;    50:17;
56:4;      83:5;
109:15
**tells** [1]  93:24
**term** [3]   37:4,
5;  93:19

**terms** [2]
102:11, 23
**terrain** [1]
101:3
**testified** [9]
4:11;     80:16;
89:18;  94:15;
95:1,     12;
99:20;  105:25;
123:10
**testify** [1]
123:7
**testifying** [1]
102:20
**testimony** [7]
25:11;    59:5;
78:18;  80:20;
92:4;    115:7;
123:19
**text** [38]  29:1;
34:18, 20, 25;
35:3,  9,  20;
36:4;      37:1;
38:3;     39:21,
22;        41:5;
42:10,    13;
43:19;   44:2;
45:25;  48:24;
49:1,  19,  23;
50:14,    24;
51:12;  52:2, 8,
20;        53:18;
54:3;     66:17,
19;        73:25;
74:3;      83:4;
93:12;  99:1
**texted** [1]
53:18
**texting** [2]
92:17;  93:14
**texts** [4]
39:22;    46:11,
13;  50:7
**thank** [5]  89:3;
93:5;   118:16;
119:11;  121:23
**themselves** [2]
103:6, 7
**thereafter** [1]
66:20

**they've** [1]
58:20
**third** [1]  18:15
**thorough** [1]
70:21
**thought** [5]
34:4;      69:15;
70:9;      91:1;
109:2
**three** [21]  8:9;
14:24;      16:9,
25;        29:3;
51:15,    24;
52:16, 24, 25;
53:2,  3,  10;
68:18;   73:21;
79:3, 15;  100:7
**through** [28]
8:1;      10:11;
21:20;   30:18;
31:4;     33:10;
35:4,      19;
54:21;   58:15;
59:16;   60:15;
66:18;    74:6;
85:13,    20;
86:1,      11;
95:20,    23;
100:18;  106:1,
7;       115:21;
116:14;   117:8,
11, 20
**throughout** [4]
58:10;   73:14;
105:9;  108:6
**thrown** [2]
100:11;  110:13
**thumbnail** [1]
100:9
**thursday** [1]
43:13
**timeline** [1]
58:17
**times** [11]
7:16;    23:21;
41:10;    57:22;
58:10,    20;
85:9;    87:23;
94:13;  103:1, 4
**tips** [1]  109:17

**today** [4]  5:19;
6:2;        42:1;
50:8
**took** [16]
11:12;    15:24;
16:1;      18:21;
24:9;     34:23;
43:19;   45:19;
49:12;   53:14;
69:18;   95:21;
105:10;  120:5;
121:12, 17
**topography** [1]
116:12
**tossed** [6]
79:11;    100:5,
24, 25;  116:9;
117:22
**total** [3]  14:24;
83:22, 23
**totality** [1]
99:17
**tough** [1]
60:19
**toward** [1]
82:25
**towards** [2]
43:15;  59:9
**towed** [2]  90:4;
91:2
**township** [27]
1:8;        2:10;
6:25;   7:4, 16;
27:6,  8,   13;
28:8, 22;  29:4,
7,  10, 13,  18;
30:1;     59:25;
60:3;     64:20;
65:10;   67:22;
70:5;     80:23;
81:3,      18;
97:17;  120:23
**track** [1]
109:17
**traffic** [13]
7:2;       28:19;
63:21;    65:23,
25;      66:6,  9,
22;     77:1,  15;

79:11;    99:24;
120:22
**trained**      [3]
87:1, 8, 19
**training**      [2]
85:12;  86:1
**transaction** [2]
50:18;  83:10
**transported** [1]
120:22
**traveling**      [2]
60:23;  115:20
**treatment**      [1]
103:11
**trial** [1]  4:6
**triple** [2]  72:1,
3
**trips** [1]  10:23
**trooper**      [3]
25:25;    99:16;
100:22
**trucking**      [1]
64:5
**true**      [11]
10:14,      19;
17:19;    31:11;
36:3;    43:18;
45:18;    49:10;
55:2;    71:16;
78:14
**trusted**      [1]
10:2
**truth**      [3]
123:7, 8
**trying**      [4]
19:11;    82:21;
87:11;  103:13
**tuesday**      [1]
68:21
**turn** [4]  82:14,
25;      96:25;
97:24
**turned**      [5]
10:4;    22:15;
53:24,    25;
99:25
**turning**      [2]
60:24;  82:10
**twelve** [1]  50:7

**type** [3]  96:11;
100:18;  102:13
**typewriting** [1]
123:17
**typical**      [1]
96:11
**typically**      [3]
6:25;      7:16;
58:18
**tyson** [9]  1:6;
2:4;      12:15;
23:24;    25:12,
16, 23;  69:24;
80:13

───────────

- U -

**ultimate**      [1]
104:25
**ultimately** [1]
81:14
**unannounced**
[1]  21:6
**under**      [15]
6:20;    17:1, 3,
4;      18:12;
55:11;      84:7,
13, 14;    87:9;
92:9,      18;
103:23;
112:25;  123:17
**undersigned**
[1]  123:4
**understand** [5]
4:19;    23:13;
24:17;  87:2, 10
**unfortunately**
[1]  45:8
**uniform**      [2]
7:2;  12:19
**union**      [1]
123:1
**unit** [7]    5:10,
12;      12:25;
27:7;      65:8;
87:24;  88:1
**united** [1]  1:1
**unless**      [1]
87:24

**unredacted** [1]
55:8
**unreliable**   [1]
108:11
**unsafe**      [2]
104:24;  105:4
**unsecured**   [2]
16:21;  17:25
**unsure**      [1]
44:11
**unusual**      [3]
65:15;  101:20;
111:1
**used** [17]  8:17;
22:12;    28:5;
44:16;    50:24;
51:2, 9;  83:17;
92:5,      15;
93:19;    94:6;
108:12;
113:18;    114:3;
119:24;  120:9
**useful**      [1]
15:13
**user** [6]  97:17,
19;      98:2;
103:7;  107:3;
109:2
**users**      [2]
41:10;  107:10
**using**      [9]
40:10;    85:12,
17;      86:22;
94:16,      19;
108:19;  113:22
**utilized**      [1]
21:25

───────────

- V -

**vehicle**      [23]
26:5;      27:15;
60:8, 17;  62:9;
63:20;   66:12;
68:9, 23;  69:3;
70:19, 22, 25;
90:3;      91:12,
16;      92:2;
110:14;
112:17;

116:21;   117:5,
16, 17
**vehicles**      [1]
64:23
**verbatim**      [1]
112:12
**verify**      [1]
87:20
**version**      [2]
55:8, 9
**versus** [5]  7:8;
22:4;    26:16;
55:8;  102:13
**video** [1]  16:14
**view** [1]  83:10
**viewing**      [1]
106:11
**voice** [1]  34:10

───────────

- W -

**waited**      [1]
68:22
**waiting**      [3]
35:16,      18;
43:23
**waived** [1]  4:4
**walk** [9]  63:10;
79:13;    105:1,
17;   110:18, 19;
116:14;   117:8,
20
**walked**      [5]
79:12,      14;
116:20,    24;
117:11
**walking**      [3]
100:6;    105:6,
14
**warrant**      [23]
7:3, 17;   11:13,
19, 22;   12:11;
13:8;      19:5;
20:8, 12,  22;
22:14;    38:1;
40:7;    68:12;
89:23;    91:14,
16;    108:15;
112:16;

116:22;
117:18;  120:25
**warrants**  [1]
23:8
**ways** [1]  63:12
**wednesday**  [1]
48:16
**week**     [2]
88:22, 25
**weeks**     [1]
10:24
**west** [2]  1:18;
2:3
**whereof**  [1]
123:19
**white** [54]  2:2;
3:6;      25:20;
30:10;  33:1, 7,
17;      34:7;
36:21;      41:7,
19;    42:4, 22;
47:13,  17,  20,
24;      48:4,  7,
20;      55:20;
57:11;    62:16,
21;    66:14;
67:3;   73:11;
75:16,  25;
78:2;    79:1;
82:17;   83:3;
88:16,    17;
89:5, 9;    93:9;
103:17;
106:13;   107:8;
111:10,   20;
113:1;   114:13,
17, 21;  117:23;
118:1;   119:12,
16;      120:11;
121:25;  122:2
**whole**     [2]
20:11; 123:7
**wholesale**  [1]
107:14
**wilkes-barre**
[3]  1:24;  90:4,
8
**william**    [3]
2:5;      18:22;
71:21

**williamsport**
[22]    1:9, 18;
2:3;   7:13, 14,
23;     16:15;
38:15;   39:18;
54:10;   71:25;
72:11,   16;
73:10,   14;
90:6,   10;
91:25;  109:14,
22
**willing** [2]  7:5;
88:15
**window**    [5]
79:11;   100:5,
12;      101:1;
110:14
**withdraw**   [1]
33:3
**within**    [11]
29:21;    65:7;
82:5;    83:23,
24;     86:23;
87:24;   99:14;
109:14;
116:17;  117:16
**without**    [6]
15:3, 7;  16:21;
40:14,    20;
54:21
**witness**   [36]
4:10;    30:12;
31:9;  33:9, 19;
34:8;  41:9, 21;
45:12;   48:5, 8;
49:8;    54:21;
55:22;   57:13;
62:23;   66:16;
73:13;   75:18;
76:1;    78:4;
79:3;    82:19;
83:4;    88:19;
90:21;  106:15;
107:10;
111:12,   22;
113:4;   116:1;
117:25;
118:15;   123:6,
13

