# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

ANTHONY BARASKY,                    :
        Plaintiff              :
                         :
    vs.                               :
                         :
KEVIN DENT, TYSON HAVENS,     :   CASE NO. 4:21-CV-02041
JOSHUA BELL, CLINTON          :
GARDNER, CHRISTOPHER          :
KRINER, JOSEPH HOPE,          :
LYCOMING COUNTY, OLD          :
LYCOMING TOWNSHIP; and        :
CITY OF WILLIAMSPORT,         :
        Defendants   :

Deposition of:    JOSHUA K. BELL

Taken by    :   Plaintiff

Before      :   Ervin S. Blank
              Reporter-Notary Public

Beginning   :   March 21, 2024; 11:44 a.m.

Place       :   McCormick Law Firm
              835 West Fourth Street
              Williamsport, Pennsylvania

COUNSEL PRESENT:

LEONARD GRYSKEWICZ, JR., ESQUIRE
Lampman Law
2 Public Square
Wilkes-Barre, Pennsylvania  18701
    For - Plaintiff

---

COUNSEL PRESENT: (CONTINUED)

AUSTIN WHITE, ESQUIRE
McCormick Law Firm
835 West Fourth Street
Williamsport, Pennsylvania  17701
    For - Defendants Kevin Dent and Tyson Havens

SHAWNA R. LAUGHLIN, ESQUIRE
William J. Ferren & Associates
P.O. Box 2903
Hartford, Connecticut  06104-2903
    For - Defendants Joshua Bell, Clinton Gardner
    and City of Williamsport

MARK J. KOZLOWSKI, ESQUIRE
Marshall Dennehey
P.O. Box 3118
Moosic, Pennsylvania  18507
    For - Defendants Old Lycoming Township,
        Joseph Hope and Christopher Kriner

---

**INDEX TO WITNESSES**

| FOR - PLAINTIFF | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Joshua K. Bell | 3 | -- | -- | -- |

**INDEX TO EXHIBITS**

| FOR - PLAINTIFF | MARKED | ADMITTED |
|---|---|---|
| Plaintiff's Exhibit No. 1 | 48 | -- |
| Plaintiff's Exhibit No. 2 | 60 | -- |

---

**STIPULATION**

It is hereby stipulated by and between counsel for the respective parties that signing, sealing, certification and filing are hereby waived; and that all objections except as to the form of the question are reserved to the time of trial.

\* \* \*

JOSHUA K. BELL, called as a witness, having been duly sworn or affirmed, testified as follows:

**DIRECT EXAMINATION**

BY MR. GRYSKEWICZ:

    Q    Captain Bell, have you ever been deposed before?

    A    Yes.

    Q    I'm going to give you some brief instructions. I'm sure your attorney probably already told you some of these, but if you don't understand a question I ask, tell me, I'll rephrase it. If the answer is I don't know or I don't remember, that's also a fine answer. I don't want you to speculate. If at any time you need a break, something comes up, just let us know and --

5

1    A    Okay.

2    Q    -- we can take a break.  I will let you fully

3  answer my questions and not interrupt you.  I'd ask

4  you to provide me with the same courtesy and --

5    A    Okay.

6    Q    -- that's it.  Do you have any questions?

7    A    No.  Nope.

8    Q    Could you state and spell your name for the

9  record?

10    A    Yes.  My name is Joshua K. Bell.

11  J-O-S-H-U-A.  The last name is B-E-L-L.

12    Q    Where are you currently employed?

13    A    Williamsport City Police.

14    Q    How old are you today?

15    A    I am 42.

16    Q    How were you employed in October of 2020?

17    A    In October of 2020, I would have been

18  employed also as a Williamsport police officer

19  specially assigned to the Lycoming County Narcotics

20  Enforcement Unit.

21    Q    Okay.  And could you tell us how that

22  assignment to the Lycoming County Narcotics

23  Enforcement Unit worked?

24    A    So I was essentially on lend from the

25  Williamsport Bureau of Police to the Lycoming County

6

1  District Attorney's Office as a -- essentially a

2  special county detective, assigned there temporarily

3  basically to conduct drug investigations.

4    Q    And at that time would the City of

5  Williamsport still have been paying your salary or

6  were you getting paid by the Lycoming County District

7  Attorney's Office?

8    A    The City of Williamsport.

9    Q    Okay.  How long have you been a police

10  officer as of today?

11    A    Approximately 14 years.

12    Q    The Lycoming County Narcotics Enforcement

13  Unit is often referred to as the NEU, is that right?

14    A    That's correct.

15    Q    Okay.  Feel free to refer to it as the NEU

16  during your testimony.

17    A    Okay.

18    Q    When I reviewed your resume, it said you

19  ended your work for the NEU in 2020.  When in 2020 did

20  you end your work with the NEU?

21    A    That would have been June 26th of 2020, I

22  was -- I was removed from the NEU and promoted to my

23  now position as captain.

24    Q    Okay.  And why did you end your work with the

25  NEU?  Just because of the promotion?

7

1    A    For the promotion, correct.

2    Q    So -- and I know many of the things that

3  occurred in this case were October 2nd, 2020.  Were

4  you still a member of the NEU then or, no, you're

5  assignment was over?

6    A    It might have my -- I might have my dates

7  wrong then.  I was still -- at the time of this

8  incident --

9    Q    Um-hum.

10    A    -- that we're here for, I would have been at

11  the NEU.

12    Q    Okay.  So maybe I had it wrong.

13    A    It might have been 2021.

14    Q    Okay.  So maybe I had it wrong from your

15  resume.  You might have been done with them in June,

16  '21 instead of '20?

17    A    Correct.

18    Q    Okay.

19    A    Yeah.  Sorry about that.

20    Q    No, that's not your fault.  So when you were

21  loaned to the NEU or assigned to the NEU, were you

22  working full time for them?

23    A    Yes.

24    Q    Could you tell me what the hierarchy of the

25  NEU was?  Who was your boss, who was under you?

8

1    A    So essentially there was the county

2  detectives and other -- you know, if there were other

3  specially assigned officers, they were basically

4  tasked for us or case officers.  At the time of this

5  incident, I was asked to take a position also

6  temporarily as the coordinator, and then I reported at

7  the District Attorney's Office to the then county --

8  chief county detective, Michael Simpler.  So my -- my

9  duties over there, I reported to Chief Simpler as part

10  of the DA's Office, but I, of course, still had --

11    Q    Um-hum.

12    A    -- my department that I was responsible for

13  reporting to as well.

14    Q    What did you do as the coordinator for the

15  NEU?

16    A    My job was essentially a little bit less case

17  management and more administrative, you know, as far

18  as assigning buy money when it was procured for the

19  officers, approving reports, things of that nature.

20  And occasionally help out with their cases.

21    Q    Was Detective Kevin Dent your superior,

22  inferior, equal?

23    A    He would have been one of the -- one of the

24  task force officers that would have worked for me

25  essentially as the first line coordinator.

9

1  Q      What about Detective Havens, how would he
2  rank in correspondence to you in the NEU?
3  A      The same manner.
4  Q      Okay.  And who would have been Detective Dent
5  and Havens superiors at the NEU?
6  A      So they would have -- as far as reporting day
7  to day, they would have reported to me as the
8  coordinator.  I in turn would report to Chief County
9  Detective Simpler.  Ultimately they were -- they would
10 fall under -- you know, as far as employment goes,
11 Chief Simpler in the District Attorney's Office.
12 Q      And then I believe you said this already, but
13 for the Barasky investigation that occurred in the
14 October 2020 range, you were a member of the NEU, not
15 Williamsport Bureau of Police?
16 A      Correct.  I was still employed with
17 Williamsport, but specially assigned to the county
18 task force.
19 Q      Okay.
20 A      Yep.
21 Q      On September 24th, 2020, a search warrant was
22 executed on a Matthew Sumpter's house.  Were you
23 involved in the execution of that search warrant?
24 A      Yes.
25 Q      Could you tell us what you did in

10

1  correspondence with that search warrant?
2  A      I searched some areas in the residence.  I
3  believe the basement, if I recall.  But that was
4  relatively it.  My -- I talked to his parents for a
5  little bit outside in the back yard, and just to
6  further explain, you know, why we were there and, you
7  know, why we were in their residence with a warrant.
8  But that would have been my involvement as far as the
9  search warrant that day.
10 Q      Would you have been aware of Matthew
11 Sumpter's criminal record before that search?
12 A      A little bit of it, depending on his status
13 as an informant.
14 Q      Were you present when Detective Dent
15 interviewed Matthew Sumpter on September 24th, 2020?
16 A      No, not that I recall.
17 Q      Did you interact with Sumpter at all on
18 September 4th, 2020?
19 A      The date of the search warrant at the
20 residence?
21 Q      Yep.
22 A      Maybe in passing, but not -- not really any
23 direct -- most -- I believe, if I recall correctly,
24 most of his interaction would have been with Detective
25 Dent.

11

1  Q      After you searched the basement processing
2  that search warrant, did you have any involvement in
3  the investigation into Matthew Sumpter after September
4  24th?
5  A      No.  No.  After my -- after assisting in the
6  search warrant, primarily -- and this is the case, you
7  know, as a general rule.  Detective Dent would have
8  continued his investigation kind on his own or with
9  the other officers until, you know, I would step in to
10 help assist.
11 Q      Do you recall what police officers were
12 present when Sumpter's house was searched on September
13 24th, 2020?
14 A      I know there were several officers.  I don't
15 remember for sure who they all were, but there was a
16 couple.
17 Q      Do you remember Detective Dent being there
18 specifically?
19 A      I believe so.
20 Q      What about Detective Tyson Havens?
21 A      It believe so.
22 Q      Okay.  Prior to the search, were you informed
23 of what criminal conduct Sumpter was being accused of?
24 A      I was aware that he -- I believe it was
25 possession of perhaps heroin or fentanyl or something

12

1  to that effect.
2  Q      Okay.  Did police have any concerns for their
3  safety when they were serving the search warrant on
4  Sumpter's house?
5  A      As far as I would say, safety in the sense of
6  exposure to controlled substances like Fentanyl -- do
7  you mean as far as what -- like assailants or anything
8  like that?
9  Q      Yeah.  Did you have any specific safety
10 concerns relating to Matthew Sumpter when you were
11 serving the warrant?
12 A      I don't recall any.  I know that as far as
13 the execution of the search warrant, that's typically
14 done in a manner where police enter and secure the
15 residence to ensure that there's no suspects.  So to
16 that end, I would say there was that, but that's a
17 general concern any time there's a warrant.
18 Q      Yeah.
19 A      But specifically about Matthew Sumpter being
20 aggressive or anything like that, I don't recall
21 having any concerns.
22 Q      Would agree with me that a burglary is a
23 violent crime?
24 A      I would -- I would say it depends.
25 Q      Okay.  And so when you look at somebody's

13

1    criminal history, it doesn't tell you the facts of the
2    crime that's on their record.  Would you agree with
3    that?
4         A    Correct.
5         Q    So if you're preparing to do a search warrant
6    of somebody's house and you see a burglary conviction,
7    would that give you a heightened sense of, you know,
8    you might be in danger of searching that house?
9         A    No, I would say not specifically.  It would
10   certainly be considered as part of the totality of the
11   circumstances, and it would also have to be considered
12   when weighed against additional crimes that were on
13   their criminal history.
14        Q    Okay.  Did you know that Sumpter offered to
15   work as an informant on September 24th, 2020, during
16   the search?
17        A    I was made aware essentially at that point or
18   after that he would have been interested in working as
19   an informant.
20        Q    And who would have told you that?
21        A    Detective Dent.
22        Q    Do you recall what Detective Dent told you
23   Sumpter could offer as an informant?
24        A    I believe he -- something to the effect that
25   one of the people that Sumpter would be able to

14

1    purchase narcotics from would be Mr. Barasky.
2         Q    Prior to October 2nd, 2020, did you ever have
3    any interactions with Anthony Barasky?
4         A    Yes.
5         Q    What were they?
6         A    Prior to -- prior to my assignment in 2020
7    with the narcotics unit, I previously had an
8    interaction with -- I had pulled Mr. Barasky over,
9    probably, at one point as a patrolman.  But
10   specifically one that I remember would have been in
11   2016 at which time I was employed as a county
12   detective at the narcotics unit during a vehicle
13   pursuit in Loyalsock.
14        Q    Okay.  And would that be the vehicle pursuit
15   where Mr. Barasky would have ended up crashing into
16   the Kmart?
17        A    Yes.
18        Q    Okay.
19        A    I had one other interaction with him,
20   excluding that, which is -- would have occurred in the
21   Newberry section of Williamsport, where I was
22   conducting surveillance on Mr. Barasky, because we had
23   received information again about him selling
24   narcotics.  And I believe at that time he was driving
25   a Durango, maybe a dark blue Durango.  I was obviously

15

1    in an unmarked police vehicle, undercover vehicle.
2    And while attempting to do surveillance on Mr.
3    Barasky, he began following me through Newberry, to
4    the degree that when I tried to break contact with
5    him, he essentially was pursuing me through Newberry.
6         Q    Do you know what year that happened in?
7         A    2016.
8         Q    2016.  Okay.  Was that before or after the
9    Kmart crash?
10        A    I don't remember.
11        Q    Okay.  So approaching October 2nd, did you
12   have any conversations with Detective Dent about using
13   Mr. Sumpter as an informant?
14        A    Sort of.  So what would have happened is
15   Detective Dent -- and again, I'm referencing this in
16   a -- sort of the general way that things are done and
17   this would have been how it was conducted.  He would
18   notify the members of NEU and myself that, you know,
19   Sumpter could purchase from, you know, any number of
20   individuals.  He would have named Mr. Barasky as one
21   of them.  He then would have prepared a packet to
22   essentially sign up Mr. Sumpter as an informant.
23        Q    Okay.  And that would have been pursuant to
24   the NEU regulations?
25        A    Correct.

16

1         Q    Okay.  And you actually have a specific form
2    that a confidential informant generally has to sign
3    before they could work for you, is that right?
4         A    Yes.
5         Q    So on October 2nd, how were you involved into
6    the preparation for Anthony Barasky's, you know,
7    arrest or the controlled buy on October 2nd?
8         A    So my involvement would have been when
9    Detective Dent relayed that he intended to conduct a
10   controlled buy for Mr. Barasky, that the members of
11   the NEU, as was the case in many instances, would be
12   asked for their input on what -- you know, what the
13   idea of the accomplishment of that mission was that
14   day.  In this instance it was to arrest Mr. Barasky
15   and basically intercept him as he arrived to conduct
16   the transaction.
17        Q    Okay.  And did that -- do you recall when
18   that meeting happened on October 2nd?
19        A    The day of.  It would have been maybe in the
20   morning or early afternoon.
21        Q    Would that have been before you involved Old
22   Lycoming Township in the case at all?
23        A    Yes.  So there would have been an initial
24   discussion with the members of the narcotics unit.
25   And then based on the fact that we knew that Mr.

**17**

1  Barasky would obviously be coming out to, you know,
2  Lycoming or Cogan Township -- or Hepburn Township,
3  excuse me, we would have then elicited the help of Old
4  Lycoming Township who had jurisdiction in that area at
5  the time.
6      Q      Okay.  And do you know where that meeting
7  between the NEU members took place?
8      A      Initially the discussion would have occurred
9  at the narcotics unit office.
10     Q      Um-hum.
11     A      Ultimately that would have culminated in a --
12  essentially a briefing with the members of NEU and Old
13  Lycoming Township police, which did include the Chief
14  and Detective Kriner.
15     Q      Okay.  And at that meeting at the NEU
16  headquarters, who would have been present besides
17  yourself at that meeting?
18     A      All the officers that were going to be
19  involved --
20     Q      Okay.
21     A      -- in the controlled buy and/or arrest.
22     Q      So it would have been at least yourself,
23  Detective Dent amid Detective Havens?
24     A      Yes.
25     Q      But possibly more?

**18**

1      A      Yes.
2      Q      Okay.  So at that meeting, that's where the
3  plan was really developed to arrest Anthony Barasky
4  that day?
5      A      If I recall correctly, it would have been at
6  least preliminarily discussed on the best way to
7  approach it.
8      Q      So -- and I'm asking in general on this, not
9  necessarily this specific meeting.  Do you discuss the
10  informant's criminal record and reliability during
11  those meetings?
12     A      No.
13     Q      What do you discuss as far as, you know, is
14  it legal for us to actually arrest somebody during
15  these meetings?
16     A      So it would have been discussed about --
17  several things, but Detective Dent would essentially
18  provide the members that were present, you know, I'm
19  looking at using this informant on this date.  We're
20  looking at purchasing, you know, this type of
21  substance.  I'm going to spend this much money.
22     Q      Um-hum.
23     A      Here's how -- and kind of a side note to
24  that.  When you're conducting a controlled buy or an
25  arrest or take down, more often than not you are sort

**19**

1  of at the mercy of how those controlled buys normally
2  go.  So we sort have to fit our plan into what's
3  normal for the informant and the dealer.
4          So in this case it would have been not
5  abnormal for Mr. Barasky to come to Sumpter's
6  residence to deliver.  So the plan was developed with
7  the collaboration of Detective Dent and the members of
8  NEU to have -- you know, to place an order for
9  narcotics.
10     Q      Um-hum.
11     A      And upon Mr. Barasky's approach into the
12  area, to essentially arrest him for coming to commit
13  the delivery in the process.
14     Q      Now, do you remember if Detective Dent
15  informed you that he never used Mr. Sumpter as a
16  confidential informant before October 2nd?
17     A      I know that he had recently just signed him
18  up.  I -- my understanding was that he had not used
19  him prior to that instance.
20     Q      Okay.  Did Detective Dent have any of the
21  text messages from Mr. Sumpter's phone in his
22  possession during this hearing?  Or I'm sorry, during
23  that meeting?
24     A      During the -- to set up how the -- how the
25  arrest would go?

**20**

1      Q      Um-hum.
2      A      I don't remember if he did.
3      Q      Okay.  Because just in -- well, the discovery
4  from the District Attorney's Office I received and
5  from your counsel there is pictures that Detective
6  Dent appears to take of text messages from Mr.
7  Sumpter's phone.
8      A      Okay.
9      Q      Do you know if he would have had those
10  before -- or at least some of them before Anthony
11  Barasky's arrest on October 2nd, 2020, or would it
12  have been after?
13     A      I don't know that he would have -- he would
14  have produced them, but I think -- I would submit that
15  it's fair to say that he would have been aware of them
16  or may have at least viewed them on Sumpter's phone.
17  One of the common practice when you're working through
18  a case with an informant is, you know, they'll go --
19  you will go through text messages with them and sort
20  of review to establish kind of what is the MO when --
21  you know, when they're buying drugs from a certain
22  individual.
23     Q      Okay.  Did Detective Dent present his
24  knowledge at this meeting of what those text messages
25  entailed to you or the other members of the NEU?

21

1    A    He had -- I do recall he had relayed

2  something to the effect that -- I think as I stated a

3  few minutes ago, he would -- it was common for him --

4  for Mr. Barasky to come to Sumpter to deliver, and

5  that Sumpter had purchased them -- purchased drugs

6  from Mr. Barasky.  So something to that effect would

7  have been provided.

8    Q    Okay.  Now, do you recall Detective Dent

9  relaying when Sumpter alleged he last purchased drugs

10 from Anthony Barasky?