**witnesses**  [1]
3:1
**wooded**    [6]
63:10,   11;
101:6;  110:20;
116:7, 13
**woods** [1]  63:9
**word** [1]  36:16
**words**     [2]
42:12;  52:3
**worked**    [1]
30:9
**works**     [1]
50:10
**would've**   [2]
40:19; 117:14
**write** [4]  74:8,
12, 17;  75:5
**writing**    [1]
90:22
**written**    [2]
56:24;  57:10
**wrong**     [3]
15:11;   23:15;
24:2
**wrote**    [10]
10:15,   18;
14:11;   30:25;
32:2,    12;
57:15;   72:8;
73:18;  75:15

--- Y -

**yards** [5]  63:4,
17;  96:9
**year** [3]   26:8,
10;  58:7
**years**     [5]
33:10;   64:9;
73:5;  108:6, 8
**yourself**  [2]
13:13;  16:13

## LYCOMING COUNTY NARCOTICS ENFORCEMENT UNIT
### NARCOTICS INVESTIGATION REPORT PAGE #

**ORIGINAL DATE OF INCIDENT:** 4/15/2020     **CASE NUMBER:** 20-03528

**OFFICER SUBMITTING REPORT:** Detective Dent     **BUY NUMBER:** Not Applicable

**DATE OF INCIDENT:** 9/24/2020

**TOTAL RESTITUTION:** 0.00

**LAW ENFORCEMENT PERSONNEL INVOLVED** Det. Dent

**CLASSIFICATION OF REPORT:**

☒ INITIAL
☐ SUPPLEMENTAL
☐ ARREST
☐ PRELIM. HEARING

☐ SUPPRESSION
☐ TRIAL
☐ FORFEITURE

☐ SENTENCING
☐ CLOSED
☐ DESTRUCTION

☐ SCHOOL ZONE REQUIRED     ☐ PROB/PAROLE     ☐ FIRE ARMS ENHANCEMENT     ☐ FORFEITURE

**Synopsis** This report involves the application of and execution of a Search Warrant at 416 Brentwood Drive, Cogan Station, PA 17728, Lycoming County.

**Suspect and Subject Information:**
Matthew SUMPTER
416 Brentwood Drive
Cogan Station, PA 17728
DOB: ▮▮▮▮▮▮
SID: 34814341
SSN ▮▮▮▮▮
Phone: (484) 725-0846

**OTN/LTN:**

**Evidence:**     ☐ LAB REQUEST SUBMITTED     ☐ LAB ANALYSIS RECEIVED
See attached Spillman report.

**Attachments:** ☒ SPILLMAN ☐ LAB REPORT ☐ CRIMINAL COMPLAINT ☐ SEARCH WARRANT
☐ PHOTOS/ AUDIO/ VIDEO ☐ STATEMENTS ☐ RIGHTS WAIVERS
☐ OTHER

PLAINTIFF'S EXHIBIT
PENGAD 800-631-6989
3/22/24   E8

#508
9/28/20

**LYCOMING COUNTY NARCOTICS ENFORCEMENT UNIT**
**NARCOTICS INVESTIGATION REPORT PAGE #**

**NARRATIVE:**

On September 23, 2020 NEU CI 20-16, contacted me with information regarding Matthew SUMPTER, a known Heroin/Fentanyl user in the Williamsport Area. SUMPTER lives with his parents at 416 Brentwood Drive, Cogan Station, PA 17728.

CI 20-16 stated that SUMPTER had made several trips to Philadelphia in the past few weeks and had been there as recently as the morning of September 23rd. CI 20-16 stated that SUMPTER had recently started to sell Fentanyl in the Williamsport Area and SUMPTER would ask CI 20-16 to try and find him customers. CI 20-16 stated they were asked by SUMPTER to come to SUMPTER's house on the evening of September 23rd to see what he had brought back from Philadelphia. SUMPTER had a pill bottle full of what he said was Fentanyl and had said he had just spent $1600 on the drug while in Philadelphia. CI 20-16 was able to take pictures of the pill bottle and send them to me. CI 20-16 stated that SUMPTER indicated that he had more than just the pill bottle of Fentanyl and said that SUMPTER would usually keep it in a room in the basement area of his residence.

On September 24, 2020 I applied for a Sealed Search Warrant for 416 Brentwood Drive based on the information that CI 20-16 had provided to me and was approved by President Judge Butts.

At approximately 1430: Members of the NEU traveled to 416 Brentwood Drive where SUMPTER's mother was encountered in the open garage. When asked where her son Matt was, she indicated that he was in the basement. Detective Havens and myself went to the basement where SUMPTER was encountered laying on the couch. SUMPTER was placed in handcuffed and searched. I then took SUMPTER out to my unmarked police car and placed him in the back seat.

At approximately 1438: I provided SUMPTER with his Miranda Rights in which he understood and agreed to speak to me. SUMPTER said that there was small bags of Fentanyl in his closet in his bedroom as well as personal use Marijuana. SUMPTER indicated that he gets his Fentanyl from a black male in Williamsport named Anthony BARASKY. SUMPTER stated that he can call BARASKY at any time and was able to meet him shortly after to purchase the Fentanyl.

At approximately 1525: The Search Warrant was completed and SUMPTER was released on his own recognizance. A copy of the front page of the warrant and the Receipt/Inventory of Seized Property form was left on the dining room table. Notable items found during the search are:

1) SW1: Small plastic bag containing suspected Fentanyl found by #515 in Room#1 on the top closet shelf inside a prescription pill bottle. Approximately .6 grams.
2) SW2: Small plastic bag containing suspected Fentanyl found by #515 in Room #1 on the top closet shelf inside a prescription pill bottle. Approximately 2.42 grams.
3) SW3: Small amount of Marijuana by #515 in Room#1 on top of a book shelf inside a prescription pill bottle. Approximately 1.59 grams.

All evidence was photographed in place. Evidence was then weighed, photographed, and entered into evidence once back at NEU Headquarters.

Nothing Further.

**SIGNATURE OF REPORTING OFFICER:** _AML #508_

**DATE:** 9/28/20

**SUPERVISOR INITIALS /DATE:** _(signature)_

Dent and Havens Production 045

A COPY OF THIS FORM, WHEN COMPLETED, IS TO BE ATTACHED TO EACH COPY OF THE SEARCH WARRANTS/AFFIDAVIT

**Commonwealth of Pennsylvania**

**COUNTY OF** Lycoming

**RECEIPT / INVENTORY**
**OF SEIZED PROPERTY**

| Docket Number (Issuing Authority): | Police Incident Number: 20-03528 | Warrant Control Number: |
|---|---|---|

| Date of Search: 9-24-20 | Time of Search: 1500 | Inventory Page Number: ___ of ___ Pages |
|---|---|---|

| ~~CPL DEMER~~ Dent | **Williamsport Bureau of Police** | |
|---|---|---|
| Affiant | Agency or Address if private affiant | Badge No. |

The following property was taken / seized and a copy of this Receipt / Inventory with a copy of the Search Warrant and affidavit(s)  (if not sealed) was
☐ personally served on (name of person) _____
☐ was left at (describe the location) _____

| Item Number | Quantity | Item Description | Make, Model, Serial No., Color, etc. |
|---|---|---|---|
| SW 1 | 1 | Small Plastic Bag Containing Fentanyl RX 1 in closet top shelf inside Prescription Pill Bottle #515 | |
| SW 2 | 1 | Small Plastic Bag Containing Fentanyl RX 1 in Closet top shelf inside Prescription Pill Bottle #515 | |
| SW 3 | 1 | Small Amount Marijuana. In 1 on top of Bookshelf Inside Pill Bottle #515 | |
| SW 4 | 1 | Fentanyl Paraphernalia - Needles, spoons  (Destroyed) SW 2? | |

I/we do hereby state that this inventory is to the best of my/our knowledge and belief a true and correct listing of all items seized, and that I/we sign this Receipt / Inventory subject to the penalties and provisions of Title 18 Pa.C.S. 4904(b)--Unsworn Falsification to Authorities.

| Signature of person Issuing Receipt / Inventory | Printed Name | Affiliation | Badge or Title |
|---|---|---|---|
| | | | 824 |
| Signature of Witness | Printed Name | Affiliation | Badge or Title |
| | | WPD | 507 |
| Signature of person making Search | Printed Name | Affiliation | Badge or Title |

AOPC 413B 12-09-96

**ISSUING AUTHORITY- CANARY   TO WHOM RECEIPT ISSUED - GOLDENROD   REPORT COPY - PINK**

Dent and Havens Production 046

COMMONWEALTH OF
PENNSYLVANIA
COUNTY OF:LYCOMING

**POLICE CRIMINAL COMPLAINT**
**COMMONWEALTH OF PENNSYLVANIA**
VS.

Magisterial District Number: 29-3-04
MDJ: Hon. WILLIAM C. SOLOMON
Address: 1965 LYCOMING CREEK RD
WILLIAMSPORT, PA 17701
Telephone: (570)323-9982

DEFENDANT:     (NAME and ADDRESS):

| MATTHEW | THOMAS | SUMPTER | |
|---|---|---|---|
| First Name | Middle Name | Last Name | Gen. |

416 BRENTWOOD DRIVE
COGAN STATION, PA 17728

### NCIC Extradition Code Type

| | | | |
|---|---|---|---|
| ☐ 1-Felony Full | ☐ 5-Felony Pend. | ☐ C-Misdemeanor Surrounding States | ☐ Distance: ____ |
| ☐ 2-Felony Ltd. | ☐ 6-Felony Pend. Extradition Determ. | ☐ D-Misdemeanor No Extradition | |
| ☒ 3-Felony Surrounding States | ☐ A-Misdemeanor Full | ☐ E-Misdemeanor Pending | |
| ☐ 4-Felony No Ext. | ☐ B-Misdemeanor Limited | ☐ F-Misdemeanor Pending Extradition Determ. | |