11   A    I believe it was just in the days prior.  It

12 wasn't -- it was fairly recent when the controlled --

13 when this attempt was made.

14   Q    Okay.  And then at what point did you decide

15 to involve the Old Lycoming Township police in this?

16   A    Around the time that the plan was developed

17 that the safest way to execute the arrest was to do it

18 on the way up -- I believe it's Eckard Road, which at

19 that point would have been in their area.  So as a --

20 obviously as a courtesy, but also as an officer safety

21 measure, we would have then included them and asked

22 for their involvement.

23   Q    The meeting that you have at the NEU where

24 Detective Dent presents his findings and what he wants

25 to do, is that a collaborative meeting where

22

1  everybody's contributing to the plan of how they're

2  going to go and arrest Mr. Barasky?

3    A    Yes.  And it was -- it was my practice as the

4  coordinator, and it's been the practice of

5  coordinators I worked for, to draw from the training

6  and experience from the officers that are there to

7  develop kind of the best plan --

8    Q    Um-hum.

9    A    -- from everybody's input, especially those

10 officers who may be familiar with the subject.  So in

11 this case, Detective Havens obviously would have had

12 some knowledge about Mr. Barasky, so we would have

13 also pulled from his.

14   Q    Okay.  And that's exactly what I was going to

15 ask you next.  I believe Detective Havens in

16 particular had some special knowledge about Mr.

17 Barasky.  Is that right?

18   A    That's correct.

19   Q    Okay.  So you would have relied on him as

20 well when developing this plan?

21   A    Yes.

22   Q    Did you make the call to Old Lycoming

23 Township to get them involved in it?

24   A    I believe I did.  I reached out either

25 directly to Detective Kriner.  He was a detective at

23

1  the time.

2    Q    Um-hum.

3    A    Or Chief Hope.  But I'm fairly certain it was

4  Detective Kriner I reached out to.

5    Q    What would you have said to him in that phone

6  call?

7    A    I would have relayed essentially what you and

8  I just discussed.  We had an informant.  Not

9  necessarily who the informant was, but sort of the

10 facts and circumstances around what our intent was

11 that day, where it was going to occur, what we were

12 looking to do.  So in a -- in this case essentially

13 make an arrest and intercept the transaction.  And,

14 you know, how we were looking to go about doing that,

15 and that would have been relayed to him.

16   Q    Would you have relayed to the officer from

17 Old Lycoming Township how -- what your probable cause

18 was to suspect and then arrest Anthony Barasky?

19   A    No, not necessarily.  We would have

20 essentially relayed to them sort of the case

21 background.  I'm pretty sure that Detective Kriner

22 also was familiar with Mr. Barasky.

23   Q    Um-hum.

24   A    So that would have -- we would have been

25 provided, you know, the name of our suspect to him.

24

1  And that's essentially what it would have been

2  relayed, but not necessarily the specifics of the case

3  prior to that.

4    Q    Okay.  So that's why -- so you would have

5  related specifics about Mr. Barasky in your plan for

6  him, but maybe not necessarily specifics about Mr.

7  Sumpter and what happened previously?

8    A    Correct.

9    Q    Okay.  Then did you have a meeting at the Old

10 Lycoming Township police station to bring everybody up

11 to speed before the arrest?

12   A    Yes.

13   Q    Could you tell us who was present at that

14 meeting?

15   A    All of the officers that were involved with

16 the -- with the takedown that day or the arrest would

17 needed to have been present.  Off the top of my head,

18 Officer Gardner, Detective Dent, Detective Sergeant

19 Kriner, Chief Hope, Detective Havens, and a couple

20 others.  Maybe Detective Caschera.  And I don't

21 recall.  There may have been an additional couple, but

22 I don't recall for sure.

23   Q    Okay.

24   A    But, yeah, several officers from the unit.

25   Q    Did you lead that meeting at the Old Lycoming

25

1  Township Police Department?

2      A     Sort of.  In a sense.  I would -- upon

3  gathering everybody, I would sort of give them the

4  initial brief that here's what our intent is, here's

5  who the target of the investigation is.  This is what

6  we're hoping to accomplish.  And then, you know,

7  here's how we're thinking we would like to go about

8  doing this.  What does everybody think.

9      Q     Okay.

10     A     And then my role at that point would sort of

11 take a second seat to letting the officers provide

12 their input and develop the plan.

13     Q     And I would assume one of the benefits of

14 involving the Old Lycoming Township police would be

15 getting their local expertise for that specific area?

16     A     Correct.  They would be able to provide us

17 with information, and I believe they did provide us

18 specifically with information about, you know, where

19 that road would lead to on the other side of Eckard

20 and where -- you know, should Mr. Barasky flee again,

21 where he may end up going, what the layout of that

22 area was like.  We would be able to gain, obviously,

23 some geographical insight but -- as well as draw from

24 their experience in how to do about executing the

25 plan.

26

1      Q     Would Chief Hope have contributed to, let's

2  say, determining the location for the traffic stop of

3  Anthony Barasky?

4      A     He may.  And I don't recall specifically if

5  he did, but it would not be out of the ordinary for,

6  again, an officer from that agency, especially the

7  chief, to make recommendations or offer some insight

8  into, you know, the safest location or where to go

9  about, you know, taking care of it.

10     Q     At that meeting did you -- at the Old

11 Lycoming Township Police Department did you discuss

12 Matthew Sumpter's criminal record at all?

13     A     I don't believe we did.  And that is --

14 again, that's a -- it's pretty common to not discuss

15 specifics about the confidential informant, to include

16 their -- their name.  Maybe the location of where they

17 live for officer safety reasons, but that's -- usually

18 those things are pretty minimalized to protect -- you

19 know, as much as we can, protect the identity of the

20 informant.

21     Q     Okay.  So you're not sure if you would have

22 even told the Old Lycoming Township officers Matthew

23 Sumpter's name during that meeting?

24     A     We may not have.  They may have mentioned at

25 a minimum his name, but not a whole lot of additional

27

1  information.

2      Q     What was the plan with Detective Dent to set

3  the sale up with Anthony Barasky?

4      A     So as I stated a little bit ago, oftentimes

5  you are -- you're sort of forced to develop your plan

6  of action within the confines of what is common.  So

7  in this instance, our understanding was that Mr.

8  Barasky would come directly to Mr. Sumpter's house and

9  deliver.

10         So our plan would have included arranging a

11 controlled buy for essentially a narcotic that he

12 commonly purchased from Mr. Barasky, which -- and

13 forgive me.  I don't recall if it was heroin or

14 Fentanyl or a mixture, but it was a controlled

15 substance, nonetheless.  So our plan would have

16 included calling him and summoning him, you know, at

17 least to the area to conduct that controlled purchase.

18     Q     Okay.  And was the plan for Detective Dent to

19 go to be with the confidential informant to make those

20 communications?

21     A     Yes.  So Detective Dent would -- you know,

22 could election to -- and this is oftentimes done.  He

23 may go with the informant or be near him.  In this

24 case I believe he was physically with him.  And he

25 essentially is the coordinating case officer for the

28

1  handling of the informant, which is his

2  responsibility, as well as a dual responsibility to

3  keep the arresting teams sort of apprised and sort

4  of -- you know, put together a concerted effort

5  between the two.

6      Q     Was it discussed that Detective Dent never

7  heard Anthony Barasky's voice before so he wouldn't be

8  able to identify him on the phone?

9      A     He may not have.  He would have -- again, he

10 would have relied on the information that was coming

11 in via phone call, via text message and/or from Mr.

12 Sumpter.

13     Q     Okay.  Would you agree with me that Detective

14 Kevin Dent was the lead investigator into the Anthony

15 Barasky case in October, 2020?

16     A     Yes.

17     Q     At that meeting at the Old Lycoming Township

18 Police Department, did you discuss Anthony Barasky's

19 prior criminal record?

20     A     I think we -- we went to the extent of at

21 least reminding everybody of his prior interactions.

22 There would have been a mixture of officers.  Some of

23 them, such as myself, Detective Havens and some

24 others -- excuse me -- who would be familiar with Mr.

25 Barasky, and some who are obviously a little bit

29

1  younger and may not have had interactions.
2          So it would have at least been discussed
3  that, you know, be advised and just keep this in your
4  mind then, you know, there's a history of fleeing and
5  this -- so on and so forth.  So at least to give the
6  officers at least a little bit of a heads up for
7  officer safety so that they understood some of the
8  dynamics there.
9      Q    What was the plan for -- strike that.  At
10 that briefing at the Old Lycoming Township Police
11 Department, what was the plan that was created to
12 actually stop Anthony Barasky's vehicle and arrest
13 him?
14     A    So one of the things that takes place when --
15 in a police operation, especially in a dangerous
16 operation like dealing with a drug trafficker -- is
17 you develop some safety measures and you have to
18 consider the safety of officers.  First and foremost,
19 the public, bystanders, the informant and officers and
20 the suspect.  So based upon what we knew about where
21 Mr. Sumpter resided and where the drug transactions
22 had occurred and his interaction, our understanding
23 was that it was a single access in and out from Eckard
24 Road, up onto a hill where there was a development of
25 houses, presumably with children and other people.

30

1      Q    Um-hum.
2      A    So the plan was developed that, you know --
3  and based on the knowledge and the experience that
4  when a drug transaction's arranged between a purchaser
5  and the drug dealer, they typically bring the
6  narcotics with them.
7      Q    Um-hum.
8      A    So he -- it wouldn't be common for, let's
9  say, Mr. Barasky, as an example, to come get money
10 from Sumpter, leave and come back.  He would come with
11 the drugs.  So the idea was to -- once Mr. Barasky had
12 indicated that he was en route with narcotics and had
13 facilitated that crime via cell phone, we would have
14 then attempted to affect an arrest and a traffic stop
15 of Mr. Barasky on his way to it.
16         Some of the other things involved there are
17 the prior knowledge, obviously, of Mr. Barasky's drug
18 history.  But moreover his -- in prior cases, his
19 concealing methods.  It was common for him to conceal
20 large amounts of drugs within the vehicles.  Not just
21 within sort of the passenger compartment, but
22 literally in the car, inside the dash and things of
23 that nature.  So those things would've all been sort
24 of tapped as considerations when developing that plan.
25     Q    Okay.  And I know you're talking about

31

1  concealing them inside the car.  So, you know, from a
2  layman's perspective like myself, there's a bunch of
3  plastic pieces around the center console or the glove
4  box area.  Are you talking about he would remove those
5  and place drugs inside and then replace them so it was
6  hidden?
7      A    Yes.  And that was Mr. Barasky's MO.  In his
8  previous case where he fled, there was a substantial
9  amount of heroin which was concealed within the dash
10 of the car.
11     Q    Um-hum.
12     A    And I knew from my experience with traffic
13 stops and criminal interdiction, that it was very
14 common and relatively easy to do to conceal drugs
15 behind plastic panels in the car and things of that
16 nature.
17     Q    You wouldn't have to be a mechanic to figure
18 that out?
19     A    No.
20     Q    And you were referring to the 2016 fleeing
21 case where he hit the Kmart, you found drugs inside
22 the plastic compartments to his vehicle?
23     A    Yes.
24     Q    So as far as the nuts and bolts of the plan
25 were to stop Anthony Barasky, who was supposed to do

32

1  what?
2      A    So the -- Detective Dent, as I stated
3  earlier, would have been the -- sort of the case
4  management officer.  He would have coordinated between
5  the narcotics unit and his informant, and essentially
6  act as a go-between to provide information.  The other
7  officers that were on scene that were undercover -- in
8  an undercover capacity would have acted as sort of --
9  twofold.  They would have been surveillance officers
10 in the event that -- or if surveillance was needed.
11         And secondary to that, they also would have
12 assisted in the -- affecting the arrest.  Myself and
13 Officer Gardner, for that detail were in the Narcotic
14 Enforcement Unit's black unmarked police vehicle
15 Interceptor.  And Chief Hope was in a -- I don't
16 recall if it was unmarked or marked, but he was also
17 in a police vehicle, both equipped with standard
18 police lights and sirens and so on and so forth.  And
19 I believe Detective Kriner was also in some fashion in
20 a police vehicle, but I don't recall if it was marked
21 or unmarked.
22     Q    Okay.  I know you said part of the plan was
23 to make sure Anthony Barasky responded to the
24 informant that he had drugs and he was on his way.  Is
25 that right?

**33**

1    A   Yes.

2    Q   When Detective Dent relayed to the team that

3  Anthony Barasky's on his way, do you recall what he

4  specifically said over the radio then?

5    A   I don't recall specifically, but he -- I do

6  know that he would have indicated that -- something to

7  the effect, okay, he's on his way.

8    Q   Um-hum.

9    A   And if there was a period of time where we

10  didn't see him, he would essential have the informant

11  reach back out and say, he's saying he's three minutes

12  away or he's saying he's ten minutes away or something

13  to that effect.

14    Q   To your knowledge, did Detective Dent ever

15  say over the radio, like Barasky confirmed he has the

16  drugs to the confidential informant and he's on his

17  way?

18    A   I don't recall that.  I just believe it was

19  something to the effect that he was -- he was on his

20  way up.

21    Q   Okay.  And then would you agree with me that

22  you went with Detective Gardner and Chief Hope to

23  select a place to sit to pull Barasky's vehicle over?

24    A   Correct.  Yes.  We would have gone up and we

25  did go up to the area of -- I believe it is Roan's RV.

**34**

1  There was a gravel lot just off of Eckard Road that

2  allowed us basically an unobstructed relatively --

3  sorry -- relatively close view of Eckard Road, which

4  is where we did select to sit.

5    Q   Okay.  And did Chief Hope help you select

6  that location?

7    A   Essentially.  We sort of pulled in there

8  together and both turned vehicles around and parked

9  sort of next to each other so that we could still talk

10  kind of face to face, but maintain a -- you know, a

11  visual on -- on Eckard.

12    Q   Okay.  And was Detective Tyson Havens located

13  on Lycoming Creek Road then trying to spot Anthony

14  Barasky on his way?

15    A   Somebody may have been.  I don't remember if

16  it was Detective Havens or if he was further up, but I

17  vaguely remember -- and I apologize.  I vaguely

18  remember somebody being a little further down on the

19  Creek Road or in that area watching for him, watching

20  for Mr. Barasky as he approached.

21    Q   And how were you in communication with the

22  rest of the team assembling to take down Barasky?

23    A   Through radio communications and cell phone.

24    Q   Would Detective Dent have been communicating

25  in the same way with everybody or just specifically

**35**

1  with you?

2    A   No, with everybody.

3    Q   Okay.

4    A   He would have been just relaying stuff out so

5  that everybody could kind of basically stay on the

6  same page.

7    Q   So Detective Dent would have been talking

8  over the same radio frequency as the rest of the

9  police officers?

10    A   Yes.

11    Q   Okay.  From -- once you got to that gravel

12  parking lot, how long do you think you waited until

13  Anthony Barasky's vehicle showed up?

14    A   I would say approximately 20 or 30 minutes,

15  somewhere in there.

16    Q   And how did you know it was Anthony Barasky's

17  vehicle?

18    A   As he drove by and began traveling,

19  essentially as I'm looking out toward Eckard, when he

20  turned off and approached, we would have seen him in

21  the car.

22    Q   Okay.

23    A   We knew that he was lighter skinned and had

24  some facial hair on the sides.  And based on the time

25  frame, based on observing him, we had -- we were

**36**

1  probably about 150 to 200 feet off of Eckard, so we're

2  relatively close.

3    Q   And just so the record's clear, you made a

4  gesture like a T, so you would have been looking

5  perpendicular to the road and would have seen the side

6  of Anthony Barasky's car go past you?

7    A   That's correct.

8    Q   Okay.  And then that's when you would have

9  identified Anthony as the driver and decided to

10  initiate the traffic stop?

11    A   Yes.

12    Q   Okay.  Who gave the command to initiate the

13  traffic stop?

14    A   We -- myself, Officer Gardner and Chief

15  Hope -- when Mr. Barasky drove by, we would have

16  called out, he just turned on Eckard.  We're going to

17  be pulling out to initiate the traffic stop.  Here's

18  the vehicle that he's in, this tag.

19    Q   Um-hum.

20    A   And we would let him know, okay, we're

21  lighting up the vehicle now.

22    Q   And the plan was to stop Mr. Barasky's

23  vehicle as soon as you saw him on Eckard Road.  Is

24  that right?

25    A   Essentially.  Once we could get behind him

37

1 and get -- you know, get into place to initiate a
2 traffic stop.
3 Q Okay. Did your vehicle or Chief Hope's
4 vehicle pull out to initiate the traffic stop first?
5 A I believe my vehicle.
6 Q And would it have been lights and sirens on
7 your vehicle to do the traffic stop?
8 A Yes.
9 Q Could you tell us what happened when you
10 turned on your lights and sirens and pulled out?
11 A Chief Hope approached in his vehicle with us.
12 As Mr. Barasky approached -- and I don't recall the
13 name of the road, but there was a secondary road
14 that -- as we're behind Mr. Barasky, there was a
15 secondary road that turned right --
16 Q Um-hum.
17 A -- and sort of went on an incline and took
18 you into the development area where Mr. Sumpter lived.
19 Q Um-hum.
20 A So just before that we had initiated the
21 traffic stop, before Mr. Barasky got to that inlet.
22 Q Um-hum.
23 A And he pulled over or essentially stopped in
24 the lane on Eckard --
25 Q Okay.

38

1 A -- just before or right as he began to turn
2 into that access road.
3 Q Did you put on the lights and sirens for your
4 police vehicle as soon as you were pulling out of that
5 gravel lot?
6 A No, we would have pulled out, caught up to
7 him, and got up a little bit closer and then
8 illuminated the lights.
9 Q At any point did you think Anthony Barasky
10 was fleeing that day?
11 A Not after he -- not after he came to a stop
12 and we got him into custody. However, it was an
13 ongoing consideration in my mind that I had to
14 evaluate, and I think the other officers kind of did
15 the same, was waiting for Mr. Barasky to pull away
16 when we got out of the car or drive away when we
17 approached.
18 Q Okay.
19 A Which is -- under the circumstances with Mr.
20 Barasky's history and the times I've had that happen
21 to me, so it's always a consideration.
22 Q And you would say like through your training
23 and experience, that's something you look for because
24 you're out of your vehicle and can't catch up to him
25 as quick then?

39

1 A Correct.
2 Q Okay. Do you recall Chief Hope calling out
3 over the radio like that he thought Barasky was not
4 going to stop for you?
5 A I don't recall that, but he may have.
6 Q Once -- so you said Barasky pulled his
7 vehicle over, but it was still kind of blocking the
8 road on Eckard Road?
9 A Yes.
10 Q Okay. Did he actually like turn into Miller
11 Road at all, the access road to Mr. Sumpter's
12 development?
13 A My recollection was that when we -- when
14 the -- when Mr. Barasky's vehicle came to rest and we
15 were able to begin taking physical custody of him, the
16 vehicle was turned slightly angular, indicating a turn
17 into Miller Road, but he had not made it all the way
18 and committed to travel up there. But he was
19 essential pulling into it and slightly turned off to
20 the right.
21 Q Do you recall if he ever put a turn signal on
22 to pull over?
23 A I don't.
24 Q Okay. Would you agree with me that Old
25 Lycoming Township officers were stationed right past

40

1 the road to go into Mr. Sumpter's development where he
2 lived?
3 A Yes.
4 Q Okay. So would you agree that Mr. Barasky
5 couldn't have passed that road going into Mr.
6 Sumpter's development, at least without dangerous
7 activity?
8 A Do you mean bypass the turn and keep going
9 straight?
10 Q Um-hum. Yes.
11 A I believe he could have -- he could have kept
12 going straight.
13 Q Um-hum.
14 A Initially when we pulled out and attempted to
15 pull him over, he would have been able to continue on.
16 And there was a short period of time there where that
17 would have been the case. However, once the traffic
18 stop was essentially moving along and he was
19 compliant, other vehicles could have pulled in to
20 assist and come up and help out.
21 Q Okay. And to -- also to drive past that road
22 to Mr. Sumpter's development, he would have had to
23 ignore your lights and sirens and flee, essentially?
24 A To continue up into the development, you
25 mean?