### DEFENDANT IDENTIFICATION INFORMATION

| Docket Number | Date Filed | OTN/LiveScan Number | Complaint/Incident Number | Request Lab Services? |
|---|---|---|---|---|
| CR-124-70 | 10/02/2020 | 091885I:3 | 20-03528 | ☐ YES  ☐ NO |

| GENDER | DOB | POB CALIFORNIA | | Add'l DOB  /   / | Co-Defendant(s) ☐ |
|---|---|---|---|---|---|
| ☒ Male | First Name | | Middle Name | Last Name | Gen. |
| ☐ Female | AKA | | | | |

| RACE | ☒ White | ☐ Asian | ☐ Black | ☐ Native American | ☐ Unknown |
|---|---|---|---|---|---|
| ETHNICITY | ☐ Hispanic | ☒ Non-Hispanic | | ☐ Unknown | |

| HAIR COLOR | ☐ GRY (Gray) | ☐ RED (Red/Aubn.) | ☐ SDY (Sandy) | ☐ BLU (Blue) | ☐ PLE (Purple) | ☒ BRO (Brown) |
|---|---|---|---|---|---|---|
| | ☐ BLK (Black) | ☐ ONG (Orange) | ☐ WHI (White) | ☐ XXX (Unk./Bald) | ☐ GRN (Green) | ☐ PNK (Pink) |
| | ☐ BLN (Blonde / Strawberry) | | | | | |

| EYE COLOR | ☐ BLK (Black) | ☒ BLU (Blue) | ☐ BRO (Brown) | ☐ GRN (Green) | ☐ GRY (Gray) |
|---|---|---|---|---|---|
| | ☐ HAZ (Hazel) | ☐ MAR (Maroon) | ☐ PNK (Pink) | ☐ MUL (Multicolored) | ☐ XXX (Unknown) |

| DNA | ☐ YES ☐ NO | DNA Location | | WEIGHT (lbs.) |
|---|---|---|---|---|
| FBI Number | 273115TC9 | | MNU Number | 160 |
| Defendant Fingerprinted | ☐ YES ☐ NO | | | Ft. HEIGHT In. |
| Fingerprint Classification: | | | | |

### DEFENDANT VEHICLE INFORMATION

| Plate # | State | Hazmat ☐ | Registration Sticker (MM/YY) / | Comm'l Veh. Ind. ☐ | School Veh. ☐ | Oth. NCIC Veh. Code | Reg. same as Def. |
|---|---|---|---|---|---|---|---|
| VIN | | Year | Make | Model | Style | Color | ☐ |

Office of the attorney for the Commonwealth ☒ Approved  ☐ Disapproved because:_____

(The attorney for the Commonwealth may require that the complaint, arrest warrant affidavit, or both be approved by the attorney for the Commonwealth prior to filing. See Pa.R.Crim.P. 507).

| MARTIN WADE | APPROVED VIA TELEPHONE | 10/2/2020 |
|---|---|---|
| (Name of the attorney for the Commonwealth) | (Signature of the attorney for the Commonwealth) | (Date) |

I, DETECTIVE DENT                      301041 / #508
(Name of the Affiant)                  (PSP/MPOETC -Assigned Affiant ID Number & Badge #)

of LYCOMING COUNTY DISTRICT ATTORNEY          PA0411300
(Identify Department or Agency Represented and Political Subdivision)  (Police Department ORI Number)
do hereby state: (check appropriate box)

1. ☒ I accuse the above named defendant who lives at the address set forth above
    ☐ I accuse the defendant whose name is unknown to me but who is described as _____

    ☐ I accuse the defendant whose name and popular designation or nickname are unknown to me and whom I have
    therefore designated as John Doe or Jane Doe
    with violating the penal laws of the Commonwealth of Pennsylvania at [230]        2000 BLOCK OLD LYCOMING
                                                                (Subdivision Code)   (Place-Political Subdivision)
TOWNSHIP

    in LYCOMING County        [41]        on or about 4/15/2020 - 9/24/2020
                          (County Code)              (Offense Date)

AOPC 412A – Rev. 07/18



PLAINTIFF'S
EXHIBIT
2
3/22/24  ESS

Page 1 of

Dent and Havens Production 053

## POLICE CRIMINAL COMPLAINT

| Docket Number: | Date Filed:<br>10/02/2020 | OTN/LiveScan Number | Complaint/Incident Number<br>20-03528 |
|---|---|---|---|
| Defendant Name | First:<br>MATTHEW | Middle:<br>THOMAS | Last:<br>SUMPTER |

The acts committed by the accused are described below with each Act of Assembly or statute allegedly violated, if appropriate. When there is more than one offense, each offense should be numbered chronologically.
(Set forth a *brief* summary of the facts sufficient to advise the defendant of the nature of the offense(s) charged. A citation to the statute(s) allegedly violated, without more, is not sufficient. In a summary case, you must cite the specific section(s) and subsection(s) of the statute(s) or ordinance(s) allegedly violated.)

| Inchoate Offense | ☐ Attempt<br>18 901 A | ☐ Solicitation<br>18 902 A | ☐ Conspiracy<br>18 903 | | Number of Victims Age 60 or Older _____ | |
|---|---|---|---|---|---|---|

| ☒ | 1 | 780-113 | A30 | of the | TITLE 35 | 1 | UFEL | 3530 | 18A/35A |
|---|---|---|---|---|---|---|---|---|---|
| Lead? | Offense# | Section | Subsection | | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |

| PennDOT Data<br>(if applicable) | Accident<br>Number | | | ☐ Interstate | | ☐ Safety Zone | | ☐ Work Zone |
|---|---|---|---|---|---|---|---|---|

Statute Description (include the name of statute or ordinance): The Controlled Substance Drug, Device, and Cosmetic Act: Delivery of a Control Substance

Acts of the accused associated with this Offense: IN THAT, on 4/15/2020, the defendant did deliver a controlled substance being SUBOXONE. TO WIT: On 4/15/2020 the defendant did deliver 3 suspected SUBOXONE (Schedule III) pills to a confidential informant in the 2000 block of Lycoming Creek Road in Old Lycoming Township, PA, 17701, Lycoming County.

| Inchoate Offense | ☐ Attempt<br>18 901 A | ☐ Solicitation<br>18 902 A | ☐ Conspiracy<br>18 903 | | Number of Victims Age 60 or Older _____ | |
|---|---|---|---|---|---|---|

| ☐ | 2 | 7512 | A | of the | TITLE 18 | 1 | FEL 3 | | |
|---|---|---|---|---|---|---|---|---|---|
| Lead? | Offense# | Section | Subsection | | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |

| PennDOT Data<br>(if applicable) | Accident<br>Number | | | ☐ Interstate | | ☐ Safety Zone | | ☐ Work Zone |
|---|---|---|---|---|---|---|---|---|

Statute Description (include the name of statute or ordinance): Criminal use of a communication facility.

Acts of the accused associated with this Offense: IN THAT, on 4/15/2020, the defendant did use a communication facility to commit, cause, or facilitate the commission or the attempt therof of any crime which constitutes a felony under this title or under the act of April 14, 1972 known as The Controlled Substance, Drug, Device and Cosmetic Act. TO WIT: On 4/15/2020 the defendant did utilize cellular telephone number (484) 725-0846 to facilitate the delivery of 3 suspected Suboxone (Schedule III) pills in the 2000 block of Lycoming Creek Road in Old Lycoming Township, PA, 17701, Lycoming County.

| Inchoate Offense | ☐ Attempt<br>18 901 A | ☐ Solicitation<br>18 902 A | ☐ Conspiracy<br>18 903 | | Number of Victims Age 60 or Older _____ | |
|---|---|---|---|---|---|---|

| ☐ | 3 | 780-113 | A16 | of the | TITLE 35 | 1 | UMIS | 3512 | 18E/35A |
|---|---|---|---|---|---|---|---|---|---|
| Lead? | Offense# | Section | Subsection | | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |

| PennDOT Data<br>(if applicable) | Accident<br>Number | | | ☐ Interstate | | ☐ Safety Zone | | ☐ Work Zone |
|---|---|---|---|---|---|---|---|---|

Statute Description (include the name of statute or ordinance): The Controlled Substance Drug, Device, and Cosmetic Act: Possession of a Controlled Substance.

Acts of the accused associated with this Offense: IN THAT, on 9/24/2020, the defendant did knowingly, intentionally, and unlawfully possess a controlled substance being suspected FENTANYL (Schedule II). TO WIT: On 9/24/2020 the defendant did possess approximately 3 grams of suspected FENTANYL (Schedule II) at 416 Brentwood Drive, Cogan Station, PA 17728.

AOPC 412A – Rev. 07/18

Dent and Havens Production 054

## POLICE CRIMINAL COMPLAINT

| Docket Number: | Date Filed: 10/02/2020 | OTN/LiveScan Number | Complaint/Incident Number 20-03528 |
|---|---|---|---|
| **Defendant Name** | First: MATTHEW | Middle: THOMAS | Last: SUMPTER |

2. I ask that a warrant of arrest or a summons be issued and that the defendant be required to answer the charges I have made.

3. I verify that the facts set forth in this complaint are true and correct to the best of my knowledge or information and belief. This verification is made subject to the penalties of Section 4904 of the Crimes Code (18 Pa.C.S. § 4904) relating to unsworn falsification to authorities.

4. This complaint consists of the preceding page(s) numbered ___ through ___.

5. I certify that this filing complies with the provisions of the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania* that require filing confidential information and documents differently than non-confidential information and documents.

The acts committed by the accused, as listed and hereafter, were against the peace and dignity of the Commonwealth of Pennsylvania and were contrary to the Act(s) of the Assembly, or in violation of the statutes cited.
**(Before a warrant of arrest can be issued, an affidavit of probable cause must be completed, sworn to before the issuing authority, and attached.)**

OCTOBER  2        2020
_____        _____
(Date)          (Year)                  (Signature of Affiant)

AND NOW, on this date ___10/2/2020___   I certify that the complaint has been properly completed and verified.