41

1     Q    No, no. So if he was going to drive past Mr.

2 Sumpter's development, keep going straight, he would

3 have had to ignore your lights and siren and the

4 traffic stop at that point?

5     A    Yes. By the time he would have bypassed the

6 turn on Miller Road, I think that's what it is -- for

7 him to bypass that and continue on, it would have been

8 fairly evident at that -- by that point after

9 initiation of the lights and siren that he was not

10 intending to stop. That would have been evident.

11     Q    Okay. When Barasky stopped his car, what did

12 you do?

13     A    I exited the driver's side. I would have

14 drawn my firearm and began giving orders. I may have

15 stopped giving orders at some point if another officer

16 began yelling. Oftentimes what happens is when

17 officers start to affect an arrest and give orders, a

18 couple different officers may all give orders. So as

19 to not make it confusing or give them conflicting

20 orders, we'll often stop. If I notice that, let's

21 say, for example, Officer Gardner's giving him orders

22 and he's complying to them, I'll stop yelling as well.

23     Q    At the time you got out of the car with your

24 firearm drawn, did you see who else got out of their

25 vehicles at that point to arrest Mr. Barasky?

42

1     A    No, not initially. My -- my attention was on

2 not only Mr. Barasky, but the vehicle itself and sort

3 of the interior, trying to make sure that Mr. Barasky

4 was, in fact, the only one in the car.

5     Q    Okay. As far as your vehicle was positioned

6 in relation to -- let me ask this differently. How

7 was your vehicle positioned in relation to Chief

8 Hope's vehicle and Barasky's vehicle?

9     A    So Mr. Barasky's vehicle would have been --

10 if this is Mr. Barasky, I would have been in our

11 vehicle -- if I recall correctly, the first unit

12 behind him.

13     Q    Um-hum.

14     A    Approximately half a car length to a full car

15 length behind. And then Chief Hope, I believe, would

16 have been offset slightly to the left or right,

17 slightly behind us or near parallel to us, somewhere

18 in there.

19     Q    Do you recall if Chief Hope got out his car

20 to participate in the arrest?

21     A    I believe he did.

22     Q    Okay. And did Detective Havens come from

23 somewhere at some point to join in?

24     A    He did. He approached from -- Detective

25 Havens approached from somewhere off of the front to

43

1 the side somewhere, and I don't recall if it was off

2 of Miller Road or if he -- if he exited and came

3 around. But I do recall him sort of coming in and

4 assisting as well. I just don't remember what

5 direction.

6     Q    Did all the officers approaching Mr.

7 Barasky's car have their firearms drawn?

8     A    I don't remember. I know that -- I'm pretty

9 sure that I did.

10     Q    Um-hum.

11     A    But I don't know that -- it's also common for

12 at least one officer to not, and they will oftentimes

13 be in charge of physically getting custody or getting

14 handcuffs out. So I think it's -- based on my

15 recollection and practice, it's fair to say that not

16 everybody did.

17     Q    Okay. How did you actually get Barasky out

18 of the vehicle?

19     A    He was -- I believe Detective Havens was able

20 to physically sort of get his hands on Mr. Barasky and

21 extract him, not without any sort of the fight or

22 anything like that. But I believe, if I recall

23 correctly, it was Detective Havens.

24     Q    Okay. Did anybody try to break a window on

25 Mr. Barasky's car?

44

1     A    No, not to my recollection.

2     Q    To the best of your recollection, did Barasky

3 resist at all getting out of the car?

4     A    No.

5     Q    You believe Detective Havens put handcuffs on

6 Mr. Barasky?

7     A    I believe so.

8     Q    Okay. Did you speak with Barasky at all when

9 he was arrested?

10     A    Just -- sort of -- yes, to answer your

11 question, I did, but not to any extent. When we began

12 transporting him back to Old Lycoming Township's

13 police department, we would have indicated we're going

14 to take you down to Lycoming. I don't even know if we

15 would have notified him yet that we were going to do a

16 search.

17     Q    Um-hum.

18     A    Usually in -- and my practice was this. That

19 if I assisted another officer with an arrest and, you

20 know, if the person was in the back of the car and

21 said, why am I under arrest, what did I do --

22     Q    Um-hum.

23     A    -- so as not to provide them any conflicting

24 information, I usually tell them, listen, the

25 detective that has your case is going to come down and

**45**

1  talk to you.
2  Q    Okay.  So even if you did talk to Mr.
3  Barasky, it was nothing substantive about the case?
4  A    Correct.
5  Q    Was Barasky searched when he was taken out of
6  the vehicle?
7  A    Initially I believe he was -- preemptive just
8  an initial search or pat down for weapons, and then a
9  subsequent search down at Old Lycoming Township.
10  Q    Were any drugs found on Mr. Barasky's person?
11  A    No, not to my recollection.
12  Q    Did you have any involvement in the search of
13  Mr. Barasky's vehicle?
14  A    No.
15  Q    At the scene did -- at the scene of the
16  traffic stop did anybody search Mr. Barasky's vehicle?
17  A    I don't recall if there was an actual search
18  done.  I think at a minimum, probably a -- a wingspan
19  visual search, but that would have been it.
20  Q    To your knowledge, were any drugs found in
21  Mr. Barasky's vehicle?
22  A    No.
23  Q    How -- or where did you take Mr. Barasky's
24  car after the traffic stop?
25  A    I believe it was towed, and it would have

**46**

1  been the practice at the time for it to go to city
2  police impound, which is where the NEU would store
3  their vehicle.
4  Q    Did you personally pat down or search Mr.
5  Barasky at all that day?
6  A    I did a strip search of Mr. Barasky with
7  Officer Gardner at Old Lycoming Township.
8  Q    And what did you find during that strip
9  search?
10  A    Nothing -- nothing of -- no contraband.
11  Q    And would you agree with me that after Mr.
12  Barasky was -- you found out he was going to the
13  Lycoming County Prison, you called ahead to make sure
14  he was put in a dry cell?
15  A    Yes.  There was some discussion from
16  Detective Dent -- or somebody had requested that I
17  call ahead, and I think the recommendation was
18  something to the effect like, hey, make sure you let
19  the county prison know -- ask them for a dry cell,
20  based on the fact that no drugs were found on the
21  physical search of him.
22  Q    Would it be common for you to request a dry
23  cell at the Lycoming County Prison?
24  A    Under the circumstances which were present
25  that day, and that would have included the fact that

**47**

1  there was no controlled substance found on the strip
2  search, however, we have had instances several times,
3  especially involving drug traffickers or users, where
4  they had controlled substances or contraband contained
5  in their body.
6  Q    Um-hum.
7  A    And oftentimes at intake on their initial
8  search in there or somewhere in there, they would
9  oftentimes retrieve them and flush them down the
10  toilet before the CO's could get them.  So it wouldn't
11  be uncommon for somebody to recommend that under
12  those -- those circumstances.
13  Q    Okay.  That's -- the concern's essentially
14  somebody sees the police lights behind them and they
15  eat the drugs, something like that?
16  A    Eat them or -- or secret them.
17  Q    Okay.  Do you know what the results of the
18  dry cell at the Lycoming County Prison were?
19  A    No.
20  Q    After Barasky was arrested, did you transport
21  him to the Old Lycoming Township Police Department?
22  A    Yes, I -- Officer Gardner and I transported
23  Mr. Barasky from Eckard Road and Miller Road --
24  Q    Um-hum.
25  A    -- to Old Lycoming Township Police

**48**

1  Department.
2  Q    Did you have any involvement with the
3  investigation after the strip search then at the Old
4  Lycoming County Police Department?
5  A    No.  My involvement after the arrest that day
6  was -- I think that concluded it --
7  Q    Okay.
8  A    -- to my recollection.
9  Q    So I don't recall searching Sumpter's phone
10  or anything like that?
11  A    No.
12       (Whereupon, a document was produced and
13  marked as Plaintiff's Exhibit No. 1 for
14  identification.)
15  BY MR. GRYSKEWICZ:
16  Q    Okay.  I'm going to show you a map.  Just
17  take a look at that for a second.  Does this map
18  appear to you to be an accurate depiction of the
19  general area where the traffic stop of Barasky
20  occurred in Brentwood Drive?
21  A    Oh, okay.  I had to find it.  I'm sorry.  So
22  right here where -- yeah.  So where you have this --
23  it looks like on this -- where this green line
24  parallels -- I'm not sure what route that is labeled
25  as, but if I'm seeing this --

**49**

1  Q  Right there.

2  A  Am I on the wrong one?

3  Q  No, no, no.  Like that's the name of the

4  road.  It just kind of loops around.

5  A  Okay.  So -- yes.  So right here where Eckard

6  Road essentially intercepts with Miller, right in

7  there where that green line stops would have been the

8  approximate location of the traffic stop.

9  Q  Would you be able to mark that on the map for

10  me with an X?

11  A  Sure.

12  Q  And then you could hang onto the pen for a

13  minute.

14  A  Okay.  Yep.

15  Q  So would you agree with me that the Miller

16  Road led to Brentwood Drive where the informant lived?

17  A  Yes.  And I'm not -- I don't recall the road

18  or the specific street that he lived on, but I know

19  that it was up there.

20  Q  Okay.  And you would agree with me that once

21  a driver turns on Miler Road, that's the only way in

22  or out of that development?

23  A  Yes.  Yeah, as far as I know.

24  Q  And to the best of your knowledge, that red

25  little dot there on the map, does that -- is that the

**50**

1  rough location of 416 Brentwood Drive where the

2  informant lived?

3  A  To my recollection, yes, that's -- that's

4  where he would have been -- that's where he -- Mr.

5  Sumpter would have resided.

6  Q  Could you put a circle on that map where you,

7  Chief Hope and Detective Gardner were staged waiting

8  for Mr. Barasky?

9  A  A circle, you said?

10  Q  Yeah.

11  A  Probably right in there (indicating).

12  Q  Okay.  And do you know where Sergeant

13  Kriner -- or where Detective Kriner would have been

14  stationed?

15  A  I believe he was up in the -- in this area,

16  right around Miller Road, I believe.

17  Q  Okay.  Could you just put a square on the map

18  where you think Detective Kriner was?

19  A  Yeah.  I'll make it rather -- a little bit

20  larger --

21  Q  Okay.

22  A  -- because I know it was somewhere in that

23  area.

24  Q  Yeah.  Somewhere in that general area, but

25  you don't know a specific location?

**51**

1  A  Correct.

2  Q  Okay.  And to the best of your knowledge, do

3  you know where Detective Dent was when this all

4  happened?

5  A  Up here (indicating).  What would you like to

6  the label that?

7  Q  Would he have just been at Sumpter's house

8  there?

9  A  As far as I recall, yeah.

10  Q  Okay.  That's fine.  You don't have to put

11  anything for that.

12  There were also officers with tack strips

13  waiting in case Mr. Barasky fled.  Is that right?

14  A  Yes.  They had some spike strips available.

15  Yep.

16  Q  And were they after Miller Road or before it

17  or where on the map?

18  A  I believe they were up on Miller Road in the

19  event that when we initiated the -- to affect the

20  traffic stop, in the event that he fled, they would be

21  able to quickly deploy them out.

22  Q  Okay.  Did Barasky's vehicle stop in the

23  general area where you guys planned to stop him?

24  A  Yeah.  Yes, I would say that's -- that's

25  accurate.

**52**

1  Q  Okay.  Would you agree with me that if he was

2  allowed to turn onto Miller Road, he wouldn't have

3  been able to exit that development except through

4  Miller Road?

5  A  Yes.

6  Q  So why was it the police decision to stop him

7  on Eckard Road where he could have had an escape route

8  versus letting him trap himself on Miller Road?

9  A  Because along this route on Eckard, as you

10  travel this, there was -- it's basically wooded area.

11  The homes that are along there are relatively sort of

12  off that road and not directly involved.  When you

13  turn onto Miller Road and you start to get up onto

14  Brentwood and these other -- kind of have a hard time

15  reading them.  But all these --

16  Q  Yep.

17  A  Essential all these roads right here, these

18  are all littered with close houses.  There's a lot of

19  residences, a lot of people.  I presume children.  So

20  when we went out, the assessment of risk to the

21  public, it was -- it would have been more risky than

22  prudent to let him -- to let Mr. Barasky proceed and

23  get up into here in the event that he fled, like he

24  had in the past, at high rate of speeds, potentially

25  injuring -- injuring somebody or striking a building.

**53**

1     Q     Okay.

2     A     So the decision was made to affect a traffic

3 stop down here where, had he fled, he's remaining on a

4 less populated road and the risk to the public would

5 have been less.

6     Q     You would agree with me without you

7 initiating the traffic stop on Eckard Road, you don't

8 know if Mr. Barasky was going to make a right onto

9 Miller Road or keep going straight onto Eckard Road?

10     A     Based upon what he relayed -- based upon what

11 Mr. Barasky relayed to Sumpter and to Detective Dent,

12 our belief was that he was committing to turn onto

13 Miller Road, subsequently making it to the residence

14 on Brentwood.

15     Q     Okay. So your belief he was going to the

16 residence on Brentwood was based entirely on what

17 Sumpter was telling Detective Dent?

18     A     And the -- and the phone call and text

19 messages that would have been kind of going back and

20 forth. Yes.

21     Q     Okay. Would you agree with me, as part of

22 drug investigations, police officers will often

23 observe a controlled buy with a -- you know, a drug

24 dealer and informant and then make an arrest at a

25 later time of the drug dealer?

**54**

1     A     Sometime, yep. Yes.

2     Q     Why wasn't that option picked for Mr. Barasky

3 this day?

4     A     Detective Dent decided that he wished to

5 affect the arrest of Mr. Barasky that day. And I'm

6 not sure what all considerations he took in in wanting

7 to go do that. But as the case officer, that would

8 have been his decision primarily to say, you know,

9 we're just -- I think we just need to arrest him

10 today.

11     Q     Okay. I'm going to take that back.

12     A     Yep, go ahead.

13     Q     How many arrests do you estimate you've made

14 as a police officer?

15     A     Thousands.

16     Q     Thousands. How many arrests for drug crimes

17 out of those thousands number do you think you made?

18     A     I would say 80 percent of them.

19     Q     Okay. So mostly drug crimes?

20     A     Yeah.

21     Q     Okay. So you're familiar with the criminal

22 use of a communication facility charge under Section

23 7512 of the Crimes Code?

24     A     Yes.

25     Q     Could you explain when you, as a police

**55**

1 officer, would file that charge against an individual?

2     A     If, based upon the phone contact, whether it

3 be voice or, you know, text message or some sort of

4 application, et cetera, where it appeared as though

5 they were facilitating the arrangement of a drug deal

6 using that phone.

7     Q     Have you ever charged somebody with criminal

8 use of a communication facility and no other crime in

9 your career?

10     A     I don't remember if I have or not.

11     Q     Have you ever charged somebody with the

12 attempted delivery of a controlled substance before?

13     A     Yes.

14     Q     And I'm sure you've used confidential

15 informants before during your career as a police

16 officer. Is that right?

17     A     Yes, sir.

18     Q     What are you taught through your training and

19 experience you must do to make sure an informant's

20 reliable in a drug case?

21     A     There's a -- there's sort of several things,

22 but the reliability of an informant can be established

23 in a couple ways, one of them being a reliability --

24 you can do it through controlled buys. You can

25 have -- you know, they'll arrange a controlled buy,

**56**

1 tell you who they can buy from. You do the buy, and

2 essentially it's successful or it goes through.

3     I've had informants where more of their

4 reliability would be based on the information they

5 provided, not taking it necessarily at face value, but

6 if they told me certain specifics about some crimes or

7 drug traffickers and their habits and it was

8 consistent with knowledge that I already possessed as

9 a -- as an officer, I would lend credibility to that

10 as well. So sometimes you have more of, you know, a

11 controlled buy. Sometimes you have more information.

12 Sometimes I can only go off of information that they

13 have, so it's -- it just depends.

14     Q     Okay. So sometimes you might just have

15 special information that you know nobody else would

16 know unless they were involved in it through your

17 investigations, you would use that?

18     A     Yes.

19     Q     Okay. And what about when you've never used

20 an informant before, what kind of precautions do you

21 take as an officer to make sure they're telling the

22 truth and they're reliable?

23     A     I'm going to examine their -- if I've never

24 used them before, I'm going to rely on more so the

25 information that they provide. So if I -- just as an

57

1 example in general. If I have a drug trafficker that
2 I know, and I know that that drug trafficker's habits
3 are very specific things, and I know that they carry a
4 specific gun and I know their MO for how they conduct
5 a drug deal -- let's say they might go to a house and
6 then come see the buyer. They might go to the buyer,
7 then go get money. They typically have a motus
8 operandi that they don't really deviate from.
9     Q     Um-hum.
10    A     And each one of them has sort of their own
11 nuances. So if the -- if an informant or a potential
12 informant says to me, you know, I can buy off of this
13 person, I won't tell them that I know that person.
14 I'll just say, all right, well, tell me about it.
15 How's it go down. Well, he always does this. This is
16 how it goes down.
17    Q     Um-hum.
18    A     Sometimes they give me the phone number that
19 they've been buying from, and I just remember the
20 phone number and I go, yep, I bought drugs off that
21 number probably 50 times.
22    Q     Okay.
23    A     So I take all those things into
24 consideration. Now, if they tell me several of those
25 sort of key things that are part of the MO -- and it

58

1 might just be as simple as he always keeps it in the
2 air vent over on the passenger's seat, or he always
3 keeps it in this door pocket or something like that.
4 Once they hit a couple of those key things and they
5 tell me, I lend credibility to that because those are
6 things that are not just general drug dealing
7 information.
8     Q     Okay.
9     A     Might even be specific to how they package it
10 or a stamp. So there's a lot.
11    Q     Okay.
12    A     But that was typically -- that would be
13 typically for me. And I apologize if I'm talking
14 really fast. Tell me to slow down.
15          For me, those are -- those are what I would
16 take into consideration on information received.
17    Q     You agree there's no hard set rules that you
18 have to follow to do that?
19    A     No.
20    Q     Okay. But when you've never used an
21 informant before, you are supposed to corroborate what
22 they're saying to you, correct?
23    A     If you can. And sometimes -- sometimes that
24 information is simply corroborated by prior knowledge.
25    Q     Um-hum.