An affidavit of probable cause must be completed before a warrant can be issued.

29-1-02
_____        _____
(Magisterial District Court Number)        (Issuing Authority)

Dent and Havens Production 055

## POLICE CRIMINAL COMPLAINT

| Docket Number: | Date Filed: 10/02/2020 | OTN/LiveScan Number | Complaint/Incident Number 20-03528 |
|---|---|---|---|
| Defendant Name | First: MATTHEW | Middle: THOMAS | Last: SUMPTER |

## AFFIDAVIT of PROBABLE CAUSE

SEE ATTACHED

I, DETECTIVE DENT, BEING DULY SWORN ACCORDING TO THE LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

I CERTIFY THAT THIS FILING COMPLIES WITH THE PROVISIONS OF THE *CASE RECORDS PUBLIC ACCESS POLICY OF THE UNIFIED JUDICIAL SYSTEM OF PENNSYLVANIA* THAT REQUIRE FILING CONFIDENTIAL INFORMATION AND DOCUMENTS DIFFERENTLY THAN NON-CONFIDENTIAL INFORMATION AND DOCUMENTS.

_____
(Signature of Affiant)

Sworn to me and subscribed before me this ___2___ day of ___October___ ___2020___

_____
Date

Magisterial District Judge

My commission expires  first Monday of January,  2026

Dent and Havens Production 056

# Affidavit of Probable Cause

This drug investigation involves a successful delivery of suspected SUBOXONE and a Search Warrant resulting in the seizure of suspected FENTANYL from suspect Matthew SUMPTER.

The delivery on April 15, 2020 included: (1) Detectives meeting the CI at a pre-determined location; (2) Searching the CI to negate the presence of any controlled substances, US Currency, or contraband; (3) The CI contacted Matthew SUMPTER on cellular telephone number (484) 725-0846 to arrange the delivery of Xanax pills and SUMPTER indicating an agreement to deliver them; (4) Detectives following the CI to the area of the 2000 block of Lycoming Creek Road (5) The CI meeting SUMPTER in the 2000 block of Lycoming Creek Road; (6) SUMPTER providing the CI with three Suboxone pills; (7) The CI turning over the three Suboxone pills to detectives; (8) Searching the CI to negate the presence of any controlled substances, US Currency, or contraband; (9) Debriefing the CI in which the CI confirmed SUMPTER delivered three Suboxone pills to the CI. It should be noted that SUMPTER provided Suboxone because he ran out of Xanax.

On September 24, 2020 a Sealed Search Warrant was granted by President Judge Butts for 416 Brentwood Drive, Cogan Station, PA 17728, SUMPTER's residence. Upon entry of the residence SUMPTER was located in the basement on the couch. SUMPTER was taken into custody and read his Miranda Rights which he understood and agreed to answer questions. When I asked SUMPTER if there was any Fentanyl in the house he told me that there was a bag in his bedroom that belonged to him. Detectives located 2 small bags of suspected Fentanyl in the closet area of SUMPTER's bedroom. SUMPTER indicated that both bags belonged to him.

10/2/2020

LYCOMING COUNTY NARCOTICS ENFORCEMENT UNIT
NARCOTICS INVESTIGATION REPORT PAGE #

---

**ORIGINAL DATE OF INCIDENT:** 10/2/2020  **CASE NUMBER:** 20-10100
**OFFICER SUBMITTING REPORT:** Detective Dent  **BUY NUMBER:** Arrest
**DATE OF INCIDENT:** 10/2/2020
**TOTAL RESTITUTION:** 0.00
**LAW ENFORCEMENT PERSONNEL INVOLVED** Detective Dent

**CLASSIFICATION OF REPORT:**
☒ INITIAL                ☐ SUPPRESSION      ☐ SENTENCING
☐ SUPPLEMENTAL      ☐ TRIAL                 ☐ CLOSED
☐ ARREST                  ☐ FORFEITURE      ☐ DESTRUCTION
☐ PRELIM. HEARING

☐ SCHOOL ZONE       ☐ PROB/PAROLE      ☐ FIRE ARMS ENHANCEMENT      ☐ FORFEITURE
REQUIRED

---

**Synopsis** This report involves the arrest of Anthony BARASKY.

---

**Suspect and Subject Information:**
Anthony Marcus BARASKY
1534 Louisa Street
Williamsport, PA 17701
SID: 34846618
SSN: ▮▮▮▮▮▮▮
Phone: 215-301-0606

---

**OTN/LTN:**

---

**Evidence:**        ☐ LAB REQUEST SUBMITTED    ☐ LAB ANALYSIS RECEIVED
See attached Spillman report.

---

**Attachments:** ☒ SPILLMAN  ☐ LAB REPORT  ☒ CRIMINAL COMPLAINT  ☒ SEARCH WARRANT
☐ PHOTOS/ AUDIO/ VIDEO  ☐ STATEMENTS  ☐ RIGHTS WAIVERS
☐ OTHER

---

*#508*
*10/8/20*



PLAINTIFF'S
EXHIBIT
3
5/22/24   ESB
PENGAD 800-631-6989

Dent and Havens Production 073

(7)

**LYCOMING COUNTY NARCOTICS ENFORCEMENT UNIT**
**NARCOTICS INVESTIGATION REPORT PAGE #**

**NARRATIVE:**

On Friday, October 2, 2020, I met with a Confidential Source (CS) who stated that they have bought suspected Heroin/Fentanyl from Anthony BARASKY approximately 100 times in the past. BARASKY is a well-known drug dealer in the Williamsport Area and has been arrested by members of the Lycoming County Narcotics Enforcement Unit (NEU) in the past. The CS stated they would contact BARASKY on telephone number 215-301-0606 to set up the deals. The CS stated that BARASKY would travel to the CS house and meet them approximately 1 block away from the house to sell them the Heroin/Fentanyl. The CS stated that BARASKY would contact them as he entered the housing development instructing the CS to "head out," meaning to leave their house to meet BARASKY. The CS stated that BARASKY has never come to the meeting without any drugs to sell.

The following events occurred on October 2, 2020. All times are approximate:

At approximately 1400: I met with the CS who provided the above information regarding Anthony BARASKY. The CS agreed to contact BARASKY to have him travel to the normal meeting spot.

At approximately 1500: Members of the NEU briefed on a potential buy bust. The plan was to have BARASKY travel to the CS location and have a marked patrol car traffic stop him in route before he was able to make it there.

At approximately 1508: The CS reached out by text to BARASKY saying "yo bro." This is a typical way that a drug user would reach out to drug dealers via text.

At approximately 1511: BARASKY responded "sup bro."

At approximately 1519: The CS texted "got your bread plus money 3." The CS was indicating they wanted 3 grams of Fentanyl, a typical amount that they usually would buy.

At approximately 1529: The CS contacted BARASKY via phone call. BARASKY told the CS that he was on his way to meet the CS. Members of the NEU and Old Lycoming Township Police Department (OLPD) traveled to their locations for the buy bust.

At approximately 1546: BARASKY contacted the CS via phone call instructing them to "Head out."

At approximately 1547: PO Bell relayed that he had visual of BARASKY driving on Eckard Road from Lycoming Creek Road. BARASKY was stopped at the intersection of Eckard Road and Miller Road by members of the NEU and OLPD and taken into custody. BARASKY was read his Miranda Rights by Detective Havens. BARASKY stated he wanted to exercise his Miranda Rights. BARASKY was then transported to the Williamsport Bureau of Police (WBP) Headquarters for processing. BARASKY's vehicle was towed from the scene to the WBP impound by Wood's Garage Towing and Recovery.

At approximately 1626: I called phone number 215-301-0606 from my work phone. The phone that was recovered from BARASKY during the traffic stop rang displaying my phone number.

At approximately 1715: BARASKY was arraigned before MDJ Biichle on (1) Count of Criminal Use of a Communication Facility. Biichle set bail at $85,000 and remanded him to the Lycoming County Prison (LCP). PO Bell contacted LCP and requested that BARASKY be placed in a dry cell so that anything that he dispense from his body he would not be able rid of.

On Tuesday, October 6, 2020, I contacted LCP and the informed me that they did not recover any contraband from BARASKY's cell. I applied for a Search Warrant for BARASKY's vehicle that was in WBP impound. A search of the vehicle yielded nothing.

**SIGNATURE OF REPORTING OFFICER:** *[signature]* #508

**DATE:** 10/8/20

**SUPERVISOR INITIALS /DATE:** *[initials]* 10-9-20

Dent and Havens Production 074

(8)



Dent and Havens Production 448

(42)

PLAINTIFF'S
EXHIBIT
14
2/22/24   ESB
PENGAD 800-631-6989



Production 176

(12)

PLAINTIFF'S
EXHIBIT
5
3/22/24   ESB
PENGAD 800-631-6989



ns Production 179

(15)

PLAINTIFF'S
EXHIBIT
6
PENGAD 800-631-6989
3/22/25   25B



< **Plug**

listen bro, that's fine if you don't want to fuck with me anymore, but I at least want to take care of the balance

10:44 AM

P If you're up in the am jus give me a shout

6:28 PM

6:30 PM   ok

Thursday, October 1, 2020

P I can get with you between 12-1 today

8:50 AM

ok that works. I'll take my break then

8:51 AM

Friday, October 2, 2020

yo bro

3:08 PM

P Sup bro   3:11 PM

got your bread bro plus money 3

3:19 PM

Enter message

PLAINTIFF'S EXHIBIT 7   3/22/24   SB   PENGAD 800-631-6989

Dent and Havens Production 181

(17)

ATTACHMENT H

## INFORMANTS AND SOURCES OF INFORMATION

### PURPOSE

This regulation establishes policies and procedures which shall be followed by all Municipal Law Enforcement Agencies under the jurisdiction of the Lycoming County Office of the District Attorney when selecting, evaluating, documenting, supervising, and compensating informants and sources of information. These policies and procedures are designed to reduce the risks inherent in supervising the activities of informants, and to protect the interests of said Law Enforcement Agencies.