59

1     A     So in this case -- and I'll use Mr. Barasky.
2 If I had an informant come to me and say -- you know,
3 if I say, all right, who can you -- who can you buy
4 from, what targets would you have. Well, I can buy
5 from a guy that goes by Ant or A, which is what Mr.
6 Barasky used as a street name. He drives a blue
7 Durango. He's got light skin. He typically does
8 this. He always conceals it really well in the car.
9     Q     Um-hum.
10    A     I know that that's credible because I know
11 from prior experience that that is how Mr. Barasky
12 operated at the time.
13    Q     Now, is there, say, staleness to the
14 information you got? So -- let me strike the whole
15 question.
16          So if -- if a person tells you I bought from,
17 you know, person X, and you know person X was charged
18 with a drug crime four years ago, does the length of
19 time since they were charged or convicted of that
20 crime to when they're being accused of selling drugs
21 now matter?
22    A     It can. It could, if there's a substantial
23 amount of time in between there. Again, I think
24 you -- I would again submit that you have to reply on
25 the -- the information and the experience of the

60

1 officer, because -- and again from my own experience,
2 I have arrested several drug dealers sort of over the
3 span of their youth. I've arrested them as juveniles.
4 I've arrested them as adults and again as parents.
5     Q     Um-hum.
6     A     So -- and their MO remained the same or, you
7 know, the drug that they sold kind of remained the
8 same. So it's sort of -- there's sort of two answers
9 to that. I guess it just -- it would depend.
10    Q     So you'd agree, like the older it is, the
11 less useful it is and the more other factors you need
12 to kind of bring it all together?
13    A     I would agree with that.
14    Q     Okay. So I know we talked previously. The
15 NEU has certain regulations you're supposed to follow
16 as far as informants go, right?
17    A     Yes.
18          (Whereupon, a document was produced and
19 marked as Plaintiff's Exhibit No. 2 for
20 identification.)
21 BY MR. GRYSKEWICZ:
22    Q     I'm going to hand you -- take a look at that.
23 Take your time, let me know when you're done.
24          MS. LAUGHLIN: Are you asking him to read
25 through the whole thing?

BY MR. GRYSKEWICZ:

Q    No.  Review it, let me know like if you agree
that is the Attachment H as part of the NEU
regulations for informants and sources of information.

A    It looks -- yes.

Q    Okay.  Now, obviously the copy you would have
with the NEU would not have the redactions in it?

A    Correct.

Q    And would you agree, except for those
redactions, this would be a true and accurate copy of
the Attachment H, the informants and sources of
information you're governed by as an NEU officer?

A    To my recollection, yes.

Q    Okay.  The policies and procedures in that
document require you to document your findings in a
written report, right?

A    Yes.  You're going to prepare a buy report or
an arrest report or -- et cetera.

Q    So that would mean you're going to detail the
information you learned from the informant in a
written report for, you know, an investigation down
the road or whatever means?

A    Correct.  Yes.

Q    The policies and regulations also instruct
that you're supposed to conduct a broad line of

inquiry to extract all information from the criminals
and criminal activity known to the prospective
informants.  Would you agree with that?

A    Yes.

Q    And what's the purpose of doing a broad line
of inquiry with an informant?

A    It allows you -- offers several different --
different things.  One of them is -- goes back to the
discussion that we just had about reliability, that
offers information on targets, and it allows the case
officer to evaluate essentially how -- the value of
that informant's capability as a CI.  So some
informants might be able to, hey, I buy from one guy
all the time.  That's all I can do.

Q    Um-hum.

A    And then you talk to another informant and
they're like, I buy from and here they
are and the list.  So that offers -- the question you
just asked kind of goes to that.

Q    Okay.  Now, you would agree, then, when
somebody's arrested for selling drugs and they're
offering to be an informant, you don't want to just
know who might be above them, but also who they're
selling drugs to themselves?

A    I'm not sure I understand your question.

Q    Yeah.  Let me rephrase it.  So if you arrest
somebody for selling drugs --

A    Okay.

Q    -- and they ask to cooperate with you, you
don't want to just know who they buy their drugs from,
a lot of times you want to know who they also sell
their drugs to?

A    Not necessarily.  The idea is to go up in the
distribution chain.  It really doesn't have a lot of
investigatory value for me to go to that person and
ask them about who they sold their drugs to.  I would
want to know where they get their drugs.  So the idea
is to climb the chain of distribution.

Q    Now, if you had a situation where one
confidential informant tells you, this person told me
they bought drugs from Philadelphia a couple days ago,
and then you arrest that person the informant told you
about, and they tell you, no, I bought my drugs from
Williamsport, wouldn't you ask that person about
the information the previous CI gave you about
purchasing drugs from Philadelphia?

A    Not necessarily.  Because sometimes the
information that's provided to informants or chatter
that they have maybe with a drug dealer is not
accurate.  Obviously, they will -- they will remove

themselves.  So as a drug trafficker, I might tell
somebody, I got this off the kilo.  It's like as fresh
as it comes, when really what I did is I took it and I
repacked it with a packing device to make it look like
it's off of a kilo, and then I charge you more.  It's
a way to rip people off.

Q    Yeah.

A    That's how you become a drug dealer.

Q    Drug dealers lie.

A    Right.  They're not honest.  So it's not --
that's not out of the realm of possibility where the
information that the informant specific to where they
get the drugs might not always be entirely accurate.

Q    Okay.  But wouldn't you want to challenge
that informant to make sure the information he's
telling you about where he's buying his drugs from is
correct?

A    I might -- I might ask them and push a little
bit.  I might say -- you know, I might tell the
informant, hey, next time your -- the opportunity
arises, you know, see if you can find out more about
this.

Q    Um-hum.

A    But you have to be cautious not to put the
informant into danger by saying, hey, I want you to

65

1  ask him who their source is, because any drug dealer
2  is going to be like, well, why are you asking me that?
3  Some of that is more on me as the officer to just go
4  do some surveillance and kind of build that on the
5  side. So you have to weigh it -- again, you have to
6  weigh the risk of that with the -- you know, you still
7  have to keep the informant safe.
8      Q     You would agree, then, whatever information
9  you obtained from that informant, interviewing them
10 with the broad line of inquiry would then be
11 documented in a written report?
12     A     Oftentimes it's documented on a -- like an
13 informant sheet. They can -- they can buy from, you
14 know, so and so or this many targets. Sometimes if
15 there's -- if it's rushed or if things are sort of
16 happening fast, you might only have time to tell
17 people, they said they can buy from, you know, one,
18 two and three. So that's -- that does get deviated
19 from at times. But, yeah, frequently and more often
20 than not it's document.
21     Q     Okay. And part of the NEU regulations also
22 provide that you to have to tell prospective
23 informants during their initial interview a number of
24 conditions that govern their conduct.
25     A     Yes.

66

1      Q     So one of those conditions would be that they
2  have to sign the informant condition statement?
3      A     Correct.
4      Q     Okay. And that informant condition statement
5  would inform them they're not allowed to engage in any
6  criminal activity outside of police supervision?
7      A     Yes.
8      Q     And if an informant violated that condition,
9  would that make you concerned as to their reliability?
10     A     A little bit. I would -- it would be
11 untruthful to say, no, not at all. But we have to
12 understand, too, as police officers in the role that
13 the informant plays, that there's a reason they're an
14 informant, and they are -- they are oftentimes a drug
15 user or commit criminal acts. So we have to weight
16 that against the reality of it.
17     Q     Are you supposed to take any certain actions
18 as an NEU member if an informant violates those
19 conditions that they sign?
20     A     They will oftentimes reinforce -- depending
21 on what they did. Obviously if the informant goes out
22 and commits an armed robbery, we're not continuing to
23 use them, or if they -- you know, some violent crime
24 or something of that effect. But, yes, if they --
25 if -- you'll counsel them and say, hey, listen, you're

67

1  jeopardizing your judicial consideration with the DA's
2  office and you're jeopardizing your status as an
3  informant by committing additional criminal acts, so
4  you've got to keep out of trouble.
5      Q     Let's say you -- you arrest somebody for
6  selling drugs, they want to be an informant. You go
7  over the informant conditions with them, and then
8  seven days later you're going to make the bust on the
9  person they gave you information on. If during that
10 seven day span you find out they had communication
11 with the person you're going to arrest, would that
12 make you concerned about the informant's reliability
13 or what's going on happen?
14     A     Not necessarily. And I say that because in
15 the realm of drug use and drug dealers, you have to
16 understand, a drug user is going to talk to that drug
17 dealer every single day.
18     Q     Um-hum.
19     A     If you're a coffee drinker and you need
20 coffee every morning or you're going to get a
21 headache, and you have to go to somebody to buy it,
22 you're going to talk to them every day. It's just
23 part of your routine. It's that way for drug user --
24 excuse me.
25          So -- and really it jeopardizes the

68

1  reliability -- or I'm sorry, the informant's safety
2  and reliability with the drug dealer. They have to
3  maintain their reliability with them as much as they
4  do with the police to a degree. So if I arrest this
5  drug user for dealing with this drug dealer, and I
6  say, how often do you talk to so and so, and they say
7  every day.
8          And then I tell them, all right, you know,
9  you're an informant now, you can't talk to them until
10 I say so, and then they stop talking to that dealer
11 for two weeks, and then I say, all right, let's do a
12 buy, the first thing that that drug dealer is going to
13 do when they text them is they're going to go, where
14 you been. Why haven't you been reaching out to me.
15         That immediately jeopardizes their safety.
16 It immediately jeopardizes the investigation. So
17 there's a -- there's sort of a balance that you need
18 to find, and it can be hard sometimes, allowing them
19 to continue their contact with the dealer and talk to
20 them.
21     Q     Um-hum.
22     A     But you'll touch base with them, hey, did you
23 hear from him today. What did he say. He said he's
24 on his way back from Philly with a kilo or, you know,
25 an ounce. So -- does that answer your question?

69

1    Q    Yeah. So I think what you would expect of an

2 informant, then, is to keep you informed if they're

3 talking to that person?

4    A    Correct. And they're not always -- they're

5 not always going to call me and say, hey, guess what,

6 he said this.

7    Q    Yeah.

8    A    A lot of times I had to call my CI's.

9    Q    Um-hum.

10    A    Hey, did you hear from him today? Yeah.

11 What did he say? Oh, he said this. And again, I have

12 to recognize I'm dealing with somebody that's got a --

13 sometimes a severe trauma or substance abuse issues

14 before I had interaction with them, so that's --

15 that's not unlikely.

16    Q    And before you actually set somebody up using

17 an informant, would you always want to see the

18 informant's phone and the communications between them?

19    A    Yes. Frequently look at their -- we

20 would go through the phone together. I would -- you

21 know, a lot of times with the informant you'll go

22 right down through and you'll say, who's so and so,

23 because they're all -- you know, a lot of times

24 they're street names or they're --

25    Q    Um-hum.

70

1    A    You know, they might be listed by a car or

2 just a letter and you'll say who's this, who's this,

3 who's this.

4    Q    Um-hum.

5    A    So on and so forth. So, yeah, that would be

6 common to go through their phone with them.

7    Q    Okay. In this case, did you see ever at any

8 point the text message between what's alleged to be

9 Barasky and Sumpter?

10    A    I don't believe I did. Maybe when

11 entering -- scanning the report in and attaching it,

12 but --

13    Q    But not in depth to make an analysis?

14    A    Not in a -- just in a review. No.

15    Q    As far as drug lingo goes in text messages,

16 is it standard or is it based on individual people a

17 lot of times?

18    A    Both.

19    Q    Okay.

20    A    There are some -- there's some lingo that's

21 standard to certain people, and there's some that is

22 general language across the board and kind of accepted

23 slang. So it's a little bit of both.

24    Q    Okay. If you saw somebody write in a text

25 message, I got your bread plus money three, what would

71

1 that mean to you?

2    A    That would indicate to me, I have your money,

3 plus some additional for a purchase of drugs.

4    Q    Would you also agree that if you saw like in

5 a text message somebody texting somebody else, like

6 H-M-U, hit me up, I got you, what would that mean to

7 you?

8    A    That would -- depending on which direction

9 it's going. If it's a drug dealer sending that to a

10 drug user, they're saying -- when I say I got you,

11 that means I've got drugs, I can sell you some. Let

12 me know.

13    Q    And, yeah, so that's the normal connotation

14 of it. It's I have drugs. You know, hit me up, I got

15 your supply?

16    A    Correct.

17    Q    In 2020 was your income as a police officer

18 your only source of income?

19    A    Yes.

20    Q    What was your annual pay as a police officer

21 in 2020?

22    A    I'd have to estimate. I think somewhere

23 around maybe 70,000, 65,000 a year.

24    MR. GRYSKEWICZ: That's all the questions I

25 have. Thank you for your cooperation, Detective Bell.

72

1    THE WITNESS: Sure. Yep.

2    MR. KOZLOWSKI: I don't have any questions.

3    MR. WHITE: I don't have any question.

4    MS. LAUGHLIN: No questions.

5    THE WITNESS: Okay.

6    (Whereupon, the deposition was concluded at

7 12:57 p.m.)

**Ervin Blank Associates, Inc.**
**107 McCracken Road, Danville, PA 17821**
**office@ervinblankassociates.com**

73

1   COUNTY OF UNION          :

2   COMMONWEALTH OF PENNSYLVANIA

3

4           I, Ervin S. Blank, the undersigned Notary

5   Public, do hereby certify that personally appeared

6   before me, JOSHUA K. BELL; the witness, being by me

7   first duly sworn to testify the truth, the whole truth

8   and nothing but the truth, in answer to the oral

9   questions propounded to him by the attorneys for the

10  respective parties, testified as set forth in the

11  foregoing deposition.

12          I further certify that before the taking of

13  said deposition, the above witness was duly sworn,

14  that the questions and answers were taken down

15  stenographically by the said Ervin S. Blank, Court

16  Reporter, Lewisburg, Pennsylvania, approved and agreed

17  to, and afterwards reduced to typewriting under the

18  direction of the said Reporter.

19          In testimony whereof, I have hereunto

20  subscribed my hand this 27th day of March, 2024.

21

22

23  _____

24  Ervin S. Blank
    Reporter-Notary Public
25  My Commission Expires
    January 28, 2025

**- 0 -**

**06104-2903** [1] 2:6

**- 1 -**

**17701** [1]  2:3
**18507** [1]  2:10
**18701** [1]  1:24

**- 2 -**

**2016** [4]  14:11; 15:7, 8;  31:20
**2020** [18]  5:16, 17;   6:19, 21; 7:3;   9:14, 21; 10:15,    18; 11:13;   13:15; 14:2, 6;  20:11; 28:15;   71:17, 21
**2021** [1]  7:13
**2024** [2]  1:16; 73:20
**2025** [1]  73:25
**21-cv-02041** [1] 1:6
**24th** [5]  9:21; 10:15;   11:4, 13;  13:15
**26th** [1]  6:21
**27th** [1]  73:20
**2903** [1]  2:6

**- 3 -**

**3118** [1]  2:9

**- 6 -**

**65,000**    [1] 71:23

**- 7 -**

**70,000**    [1] 71:23

**7512** [1]  54:23

**- A -**

**a.m.** [1]  1:16
**able**    [11] 13:25;    25:16, 22;     28:8; 39:15;   40:15; 43:19;    49:9; 51:21;    52:3; 62:13
**abnormal**   [1] 19:5
**above**    [2] 62:23;  73:13
**abuse**    [1] 69:13
**accepted**   [1] 70:22
**access**    [3] 29:23;   38:2; 39:11
**accomplish** [1] 25:6
**accomplishment** [1]  16:13
**accurate**   [5] 48:18;   51:25; 61:10;   63:25; 64:13
**accused**   [2] 11:23;  59:20
**acted** [1]  32:8
**action** [1]  27:6
**actions**    [1] 66:17
**activity**    [3] 40:7;     62:2; 66:6
**acts** [2]  66:15; 67:3
**actual**    [1] 45:17
**additional**   [5] 13:12;  24:21; 26:25;   67:3; 71:3
**administrative** [1]  8:17

**admitted**   [1] 3:14
**adults** [1]  60:4
**advised**    [1] 29:3
**affect**    [5] 30:14;   41:17; 51:19;    53:2; 54:5
**affecting**   [1] 32:12
**affirmed**    [1] 4:12
**afternoon**   [1] 16:20
**afterwards**  [1] 73:17
**again**    [12] 14:23;   15:15; 25:20,    26:6, 14;     28:9; 59:23,    24; 60:1, 4;  65:5; 69:11
**against**    [3] 13:12;   55:1; 66:16
**agency**    [1] 26:6
**aggressive** [1] 12:20
**agree**    [21] 12:22;   13:2; 28:13;  33:21; 39:24;    40:4; 46:11;   49:15, 20;   52:1; 53:6,    21; 58:17;   60:10, 13;  61:2, 9; 62:3, 20;  65:8; 71:4
**agreed**    [1] 73:16
**ahead**    [3] 46:13,    17; 54:12
**alleged**    [2] 21:9;  70:8

**allowed**    [3] 34:2;    52:2; 66:5
**allowing**   [1] 68:18
**allows**    [2] 62:7, 10
**along**    [3] 40:18;  52:9, 11
**always**    [9] 38:21;    57:15; 58:1, 2;  59:8; 64:13;  69:4, 5, 17
**amid** [1]  17:23
**amount**    [2] 31:9;  59:23
**amounts**    [1] 30:20
**analysis**    [1] 70:13
**angular**    [1] 39:16
**annual**    [1] 71:20
**answer**    [6] 4:22, 23;    5:3; 44:10;   68:25; 73:8
**answers**    [2] 60:8;  73:14
**anthony**   [22] 1:2;     14:3; 16:6;     18:3; 20:10;    21:10; 23:18;    26:3; 27:3;  28:7, 14, 18;   29:12; 31:25;    32:23; 33:3;    34:13; 35:13,    16; 36:6, 9;  38:9
**apologize**  [2] 34:17;  58:13
**appear**    [1] 48:18
**appeared**   [2] 55:4;  73:5
**application** [1] 55:4

**apprised** [1] 28:3
**approach** [2] 18:7; 19:11
**approached** [7] 34:20; 35:20; 37:11, 12; 38:17; 42:24, 25
**approaching** [2] 15:11; 43:6
**approved** [1] 73:16
**approving** [1] 8:19
**approximate** [1] 49:8
**area** [16] 17:4; 19:12; 21:19; 25:15, 22; 27:17; 31:4; 33:25; 34:19; 37:18; 48:19; 50:15, 23, 24; 51:23; 52:10
**areas** [1] 10:2
**arises** [1] 64:21
**armed** [1] 66:22
**arrange** [1] 55:25
**arranged** [1] 30:4
**arrangement** [1] 55:5
**arranging** [1] 27:10
**arrest** [33] 16:7, 14; 17:21; 18:3, 14, 25; 19:12, 25; 20:11; 21:17; 22:2; 23:13, 18; 24:11, 16; 29:12; 30:14; 32:12; 41:17, 25; 42:20;

44:19, 21; 48:5; 53:24; 54:5, 9; 61:18; 63:1, 17; 67:5, 11; 68:4
**arrested** [6] 44:9; 47:20; 60:2, 3, 4; 62:21
**arresting** [1] 28:3
**arrests** [2] 54:13, 16
**arrived** [1] 16:15
**assailants** [1] 12:7
**assembling** [1] 34:22
**assessment** [1] 52:20
**assigned** [5] 5:19; 6:2; 7:21; 8:3; 9:17
**assigning** [1] 8:18
**assignment** [3] 5:22; 7:5; 14:6
**assist** [2] 11:10; 40:20
**assisted** [2] 32:12; 44:19
**assisting** [2] 11:5; 43:4
**associates** [1] 2:5
**assume** [1] 25:13
**attaching** [1] 70:11
**attachment** [2] 61:3, 11
**attempt** [1] 21:13
**attempted** [3] 30:14; 40:14; 55:12