### INTRODUCTION

General: The District Attorney recognizes that informants and sources of information are valuable assets essential to the success of many investigations. However, motivations such as fear and revenge, or expectations of financial gain and prosecutorial consideration, make working with certain individuals precarious and at times dangerous. Members/enforcement officers must therefore exercise extreme caution in selecting, evaluating, supervising, and compensating informants.

### DEFINITIONS

A.    Informant:  A private citizen, under the direct supervision of a law enforcement officer, who furnishes information about suspected criminals or criminal activity for consideration, either financial, prosecutorial, or judicial; or a person who actively participates in a criminal investigation or intelligence operation, under the direct supervision of a law enforcement officer, with or without compensation.

B.    Source of Information:  A private citizen, not under the direction of a law enforcement officer, who provides information in return for financial compensation, without becoming an active party to the investigation itself (e.g., a business firm furnishing information from its records; an employee of an organization who, through the normal course of his or her activities, obtains information of value to law enforcement. An individual shall not be categorized as a source of information, if any criminal charges are pending against that individual.



PLAINTIFF'S
EXHIBIT
8
3/22/24   EB
PENGAD 800-631-6989

-1-

INFORMANT EVALUATION

A.   General:   Every law enforcement officer shall apply the following criteria when considering individuals as prospective informants:

    1.   The informant must be in a position to measurably benefit current investigations or intelligence operations, or provide sufficient information to initiate new investigations or intelligence operations.

    2.   The informant must be judged, to the extent reasonably possible, to be unlikely to compromise law enforcement interests, activities, or personnel.

    3.   The informant must be willing to accept the degree of supervision and direction required to effectively complete assignments during an investigation.

B.   Special Authorizations:   All law enforcement officers shall obtain special authorizations as indicated for prospective informants meeting the following criteria:

    1.   Juveniles



    2.   Individuals subject to future arrest, e.g., the member/enforcement officer has sufficient evidence to prosecute, may be used as informants only with the approval of the Lycoming County District Attorney and/or the Lycoming County Narcotics Enforcement Unit (NEU) Coordinator.

    3.   Any agreement with a prospective informant based on expectations of prosecutorial or judicial consideration, must be approved by the Lycoming County Assistant District Attorney prosecuting the case.

-2-

Dent and Havens Production 404

ATTACHMENT H

4.  Individuals previously declared unreliable, in accordance with this regulation, may be used as informants, only with the approval of the Lycoming County District Attorney and/or the Lycoming County NEU Coordinator.

5.  Individuals on state probation/parole

a.  The request shall include:



-3-

Dent and Havens Production 405



6.    Individuals on county probation or parole

7.    Individuals currently incarcerated.

C.    Initial Interview:

    1.    A comprehensive initial interview by the lead law enforcement officer is essential to properly evaluate and determine a prospective informant's eligibility, motivations, and potential value. The degree of the informant's exposure to Lycoming County Narcotics Enforcement Unit activities and judicial proceedings shall be determined by a critical analysis of the informant's capabilities, veracity, and credibility.

    2.    While the nature and extent of initial interviews may vary with individual backgrounds and circumstances, a broad line of inquiry shall be developed to extract information on all criminals and criminal activity known to prospective informants. The law enforcement officer conducting the interview should document the findings using their departments reporting requirements.

D.    Dissemination:

    1.    The documented information gathered from the initial interview shall be disseminated as per the established guidelines of the respective law enforcement agency. Any documented information shall also be provided to the Lycoming County NEU Coordinator in a timely manner.

    2.    Except under extraordinarily justifiable circumstances, information gained on serious criminal activities, i.e., felonies, shall be acted on immediately, or when

-4-

ATTACHMENT H

applicable, forwarded by the most expedient means practicable to the appropriate law enforcement personnel. Whenever possible, such information shall be forwarded to the applicable law enforcement officers or agencies without compromising sources or investigations.

E.   Informant History Report:   A detailed account of initial interviews and subsequent personal and administrative information regarding informants shall be reported on the Informant History Report. (See Appendage C.)

G.   Criminal History Records and Fingerprints:

1.   Positive identification of prospective informants is an essential element in ensuring the safety of personnel. All prospective informants shall be queried for criminal history. Inquiries and responses shall be attached to all copies of the Informant History Report.

2.   Prospective informants, not identified by SID or FBI numbers, shall be fingerprinted for criminal inquiry. A completed card indicating "Criminal Inquiry, shall be attached to the original copy of the Informant History Report.

EXCEPTION:   Those individuals acting solely as sources of information need not be fingerprinted or photographed, if their identities can be definitively established by other means of verification, e.g., driver's license or other photo identification. If after activation, a source of information begins to take an "active" part in an investigation or intelligence operation (e.g., wears a wire, participates in a controlled buy, personally introduces undercover personnel), the above requirement for photographing and fingerprinting shall apply. Approval to compensate a source of information must be received from the Lycoming County District Attorney.   The approval will be documented in the Informant History Report.

3.   Informants may be used on a limited and provisional basis pending positive identification. However, suitable precautions shall be taken to ensure absolute control over such individuals until identification is confirmed.

Dent and Havens Production 407

H.   Liability Issues:   There are many situations encountered in supervising informants, which exposes the Lycoming County Narcotics Enforcement Unit and/or other Police Agencies to possible liability. Therefore, the following conditions shall be addressed during all initial interviews. Prospective informants must freely and voluntarily agree to the following:

1.   Informants are not law enforcement officers nor police officers, and at no time shall they represent themselves as such.

2.   Informants shall not carry firearms or other weapons while cooperating with investigations.

3.   Informants shall not participate in criminal activities outside the scope of law enforcement supervised investigations.

4.   Informants shall follow the instructions of the supervising law enforcement officer while cooperating with investigations.

5.   Informants shall not engage in any activity which would persuade a person, who would not otherwise do so, to commit a crime.

6.   They shall remain available to the supervising law enforcement officer until all investigations with which they cooperated are closed.

7.   They shall not hold the Office of the District Attorney and/or any other Law Enforcement Agency and its officers liable for any injury suffered or sustained as a result of their cooperation with investigations.

8.   Compensation received for specific services rendered during their cooperation with investigations represents full and complete payment for such services. Cooperating individuals have no future claims against the Office of the District Attorney and/or any other Law Enforcement Agency for such services.   Participation does not make them an employee of any kind of the Office of the District Attorney and/or any other Law Enforcement Agency.

Dent and Havens Production 408

ATTACHMENT H

9.   Information they provide may result in a criminal proceeding. The Office of the District Attorney and/or any other Law Enforcement Agency will use all lawful means to protect their confidentiality, but <u>cannot</u> guarantee the informant's identity will not be disclosed.

I.   Informant Conditions Statement:  The informant or source of information shall indicate their agreement to the above conditions by signing an Informant Conditions Statement Form, (Appendage D) at the time of the initial interview. The Informant Conditions Statement will be witnessed by the supervising law enforcement officer and when practicable, another law enforcement officer. The Informant Conditions Statement shall then be attached to all copies of the Informant History Report.


## DUTIES AND RESPONSIBILITIES

A.   Lycoming County NEU Coordinator and/or the Assistant Coordinator:

1.   Administer and securely maintain the NEU Informant History Files.

2.   Ensure the same individual is not activated as an informant by more than one law enforcement agency.

4.   Ensure individuals declared unreliable by one law enforcement agency have not been unknowingly reactivated by another.

5.   Ensure persons meeting the definition of informant or source of information are documented as such.

6.   Ensure initial interviews are comprehensive and that a signed and witnessed Informant Conditions Statement is attached to the Informant History Report.

7.   Ensure all Informant History Reports are complete and include criminal history documentation and an Informant Conditions Statement, as well as photographs, fingerprint cards, as required.

8.   Ensure special authorizations required by this regulation have been acquired.

-7-

Dent and Havens Production 409

9.    Ensure all prospective informants have been assigned for work with specific law enforcement officers.

10.   Ensure informant code numbers are assigned to each informant.

11.   Ensure informant compensation is commensurate with the service or information provided.

12.   Ensure the funds compensated are disbursed in accordance with established procedures.

13.   Ensure inactive or unreliable informants are deactivated by the supervising law enforcement officer.

14.   Ensure an annual review is conducted of all informants to ensure that all provisions of this regulation are being followed.

INFORMANT FILES

A.

B.



C.

-8-

Dent and Havens Production 410

ATTACHMENT H



SUPERVISING INFORMANTS

A.  Contacts:  (At least two law enforcement officers must be able to contact each informant.) Informant contacts shall be strictly professional and controlled to minimize exposure of NEU facilities, operations, activities, and personnel. Whenever practicable, two law enforcement officers shall be present at all in-person informant contacts. Extraneous business or social contacts with informants are prohibited.

B.  Opposite Sex Informants:  All personal contacts with informants of the opposite sex, or whose sexual preference may make an investigation more susceptible to compromise through alleged improprieties, shall be conducted by any combination of two law enforcement officers.

C.  Documentation:   All contacts with informants shall be documented on the appropriate investigative report.

D.  Searches:  Informants, who are exposed to Lycoming County NEU funds, controlled substances, or evidence of any kind, shall be thoroughly searched before and after undercover encounters and, kept under continuous observation between searches. All searches shall be conducted by law enforcement officers of the same sex as the informant.