**attempting** [1] 15:2
**attention** [1] 42:1
**attorney** [1] 4:19
**attorney's** [5] 6:1, 7; 8:7; 9:11; 20:4
**attorneys** [1] 73:9
**austin** [1] 2:2
**available** [1] 51:14
**aware** [4] 10:10; 11:24; 13:17; 20:15
**away** [4] 33:12; 38:15, 16

--- B ---

**b-e-l-l** [1] 5:11
**background** [1] 23:21
**balance** [1] 68:17
**barasky** [77] 1:2; 9:13; 14:1, 3, 8, 15, 22; 15:3, 20; 16:10, 14; 17:1; 18:3; 19:5; 21:4, 6, 10; 22:2, 12, 17; 23:18, 22; 24:5; 25:20; 26:3; 27:3, 8, 12; 28:15, 25; 30:9, 11, 15; 31:25; 32:23; 33:15; 34:14, 20, 22; 36:15; 37:12, 14, 21; 38:9, 15; 39:3, 6; 40:4; 41:11, 25; 42:2, 3, 10; 43:17, 20;

44:2, 6, 8; 45:3, 5; 46:5, 6, 12; 47:20, 23; 48:19; 50:8; 51:13; 52:22; 53:8, 11; 54:2, 5; 59:1, 6, 11; 70:9
**barasky's** [26] 16:6; 19:11; 20:11; 28:7, 18; 29:12; 30:17; 31:7; 33:3, 23; 35:13, 16; 36:6, 22; 38:20; 39:14; 42:8, 9; 43:7, 25; 45:10, 13, 16, 21, 23; 51:22
**base** [1] 68:22
**based** [13] 16:25; 29:20; 30:3; 35:24, 25; 43:14; 46:20; 53:10, 16; 55:2; 56:4; 70:16
**basement** [2] 10:3; 11:1
**become** [1] 64:8
**began** [6] 15:3; 35:18; 38:1; 41:14, 16; 44:11
**begin** [1] 39:15
**beginning** [1] 1:16
**behind** [7] 31:15; 36:25; 37:14; 42:12, 15, 17; 47:14
**belief** [2] 53:12, 15
**bell** [9] 1:6, 13; 2:7; 3:3;

4:11, 15;  5:10;
71:25; 73:6
**benefits**  [1]
25:13
**best** [5]  18:6;
22:7;     44:2;
49:24; 51:2
**between**  [8]
4:3;       17:7;
28:5;     30:4;
32:4;   59:23;
69:18; 70:8
**black** [1] 32:14
**blank** [4] 1:15;
73:4, 15, 23
**blocking**   [1]
39:7
**blue** [2]  14:25;
59:6
**board**    [1]
70:22
**body** [1] 47:5
**bolts** [1] 31:24
**boss** [1] 7:25
**bought**    [4]
57:20;   59:16;
63:16, 18
**bread**     [1]
70:25
**break** [4]  4:24;
5:2;       15:4;
43:24
**brentwood**  [6]
48:20;   49:16;
50:1;    52:14;
53:14, 16
**brief** [2]  4:18;
25:4
**briefing**   [2]
17:12; 29:10
**bring**     [3]
24:10;    30:5;
60:12
**broad**     [3]
61:25;    62:5;
65:10
**build** [1] 65:4
**building**   [1]
52:25
**bunch** [1] 31:2

**bureau**    [2]
5:25;  9:15
**burglary**   [2]
12:22;  13:6
**bust** [1] 67:8
**buyer** [2] 57:6
**buying**    [3]
20:21;   57:19;
64:16
**buys** [2]  19:1;
55:24
**bypass**    [2]
40:8; 41:7
**bypassed**   [1]
41:5
**bystanders**  [1]
29:19

- C -

**capability**  [1]
62:12
**capacity**   [1]
32:8
**captain**    [2]
4:15; 6:23
**care** [1] 26:9
**career**    [2]
55:9, 15
**carry** [1] 57:3
**caschera**   [1]
24:20
**case** [28]  1:6;
7:3;    8:4, 16;
11:6;     16:11,
22;      19:4;
20:18;   22:11;
23:12,   20;
24:2;     27:24,
25;     28:15;
31:8, 21; 32:3;
40:17;  44:25;
45:3;    51:13;
54:7;    55:20;
59:1;    62:10;
70:7
**cases** [2]  8:20;
30:18
**catch** [1] 38:24

**caught**    [1]
38:6
**cautious**   [1]
64:24
**cell** [6]  30:13;
34:23;    46:14,
19, 23;  47:18
**center** [1] 31:3
**certain**    [6]
20:21;    23:3;
56:6;    60:15;
66:17;  70:21
**certainly**   [1]
13:10
**certification**
[1]  4:5
**certify**    [2]
73:5, 12
**cetera**    [2]
55:4;  61:18
**chain** [2]  63:9,
13
**challenge**   [1]
64:14
**charge**    [4]
43:13;   54:22;
55:1;  64:5
**charged**    [4]
55:7,    11;
59:17, 19
**chatter**    [1]
63:23
**chief** [20]  8:8,
9;     9:8,  11;
17:13;    23:3;
24:19;  26:1, 7;
32:15;   33:22;
34:5;    36:14;
37:3, 11;  39:2;
42:7,  15,  19;
50:7
**children**   [2]
29:25; 52:19
**christopher** [2]
1:7;  2:11
**ci's** [1]  69:8
**circle** [2] 50:6,
9
**circumstances**
[5]      13:11;

23:10;    38:19;
46:24;  47:12
**city** [6]    1:9;
2:7;  5:13;  6:4,
8;  46:1
**clear** [1] 36:3
**climb** [1] 63:13
**clinton**    [2]
1:6;  2:7
**close** [3]  34:3;
36:2; 52:18
**closer** [1] 38:7
**co's** [1] 47:10
**code** [1] 54:23
**coffee**    [2]
67:19, 20
**cogan** [1] 17:2
**collaboration**
[1] 19:7
**collaborative**
[1] 21:25
**coming**    [4]
17:1;    19:12;
28:10; 43:3
**command**   [1]
36:12
**commission** [1]
73:24
**commit**    [2]
19:12; 66:15
**commits**   [1]
66:22
**committed**  [1]
39:18
**committing**  [2]
53:12; 67:3
**common**   [10]
20:17;    21:3;
26:14;    27:6;
30:8,     19;
31:14;   43:11;
46:22; 70:6
**commonly**   [1]
27:12
**commonwealth**
[1]  73:2
**communicating**
[1] 34:24
**communication**
[4]      34:21;

54:22;   55:8;
67:10

**communications** [3]  27:20;
34:23;  69:18

**compartment**
[1]  30:21

**compartments**
[1]  31:22

**compliant** [1]
40:19

**complying** [1]
41:22

**conceal** [2]
30:19;  31:14

**concealed** [1]
31:9

**concealing** [2]
30:19;  31:1

**conceals** [1]
59:8

**concern** [1]
12:17

**concern's** [1]
47:13

**concerned** [2]
66:9;  67:12

**concerns** [3]
12:2, 10, 21

**concerted** [1]
28:4

**concluded** [2]
48:6;  72:6

**condition** [3]
66:2, 4, 8

**conditions** [4]
65:24;   66:1,
19;  67:7

**conduct** [8]
6:3;    11:23;
16:9,   15;
27:17;   57:4;
61:25;  65:24

**conducted** [1]
15:17

**conducting** [2]
14:22;  18:24

**confidential** [7]
16:2;   19:16;
26:15;  27:19;

33:16;   55:14;
63:15

**confines** [1]
27:6

**confirmed** [1]
33:15

**conflicting** [2]
41:19;  44:23

**confusing** [1]
41:19

**connecticut** [1]
2:6

**connotation** [1]
71:13

**consider** [1]
29:18

**consideration**
[5]  38:13, 21;
57:24;  58:16;
67:1

**considerations**
[2]    30:24;
54:6

**considered** [2]
13:10, 11

**consistent** [1]
56:8

**console** [1]
31:3

**contact** [3]
15:4;    55:2;
68:19

**contained** [1]
47:4

**continue** [4]
40:15,   24;
41:7; 68:19

**continued** [2]
2:1; 11:8

**continuing** [1]
66:22

**contraband** [2]
46:10; 47:4

**contributed** [1]
26:1

**contributing**
[1] 22:1

**controlled** [17]
12:6;  16:7, 10;
17:21;  18:24;

19:1;   21:12;
27:11, 14, 17;
47:1, 4; 53:23;
55:12, 24, 25;
56:11

**conversations**
[1] 15:12

**convicted** [1]
59:19

**conviction** [1]
13:6

**cooperate** [1]
63:4

**cooperation** [1]
71:25

**coordinated** [1]
32:4

**coordinating**
[1] 27:25

**coordinator** [5]
8:6,  14,  25;
9:8; 22:4

**coordinators**
[1] 22:5

**copy** [2]  61:6,
10

**correct** [21]
6:14;   7:1, 17;
9:16;    13:4;
15:25;   22:18;
24:8;    25:16;
33:24;    36:7;
39:1;    45:4;
51:1;    58:22;
61:8,     23;
64:17;    66:3;
69:4; 71:16

**correctly** [4]
10:23;    18:5;
42:11; 43:23

**correspondence** [2] 9:2; 10:1

**corroborate** [1]
58:21

**corroborated**
[1] 58:24

**counsel** [5]
1:22;  2:1;  4:4;
20:5;  66:25

**county** [19]
1:8;   5:19, 22,
25;  6:2, 6, 12;
8:1, 7, 8;   9:8,
17;    14:11;
46:13, 19, 23;
47:18;   48:4;
73:1

**couple** [7]
11:16;   24:19,
21;    41:18;
55:23;   58:4;
63:16

**course** [1]
8:10

**court** [2]   1:1;
73:15

**courtesy** [2]
5:4;  21:20

**crash** [1] 15:9

**crashing** [1]
14:15

**created** [1]
29:11

**credibility** [2]
56:9;  58:5

**credible** [1]
59:10

**creek** [2]
34:13, 19

**crime** [7]
12:23;    13:2;
30:13;   55:8;
59:18,   20;
66:23

**crimes** [5]
13:12;   54:16,
19, 23;  56:6

**criminal** [14]
10:11;   11:23;
13:1,    13;
18:10;  26:12;
28:19;  31:13;
54:21;   55:7;
62:2;  66:6, 15;
67:3

**criminals** [1]
62:1

**cross** [1]  3:2

**culminated** [1] 17:11
**custody** [3] 38:12; 39:15; 43:13

**- D -**

**da's** [2] 8:10; 67:1
**danger** [2] 13:8; 64:25
**dangerous** [2] 29:15; 40:6
**dark** [1] 14:25
**dash** [2] 30:22; 31:9
**date** [2] 10:19; 18:19
**dates** [1] 7:6
**days** [3] 21:11; 63:16; 67:8
**deal** [2] 55:5; 57:5
**dealer** [14] 19:3; 30:5; 53:24, 25; 63:24; 64:8; 65:1; 67:17; 68:2, 5, 10, 12, 19; 71:9
**dealers** [3] 60:2; 64:9; 67:15
**dealing** [4] 29:16; 58:6; 68:5; 69:12
**decide** [1] 21:14
**decided** [2] 36:9; 54:4
**decision** [3] 52:6; 53:2; 54:8
**defendants** [4] 1:9; 2:4, 7, 10
**degree** [2] 15:4; 68:4

**deliver** [3] 19:6; 21:4; 27:9
**delivery** [2] 19:13; 55:12
**dennehey** [1] 2:9
**dent** [38] 1:6; 2:4; 8:21; 9:4; 10:14, 25; 11:7, 17; 13:21, 22; 15:12, 15; 16:9; 17:23; 18:17; 19:7, 14, 20; 20:6, 23; 21:8, 24; 24:18; 27:2, 18, 21; 28:6, 14; 32:2; 33:2, 14; 34:24; 35:7; 46:16; 51:3; 53:11, 17; 54:4
**department** [9] 8:12; 25:1; 26:11; 28:18; 29:11; 44:13; 47:21; 48:1, 4
**depend** [1] 60:9
**depending** [3] 10:12; 66:20; 71:8
**depiction** [1] 48:18
**deploy** [1] 51:21
**deposed** [1] 4:15
**deposition** [4] 1:13; 72:6; 73:11, 13
**depth** [1] 70:13
**detail** [2] 32:13; 61:19
**detective** [68] 6:2; 8:8, 21; 9:1, 4, 9;

10:14, 24; 11:7, 17, 20; 13:21, 22; 14:12; 15:12, 15; 16:9; 17:14, 23; 18:17; 19:7, 14, 20; 20:5, 23; 21:8, 24; 22:11, 15, 25; 23:4, 21; 24:18, 19, 20; 27:2, 18, 21; 28:6, 13, 23; 32:2, 19; 33:2, 14, 22; 34:12, 16, 24; 35:7; 42:22, 24; 43:19, 23; 44:5, 25; 46:16; 50:7, 13, 18; 51:3; 53:11, 17; 54:4; 71:25
**detectives** [1] 8:2
**determining** [1] 26:2
**develop** [4] 22:7; 25:12; 27:5; 29:17
**developed** [4] 18:3; 19:6; 21:16; 30:2
**developing** [2] 22:20; 30:24
**development** [10] 29:24; 37:18; 39:12; 40:1, 6, 22, 24; 41:2; 49:22; 52:3
**deviate** [1] 57:8
**deviated** [1] 65:18
**device** [1] 64:4
**different** [3] 41:18; 62:7, 8

**differently** [1] 42:6
**direct** [3] 3:2; 4:13; 10:23
**direction** [3] 43:5; 71:8; 73:18
**directly** [3] 22:25; 27:8; 52:12
**discovery** [1] 20:3
**discuss** [5] 18:9, 13; 26:11, 14; 28:18
**discussed** [5] 18:6, 16; 23:8; 28:6; 29:2
**discussion** [4] 16:24; 17:8; 46:15; 62:9
**distribution** [2] 63:9, 13
**district** [7] 1:1; 6:1, 6; 8:7; 9:11; 20:4
**document** [5] 48:12; 60:18; 61:15; 65:20
**documented** [2] 65:11, 12
**doesn't** [2] 13:1; 63:9
**done** [6] 7:15; 12:14; 15:16; 27:22; 45:18; 60:23
**door** [1] 58:3
**down** [16] 18:25; 34:18, 22; 44:14, 25; 45:8, 9; 46:4; 47:9; 53:3; 57:15, 16; 58:14; 61:21; 69:22; 73:14
**draw** [2] 22:5; 25:23

**drawn** [3]
41:14, 24; 43:7
**drinker** [1]
67:19
**drive** [6]
38:16; 40:21;
41:1; 48:20;
49:16; 50:1
**driver** [2]
36:9; 49:21
**driver's** [1]
41:13
**drives** [1] 59:6
**driving** [1]
14:24
**drove** [2]
35:18; 36:15
**drug** [40] 6:3;
29:16, 21;
30:4, 5, 17;
47:3; 53:22,
23, 25; 54:16,
19; 55:5, 20;
56:7; 57:1, 2,
5; 58:6;
59:18; 60:2, 7;
63:24; 64:1, 8,
9; 65:1;
66:14; 67:15,
16, 23; 68:2,
5, 12; 70:15;
71:9, 10
**drugs** [32]
20:21; 21:5, 9;
30:11, 20;
31:5, 14, 21;
32:24; 33:16;
45:10, 20;
46:20; 47:15;
57:20; 59:20;
62:21, 24;
63:2, 5, 7, 11,
12, 16, 18, 21;
64:13, 16;
67:6; 71:3, 11,
14
**dual** [1] 28:2
**duly** [3] 4:12;
73:7, 13

**durango** [3]
14:25; 59:7
**during** [13]
6:16; 13:15;
14:12; 18:10,
14; 19:22, 24;
26:23; 46:8;
55:15; 65:23;
67:9
**duties** [1] 8:9
**dynamics** [1]
29:8

———————

**- E -**

**early** [1] 16:20
**easy** [1] 31:14
**eckard** [18]
21:18; 25:19;
29:23; 34:1, 3,
11; 35:19;
36:1, 16, 23;
37:24; 39:8;
47:23; 49:5;
52:7, 9; 53:7,
9
**effect** [9] 12:1;
13:24; 21:2, 6;
33:7, 13, 19;
46:18; 66:24
**effort** [1] 28:4
**either** [1]
22:24
**election** [1]
27:22
**elicited** [1]
17:3
**employed** [5]
5:12, 16, 18;
9:16; 14:11
**employment** [1]
9:10
**ended** [2]
6:19; 14:15
**enforcement**
[4] 5:20, 23;
6:12; 32:14
**engage** [1]
66:5

**ensure** [1]
12:15
**entailed** [1]
20:25
**enter** [1] 12:14
**entering** [1]
70:11
**entirely** [2]
53:16; 64:13
**equal** [1] 8:22
**equipped** [1]
32:17
**ervin** [4] 1:15;
73:4, 15, 23
**escape** [1]
52:7
**especially** [4]
22:9; 26:6;
29:15; 47:3
**esquire** [4]
1:23; 2:2, 5, 8
**essential** [3]
33:10; 39:19;
52:17
**essentially** [28]
5:24; 6:1; 8:1,
16, 25; 13:17;
15:5, 22;
17:12; 18:17;
19:12; 23:7,
12, 20; 24:1;
27:11, 25;
32:5; 34:7;
35:19; 36:25;
37:23; 40:18,
23; 47:13;
49:6; 56:2;
62:11
**establish** [1]
20:20
**established** [1]
55:22
**estimate** [2]
54:13; 71:22
**evaluate** [2]
38:14; 62:11
**event** [4]
32:10; 51:19,
20; 52:23

**everybody** [8]
24:10; 25:3, 8;
28:21; 34:25;
35:2, 5; 43:16
**everybody's** [2]
22:1, 9
**evident** [2]
41:8, 10
**exactly** [1]
22:14
**examination** [1]
4:13
**examine** [1]
56:23
**example** [3]
30:9; 41:21;
57:1
**except** [3] 4:6;
52:3; 61:9
**excluding** [1]
14:20
**excuse** [3]
17:3; 28:24;
67:24
**execute** [1]
21:17
**executed** [1]
9:22
**executing** [1]
25:24
**execution** [2]
9:23; 12:13
**exhibit** [4]
3:15, 16;
48:13; 60:19
**exhibits** [1]
3:13
**exit** [1] 52:3
**exited** [2]
41:13; 43:2
**expect** [1] 69:1
**experience** [9]
22:6; 25:24;
30:3; 31:12;
38:23; 55:19;
59:11, 25; 60:1
**expertise** [1]
25:15
**expires** [1]
73:24

**explain** [2] 10:6; 54:25
**exposure** [1] 12:6
**extent** [2] 28:20; 44:11
**extract** [2] 43:21; 62:1

- F -

**face** [3] 34:10; 56:5
**facial** [1] 35:24
**facilitated** [1] 30:13
**facilitating** [1] 55:5
**facility** [2] 54:22; 55:8
**fact** [4] 16:25; 42:4; 46:20, 25
**factors** [1] 60:11
**facts** [2] 13:1; 23:10
**fair** [2] 20:15; 43:15
**fairly** [3] 21:12; 23:3; 41:8
**fall** [1] 9:10
**familiar** [4] 22:10; 23:22; 28:24; 54:21
**fashion** [1] 32:19
**fast** [2] 58:14; 65:16
**fault** [1] 7:20
**feet** [1] 36:1
**fentanyl** [3] 11:25; 12:6; 27:14
**ferren** [1] 2:5
**fight** [1] 43:21
**figure** [1] 31:17
**file** [1] 55:1