E.  Juveniles:  

-9-

Dent and Havens Production 411

F.   Polygraph Examinations:   Informant information is normally corroborated through comparison with known facts and investigative follow-up. In situations where these approaches are impractical or insufficient, and corroboration is essential to the investigation or prosecution, polygraph examinations by shall be considered.

G.   Criminal Activity:  Any law enforcement officer with knowledge of an informant's arrest or unsupervised involvement in criminal activity shall, as soon as practicable, notify the Lycoming County NEU Coordinator and/or the Assistant Coordinator. The NEU Coordinator shall ensure a review is conducted to determine the appropriate course of action to be followed.

H.   Reassignment:  Informants are valuable assets whose services and information must be managed wisely. Lycoming County NEU Coordinator and /or the assistant Coordinator, asserts the right to reassign informants in order to increase productivity or meet changing investigative needs.

I.    Transfer:   Informants may be transferred between outside Local, State and Federal Law Enforcement Agency to meet operational needs.

INFORMANT COMPENSATION

A.



B.

-10-

Dent and Havens Production 412

ATTACHMENT H

C.

INFORMANT DEACTIVATION

A.

B.



-11-

Dent and Havens Production 413

## INFORMANT REACTIVATION



Dent and Havens Production 414

APPENDAGE  D

## INFORMANT CONDITIONS STATEMENT

I, _____ freely and voluntarily agree to the following conditions while cooperating with the Lycoming County Narcotics Enforcement Unit.

I am not a law enforcement officer or a police officer and at no time shall I represent myself as such.

I shall not carry a firearm or any other weapon while cooperating with the Lycoming County Narcotics Enforcement Unit.

I shall not participate in criminal activity outside the scope of the Lycoming County Narcotics Enforcement Unit supervised investigations.

I will follow the instructions of the supervising law enforcement officer while cooperating with the Lycoming County Narcotics Enforcement Unit

I shall not engage in any activity which would persuade a person, who would not otherwise do so, to commit a crime.

I will remain available to the supervising member or enforcement officer until all investigations with which I cooperated are closed.

I, on behalf of myself, my heirs, executors, administrators, successors, and assigns, with the intention to be legally bound, hereby agree to forever release and discharge, indemnify and hold harmless the Lycoming County Narcotics Enforcement Unit, its officers, agents, employees, and all other persons, entities, and political subdivisions, from and against all suits, damages, claims or other liabilities of whatever kind or nature for personal injuries or death, loss of consortium, damage to or loss of property, or any other loss or damage of any kind and nature, known or unknown, foreseen or unforeseen, including attorney's fees, arising from my cooperation with investigations.

If I am to receive compensation for specific services rendered during my cooperation with investigations, it will represent full and complete payment for such services.  That I have no future claims against the Lycoming County Narcotics Enforcement Unit for such services.  Although I may accept some compensation, I understand I am not an employee of any kind of the Lycoming County Narcotics Enforcement Unit.

That the information I provide may result in a criminal proceeding.  The Lycoming County Narcotics Enforcement Unit will use all lawful means to protect my confidentiality but <u>cannot</u> guarantee my identity will not be disclosed.


_____          _____
        WITNESS                              CI SIGNATURE

_____          _____
        WITNESS                            DATE            TIME

APPENDAGE C

| LYCOMING COUNTY DRUG TASK FORCE **INFORMANT HISTORY REPORT** | | | 2. INFORMANT NO. |
|---|---|---|---|
| | 1. DEPARTMENT | | |

**3. PURPOSE**
☐ ACTIVATION   ☐ REACTIVATION   ☐ SUPPLEMENT   ☐ DECLARATION OF UNRELIABILITY   ☐ DEACTIVATION   ☐ SOURCE OF INFORMATION

**4. ATTACHMENTS**
☐ INFORMANT CONDITIONS STATEMENT   ☐ CRIMINAL HISTORY RECORD INQUIRIES   ☐ PHOTOGRAPH   ☐ FINGERPRINT CARD
☐ SPECIAL AUTHORIZATIONS   ☐ RECEIPT   ☐ DEBRIEFING QUESTIONNAIRE
☐ _____

| 5. NAME | | 6. ALIAS/NICKNAME |
|---|---|---|

| 7. ADDRESS | ZIP CODE | 8. TELEPHONE NO. |
|---|---|---|

| 9. RACE | 10. SEX | 11. AGE | 12. DOB | 13. HEIGHT | 14. WEIGHT | 15. HAIR | 16. EYES | 17. SCARS/MARKS/TATTOOS |
|---|---|---|---|---|---|---|---|---|

| 18. BIRTHPLACE (CITY, STATE) | 19. SSN | 20. OLN (STATE) | 21. SID | 22. FBI |
|---|---|---|---|---|

| 23. VEHICLE 1 | 24. VEHICLE 2 |
|---|---|

| 25. EMPLOYER/SCHOOL | 26. OCCUPATION |
|---|---|

| 27. ADDRESS | ZIP CODE | 28. TELEPHONE NO. |
|---|---|---|

| 29. HOUSEHOLD MEMBERS |
|---|

| 30. POC FOR CI | ADDRESS | TELEPHONE NO. |
|---|---|---|

| 31. PAST/PRESENT AGENCY WORKING WITH CI | 32. DATES | 33. AGENCY CONTACT |
|---|---|---|

| 34. ALTERNATE LAW ENFORCEMENT OFFICER | BADGE NO. | 35. UNIT |
|---|---|---|

**36. NARRATIVE** (1) INCLUDE ADDITIONAL INFORMATION WHICH WOULD HELP IDENTIFY OR LOCATE THE INFORMANT. (2) PROVIDE A DETAILED ACCOUNTING OF INFORMANT INTERVIEWS WITHOUT INCLUDING SPECIFIC INVESTIGATIVE INFORMATION RECORDED ELSEWHERE. (3) PRESENT JUSTIFICATION FOR ADMINISTRATIVE ACTION INDICATED IN BLOCK 3.

| 37. SIGNATURE | 38. DATE OF REPORT | 39. DTF COORDINATOR |
|---|---|---|
| REPORTING OFFICER                BADGE NO. | | ☐ APPROVED ☐ DENIED<br>DATE: |

Dent and Havens Production 416

Google Maps    416 Brentwood Dr





Map data ©2024    500 ft

OCT/05/2020/MON 10:29 AM   DJ PAGE          FAX No. 570 327 2426                    P. 004

---

| COMMONWEALTH OF PENNSYLVANIA<br>COUNTY OF LYCOMING | | **POLICE CRIMINAL COMPLAINT**<br>COMMONWEALTH OF PENNSYLVANIA<br>VS. |
|---|---|---|

Magisterial District Number: 29-3-04
MDJ: Hon. WILLIAM C. SOLOMON
Address: 1965 LYCOMING CREEK RD
WILLIAMSPORT, PA 17701
Telephone: (570)323-9982

DEFENDANT:                              (NAME and ADDRESS):
ANTHONY        MARCUS        BARASKY
First Name      Middle Name      Last Name          Gen.

1534 LOUISA STREET
WILLIAMSPORT, PA 17701

### NCIC Extradition Code Type

| | | | |
|---|---|---|---|
| ☐ 1-Felony Full | ☐ 5-Felony Pend. | ☐ C-Misdemeanor Surrounding States | |
| ☐ 2-Felony Ltd. | ☐ 6-Felony Pend. Extradition Determ. | ☐ D-Misdemeanor No Extradition | ☐ Distance: ____ |
| ☒ 3-Felony Surrounding States | ☐ A-Misdemeanor Full | ☐ E-Misdemeanor Pending | |
| ☐ 4-Felony No Ext. | ☐ B-Misdemeanor Limited | ☐ F-Misdemeanor Pending Extradition Determ. | |

### DEFENDANT IDENTIFICATION INFORMATION

| Docket Number<br>OR 179.20 | Date Filed<br>10/02/2020 | OTN/LiveScan Number<br>4B67121-3 | Complaint/Incident Number<br>20-10100 | Request Lab Services?<br>☐ YES ☐ NO |
|---|---|---|---|---|

| GENDER | DOB ▉▉▉▉ | POB PENNSYLVANIA | | Add'l DOB / / | Co-Defendant(s) ☐ |
|---|---|---|---|---|---|
| ☒ Male | First Name | | Middle Name | Last Name | Gen. |
| ☐ Female | AKA | | | | |

| RACE | ☐ White | ☐ Asian | ☒ Black | ☐ Native American | ☐ Unknown |
|---|---|---|---|---|---|
| ETHNICITY | ☐ Hispanic | | ☒ Non-Hispanic | | ☐ Unknown |

| HAIR COLOR | ☐ GRY (Gray) | ☐ RED (Red/Aubn.) | ☐ SDY (Sandy) | ☐ BLU (Blue) | ☐ PLE (Purple) | ☐ BRO (Brown) |
|---|---|---|---|---|---|---|
| | ☒ BLK (Black) | ☐ ONG (Orange) | ☐ WHI (White) | ☐ XXX (Unk./Bald) | ☐ GRN (Green) | ☐ PNK (Pink) |
| | ☐ BLN (Blonde / Strawberry) | | | | | |

| EYE COLOR | ☐ BLK (Black) | ☐ BLU (Blue) | ☒ BRO (Brown) | ☐ GRN (Green) | ☐ GRY (Gray) |
|---|---|---|---|---|---|
| | ☐ HAZ (Hazel) | ☐ MAR (Maroon) | ☐ PNK (Pink) | ☐ MUL (Multicolored) | ☐ XXX (Unknown) |

| DNA | ☐ YES ☐ NO: | DNA Location | | WEIGHT (lbs.) |
|---|---|---|---|---|
| FBI Number 371883TC6 | | MNU Number | | 175 |
| Defendant Fingerprinted | ☐ YES ☐ NO | | | Ft. HEIGHT In. |
| Fingerprint Classification: | | | | |

### DEFENDANT VEHICLE INFORMATION

| Plate # | State | Hazmat ☐ | Registration Sticker (MM/YY) / | Comm'l Veh. Ind. ☐ | School Veh. ☐ | Oth. NCIC Veh. Code | Reg. same as Def. ☐ |
|---|---|---|---|---|---|---|---|
| VIN | | Year | Make | Model | Style | Color | |

Office of the attorney for the Commonwealth ☒ Approved ☐ Disapproved because: _____

(The attorney for the Commonwealth may require that the complaint, arrest warrant affidavit, or both be approved by the attorney for the Commonwealth prior to filing. See Pa.R.Crim.P. 507).