**filing** [1] 4:5
**findings** [2] 21:24; 61:15
**fine** [2] 4:23; 51:10
**firearm** [2] 41:14, 24
**firearms** [1] 43:7
**firm** [2] 1:17; 2:2
**first** [6] 8:25; 29:18; 37:4; 42:11; 68:12; 73:7
**fled** [5] 31:8; 51:13, 20; 52:23; 53:3
**flee** [2] 25:20; 40:23
**fleeing** [3] 29:4; 31:20; 38:10
**flush** [1] 47:9
**follow** [2] 58:18; 60:15
**following** [1] 15:3
**follows** [1] 4:12
**force** [2] 8:24; 9:18
**forced** [1] 27:5
**foregoing** [1] 73:11
**foremost** [1] 29:18
**forgive** [1] 27:13
**form** [2] 4:6; 16:1
**forth** [5] 29:5; 32:18; 53:20; 70:5; 73:10
**found** [6] 31:21; 45:10, 20; 46:12, 20; 47:1
**four** [1] 59:18

**fourth** [2] 1:18; 2:3
**frame** [1] 35:25
**free** [1] 6:15
**frequency** [1] 35:8
**frequently** [2] 65:19; 69:19
**fresh** [1] 64:2
**front** [1] 42:25
**full** [2] 7:22; 42:14
**fully** [1] 5:2

- G -

**gain** [1] 25:22
**gardner** [9] 1:7; 2:7; 24:18; 32:13; 33:22; 36:14; 46:7; 47:22; 50:7
**gardner's** [1] 41:21
**gathering** [1] 25:3
**general** [10] 11:7; 12:17; 15:16; 18:8; 48:19; 50:24; 51:23; 57:1; 58:6; 70:22
**generally** [1] 16:2
**geographical** [1] 25:23
**gesture** [1] 36:4
**giving** [3] 41:14, 15, 21
**glove** [1] 31:3
**go-between** [1] 32:6
**goes** [8] 9:10; 56:2; 57:16; 59:5; 62:8, 19; 66:21; 70:15
**gone** [1] 33:24

**govern** [1] 65:24
**governed** [1] 61:12
**gravel** [3] 34:1; 35:11; 38:5
**green** [2] 48:23; 49:7
**gryskewicz** [6] 1:23; 4:14; 48:15; 60:21; 61:1; 71:24
**guess** [2] 60:9; 69:5
**guys** [1] 51:23

- H -

**h-m-u** [1] 71:6
**habits** [2] 56:7; 57:2
**hair** [1] 35:24
**half** [1] 42:14
**hand** [2] 60:22; 73:20
**handcuffs** [2] 43:14; 44:5
**handling** [1] 28:1
**hands** [1] 43:20
**hang** [1] 49:12
**happening** [1] 65:16
**hard** [3] 52:14; 58:17; 68:18
**hartford** [1] 2:6
**havens** [17] 1:6; 2:4; 9:1, 5; 11:20; 17:23; 22:11, 15; 24:19; 28:23; 34:12, 16; 42:22, 25; 43:19, 23; 44:5
**head** [1] 24:17
**headache** [1] 67:21

**headquarters** [1] 17:16
**heads** [1] 29:6
**hear** [2] 68:23; 69:10
**heard** [1] 28:7
**hearing** [1] 19:22
**heightened** [1] 13:7
**help** [5] 8:20; 11:10; 17:3; 34:5; 40:20
**hepburn** [1] 17:2
**hereby** [3] 4:3, 5; 73:5
**hereunto** [1] 73:19
**heroin** [3] 11:25; 27:13; 31:9
**hidden** [1] 31:6
**hierarchy** [1] 7:24
**high** [1] 52:24
**hill** [1] 29:24
**himself** [1] 52:8
**history** [5] 13:1, 13; 29:4; 30:18; 38:20
**homes** [1] 52:11
**honest** [1] 64:10
**hope** [14] 1:7; 2:11; 23:3; 24:19; 26:1; 32:15; 33:22; 34:5; 36:15; 37:11; 39:2; 42:15, 19; 50:7
**hope's** [2] 37:3; 42:8
**hoping** [1] 25:6
**house** [8] 9:22; 11:12;

12:4; 13:6, 8; 27:8; 51:7; 57:5
**houses** [2] 29:25; 52:18

- I -

**idea** [4] 16:13; 30:11; 63:8, 12
**identification** [2] 48:14; 60:20
**identified** [1] 36:9
**identify** [1] 28:8
**identity** [1] 26:19
**ignore** [2] 40:23; 41:3
**illuminated** [1] 38:8
**immediately** [2] 68:15, 16
**impound** [1] 46:2
**incident** [2] 7:8; 8:5
**incline** [1] 37:17
**include** [2] 17:13; 26:15
**included** [4] 21:21; 27:10, 16; 46:25
**income** [2] 71:17, 18
**index** [2] 3:1, 13
**indicate** [1] 71:2
**indicated** [3] 30:12; 33:6; 44:13
**indicating** [3] 39:16; 50:11; 51:5

**individual** [3] 20:22; 55:1; 70:16
**individuals** [1] 15:20
**inferior** [1] 8:22
**inform** [1] 66:5
**informant** [59] 10:13; 13:15, 19, 23; 15:13, 22; 16:2; 18:19; 19:3, 16; 20:18; 23:8; 26:15, 20; 27:19, 23; 28:1; 29:19; 32:5, 24; 33:10, 16; 49:16; 50:2; 53:24; 55:22; 56:20; 57:11, 12; 58:21; 59:2; 61:20; 62:6, 16, 22; 63:15, 17; 64:12, 15, 20, 25; 65:7, 9, 13; 66:2, 4, 8, 13, 14, 18, 21; 67:3, 6, 7; 68:9; 69:2, 17, 21
**informant's** [6] 18:10; 55:19; 62:12; 67:12; 68:1; 69:18
**informants** [9] 55:15; 56:3; 60:16; 61:4, 11; 62:3, 13; 63:23; 65:23
**information** [28] 14:23; 25:17, 18; 27:1; 28:10; 32:6; 44:24; 56:4, 11, 12, 15, 25; 58:7, 16, 24; 59:14,

25; 61:4, 12, 20; 62:1, 10; 63:20, 23; 64:12, 15; 65:8; 67:9
**informed** [3] 11:22; 19:15; 69:2
**initial** [5] 16:23; 25:4; 45:8; 47:7; 65:23
**initiate** [5] 36:10, 12, 17; 37:1, 4
**initiated** [2] 37:20; 51:19
**initiating** [1] 53:7
**initiation** [1] 41:9
**injuring** [2] 52:25
**inlet** [1] 37:21
**input** [3] 16:12; 22:9; 25:12
**inquiry** [3] 62:1, 6; 65:10
**inside** [4] 30:22; 31:1, 5, 21
**insight** [2] 25:23; 26:7
**instance** [3] 16:14; 19:19; 27:7
**instances** [2] 16:11; 47:2
**instead** [1] 7:16
**instruct** [1] 61:24
**instructions** [1] 4:19
**intake** [1] 47:7
**intended** [1] 16:9
**intending** [1] 41:10

**intent** [2] 23:10; 25:4
**interact** [1] 10:17
**interaction** [5] 10:24; 14:8, 19; 29:22; 69:14
**interactions** [3] 14:3; 28:21; 29:1
**intercept** [2] 16:15; 23:13
**interceptor** [1] 32:15
**intercepts** [1] 49:6
**interdiction** [1] 31:13
**interested** [1] 13:18
**interior** [1] 42:3
**interrupt** [1] 5:3
**interview** [1] 65:23
**interviewed** [1] 10:15
**interviewing** [1] 65:9
**investigation** [7] 9:13; 11:3, 8; 25:5; 48:3; 61:21; 68:16
**investigations** [3] 6:3; 53:22; 56:17
**investigator** [1] 28:14
**investigatory** [1] 63:10
**involve** [1] 21:15
**involved** [9] 9:23; 16:5, 21; 17:19; 22:23; 24:15; 30:16; 52:12; 56:16

**involvement** [7] 10:8; 11:2; 16:8; 21:22; 45:12; 48:2, 5
**involving** [2] 25:14; 47:3
**issues** [1] 69:13
**itself** [1] 42:2

- J -

**j-o-s-h-u-a** [1] 5:11
**january** [1] 73:25
**jeopardizes** [3] 67:25; 68:15, 16
**jeopardizing** [2] 67:1, 2
**join** [1] 42:23
**joseph** [2] 1:7; 2:11
**joshua** [7] 1:6, 13; 2:7; 3:3; 4:11; 5:10; 73:6
**judicial** [1] 67:1
**june** [2] 6:21; 7:15
**jurisdiction** [1] 17:4
**juveniles** [1] 60:3

- K -

**keep** [8] 28:3; 29:3; 40:8; 41:2; 53:9; 65:7; 67:4; 69:2
**keeps** [2] 58:1, 3
**kept** [1] 40:11
**kevin** [4] 1:6; 2:4; 8:21; 28:14

**kilo** [3] 64:2, 5; 68:24
**kind** [17] 11:8; 18:23; 20:20; 22:7; 34:10; 35:5; 38:14; 39:7; 49:4; 52:14; 53:19; 56:20; 60:7, 12; 62:19; 65:4; 70:22
**kmart** [3] 14:16; 15:9; 31:21
**knew** [4] 16:25; 29:20; 31:12; 35:23
**knowledge** [11] 20:24; 22:12, 16; 30:3, 17; 33:14; 45:20; 49:24; 51:2; 56:8; 58:24
**known** [1] 62:2
**kozlowski** [2] 2:8; 72:2
**kriner** [11] 1:7; 2:11; 17:14; 22:25; 23:4, 21; 24:19; 32:19; 50:13, 18

- L -

**label** [1] 51:6
**labeled** [1] 48:24
**lampman** [1] 1:23
**lane** [1] 37:24
**language** [1] 70:22
**large** [1] 30:20
**larger** [1] 50:20
**last** [2] 5:11; 21:9

**laughlin** [3] 2:5; 60:24; 72:4
**layman's** [1] 31:2
**layout** [1] 25:21
**lead** [3] 24:25; 25:19; 28:14
**learned** [1] 61:20
**least** [11] 17:22; 18:6; 20:10, 16; 27:17; 28:21; 29:2, 5, 6; 40:6; 43:12
**leave** [1] 30:10
**left** [1] 42:16
**legal** [1] 18:14
**lend** [3] 5:24; 56:9; 58:5
**length** [3] 42:14, 15; 59:18
**leonard** [1] 1:23
**less** [4] 8:16; 53:4; 60:11
**letter** [1] 70:2
**letting** [2] 25:11; 52:8
**lewisburg** [1] 73:16
**light** [1] 59:7
**lighter** [1] 35:23
**lighting** [1] 36:21
**lights** [9] 32:18; 37:6, 10; 38:3, 8; 40:23; 41:3, 9; 47:14
**line** [6] 8:25; 48:23; 49:7; 61:25; 62:5; 65:10
**lingo** [2] 70:15, 20

list [1] 62:18
listed [1] 70:1
listen [2]
44:24; 66:25
literally [1]
30:22
littered [1]
52:18
live [1] 26:17
lived [5]
37:18; 40:2;
49:16, 18; 50:2
loaned [1]
7:21
local [1] 25:15
located [1]
34:12
location [7]
26:2, 8, 16;
34:6; 49:8;
50:1, 25
look [6] 12:25;
38:23; 48:17;
60:22; 64:4;
69:19
looking [6]
18:19, 20;
23:12, 14;
35:19; 36:4
looks [2]
48:23; 61:5
loops [1] 49:4
loyalsock [1]
14:13
lycoming [34]
1:8; 2:10;
5:19, 22, 25;
6:6, 12; 16:22;
17:2, 13;
21:15; 22:22;
23:17; 24:10,
25; 25:14;
26:11, 22;
28:17; 29:10;
34:13; 39:25;
44:12, 14;
45:9; 46:7, 13,
23; 47:18, 21,
25; 48:4

- M -

maintain [2]
34:10; 68:3
management [2]
8:17; 32:4
manner [2]
9:3; 12:14
march [2]
1:16; 73:20
mark [2] 2:8;
49:9
marked [5]
3:14; 32:16,
20; 48:13;
60:19
marshall [1]
2:9
matter [1]
59:21
matthew [8]
9:22; 10:10,
15; 11:3;
12:10, 19;
26:12, 22
mccormick [2]
1:17; 2:2
mean [6] 12:7;
40:8, 25;
61:19; 71:1, 6
means [2]
61:22; 71:11
measure [1]
21:21
measures [1]
29:17
mechanic [1]
31:17
meeting [16]
16:18; 17:6,
15, 17; 18:2,
9; 19:23;
20:24; 21:23,
25; 24:9, 14,
25; 26:10, 23;
28:17
meetings [2]
18:11, 15

member [3]
7:4; 9:14;
66:18
members [8]
15:18; 16:10,
24; 17:7, 12;
18:18; 19:7;
20:25
mentioned [1]
26:24
mercy [1] 19:1
message [5]
28:11; 55:3;
70:8, 25; 71:5
messages [6]
19:21; 20:6,
19, 24; 53:19;
70:15
methods [1]
30:19
michael [1] 8:8
middle [1] 1:1
might [20] 7:6,
13, 15; 13:8;
56:14; 57:5, 6;
58:1, 9; 62:13,
23; 64:1, 13,
18, 19; 65:16;
70:1
miler [1] 49:21
miller [16]
39:10, 17;
41:6; 43:2;
47:23; 49:6,
15; 50:16;
51:16, 18;
52:2, 4, 8, 13;
53:9, 13
mind [2] 29:4;
38:13
minimalized [1]
26:18
minimum [2]
26:25; 45:18
minute [1]
49:13
minutes [4]
21:3; 33:11,
12; 35:14

mission [1]
16:13
mixture [2]
27:14; 28:22
money [6]
8:18; 18:21;
30:9; 57:7;
70:25; 71:2
moosic [1]
2:10
moreover [1]
30:18
morning [2]
16:20; 67:20
most [2]
10:23, 24
mostly [1]
54:19
motus [1] 57:7
moving [1]
40:18
must [1] 55:19

- N -

name [10] 5:8,
10, 11; 23:25;
26:16, 23, 25;
37:13; 49:3;
59:6
named [1]
15:20
names [1]
69:24
narcotic [2]
27:11; 32:13
narcotics [13]
5:19, 22; 6:12;
14:1, 7, 12, 24;
16:24; 17:9;
19:9; 30:6, 12;
32:5
nature [3]
8:19; 30:23;
31:16
near [2] 27:23;
42:17
necessarily [9]
18:9; 23:9, 19;

24:2, 6; 56:5;
63:8, 22; 67:14
**need** [5] 4:24;
54:9; 60:11;
67:19; 68:17
**needed** [2]
24:17; 32:10
**never** [5]
19:15; 28:6;
56:19, 23;
58:20
**newberry** [3]
14:21; 15:3, 5
**next** [3] 22:15;
34:9; 64:20
**nobody** [1]
56:15
**nonetheless** [1]
27:15
**nope** [1] 5:7
**normal** [2]
19:3; 71:13
**normally** [1]
19:1
**notary** [1] 73:4
**note** [1] 18:23
**nothing** [4]
45:3; 46:10;
73:8
**notice** [1]
41:20
**notified** [1]
44:15
**notify** [1]
15:18
**nuances** [1]
57:11
**number** [6]
15:19; 54:17;
57:18, 20, 21;
65:23
**nuts** [1] 31:24

- O -

**objections** [1]
4:6
**observe** [1]
53:23

**observing** [1]
35:25
**obtained** [1]
65:9
**obviously** [10]
14:25; 17:1;
21:20; 22:11;
25:22; 28:25;
30:17; 61:6;
63:25; 66:21
**occasionally**
[1] 8:20
**occur** [1]
23:11
**occurred** [6]
7:3; 9:13;
14:20; 17:8;
29:22; 48:20
**october** [12]
5:16, 17; 7:3;
9:14; 14:2;
15:11; 16:5, 7,
18; 19:16;
20:11; 28:15
**offer** [2]
13:23; 26:7
**offered** [1]
13:14
**offering** [1]
62:22
**offers** [3]
62:7, 10, 18
**office** [8] 6:1,
7; 8:7, 10;
9:11; 17:9;
20:4; 67:2
**officer** [30]
5:18; 6:10;
21:20; 23:16;
24:18; 26:6,
17; 27:25;
29:7; 32:4, 13;
36:14; 41:15,
21; 43:12;
44:19; 46:7;
47:22; 54:7,
14; 55:1, 16;
56:9, 21; 60:1;
61:12; 62:11;
65:3; 71:17, 20

**officers** [29]
8:3, 4, 19, 24;
11:9, 11, 14;
17:18; 22:6,
10; 24:15, 24;
25:11; 26:22;
28:22; 29:6,
18, 19; 32:7;
35:9; 38:14;
39:25; 41:17,
18; 43:6;
51:12; 53:22;
66:12
**offset** [1]
42:16
**often** [6] 6:13;
18:25; 41:20;
53:22; 65:19;
68:6
**oftentimes** [9]
27:4, 22;
41:16; 43:12;
47:7, 9; 65:12;
66:14, 20
**older** [1] 60:10
**once** [7] 30:11;
35:11; 36:25;
39:6; 40:17;
49:20; 58:4
**ongoing** [1]
38:13
**onto** [8] 29:24;
49:12; 52:2,
13; 53:8, 9, 12
**operandi** [1]
57:8
**operated** [1]
59:12
**operation** [2]
29:15, 16
**opportunity** [1]
64:20
**option** [1] 54:2
**oral** [1] 73:8
**order** [1] 19:8
**orders** [6]
41:14, 15, 17,
18, 20, 21
**ordinary** [1]
26:5

**ounce** [1]
68:25
**outside** [2]
10:5; 66:6

- P -

**p.m.** [1] 72:7
**p.o.** [2] 2:6, 9
**package** [1]
58:9
**packet** [1]
15:21
**packing** [1]
64:4
**page** [1] 35:6
**paid** [1] 6:6
**panels** [1]
31:15
**parallel** [1]
42:17
**parallels** [1]
48:24
**parents** [2]
10:4; 60:4
**parked** [1]
34:8
**parking** [1]
35:12
**part** [8] 8:9;
13:10; 32:22;
53:21; 57:25;
61:3; 65:21;
67:23
**participate** [1]
42:20
**particular** [1]
22:16
**parties** [2]
4:4; 73:10
**passed** [1]
40:5
**passenger** [1]
30:21
**passenger's** [1]
58:2
**passing** [1]
10:22