RYAN GARDNER                    VIA PHONE                          1ST /2/ 2020
(Name of the attorney for the Commonwealth).      (Signature of the attorney for the Commonwealth)          (Date)

---

I, DETECTIVE DENT                                301041 / #508
(Name of the Affiant)                           (PSP/MPOETC-Assigned Affiant ID Number & Badge #)

of LYCOMING COUNTY DISTRICT ATTORNEY            PA0411300
(Identify Department or Agency Represented and Political Subdivision)   (Police Agency ORI Number)
do hereby state: (check appropriate box)

1. ☒ I accuse the above named defendant who lives at the address set forth above
   ☐ I accuse the defendant whose name is unknown to me but who is described as _____

   ☐ I accuse the defendant whose name and popular designation or nickname are unknown to me and whom I have
   therefore designated as John Doe or Jane Doe
   with violating the penal laws of the Commonwealth of Pennsylvania at 2141   LYCOMING CREEK ROAD AND
   ECKARD ROAD, HEPBURN TOWNSHIP                                    (Subdivision Code)   (Place-Political Subdivision)

   In LYCOMING County        [41]         on or about 4/15/2020 - 9/24/2020
                          (County Code)              (Offense Date)



**PLAINTIFF'S EXHIBIT**
10
3/22/24   ESB

Dent and Havens Production 060

OCT/05/2020/MON 10:30 AM   DJ PAGE                FAX No. 570 327 2426              P. 005

## POLICE CRIMINAL COMPLAINT

| Docket Number | Date Filed: | OTN/LiveScan Number | Complaint/Incident Number |
|---|---|---|---|
| 02.129.20 | 10/02/2020 | | 20-10100 |

| Defendant Name | First: ANTHONY | Middle: MARCUS | Last: BARASKY |
|---|---|---|---|

The acts committed by the accused are described below with each Act of Assembly or statute allegedly violated, if appropriate. When there is more than one offense, each offense should be numbered chronologically.
(Set forth a brief summary of the facts sufficient to advise the defendant of the nature of the offense(s) charged. A citation to the statute(s) allegedly violated, without more, is not sufficient. In a summary case, you must cite the specific section(s) and subsection(s) of the statute(s) or ordinance(s) allegedly violated.)

| Inchoate Offense | ☐ Attempt 18 901 A | ☐ Solicitation 18 902 A | ☐ Conspiracy 18 903 | Number of Victims Age 60 or Older _____ |
|---|---|---|---|---|

| ☒ | 1 | 7512 | A | of the 3 | TITLE 18 | 1 | FEL3 | |
|---|---|---|---|---|---|---|---|---|
| Lead? | Offense# | Section | Subsection | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |

| PennDOT Data (if applicable) | Accident Number | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|

Statute Description (Include the name of statute or ordinance): Criminal use of a communication facility

Acts of the accused associated with this Offense: IN THAT, on 10/2/2020, the defendant did use a communication facility to commit, cause, or facilitate the commission or the attempt therof of any crime which constitutes a felony under this title or under the act of April 14, 1972 known as The Controlled Substance, Drug, Device and Cosmetic Act. TO WIT::On 10/2/2020 the defendant did utilize cellular telephone number (215) 301-0606 to facilitate the attempted delivery suspected Fentanyl (Schedule II) in area of Cogan Station, PA, 17728, Lycoming County.

| Inchoate Offense | ☐ Attempt 18 901 A | ☐ Solicitation 18 902 A | ☐ Conspiracy 18 903 | Number of Victims Age 60 or Older _____ |
|---|---|---|---|---|

| ☐ | | | | of the | | | | |
|---|---|---|---|---|---|---|---|---|
| Lead? | Offense# | Section | Subsection | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |

| PennDOT Data (if applicable) | Accident Number | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|

Statute Description (Include the name of statute or ordinance):

Acts of the accused associated with this Offense:

| Inchoate Offense | ☐ Attempt 18 901 A | ☐ Solicitation 18 902 A | ☐ Conspiracy 18 903 | Number of Victims Age 60 or Older _____ |
|---|---|---|---|---|

| ☐ | | | | of the | | | | |
|---|---|---|---|---|---|---|---|---|
| Lead? | Offense# | Section | Subsection | PA Statute (Title) | Counts | Grade | NCIC Offense Code | UCR/NIBRS Code |

| PennDOT Data (if applicable) | Accident Number | | ☐ Interstate | ☐ Safety Zone | ☐ Work Zone |
|---|---|---|---|---|---|

Statute Description (Include the name of statute or ordinance):

Acts of the accused associated with this Offense:

AOPC 412A - Rev. 07/18

Dent and Havens Production 061

OCT/05/2020/MON 10:30 AM   DJ PAGE                    FAX No. 570 327 2426                    P. 006

## POLICE CRIMINAL COMPLAINT

| Docket Number: 02.124.20 | Date Filed: 10/02/2020 | QTN/LiveScan Number | Complaint/Incident Number: 20-10100 |
|---|---|---|---|
| Defendant Name | First: ANTHONY | Middle: MARCUS | Last: BARASKY |

2. I ask that a warrant of arrest or a summons be issued and that the defendant be required to answer the charges I have made.

3. I verify that the facts set forth in this complaint are true and correct to the best of my knowledge or information and belief. This verification is made subject to the penalties of Section 4904 of the Crimes Code (18 Pa.C.S. § 4904) relating to unsworn falsification to authorities.

4. This complaint consists of the preceding page(s) numbered ___ through ___.

5. I certify that this filing complies with the provisions of the *Case Records Public Access Policy of the Unified Judicial System of Pennsylvania* that require filing confidential information and documents differently than non-confidential information and documents.

The acts committed by the accused, as listed and hereafter, were against the peace and dignity of the Commonwealth of Pennsylvania and were contrary to the Act(s) of the Assembly, or in violation of the statutes cited.
(Before a warrant of arrest can be issued, an affidavit of probable cause must be completed, sworn to before the issuing authority, and attached.)

OCTOBER 2ND        2020                             _____
(Date)            (Year)                           (Signature of Affiant)

AND NOW, on this date    10/2/2020    I certify that the complaint has been properly completed and verified.

An affidavit of probable cause must be completed before a warrant can be issued.

29-1-02                                             S/A
(Magisterial District Court Number)    (Issuing Authority)

AOPC 412A – Rev. 07/18                                          Page    of

Dent and Havens Production 062

OCT/05/2020/MON 10:30 AM   DJ PAGE                    FAX No. 570 327 2426                    P. 007

## POLICE CRIMINAL COMPLAINT

| Docket Number: | Date Filed: | OTN/LiveScan Number | Complaint/Incident Number |
| --- | --- | --- | --- |
| CR-129-20 | 10/02/2020 | | 20-10100 |
| Defendant Name | First: ANTHONY | Middle: MARCUS | Last: BARASKY |

### AFFIDAVIT of PROBABLE CAUSE

SEE ATTACHED

I, DETECTIVE DENT, BEING DULY SWORN ACCORDING TO THE LAW, DEPOSE AND SAY THAT THE FACTS SET FORTH IN THE FOREGOING AFFIDAVIT ARE TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE, INFORMATION AND BELIEF.

I CERTIFY THAT THIS FILING COMPLIES WITH THE PROVISIONS OF THE CASE RECORDS PUBLIC ACCESS POLICY OF THE UNIFIED JUDICIAL SYSTEM OF PENNSYLVANIA THAT REQUIRE FILING CONFIDENTIAL INFORMATION AND DOCUMENTS DIFFERENTLY THAN NON-CONFIDENTIAL INFORMATION AND DOCUMENTS.

_____
(Signature of Affiant)

Sworn to me and subscribed before me this ___2___ day of ___October___ ___2020___

Date _____ Magisterial District Judge
S/A

My commission expires: first Monday of January, ___2026___

CR.129.20                        U. 8|07121.3

# Affidavit of Probable Cause

This drug investigation involves an attempted delivery of suspected Fentanyl from Anthony BARASKY.

On October 2, 2020 I met with a Confidential Source (CS) who told me that have purchased suspected Fentanyl from Anthony BARASKY approximately 100 times. It should be noted BARASKY is a known narcotics dealer in the Williamsport Area. The CS stated that BARASKY would usually come to their house and deliver the suspected Fentanyl. In my presence the CS contacted BARASKY on telephone number (215) 301-0606 and asked BARASKY for "3", meaning 3 grams of Fentanyl. BARASKY then contacted the CS to let them know that he was almost there at which point BARASKY was traffic stopped and taken into custody by members of the Lycoming County Narcotics Enforcement Unit. Once BARASKY was in custody I contacted phone number (215) 301-0606 and the phone that was taken off his person rang displaying my phone number.