**past** [5] 36:6; 39:25; 40:21; 41:1; 52:24

**patrolman** [1] 14:9

**paying** [1] 6:5

**pennsylvania** [7] 1:1, 18, 24; 2:3, 10; 73:2, 16

**people** [7] 13:25; 29:25; 52:19; 64:6; 65:17; 70:16, 21

**percent** [1] 54:18

**perhaps** [1] 11:25

**period** [2] 33:9; 40:16

**perpendicular** [1] 36:5

**person** [14] 44:20; 45:10; 57:13; 59:16, 17; 63:10, 15, 17, 19; 67:9, 11; 69:3

**personally** [2] 46:4; 73:5

**perspective** [1] 31:2

**philadelphia** [2] 63:16, 21

**philly** [1] 68:24

**phone** [17] 19:21; 20:7, 16; 23:5; 28:8, 11; 30:13; 34:23; 48:9; 53:18; 55:2, 6; 57:18, 20; 69:18, 20; 70:6

**physical** [2] 39:15; 46:21

**physically** [3] 27:24; 43:13, 20

**picked** [1] 54:2

**pictures** [1] 20:5

**pieces** [1] 31:3

**place** [7] 1:17; 17:7; 19:8; 29:14; 31:5; 33:23; 37:1

**plaintiff** [5] 1:3, 14, 25; 3:2, 14

**plaintiff's** [4] 3:15, 16; 48:13; 60:19

**plan** [22] 18:3; 19:2, 6; 21:16; 22:1, 7, 20; 24:5; 25:12, 25; 27:2, 5, 10, 15, 18; 29:9, 11; 30:2, 24; 31:24; 32:22; 36:22

**planned** [1] 51:23

**plastic** [3] 31:3, 15, 22

**plays** [1] 66:13

**plus** [2] 70:25; 71:3

**pocket** [1] 58:3

**point** [12] 13:17; 14:9; 21:14, 19; 25:10; 38:9; 41:4, 8, 15, 25; 42:23; 70:8

**police** [40] 5:13, 18, 25; 6:9; 9:15; 11:11; 12:2, 14; 15:1; 17:13; 21:15; 24:10; 25:1, 14; 26:11; 28:18; 29:10,

15; 32:14, 17, 18, 20; 35:9; 38:4; 44:13; 46:2; 47:14, 21, 25; 48:4; 52:6; 53:22; 54:14, 25; 55:15; 66:6, 12; 68:4; 71:17, 20

**policies** [2] 61:14, 24

**populated** [1] 53:4

**position** [2] 6:23; 8:5

**positioned** [2] 42:5, 7

**possessed** [1] 56:8

**possession** [2] 11:25; 19:22

**possibility** [1] 64:11

**possibly** [1] 17:25

**potential** [1] 57:11

**potentially** [1] 52:24

**practice** [6] 20:17; 22:3, 4; 43:15; 44:18; 46:1

**precautions** [1] 56:20

**preemptive** [1] 45:7

**preliminarily** [1] 18:6

**preparation** [1] 16:6

**prepare** [1] 61:17

**prepared** [1] 15:21

**preparing** [1] 13:5

**present** [10] 1:22; 2:1;

10:14; 11:12; 17:16; 18:18; 20:23; 24:13, 17; 46:24

**presents** [1] 21:24

**presumably** [1] 29:25

**presume** [1] 52:19

**pretty** [4] 23:21; 26:14, 18; 43:8

**previous** [2] 31:8; 63:20

**previously** [3] 14:7; 24:7; 60:14

**primarily** [2] 11:6; 54:8

**prison** [4] 46:13, 19, 23; 47:18

**probable** [1] 23:17

**procedures** [1] 61:14

**proceed** [1] 52:22

**process** [1] 19:13

**processing** [1] 11:1

**procured** [1] 8:18

**produced** [3] 20:14; 48:12; 60:18

**promoted** [1] 6:22

**promotion** [2] 6:25; 7:1

**propounded** [1] 73:9

**prospective** [2] 62:2; 65:22

**protect** [2] 26:18, 19

**provide** [9] 5:4; 18:18;

25:11, 16, 17;
32:6; 44:23;
56:25; 65:22
**provided** [4]
21:7; 23:25;
56:5; 63:23
**prudent** [1]
52:22
**public** [7]
1:15, 24;
29:19; 52:21;
53:4; 73:5, 24
**pull** [5] 33:23;
37:4; 38:15;
39:22; 40:15
**pulled** [9]
14:8; 22:13;
34:7; 37:10,
23; 38:6;
39:6; 40:14, 19
**pulling** [3]
36:17; 38:4;
39:19
**purchase** [4]
14:1; 15:19;
27:17; 71:3
**purchased** [4]
21:5, 9; 27:12
**purchaser** [1]
30:4
**purchasing** [2]
18:20; 63:21
**purpose** [1]
62:5
**pursuant** [1]
15:23
**pursuing** [1]
15:5
**pursuit** [2]
14:13, 14
**push** [1] 64:18

- Q -

**questions** [7]
5:3, 6; 71:24;
72:2, 4; 73:9,
14
**quick** [1] 38:25

**quickly** [1]
51:21

- R -

**radio** [5] 33:4,
15; 34:23;
35:8; 39:3
**range** [1] 9:14
**rank** [1] 9:2
**rate** [1] 52:24
**rather** [1]
50:19
**reach** [1]
33:11
**reached** [2]
22:24; 23:4
**reaching** [1]
68:14
**read** [1] 60:24
**reading** [1]
52:15
**reality** [1]
66:16
**really** [8]
10:22; 18:3;
57:8; 58:14;
59:8; 63:9;
64:3; 67:25
**realm** [2]
64:11; 67:15
**reason** [1]
66:13
**reasons** [1]
26:17
**received** [3]
14:23; 20:4;
58:16
**recent** [1]
21:12
**recently** [1]
19:17
**recognize** [1]
69:12
**recollection** [8]
39:13; 43:15;
44:1, 2; 45:11;
48:8; 50:3;
61:13

**recommend** [1]
47:11
**recommendatio
n** [1] 46:17
**recommendatio
ns** [1] 26:7
**record** [6] 5:9;
10:11; 13:2;
18:10; 26:12;
28:19
**record's** [1]
36:3
**recross** [1] 3:2
**redactions** [2]
61:7, 10
**redirect** [1]
3:2
**reduced** [1]
73:17
**refer** [1] 6:15
**referencing** [1]
15:15
**referred** [1]
6:13
**referring** [1]
31:20
**regulations** [5]
15:24; 60:15;
61:4, 24; 65:21
**reinforce** [1]
66:20
**related** [1]
24:5
**relating** [1]
12:10
**relation** [2]
42:6, 7
**relatively** [6]
10:4; 31:14;
34:2, 3; 36:2;
52:11
**relayed** [10]
16:9; 21:1;
23:7, 15, 16,
20; 24:2;
33:2; 53:10, 11
**relaying** [2]
21:9; 35:4
**reliability** [10]
18:10; 55:22,

23; 56:4;
62:9; 66:9;
67:12; 68:1, 2,
3
**reliable** [2]
55:20; 56:22
**relied** [2]
22:19; 28:10
**rely** [1] 56:24
**remained** [2]
60:6, 7
**remaining** [1]
53:3
**remember** [14]
4:22; 11:15,
17; 14:10;
15:10; 19:14;
20:2; 34:15,
17, 18; 43:4,
8; 55:10;
57:19
**reminding** [1]
28:21
**remove** [2]
31:4; 63:25
**removed** [1]
6:22
**repacked** [1]
64:4
**rephrase** [2]
4:21; 63:1
**replace** [1]
31:5
**reply** [1] 59:24
**report** [7] 9:8;
61:16, 17, 18,
21; 65:11;
70:11
**reported** [3]
8:6, 9; 9:7
**reporter** [1]
73:16, 18
**reporter-notary**
[2] 1:15;
73:24
**reporting** [2]
8:13; 9:6
**reports** [1]
8:19

**request** [1] 46:22

**requested** [1] 46:16

**require** [1] 61:15

**reserved** [1] 4:7

**resided** [2] 29:21; 50:5

**residence** [7] 10:2, 7, 20; 12:15; 19:6; 53:13, 16

**residences** [1] 52:19

**resist** [1] 44:3

**respective** [2] 4:4; 73:10

**responded** [1] 32:23

**responsibility** [2] 28:2

**responsible** [1] 8:12

**rest** [3] 34:22; 35:8; 39:14

**results** [1] 47:17

**resume** [2] 6:18; 7:15

**retrieve** [1] 47:9

**review** [3] 20:20; 61:2; 70:14

**reviewed** [1] 6:18

**right** [28] 6:13; 16:3; 22:17; 32:25; 36:24; 37:15; 38:1; 39:20, 25; 42:16; 48:22; 49:1, 6; 50:11, 16; 51:13; 52:17; 53:8; 55:16; 57:14; 59:3; 60:16; 61:16;

64:10; 68:8, 11; 69:22

**risk** [3] 52:20; 53:4; 65:6

**risky** [1] 52:21

**road** [45] 21:18; 25:19; 29:24; 34:1, 3, 13, 19; 36:5, 23; 37:13, 15; 38:2; 39:8, 11, 17; 40:1, 5, 21; 41:6; 43:2; 47:23; 49:4, 6, 16, 17, 21; 50:16; 51:16, 18; 52:2, 4, 7, 8, 12, 13; 53:4, 7, 9, 13; 61:22

**roads** [1] 52:17

**roan's** [1] 33:25

**robbery** [1] 66:22

**role** [2] 25:10; 66:12

**rough** [1] 50:1

**route** [4] 30:12; 48:24; 52:7, 9

**routine** [1] 67:23

**rule** [1] 11:7

**rules** [1] 58:17

**rushed** [1] 65:15

---

**- S -**

**safe** [1] 65:7

**safest** [2] 21:17; 26:8

**safety** [10] 12:3, 5, 9; 21:20; 26:17; 29:7, 17, 18; 68:1, 15

**salary** [1] 6:5

**sale** [1] 27:3

**says** [1] 57:12

**scanning** [1] 70:11

**scene** [3] 32:7; 45:15

**sealing** [1] 4:5

**search** [27] 9:21, 23; 10:1, 9, 11, 19; 11:2, 6, 22; 12:3, 13; 13:5, 16; 44:16; 45:8, 9, 12, 16, 17, 19; 46:4, 9, 21; 47:2, 8; 48:3

**searched** [4] 10:2; 11:1, 12; 45:5

**searching** [2] 13:8; 48:9

**seat** [2] 25:11; 58:2

**second** [2] 25:11; 48:17

**secondary** [3] 32:11; 37:13, 15

**secret** [1] 47:16

**section** [2] 14:21; 54:22

**secure** [1] 12:14

**seeing** [1] 48:25

**sees** [1] 47:14

**select** [3] 33:23; 34:4, 5

**sell** [2] 63:6; 71:11

**selling** [6] 14:23; 59:20; 62:21, 24; 63:2; 67:6

**sending** [1] 71:9

**sense** [3] 12:5; 13:7; 25:2

**september** [6] 9:21; 10:15, 18; 11:3, 12; 13:15

**sergeant** [2] 24:18; 50:12

**serving** [2] 12:3, 11

**seven** [2] 67:8, 10

**several** [8] 11:14; 18:17; 24:24; 47:2; 55:21; 57:24; 60:2; 62:7

**severe** [1] 69:13

**shawna** [1] 2:5

**sheet** [1] 65:13

**short** [1] 40:16

**show** [1] 48:16

**showed** [1] 35:13

**side** [6] 18:23; 25:19; 36:5; 41:13; 43:1; 65:5

**sides** [1] 35:24

**sign** [4] 15:22; 16:2; 66:2, 19

**signal** [1] 39:21

**signed** [1] 19:17

**signing** [1] 4:4

**simple** [1] 58:1

**simpler** [4] 8:8, 9; 9:9, 11

**simply** [1] 58:24

**single** [2] 29:23; 67:17

**siren** [2] 41:3, 9

**sirens** [5] 32:18; 37:6, 10; 38:3; 40:23

**situation** [1] 63:14

skin [1] 59:7
skinned [1] 35:23
slang [1] 70:23
slightly [4] 39:16, 19; 42:16, 17
slow [1] 58:14
sold [2] 60:7; 63:11
sometime [1] 54:1
sometimes [11] 56:10, 11, 12, 14; 57:18; 58:23; 63:22; 65:14; 68:18; 69:13
somewhere [9] 35:15; 42:17, 23, 25; 43:1; 47:8; 50:22, 24; 71:22
soon [2] 36:23; 38:4
sorry [5] 7:19; 19:22; 34:3; 48:21; 68:1
sort [35] 15:14, 16; 18:25; 19:2; 20:19; 23:9, 20; 25:2, 3, 10; 27:5; 28:3; 30:21, 23; 32:3, 8; 34:7, 9; 37:17; 42:2; 43:3, 20, 21; 44:10; 52:11; 55:3, 21; 57:10, 25; 60:2, 8; 65:15; 68:17
source [2] 65:1; 71:18
sources [2] 61:4, 11
span [2] 60:3; 67:10
speak [1] 44:8

special [3] 6:2; 22:16; 56:15
specially [3] 5:19; 8:3; 9:17
specific [10] 12:9; 16:1; 18:9; 25:15; 49:18; 50:25; 57:3, 4; 58:9; 64:12
specifically [9] 11:18; 12:19; 13:9; 14:10; 25:18; 26:4; 33:4, 5; 34:25
specifics [5] 24:2, 5, 6; 26:15; 56:6
speculate [1] 4:23
speed [1] 24:11
speeds [1] 52:24
spell [1] 5:8
spend [1] 18:21
spike [1] 51:14
spot [1] 34:13
square [2] 1:24; 50:17
staged [1] 50:7
staleness [1] 59:13
stamp [1] 58:10
standard [3] 32:17; 70:16, 21
start [2] 41:17; 52:13
state [1] 5:8
statement [2] 66:2, 4
states [1] 1:1
station [1] 24:10

stationed [2] 39:25; 50:14
status [2] 10:12; 67:2
stay [1] 35:5
stenographically [1] 73:15
step [1] 11:9
still [8] 6:5; 7:4, 7; 8:10; 9:16; 34:9; 39:7; 65:6
stipulated [1] 4:3
stipulation [1] 4:2
stop [30] 26:2; 29:12; 30:14; 31:25; 36:10, 13, 17, 22; 37:2, 4, 7, 21; 38:11; 39:4; 40:18; 41:4, 10, 20, 22; 45:16, 24; 48:19; 49:8; 51:20, 22, 23; 52:6; 53:3, 7; 68:10
stopped [3] 37:23; 41:11, 15
stops [2] 31:13; 49:7
store [1] 46:2
straight [4] 40:9, 12; 41:2; 53:9
street [5] 1:18; 2:3; 49:18; 59:6; 69:24
strike [2] 29:9; 59:14
striking [1] 52:25
strip [4] 46:6, 8; 47:1; 48:3
strips [2] 51:12, 14

stuff [1] 35:4
subject [1] 22:10
submit [2] 20:14; 59:24
subscribed [1] 73:20
subsequent [1] 45:9
subsequently [1] 53:13
substance [5] 18:21; 27:15; 47:1; 55:12; 69:13
substances [2] 12:6; 47:4
substantial [2] 31:8; 59:22
substantive [1] 45:3
successful [1] 56:2
such [1] 28:23
summoning [1] 27:16
sumpter [25] 10:15, 17; 11:3, 23; 12:10, 19; 13:14, 23, 25; 15:13, 19, 22; 19:15; 21:4, 5, 9; 24:7; 28:12; 29:21; 30:10; 37:18; 50:5; 53:11, 17; 70:9
sumpter's [18] 9:22; 10:11; 11:12; 12:4; 19:5, 21; 20:7, 16; 26:12, 23; 27:8; 39:11; 40:1, 6, 22; 41:2; 48:9; 51:7
superior [1] 8:21

superiors  [1]
9:5
supervision [1]
66:6
supply    [1]
71:15
supposed  [5]
31:25;   58:21;
60:15;   61:25;
66:17
surveillance
[5]    14:22;
15:2;  32:9, 10;
65:4
suspect    [3]
23:18,    25;
29:20
suspects  [1]
12:15
sworn     [3]
4:12;  73:7, 13

- T -

tack [1]  51:12
takedown   [1]
24:16
takes [1]  29:14
taking    [4]
26:9;   39:15;
56:5;  73:12
tapped    [1]
30:24
target [1]  25:5
targets    [3]
59:4;   62:10;
65:14
task [2]   8:24;
9:18
tasked [1]  8:4
taught    [1]
55:18
team [2]   33:2;
34:22
teams [1]  28:3
telling    [3]
53:17;   56:21;
64:16
tells [2]  59:16;
63:15

temporarily [2]
6:2;  8:6
testified   [2]
4:12;  73:10
testify [1]  73:7
testimony   [2]
6:16;  73:19
text      [12]
19:21;    20:6,
19, 24;  28:11;
53:18;   55:3;
68:13;   70:8,
15, 24;  71:5
texting    [1]
71:5
thank     [1]
71:25
themselves [2]
62:24;  64:1
they've    [1]
57:19
thinking   [1]
25:7
thought    [1]
39:3
thousands  [3]
54:15, 16, 17
three     [3]
33:11;   65:18;
70:25
through   [15]
15:3, 5;  20:17,
19;    34:23;
38:22;    52:3;
55:18,    24;
56:2,    16;
60:25;   69:20,
22;  70:6
times     [9]
38:20;   47:2;
57:21;   63:6;
65:19;   69:8,
21, 23;  70:17
today [5]  5:14;
6:10;   54:10;
68:23;  69:10
together   [4]
28:4;    34:8;
60:12;  69:20
toilet [1]  47:10

took  [4]   17:7;
37:17,   54:6;
64:3
totality   [1]
13:10
touch     [1]
68:22
toward    [1]
35:19
towed     [1]
45:25
township  [22]
1:8;    2:10;
16:22;  17:2, 4,
13;    21:15;
22:23;   23:17;
24:10;    25:1,
14;  26:11, 22;
28:17;   29:10;
39:25;    45:9;
46:7;  47:21, 25
township's  [1]
44:12
traffic    [19]
26:2;    30:14;
31:12;   36:10,
13,  17;    37:2,
4,    7,    21;
40:17;    41:4;
45:16,    24;
48:19;    49:8;
51:20;  53:2, 7
trafficker   [3]
29:16;    57:1;
64:1
trafficker's [1]
57:2
traffickers [2]
47:3;  56:7
training    [3]
22:5;    38:22;
55:18
transaction [2]
16:16;  23:13
transaction's
[1]  30:4
transactions
[1]  29:21
transport   [1]
47:20

transported [1]
47:22
transporting
[1]  44:12
trap [1]  52:8
trauma    [1]
69:13
travel    [2]
39:18;  52:10
traveling  [1]
35:18
trial [1]  4:7
tried [1]  15:4
trouble    [1]
67:4
true [1]  61:10
truth     [4]
56:22;  73:7, 8
trying    [2]
34:13;  42:3
turn [10]   9:8;
38:1;   39:10,
16,  21;   40:8;
41:6;  52:2, 13;
53:12
turned    [7]
34:8;   35:20;
36:16;   37:10,
15;  39:16, 19
turns [1]  49:21
twofold   [1]
32:9
type [1]  18:20
typewriting [1]
73:17
typically  [6]
12:13;   30:5;
57:7;    58:12,
13;  59:7
tyson [4]   1:6;
2:4;    11:20;
34:12