10/2/2020

Dent and Havens Production 064

# Williamsport Bureau of Police

Officer Report for Incident 20-10100

100220148

**Nature:** DRUG     **Address:** ECKARD RD & MILLER RD
**Location:** PSP     Hepburn Twp PA 17728

**Offense Codes:** ALLO
**Received By:**     **How Received:** O     **Agency:** WBP
**Responding Officers:**
**Responsible Officer:** K Dent     **Disposition:** CAA 10/15/20
**When Reported:** 16:36:49 10/02/20     **Occurred Between:** 16:36:49 10/02/20 and 16:36:49 10/02/20

**Assigned To:**     **Detail:**     **Date Assigned:** **/**/**
**Status:**     **Status Date:** **/**/**     **Due Date:** **/**/**

**Complainant:**
**Last:**     **First:**     **Mid:**
**DOB:** **/**/**     **Dr Lic:**     **Address:**
**Race:**     **Sex:**     **Phone:**     **City:** ,

## Offense Codes
**Reported:**     **Observed:**
**Additional Offense:** ALLO All Other Offenses

## Circumstances

**Responding Officers:**     **Unit :**

**Responsible Officer:** K Dent     **Agency:** WBP
**Received By:**     **Last Radio Log:** **:**:** **/**/**
**How Received:** O Another Agency     **Clearance:** CRO Cleared by Responding Officer
**When Reported:** 16:36:49 10/02/20     **Disposition:** CAA **Date:** 10/15/20
**Judicial Status:**     **Occurred between:** 16:36:49 10/02/20
**Misc Entry:**     **and:** 16:36:49 10/02/20

**Modus Operandi:**     **Description :**     **Method :**

## Involvements

**Date**     **Type**     **Description**



PLAINTIFF'S
EXHIBIT

3/22/24

10/15/20

| | | | |
|---|---|---|---|
| 10/02/20 | Name | BARASKY, ANTHONY MARCUS | Suspect |
| 10/02/20 | Offense | Offense#: 22796 - F3 - 1 count | Charged With |
| 10/02/20 | Vehicle | GRY 2019 NISS PATHFIND FL | Involved Vehicle |
| 10/07/20 | Property | Wallet 0 | Evidence |
| 10/05/20 | Property | BLK Cellular Phone IPHONE 0 | Evidence |
| 10/05/20 | Property | keys 0 | Evidence |

**Narrative**

THIS IS AN NEU CASE.   ALL RECORDS WILL BE MAINTAINED BY THE NEU.

_____

Responsible LEO:


_____

Approved by:


_____

' Date

## Supplement

```
TimeDisp: 10/02/2020 16:37:45
TimeCmpl: 10/02/2020 16:38:18
TimeArch: 10/02/2020 16:38:28
Received by: eSCHRECong
Complainant: 508
PrimaryUnit: 508
Dispatcher: eSCHRECong
Summary: P
IncLatitude: 41.310509
IncLongitude: 77.060516
CompLatitude: -1.000000
CompLongitude: -1.000000
```

Comment: eSCHRECong(10/02/2020 16:36:55): Inc Code changed to DRUG at 16:36

Comment: eSCHRECong(10/02/2020 16:37:24): Inc Addr changed to ECKARD RD and MILLER RD at 16:37

Comment: eSCHRECong(10/02/2020 16:37:34): RP Name changed from 5098 to 509 at 16:37

Comment: eSCHRECong(10/02/2020 16:37:37): RP Name changed from 509 to 508 at 16:37

Comment: eSCHRECong(10/02/2020 16:38:18): CFS Status changed to CMPL by eSCHRECong.

Comment: eSCHRECong(10/02/2020 16:38:24): Summary changed to P at 16:38

Comment: eSCHRECong(10/02/2020 16:38:28): CFS Status changed to ARCH by eSCHRECong.

```
TimeChanged: 10/02/2020 16:37:45
UnitNumber: 508
NewStat: DISP
Agency: LYCOMING COUNTY DETECTIVES
Zone: LCDET
```

```
TimeChanged: 10/02/2020 16:38:18
UnitNumber: 508
NewStat: AVAIL
Agency: LYCOMING COUNTY DETECTIVES
Zone: LCDET
```

```
Agency: WILLIAMSPORT POLICE
NumberStr: WBP-2020-010100
```

## Vehicles

**Vehicle Number:**
    **18437**

| | | | |
|---|---|---|---|
| **License Plate:** DFIS45 | | **License Type:** | PC Regular Passenger Automobile |
| **State:** FL | | **Expires:** | \*\*/\*\*/\*\* |
| **Vehicle Year:** 2019 | | **VIN:** | 5N1DR2BN2LC579356 |
| **Make:** NISS Nissan | | **Model:** | PATHFIND |
| **Color:** GRY / | | **Doors:** | 4 |
| **Vehicle Type:** PCAR Passenger Car | | **Value:** | $0.00 |

**Owner:**

| | | | | | |
|---|---|---|---|---|---|
| **Last:** BARASKY | **First:** ANTHONY | | | **Mid:** MARCUS | |
| **DOB:** | **Dr Lic:** | | | **Address:** 1534 LOUISA ST | |
| **Race:** B | **Sex:** M | **Phone:** (215)468-5955 | | **City:** Williamsport, PA 17701 | |

| | |
|---|---|
| **Agency:** WBP Williamsport Bureau of Police | **Date Recov/Rcvd:** 10/02/20 |
| **Officer:** K Dent | **Area:** |
| **UCR Status:** | **Wrecker Service:** WG Wood's Garage |
| **Local Status:** REL Release | **Storage Location:** |
| **Status Date:** \*\*/\*\*/\*\* | **Release Date:** \*\*/\*\*/\*\* |

**Comments:**

NEU arrest of Anthony Barasky, vehicle is rental, placed in inside impound
pending SW to be performed on 10/5 by Det. Dent.

10/15/20

## Property

| | | | |
|---|---|---|---|
| **Property Number:** | 30268 | | |
| **Item:** | Wallet | **Owner Applied Nmbr:** | |
| | | | |
| **Brand:** | | **Model:** | |
| **Year:** | 0 | **Quantity:** | 1 |
| **Meas:** | | **Serial Nmbr:** | |
| **Total Value:** | $0.00 | **Color:** | |
| **Owner:** | BARASKY ANTHONY MARCUS 1009 | | |
| **Agency:** | WBP Williamsport Bureau of Police | **Tag Number:** | AB3 |
| **Accum Amt Recov:** | $0.00 | **Officer:** | K Dent |
| **UCR:** | PHW Purses, Handbags, Wallets | **UCR Status:** | SAF |
| **Local Status:** | REL | **Storage Location:** | |
| **Crime Lab Number:** | | **Status Date:** | 10/07/20 |
| **Date Released:** | **/**/** | **Date Recov/Rcvd:** | 10/07/20 |
| **Released By:** | | **Amt Recovered:** | $0.00 |
| **Released To:** | | **Custody:** | **:**:** **/**/** |
| **Reason:** | | | |
| **Comments:** | WALLET BELONGING TO ANTHONTY BARASKY LOCATED IN BARASKY'S CAR. #508 | | |
| **Property Number:** | 30228 | | |
| **Item:** | Cellular Phone | **Owner Applied Nmbr:** | |
| | | | |
| **Brand:** | IPHONE | **Model:** | |
| **Year:** | 0 | **Quantity:** | 1 |
| **Meas:** | | **Serial Nmbr:** | |
| **Total Value:** | $0.00 | **Color:** | BLK |
| **Owner:** | BARASKY ANTHONY MARCUS 1009 | | |
| **Agency:** | WBP Williamsport Bureau of Police | **Tag Number:** | AB1 |
| **Accum Amt Recov:** | $0.00 | **Officer:** | K Dent |
| **UCR:** | CPH Cell Phone | **UCR Status:** | SAF |
| **Local Status:** | HOL | **Storage Location:** | |
| **Crime Lab Number:** | | **Status Date:** | 10/05/20 |
| **Date Released:** | **/**/** | **Date Recov/Rcvd:** | 10/05/20 |
| **Released By:** | | **Amt Recovered:** | $0.00 |
| **Released To:** | | **Custody:** | **:**:** **/**/** |
| **Reason:** | | | |
| **Comments:** | (1) BLACK IPHONE TAKEN OFF ANTHONY BARASKY. #508 | | |
| **Property Number:** | 30229 | | |
| **Item:** | keys | **Owner Applied Nmbr:** | |
| | | | |
| **Brand:** | | **Model:** | |

| | | | |
|---|---|---|---|
| **Year:** | 0 | **Quantity:** | 1 |
| **Meas:** | | **Serial Nmbr:** | |
| **Total Value:** | $0.00 | **Color:** | |
| **Owner:** | BARASKY ANTHONY MARCUS 1009 | | |
| **Agency:** | WBP Williamsport Bureau of Police | **Tag Number:** | AB2 |
| **Accum Amt Recov:** | $0.00 | **Officer:** | K Dent |
| **UCR:** | MSC Miscellaneous | **UCR Status:** | SAF |
| **Local Status:** | REL | **Storage Location:** | |
| **Crime Lab Number:** | | **Status Date:** | 10/05/20 |
| **Date Released:** | **/**/** | **Date Recov/Rcvd:** | 10/05/20 |
| **Released By:** | | **Amt Recovered:** | $0.00 |
| **Released To:** | | **Custody:** | **:**:** **/**/** |
| **Reason:** | | | |
| **Comments:** | (1) SET OF KEYS TAKEN OFF OF ANTHONY BARASKY. #508 | | |

## Name Involvements:

**Suspect :**  1009
    **Last:** BARASKY       **First:** ANTHONY       **Mid:** MARCUS
    **DOB:** ███████      **Dr Lic:** ███████    **Address:** 1534 LOUISA ST
    **Race:** B    **Sex:** M    **Phone:** (215)468-5955    **City:** Williamsport, PA 17701

10/15/20