- U -

ultimately  [2]
9:9;  17:11
uncommon  [1]
47:11

**under** [8] 7:25; 9:10; 38:19; 44:21; 46:24; 47:11; 54:22; 73:17
**undercover** [3] 15:1; 32:7, 8
**undersigned** [1] 73:4
**understand** [4] 4:20; 62:25; 66:12; 67:16
**understood** [1] 29:7
**union** [1] 73:1
**unit** [10] 5:20, 23; 6:13; 14:7, 12; 16:24; 17:9; 24:24; 32:5; 42:11
**unit's** [1] 32:14
**united** [1] 1:1
**unless** [1] 56:16
**unlikely** [1] 69:15
**unmarked** [4] 15:1; 32:14, 16, 21
**unobstructed** [1] 34:2
**untruthful** [1] 66:11
**used** [7] 19:15, 18; 55:14; 56:19, 24; 58:20; 59:6
**useful** [1] 60:11
**user** [5] 66:15; 67:16, 23; 68:5; 71:10
**users** [1] 47:3
**using** [4] 15:12; 18:19; 55:6; 69:16

**usually** [3] 26:17; 44:18, 24

---

**- V -**

**vaguely** [2] 34:17
**value** [3] 56:5; 62:11; 63:10
**vehicle** [39] 14:12, 14; 15:1; 29:12; 31:22; 32:14, 17, 20; 33:23; 35:13, 17; 36:18, 21, 23; 37:3, 4, 5, 7, 11; 38:4, 24; 39:7, 14, 16; 42:2, 5, 7, 8, 9, 11; 43:18; 45:6, 13, 16, 21; 46:3; 51:22
**vehicles** [4] 30:20; 34:8; 40:19; 41:25
**vent** [1] 58:2
**versus** [1] 52:8
**view** [1] 34:3
**viewed** [1] 20:16
**violated** [1] 66:8
**violates** [1] 66:18
**violent** [2] 12:23; 66:23
**visual** [2] 34:11; 45:19
**voice** [2] 28:7; 55:3

---

**- W -**

**waited** [1] 35:12

**waiting** [3] 38:15; 50:7; 51:13
**waived** [1] 4:5
**wanting** [1] 54:6
**wants** [1] 21:24
**warrant** [13] 9:21, 23; 10:1, 7, 9, 19; 11:2, 6; 12:3, 11, 13, 17; 13:5
**watching** [2] 34:19
**ways** [1] 55:23
**weapons** [1] 45:8
**weeks** [1] 68:11
**weigh** [2] 65:5, 6
**weighed** [1] 13:12
**weight** [1] 66:15
**west** [2] 1:18; 2:3
**whereof** [1] 73:19
**white** [2] 2:2; 72:3
**whole** [4] 26:25; 59:14; 60:25; 73:7
**wilkes-barre** [1] 1:24
**william** [1] 2:5
**williamsport** [13] 1:9, 18; 2:3, 7; 5:13, 18, 25; 6:5, 8; 9:15, 17; 14:21; 63:19
**window** [1] 43:24
**wingspan** [1] 45:18
**wished** [1] 54:4

**within** [4] 27:6; 30:20, 21; 31:9
**without** [3] 40:6; 43:21; 53:6
**witness** [5] 4:11; 72:1, 5; 73:6, 13
**witnesses** [1] 3:1
**wooded** [1] 52:10
**worked** [3] 5:23; 8:24; 22:5
**would've** [1] 30:23
**write** [1] 70:24
**written** [3] 61:16, 21; 65:11
**wrong** [4] 7:7, 12, 14; 49:2

---

**- Y -**

**yard** [1] 10:5
**year** [2] 15:6; 71:23
**years** [2] 6:11; 59:18
**yelling** [2] 41:16, 22
**younger** [1] 29:1
**yourself** [2] 17:17, 22
**youth** [1] 60:3



416 Brentwood Dr

Google Maps

Map data ©2024

500 ft



PLAINTIFF'S
EXHIBIT

PENGAD 800-631-6989

ATTACHMENT H

INFORMANTS AND SOURCES OF INFORMATION

PURPOSE

This regulation establishes policies and procedures which shall be followed by all Municipal Law Enforcement Agencies under the jurisdiction of the Lycoming County Office of the District Attorney when selecting, evaluating, documenting, supervising, and compensating informants and sources of information. These policies and procedures are designed to reduce the risks inherent in supervising the activities of informants, and to protect the interests of said Law Enforcement Agencies.

INTRODUCTION

General:  The District Attorney recognizes that informants and sources of information are valuable assets essential to the success of many investigations. However, motivations such as fear and revenge, or expectations of financial gain and prosecutorial consideration, make working with certain individuals precarious and at times dangerous. Members/enforcement officers must therefore exercise extreme caution in selecting, evaluating, supervising, and compensating informants.

DEFINITIONS

A.    Informant:  A private citizen, under the direct supervision of a law enforcement officer, who furnishes information about suspected criminals or criminal activity for consideration, either financial, prosecutorial, or judicial; or a person who actively participates in a criminal investigation or intelligence operation, under the direct supervision of a law enforcement officer, with or without compensation.

B.    Source of Information:  A private citizen, not under the direction of a law enforcement officer, who provides information in return for financial compensation, without becoming an active party to the investigation itself (e.g., a business firm furnishing information from its records; an employee of an organization who, through the normal course of his or her activities, obtains information of value to law enforcement. An individual shall not be categorized as a source of information, if any criminal charges are pending against that individual.



PLAINTIFF'S
EXHIBIT
2
3/2/24   698
PENGAD 800-631-6989

-1-

INFORMANT EVALUATION

A.   General:   Every law enforcement officer shall apply the following criteria when considering individuals as prospective informants:

   1.   The informant must be in a position to measurably benefit current investigations or intelligence operations, or provide sufficient information to initiate new investigations or intelligence operations.

   2.   The informant must be judged, to the extent reasonably possible, to be unlikely to compromise law enforcement interests, activities, or personnel.

   3.   The informant must be willing to accept the degree of supervision and direction required to effectively complete assignments during an investigation.

B.   Special Authorizations:   All law enforcement officers shall obtain special authorizations as indicated for prospective informants meeting the following criteria:

   1.   Juveniles



   2.   Individuals subject to future arrest, e.g., the member/enforcement officer has sufficient evidence to prosecute, may be used as informants only with the approval of the Lycoming County District Attorney and/or the Lycoming County Narcotics Enforcement Unit (NEU) Coordinator.

   3.   Any agreement with a prospective informant based on expectations of prosecutorial or judicial consideration, must be approved by the Lycoming County Assistant District Attorney prosecuting the case.

Dent and Havens Production 404

ATTACHMENT H

4.  Individuals previously declared unreliable, in accordance with this regulation, may be used as informants, only with the approval of the Lycoming County District Attorney and/or the Lycoming County NEU Coordinator.

5.  Individuals on state probation/parole

a.  The request shall include:



-3-

Dent and Havens Production 405



6.  Individuals on county probation or parole



7.  Individuals currently incarcerated.

C.  Initial Interview:

    1.  A comprehensive initial interview by the lead law enforcement officer is essential to properly evaluate and determine a prospective informant's eligibility, motivations, and potential value. The degree of the informant's exposure to Lycoming County Narcotics Enforcement Unit activities and judicial proceedings shall be determined by a critical analysis of the informant's capabilities, veracity, and credibility.

    2.  While the nature and extent of initial interviews may vary with individual backgrounds and circumstances, a broad line of inquiry shall be developed to extract information on all criminals and criminal activity known to prospective informants.  The law enforcement officer conducting the interview should document the findings using their departments reporting requirements.

D.  Dissemination:

    1.  The documented information gathered from the initial interview shall be disseminated as per the established guidelines of the respective law enforcement agency.  Any documented information shall also be provided to the Lycoming County NEU Coordinator in a timely manner.

    2.  Except under extraordinarily justifiable circumstances, information gained on serious criminal activities, i.e., felonies, shall be acted on immediately, or when

Dent and Havens Production 406

ATTACHMENT H

applicable, forwarded by the most expedient means practicable to the appropriate law enforcement personnel. Whenever possible, such information shall be forwarded to the applicable law enforcement officers or agencies without compromising sources or investigations.

E.   Informant History Report:   A detailed account of initial interviews and subsequent personal and administrative information regarding informants shall be reported on the Informant History Report.  (See Appendage C.)

G.   Criminal History Records and Fingerprints:

1.   Positive identification of prospective informants is an essential element in ensuring the safety of personnel. All prospective informants shall be queried for criminal history. Inquiries and responses shall be attached to all copies of the Informant History Report.

2.   Prospective informants, not identified by SID or FBI numbers, shall be fingerprinted for criminal inquiry.  A completed card indicating "Criminal Inquiry, shall be attached to the original copy of the Informant History Report.

EXCEPTION:   Those individuals acting solely as sources of information need not be fingerprinted or photographed, if their identities can be definitively established by other means of verification, e.g., driver's license or other photo identification. If after activation, a source of information begins to take an "active" part in an investigation or intelligence operation (e.g., wears a wire, participates in a controlled buy, personally introduces undercover personnel), the above requirement for photographing and fingerprinting shall apply. Approval to compensate a source of information must be received from the Lycoming County District Attorney.   The approval will be documented in the Informant History Report.

3.   Informants may be used on a limited and provisional basis pending positive identification. However, suitable precautions shall be taken to ensure absolute control over such individuals until identification is confirmed.

Dent and Havens Production 407

H.   Liability Issues:   There are many situations encountered in supervising informants, which exposes the Lycoming County Narcotics Enforcement Unit and/or other Police Agencies to possible liability. Therefore, the following conditions shall be addressed during all initial interviews. Prospective informants must freely and voluntarily agree to the following:

1.   Informants are not law enforcement officers nor police officers, and at no time shall they represent themselves as such.

2.   Informants shall not carry firearms or other weapons while cooperating with investigations.

3.   Informants shall not participate in criminal activities outside the scope of law enforcement supervised investigations.

4.   Informants shall follow the instructions of the supervising law enforcement officer while cooperating with investigations.

5.   Informants shall not engage in any activity which would persuade a person, who would not otherwise do so, to commit a crime.

6.   They shall remain available to the supervising law enforcement officer until all investigations with which they cooperated are closed.

7.   They shall not hold the Office of the District Attorney and/or any other Law Enforcement Agency and its officers liable for any injury suffered or sustained as a result of their cooperation with investigations.

8.   Compensation received for specific services rendered during their cooperation with investigations represents full and complete payment for such services. Cooperating individuals have no future claims against the Office of the District Attorney and/or any other Law Enforcement Agency for such services.   Participation does not make them an employee of any kind of the Office of the District Attorney and/or any other Law Enforcement Agency.

Dent and Havens Production 408

ATTACHMENT H

9.     Information they provide may result in a criminal proceeding. The Office of the District Attorney and/or any other Law Enforcement Agency will use all lawful means to protect their confidentiality, but <u>cannot</u> guarantee the informant's identity will not be disclosed.

I.     Informant Conditions Statement:  The informant or source of information shall indicate their agreement to the above conditions by signing an Informant Conditions Statement Form, (Appendage D) at the time of the initial interview. The Informant Conditions Statement will be witnessed by the supervising law enforcement officer and when practicable, another law enforcement officer. The Informant Conditions Statement shall then be attached to all copies of the Informant History Report.

## DUTIES AND RESPONSIBILITIES

A.     Lycoming County NEU Coordinator and/or the Assistant Coordinator:

1.     Administer and securely maintain the NEU Informant History Files.

2.     Ensure the same individual is not activated as an informant by more than one law enforcement agency.

4.     Ensure individuals declared unreliable by one law enforcement agency have not been unknowingly reactivated by another.

5.     Ensure persons meeting the definition of informant or source of information are documented as such.

6.     Ensure initial interviews are comprehensive and that a signed and witnessed Informant Conditions Statement is attached to the Informant History Report.

7.     Ensure all Informant History Reports are complete and include criminal history documentation and an Informant Conditions Statement, as well as photographs, fingerprint cards, as required.

8.     Ensure special authorizations required by this regulation have been acquired.

Dent and Havens Production 409

9.   Ensure all prospective informants have been assigned for work with specific law enforcement officers.

10.  Ensure informant code numbers are assigned to each informant.

11.  Ensure informant compensation is commensurate with the service or information provided.

12.  Ensure the funds compensated are disbursed in accordance with established procedures.

13.  Ensure inactive or unreliable informants are deactivated by the supervising law enforcement officer.

14.  Ensure an annual review is conducted of all informants to ensure that all provisions of this regulation are being followed.

INFORMANT FILES

A.

B.



C.

Dent and Havens Production 410

ATTACHMENT H



SUPERVISING INFORMANTS

A.   Contacts:  (At least two law enforcement officers must be able
     to contact each informant.) Informant contacts shall be strictly
     professional and controlled to minimize exposure of NEU
     facilities, operations, activities, and personnel. Whenever
     practicable, two law enforcement officers shall be present at all
     in-person informant contacts. Extraneous business or social
     contacts with informants are prohibited.

B.   Opposite Sex Informants:  All personal contacts with informants
     of the opposite sex, or whose sexual preference may make an
     investigation more susceptible to compromise through alleged
     improprieties, shall be conducted by any combination of two
     law enforcement officers.

C.   Documentation:   All contacts with informants shall be
     documented on the appropriate investigative report.

D.   Searches:  Informants, who are exposed to Lycoming County
     NEU funds, controlled substances, or evidence of any kind,
     shall be thoroughly searched before and after undercover
     encounters and, kept under continuous observation between
     searches. All searches shall be conducted by law enforcement
     officers of the same sex as the informant.

E.   Juveniles:



-9-

Dent and Havens Production 411

F.     Polygraph Examinations:   Informant information is normally
       corroborated through comparison with known facts and
       investigative follow-up. In situations where these approaches
       are impractical or insufficient, and corroboration is essential to
       the investigation or prosecution, polygraph examinations by
       shall be considered.

G.     Criminal Activity:  Any law enforcement officer with knowledge
       of an informant's arrest or unsupervised involvement in criminal
       activity shall, as soon as practicable, notify the Lycoming
       County NEU Coordinator and/or the Assistant Coordinator.
       The NEU Coordinator shall ensure a review is conducted to
       determine the appropriate course of action to be followed.

H.     Reassignment: Informants are valuable assets whose services
       and information must be managed wisely. Lycoming County
       NEU Coordinator and /or the assistant Coordinator, asserts the
       right to reassign informants in order to increase productivity or
       meet changing investigative needs.

I.     Transfer:   Informants may be transferred between outside
       Local, State and Federal Law Enforcement Agency to meet
       operational needs.


INFORMANT COMPENSATION

A.



B.

Dent and Havens Production 412

ATTACHMENT H

C.



INFORMANT DEACTIVATION

A.

B.

-11-

Dent and Havens Production 413

INFORMANT REACTIVATION



-12-

Dent and Havens Production 414

APPENDAGE D

## INFORMANT CONDITIONS STATEMENT

I, _____ freely and voluntarily agree to the following conditions while cooperating with the Lycoming County Narcotics Enforcement Unit.

I am not a law enforcement officer or a police officer and at no time shall I represent myself as such.

I shall not carry a firearm or any other weapon while cooperating with the Lycoming County Narcotics Enforcement Unit.

I shall not participate in criminal activity outside the scope of the Lycoming County Narcotics Enforcement Unit supervised investigations.

I will follow the instructions of the supervising law enforcement officer while cooperating with the Lycoming County Narcotics Enforcement Unit

I shall not engage in any activity which would persuade a person, who would not otherwise do so, to commit a crime.

I will remain available to the supervising member or enforcement officer until all investigations with which I cooperated are closed.

I, on behalf of myself, my heirs, executors, administrators, successors, and assigns, with the intention to be legally bound, hereby agree to forever release and discharge, indemnify and hold harmless the Lycoming County Narcotics Enforcement Unit, its officers, agents, employees, and all other persons, entities, and political subdivisions, from and against all suits, damages, claims or other liabilities of whatever kind or nature for personal injuries or death, loss of consortium, damage to or loss of property, or any other loss or damage of any kind and nature, known or unknown, foreseen or unforeseen, including attorney's fees, arising from my cooperation with investigations.

If I am to receive compensation for specific services rendered during my cooperation with investigations, it will represent full and complete payment for such services. That I have no future claims against the Lycoming County Narcotics Enforcement Unit for such services. Although I may accept some compensation, I understand I am not an employee of any kind of the Lycoming County Narcotics Enforcement Unit.

That the information I provide may result in a criminal proceeding. The Lycoming County Narcotics Enforcement Unit will use all lawful means to protect my confidentiality but cannot guarantee my identity will not be disclosed.

_____          _____
WITNESS                                      CI SIGNATURE

_____          _____
WITNESS                                      DATE          TIME

Dent and Havens Production 415

APPENDAGE C

| LYCOMING COUNTY DRUG TASK FORCE **INFORMANT HISTORY REPORT** | 1. DEPARTMENT | | 2. INFORMANT NO. |
|---|---|---|---|

**3. PURGE**
☐ ACTIVATION   ☐ REACTIVATION   ☐ SUPPLEMENT   ☐ DECLARATION OF UNRELIABILITY   ☐ DEACTIVATION   ☐ SOURCE OF INFORMATION

**4. ATTACHMENTS**
☐ INFORMANT CONDITIONS STATEMENT   ☐ CRIMINAL HISTORY RECORD INQUIRIES   ☐ PHOTOGRAPH   ☐ FINGERPRINT CARD
☐ SPECIAL AUTHORIZATIONS   ☐ RECEIPT   ☐ DEBRIEFING QUESTIONNAIRE
☐ _____

| 5. NAME | | 6. ALIAS/NICKNAME |
|---|---|---|

| 7. ADDRESS | | ZIP CODE | 8. TELEPHONE NO. |
|---|---|---|---|

| 9. RACE | 10. SEX | 11. AGE | 12. DOB | 13. HEIGHT | 14. WEIGHT | 15. HAIR | 16. EYES | 17. SCARS/MARKS/TATTOOS |
|---|---|---|---|---|---|---|---|---|

| 18. BIRTHPLACE (CITY, STATE) | 19. SSN | 20. OLN (STATE) | 21. SID | 22. FBI |
|---|---|---|---|---|

| 23. VEHICLE 1 | 24. VEHICLE 2 |
|---|---|

| 25. EMPLOYER/SCHOOL | 26. OCCUPATION |
|---|---|

| 27. ADDRESS | | ZIP CODE | 28. TELEPHONE NO. |
|---|---|---|---|

| 29. HOUSEHOLD MEMBERS |
|---|

| 30. POC FOR CI | ADDRESS | | TELEPHONE NO. |
|---|---|---|---|

| 31. PAST/PRESENT AGENCY WORKING WITH CI | 32. DATES | 33. AGENCY CONTACT |
|---|---|---|

| 34. ALTERNATE LAW ENFORCEMENT OFFICER | | BADGE NO. | 35. UNIT |
|---|---|---|---|

**36. NARRATIVE** (1) INCLUDE ADDITIONAL INFORMATION WHICH WOULD HELP IDENTIFY OR LOCATE THE INFORMANT. (2) PROVIDE A DETAILED ACCOUNTING OF INFORMANT INTERVIEWS WITHOUT INCLUDING SPECIFIC INVESTIGATIVE INFORMATION RECORDED ELSEWHERE. (3) PRESENT JUSTIFICATION FOR ADMINISTRATIVE ACTION INDICATED IN BLOCK 3.

| 37. SIGNATURE | | 38. DATE OF REPORT | 39. DTF COORDINATOR |
|---|---|---|---|
| REPORTING OFFICER | BADGE NO. | | ☐ APPROVED ☐ DENIED<br>DATE: |

Dent and Havens Production 416