# EXHIBIT D

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ANTHONY BARASKY,                    :
        Plaintiff          :
                    :
   vs.                              :
                    :
KEVIN DENT, TYSON HAVENS,   CASE NO. 4:21-CV-02041
JOSHUA BELL, CLINTON           :
GARDNER, CHRISTOPHER
KRINER, JOSEPH HOPE,           :
LYCOMING COUNTY, OLD
LYCOMING TOWNSHIP; and   :
CITY OF WILLIAMSPORT,          :
        Defendants   :

Deposition of:   CLINTON GARDNER

Taken by      :   Plaintiff

Before        :   Ervin S. Blank
               Reporter-Notary Public

Beginning     :   April 10, 2024; 10:00 a.m.

Place         :   McCormick Law Firm
               835 West Fourth Street
               Williamsport, Pennsylvania

COUNSEL PRESENT:

LEONARD GRYSKEWICZ, JR., ESQUIRE
Lampman Law
2 Public Square
Wilkes-Barre, Pennsylvania  18701
    For - Plaintiff

**Page 2**

COUNSEL PRESENT:  (CONTINUED)

STEPHEN C. HARTLEY, ESQUIRE
McCormick Law Firm
835 West Fourth Street
Williamsport, Pennsylvania  17701
    For - Defendants Kevin Dent and Tyson Havens

SHAWNA R. LAUGHLIN, ESQUIRE
William J. Ferren & Associates
P.O. Box 2903
Hartford, Connecticut  06104-2903
    For - Defendants Joshua Bell, Clinton Gardner
       and City of Williamsport

MARK J. KOZLOWSKI, ESQUIRE
Marshall Dennehey
P.O. Box 3118
Moosic, Pennsylvania  18507
    For - Defendants Old Lycoming Township,
       Joseph Hope and Christopher Kriner

**Page 3**

INDEX TO WITNESSES

| CLINTON GARDNER | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| Examination by: | | | | |
|   Mr. Gryskewicz | 4 | -- | -- | -- |
|   Mr. Kozlowski | -- | 42 | -- | -- |

INDEX TO EXHIBITS

| FOR - PLAINTIFF | MARKED | ADMITTED |
|---|---|---|
| Plaintiff's Exhibit No. 1 | 37 | -- |
| Plaintiff's Exhibit No. 2 | 20 | -- |

**Page 4**

STIPULATION

      It is hereby stipulated by and between
counsel for the respective parties that signing,
sealing, certification and filing are hereby waived;
and that all objections except as to the form of the
question are reserved to the time of trial.

               *   *   *

      CLINTON GARDNER, called as a witness, having
been duly sworn or affirmed, testified as follows:

              DIRECT EXAMINATION

BY MR. GRYSKEWICZ:

    Q   Mr. Gardner, I'm going to give you some brief
instructions I'm sure your attorney may have already
given you.  I'm sure you testified before as a police
officer, but if you don't understand a question I ask,
let me know, I could rephrase it.  If you don't know
or don't remember a response to a question, that is
also a fine answer.  I don't want you to speculate
about what happened.  If you need a break at any
point, you can let us know.  And, of course, just
remember you're under oath.  Okay?

    A   Yes, sir.

    Q   Do you have any questions before we begin?

5

1  A    No, sir.

2  Q    Could you state and spell your name for the

3  record for us?

4  A    Clinton Gardner.  C-L-I-N-T-O-N,

5  G-A-R-D-N-E-R.  Sorry.  I'll slow down.

6  Q    Have you ever been deposed before?

7  A    Yes.

8  Q    How many times?

9  A    Once.

10  Q    Where are you currently employed?

11  A    I'm currently employed with a nonprofit,

12  Lantern Rescue, and then part time with Montoursville

13  police department.

14  Q    How old are you today?

15  A    36.

16  Q    And how were you employed on October 1st of

17  2020?

18  A    With the Williamsport police.

19  Q    And how long have you been a police officer

20  as you sit here today?

21  A    About nine -- well, starting into my ninth

22  year as of November.

23  Q    Okay.  So that would be -- November, 2024

24  would be your ninth year?

25  A    Yeah.

6

1  Q    Okay.

2  A    Or sorry.  November of last year.

3  Q    November of 2023?  Okay.  That's why I ask.

4  Sometimes it's not clear with it so -- yep.

5      In October of 2020, you said you were a

6  police officer with the Williamsport Bureau of Police?

7  A    Yes, sir.

8  Q    And were you also working for the Lycoming

9  County Narcotics Enforcement Bureau at the time?

10  A    Yes.

11  Q    And organization is often referred to as the

12  NEU?

13  A    Yes.

14  Q    And you can feel free to refer to it as that

15  during this deposition.  I believe when I reviewed

16  your resume, it said you were full time with the NEU

17  from January of 2020 until September of 2022, is that

18  correct?

19  A    Yes, sir.

20  Q    Okay.  Why did you leave the NEU in September

21  of 2022?

22  A    I was offered the intelligence officer

23  position at the city.

24  Q    Okay.  And when you say the city, do you mean

25  Williamsport?

7

1  A    Yes.

2  Q    Okay.  When you were working with the NEU,

3  were you specifically employed by Lycoming County or

4  the City of Williamsport?

5  A    The City of Williamsport.

6  Q    How was it that you came to work with the NEU

7  even though you were a Williamsport Bureau of police

8  officer?

9  A    Through special assignment.

10  Q    And could you tell us you that special

11  assignment worked?

12  A    I was approached by the chief at the time and

13  asked if I was interested in working full time with

14  the narcotics unit.  I had done a lot of drug work on

15  patrol.

16  Q    Okay.  And when you were loaned to the NEU,

17  what was your rank with the NEU?

18  A    It was just officer.

19  Q    And then what was the working hierarchy

20  within the NEU when you were first assigned to it?

21  A    Mike Simpler was the chief detective, and

22  then Josh Bell was supervisor, and then everybody else

23  was just either detective or officer.

24  Q    And would have detective or officer been the

25  higher rank or was there even a difference between

8

1  them within it?

2  A    I don't think there is a difference.

3  Q    So you would have had the same rank

4  essentially as Detective Kevin Dent or Detective Tyson

5  Havens?

6  A    Yeah.  I don't know.

7  Q    Okay.  For the Sumpter and Barasky

8  investigations in and around 2020, were you acting as

9  a member of the NEU or the Williamsport Bureau of

10  Police?

11  A    I mean, technically both since Williamsport's

12  my employer, but as a member of the NEU, yes, in that

13  capacity.

14  Q    What were your normal roles and duties with

15  the NEU in 2020?

16  A    They would vary.  I would utilize

17  confidential informants to conduct controlled

18  purchases of narcotics, and I would also do

19  interdiction in an unmarked police car.

20  Q    Were you still doing like patrol work for the

21  City of Williamsport at the time or no?

22  A    No.

23  Q    Did you have any involvement in a controlled

24  buy that involved Matthew Sumpter in April of 2020?

25  A    Not that I recall.

9

1    Q    Okay. I'll direct your attention to
2  September 24th of 2020. Were you involved in the
3  search warrant that was executed on Matthew Sumpter's
4  house that day?
5    A    Yes.
6    Q    Could you tell us what your involvement was
7  in it?
8    A    Residential clearing. By clearing, I mean
9  clearing for either suspects or individuals to secure
10  the residence, and then they searched after.
11    Q    Okay. And I know we were saying like
12  residential clearing. Were you inside the house or
13  outside the house looking for people or both?
14    A    Inside the house.
15    Q    Okay. Did you have any interactions with Mr.
16  Sumpter that day?
17    A    I don't recall if I did.
18    Q    Prior to executing that search on Mr.
19  Sumpter's house, were you briefed by any other members
20  of the NEU about where their investigation was into
21  Mr. Sumpter at that point?
22    A    I don't recall if I was.
23    Q    And do you recall if you had any, you know,
24  conversations with Mr. Sumpter either when he was
25  arrested or after he was arrested on September 24th?

10

1    A    I do not.
2    Q    Prior to September 24th, did you have any
3  involvement in the investigation into Mr. Sumpter?
4    A    I don't recall, no.
5    Q    Would you have been aware of Mr. Sumpter's
6  criminal record prior to the execution of the search
7  warrant on his house?
8    A    I don't recall if I was.
9    Q    When you went to execute the search warrant,
10  would Detective Dent or any other officer would have
11  showed you the search warrant or their affidavits
12  supporting it prior to the search?
13    A    I'll say typically we do -- we do a brief.
14  We do observe like if there's a warrant, whether it be
15  arrest warrant or search warrant, but I don't
16  recall --
17    Q    Okay.
18    A    -- for this particular instance.
19    Q    What other police officers were present
20  during the search of Matthew Sumpter's house on
21  September 24th of 2020?
22    A    Dent, Bell, Havens are the only three that I
23  remember specifically.
24    Q    Okay. Do you recall if police had any
25  concerns for their safety when they were serving the

11

1  search warrant on Mr. Sumpter's house out of the
2  ordinary?
3    A    I don't.
4    Q    When I say out of the ordinary, I assume that
5  there's always some concern for police officer safety
6  when you serve a search warrant; is that right?
7    A    Yes, sir.
8    Q    Would you agree with me that burglary is a
9  violent crime?
10    A    I would not.
11    Q    If you found that somebody had a burglary
12  conviction on their criminal record prior to executing
13  a search warrant, would it give you any pause or
14  heightened concern for your safety doing the search
15  warrant?
16    A    May I ask if this is personal opinion or --
17    Q    Based on your training and experience as a
18  police officer.
19    A    Okay. Not necessarily, no.
20    Q    Okay. On September 24th, 2020, did Detective
21  Dent or anybody else inform you that Mr. Sumpter was
22  offering to provide information to the NEU?
23    A    I don't recall.
24    Q    After the search on Mr. Sumpter's house on
25  September 24th, 2020, did you have any involvement in

12

1  the Sumpter investigation between that day, September
2  24th, till October 2nd of 2020?
3    A    After the search warrant?
4    Q    Yes.
5    A    Yes.
6    Q    Could you tell us what that involvement was?
7    A    The arrest of Mr. Barasky.
8    Q    Okay. So I'd represent to you that that
9  happened on October 2nd. So prior to developing the
10  plan to arrest Mr. Barasky, did you have any
11  involvement with Mr. Sumpter between September 24th
12  and October 2nd?
13    A    Sorry. In between that?
14    Q    Yes.
15    A    Not that I recall.
16    Q    Okay. Now, prior to October 2nd of 2020, did
17  you have any interactions with Anthony Barasky?
18    A    No.
19    Q    So when was the first time you learned of
20  Detective Dent's investigation into Barasky that
21  ultimately culminated in his arrest on October 2nd of
22  2020?
23    A    It would have been that day.
24    Q    Okay. And who would've --
25    A    I'm sorry.

13

1  Q   Go ahead.

2  A   By that day, I mean the day of the search

3 warrant.

4  Q   October -- oh, September 24th of 2020 when

5 you searched Mr. Sumpter's house?

6  A   Correct.  That day, yes.

7  Q   And what would you have learned about Mr.

8 Barasky that day on September 24th?

9  A   That they were -- they wanted to do a

10 purchase, but to stop him before the purchase

11 occurred.

12  Q   And when you say they wanted to do the

13 purchase, who's they?

14  A   It would have been Detective Dent.

15  Q   And why did he want to stop Mr. Barasky

16 before the purchase occurred?

17  A   I know there were -- I don't know.

18  Q   Okay.  So then between September 24th of 2020

19 and let's say October 1st of 2020, the day before Mr.

20 Barasky's arrest, did you have any involvement in an

21 investigation into Mr. Barasky in those days?

22  A   No.

23  Q   Then on October 2nd, 2020, how were you first

24 contacted about the plan to arrest Mr. Barasky?

25  A   I don't recall how exactly I was contacted.

14

1  Q   How did the plan come together on October 2nd

2 to arrest Mr. Barasky?

3  A   As far as --

4  Q   Where did you first meet with everybody to,

5 you know, discuss the case?

6  A   I don't remember where we met.

7  Q   Okay.  Did you discuss the case with

8 Detective Dent that day?

9  A   I don't know if I did specifically with him.

10  Q   Did you do it with anybody else that you

11 remember?

12  A   I mean, I had to have.

13  Q   Okay.

14  A   I just don't remember.

15  Q   You just don't remember specifically --

16  A   I don't recall.

17  Q   -- who you might have talked to?

18  A   Correct.

19  Q   Now, with the NEU, was it typically a

20 collaborative process where you'd have worked with the

21 other officers?

22  A   Yeah.  Typically, like I said, if we were

23 doing -- like what this would be called a buy/bust --

24 I used the quotations.  Sorry.  It would -- there

25 would be a briefing beforehand.

15

1  Q   Um-hum.

2  A   Typically like criminal histories would be

3 discussed, safety concerns, things of that nature.

4 But I don't recall specifically for this one, like

5 where it was or --

6  Q   Okay.  But the normal operating procedure of

7 the NEU would have been to discuss criminal histories,

8 other things surrounding the case before the buy/bust?

9  A   Correct.

10  Q   And when you say discuss criminal histories,

11 would that be of both the informant and the suspect

12 you intended to arrest?

13      MS. LAUGHLIN:  Object to form, but you can

14 answer.

15      THE WITNESS:  It would depend, up to the case

16 officer.

17 BY MR. GRYSKEWICZ:

18  Q   Were you present at any meeting at the NEU

19 headquarters prior to going to the Old Lycoming

20 Township for the traffic stop of Mr. Barasky on

21 October 2nd?

22  A   I don't recall.

23  Q   Prior to Mr. Barasky's arrest on October 2nd,

24 were you ever made aware of Mr. Sumpter's criminal

25 record?

16

1  A   Not that I recall.

2  Q   What was your understanding -- strike that.

3 Was Mr. Sumpter going to be a confidential informant

4 or a confidential source on the day of Anthony

5 Barasky's arrest?

6  A   I don't know.

7  Q   Were you informed of when Mr. Sumpter

8 allegedly last purchased heroin from Mr. Barasky?

9  A   I don't recall.

10  Q   Do you recall if Detective Dent ever informed

11 you that he couldn't identify Barasky's voice in any

12 of the phone calls, other than what the confidential

13 informant told him, before Mr. Barasky's arrest?

14  A   I do not.

15  Q   And that's a you don't recall, right?  I

16 phrased that question kind of --

17  A   Yes.

18  Q   -- strange.  Okay.

19      Do you recall a meeting at the Old Lycoming

20 Township police station where a plan was created to

21 arrest Mr. Barasky?

22  A   I do not.

23  Q   Do you know if you were ever present at the

24 Old Lycoming Township police station on October 2nd,

25 2020?

17

1   A   Yes.

2   Q   And would that have been before or after Mr.

3   Barasky's arrest?

4   A   I know I was there after.

5   Q   What was the role you were assigned in Mr.

6   Barasky's arrest on October 2nd, 2020?

7   A   I was one of the cars that would be

8   initiating the stop, and then transport.

9   Q   And how was it decided you were going to be

10  one of the cars initiating the stop?

11  A   I don't know.  I don't recall.  Sorry.

12  Q   Based on typical NEU policies and procedures,

13  would it have been assigned, you know, sometime in a

14  collaborative fashion before the traffic stop?

15  A   Correct.

16  Q   And that collaborative fashion would have

17  been between the NEU officers?

18  A   Yeah, and whoever would be assisting with

19  that investigation.

20  Q   Okay.  So sometimes the NEU would involve a

21  local police department in your investigations?

22  A   Correct.

23  Q   And in this case do you recall if that was

24  Old Lycoming Township police?

25  A   Yes, sir.

18

1   Q   Okay.  So the Old Lycoming Township police

2   officers would have been involved in creating the plan

3   to arrest Mr. Barasky?

4   A   I don't know if they would have been involved

5   in the plan, but they're typically notified.  The

6   agencies -- sorry.  Whatever jurisdiction we're in,

7   the agencies are typically notified.

8   Q   Okay.  Who was the lead investigator into Mr.

9   Barasky, to the best of your knowledge, on October

10  2nd, 2020?

11  A   Kevin Dent.

12  Q   Prior to Mr. Barasky's arrest on October 2nd,

13  did anyone show you Mr. Barasky's prior criminal

14  record?

15  A   I don't recall.

16  Q   Did anybody voice any concerns to you that

17  Mr. Barasky might be a flight risk during the arrest?

18  A   Yes.

19  Q   Okay.  Could you tell us about that?

20  A   There were -- I know there was a concern that

21  there was a history of flight.

22  Q   And do you recall who would have told you

23  about that concern?

24  A   I don't.

25  Q   And do you recall when that concern would

19

1   have been relayed to you?

2   A   Prior to the stop.

3   Q   Okay.  Was anybody else assigned to the

4   vehicles that were actually going to initiate the

5   traffic stop on Mr. Barasky?

6   A   Yes, sir.

7   Q   And who was that?

8   A   Josh Bell.  I was with him.  He drove our

9   vehicle.  And Chief Hope of Old Lycoming.

10  Q   And was Chief Hope in a different vehicle?

11  A   Yes, sir.

12  Q   While you were stationed waiting for Mr.

13  Barasky to come into the area, were you, Josh Bell and

14  Chief Hope in the same area waiting?

15  A   I don't know where Chief Hope was stationed.

16  Q   Okay.  Obviously Josh Bell would have had to

17  be with you because you're in the same car?

18  A   Yes.

19  Q   Do you recall how you were notified that Mr.

20  Barasky was in the general area of your vehicle on

21  October 2nd, 2020?

22  A   I do not.

23  Q   Do you recall if Chief Hope's car was in

24  front of yours when the traffic stop of Mr. Barasky's

25  vehicle was initiated or not?

20

1   A   Yes.

2   Q   So his vehicle -- Chief Hope would have been

3   in front of your vehicle?

4   A   Yes.

5   Q   Could you describe for us how, you know, the

6   whole traffic stop happened?

7   A   I'll do the best I can.  I know that Chief

8   Hope was ahead of us and that he had activated his

9   lights pretty early.  Caught up to him and then we

10  initiated the stop.  I think prior to -- I don't

11  remember the name of the road, but it was like one way

12  in, one way out to the community where Mr. Sumpter

13  lived.

14      (Whereupon, a document was produced and

15  marked as Plaintiff's Exhibit No. 2 for

16  identification.)

17  BY MR. GRYSKEWICZ:

18  Q   I'm going to show you what's marked as

19  Plaintiff's Exhibit 2.  It's out of order.  Take a

20  look at that and let me know when you've taken a look

21  at it.

22  A   Is this Eckard Road?  I can't tell.

23  Q   I'll represent to you that Eckard Road is --

24      MS. LAUGHLIN:  So it will come around over

25  here to get to the name, but --

21

```
1        THE WITNESS:  Okay.  So I think we were down
2   here -- Josh and I, sorry, near Roan's RV at the
3   intersection of Eckard and Old Lycoming.
4   BY MR. GRYSKEWICZ:
5        Q    Okay.  So would you agree with me that this
6   is a depiction from Google maps of the general area
7   where the traffic stop of Anthony Barasky occurred on
8   October 2nd, 2020?
9        A    Yes.
10       Q    I'm going to -- I will give you my pen.
11       A    Thank you.
12       Q    Could you mark on that map with an X where
13  you and Detective Bell were waiting for Mr. Barasky?
14       A    I don't know exactly where, but it would have
15  been this general vicinity (indicating).
16       Q    Okay.  And you circled the RV business in
17  that area?
18       A    Yes, sir.
19       A    It was --
20       A    It was a gravel lot.
21       Q    And do you know if Chief Hope was in that
22  area or no?
23       A    He would have had to have been close, but I
24  don't know exactly where he was because he pulled out
25  before us.
```

22

```
1        Q    Okay.  Did you know where Mr. Sumpter's house
2   was when you initiated the traffic stop of Mr.
3   Barasky's vehicle?
4        A    Did -- I mean, I was there.
5        Q    Okay.
6        A    I don't know this area well.  It's not --
7        Q    Okay.
8        A    -- primarily where I work.  Sorry.
9        Q    No.  That's okay.  Could you put like an X on
10  the map where you believe Chief Hope would have
11  initiated his emergency lights?
12       A    It would have been, I think, in this little
13  straight stretch pulling out onto the road.
14       Q    Okay.  And maybe if you --
15       A    It's that --
16       Q    Since it's like a general area, if you could
17  just like drawn a line next to the general area you
18  think it might have happened in?
19       A    If this is the right road.
20       Q    Would you agree the traffic stop happened on
21  Eckard Road?
22       A    Yes.
23       Q    Okay.  So, yeah, as long as that's Eckard
24  Road, you would think that would be like the general
25  area --
```

23

```
1        A    Yeah.
2        Q    -- where the traffic stop occurred?
3        A    He activated them pretty early on from when
4   he pulled out into this kind of straight stretch
5   before -- I think I recall this bend.
6        Q    Okay.  Do you know where Mr. Barasky would
7   have brought his vehicle to a stop?
8        A    I know it was the road prior to the --
9   entering the development that Sumpter lives.
10       Q    Okay.
11       A    But I don't know what road that is.
12       Q    Okay.  Would you agree with me that Mr.
13  Sumpter's house is in the general area of the red
14  marker on the map?  Okay.  If you don't know, you
15  don't know.
16       A    I don't know.
17       Q    Okay.  But to your recollection, Mr. Barasky
18  stopped his vehicle before he turned into --
19       A    It was --
20       Q    -- Mr. Sumpter's development?
21       A    Yes, I do know it was before the development.
22       Q    Okay.  And would you agree with me that the
23  plan was to stop Mr. Barasky before he got into that
24  development?
25       A    Yes.
```

24

```
1        Q    So you guys didn't want him to turn into that
2   development at all?
3        A    Yeah.  To my recollection, the plan was to
4   stop before he entered the development.
5        Q    Okay.  Do you recall where any of the other
6   officers were stationed at the time besides yourself,
7   Josh Bell and Chief Hope?
8        A    I do not.
9        Q    Okay.
10            MS. LAUGHLIN:  And if we can clarify for the
11  record.
12            MR. GRYSKEWICZ:  Um-hum.
13            MS. LAUGHLIN:  There are two circles on the
14  map.  One is of Roan's RV, which is where the vehicle
15  was prior to the stop.  And then the second circle
16  that encompasses part of Eckard Road and what's
17  probably a river or stream that's noted in blue, is
18  the area -- general area where the lights were
19  activated on Chief Hope's vehicle.
20            MR. GRYSKEWICZ:  I agree with that.
21  BY MR. GRYSKEWICZ:
22       Q    Now, would you agree with me that Mr. Barasky
23  didn't flee once Chief Hope turned on his emergency
24  lights on his vehicle?
25       A    I would agree.
```

25

1     Q     What happened after Mr. Barasky's vehicle was

2 stopped?

3     A     A felony stop was conducted, but I -- I don't

4 remember all the details of what occurred during that

5 stop.

6     Q     When you say a felony stop was conducted,

7 what do you mean by that?

8     A     So a felony stop would be generally firearms

9 are out. Commands are given to the driver and/or

10 passengers in a specific manner to exit the vehicle or

11 to stay in place. Sorry.

12     Q     So that would be different than a normal

13 traffic stop where you walk up to a window and ask for

14 a driver's license, registration, insurance, something

15 like that?

16     A     Yes, sir.

17     Q     So there would have been no asking Mr.

18 Barasky for his license or insurance, it would have

19 been immediate orders to get out of the car?

20     A     I don't know what the immediate orders were,

21 but yes --

22     Q     Okay.

23     A     -- it would have been different than just

24 walking up and asking for a license.

25     Q     Okay. So to the best of your recollection

26

1 there would have been, you know, some officers with

2 firearms drawn and some orders given for Mr. Barasky

3 to exit the vehicle?

4     A     I don't know -- again, I don't know what

5 specific orders, but, yes, orders and firearms, yes.

6     Q     Okay. Do you know what your role would have

7 been at that time?

8     A     I don't.

9     Q     Okay. So you don't recall if you had a

10 firearm drawn?

11     A     I honestly don't. No.

12     Q     Okay. And I'm not trying to harass you or

13 anything.

14     A     No.

15     Q     I just want to make sure it's clear for the

16 record. Yep.

17     So would you agree Mr. Barasky was arrested

18 without incident then?

19     A     Yes.

20     Q     So he didn't resist you guys at all?

21     A     Not that I recall.

22     Q     Do you recall if you spoke with Mr. Barasky

23 at all when he was arrested?

24     A     I don't recall if I spoke when he was

25 arrested. In -- sorry. I'll clarify. What time

27

1 frame are you looking at --

2     Q     So --

3     A     -- as far as arrested?

4     Q     -- when he's basically at the scene of the

5 traffic stop there, did you speak with Mr. Barasky at

6 all?

7     A     No, I don't recall that. No.

8     Q     Okay. After he was arrested and taken from

9 the scene of the traffic stop, did you talk to Mr.

10 Barasky at all?

11     A     Yes.

12     Q     Could you tell us about that?

13     A     I don't recall the specific conversation, but

14 I know it was a casual conversation. And I know it

15 was more than was once. I know in the holding cell, I

16 had a casual conversation with him, but there was

17 nothing along the lines of like asking anything about

18 the case that I recall.

19     Q     Okay. And a casual conversation, what would

20 you mean by that?

21     A     Just --

22     Q     Small talk?

23     A     Small talk. Yeah.

24     Q     So nothing about the case would have been

25 said between either of you?

28

1     A     Not that I recall, no.

2     Q     Okay. Do you recall if you were present when

3 Mr. Barasky was arraigned by the magistrate?

4     A     I don't think I was.

5     Q     Did you have any involvement in asking Mr.

6 Barasky to be placed in a dry cell at the Lycoming

7 County Prison?

8     A     I don't think. I don't believe, no.

9     Q     After Mr. Barasky was arrested, did you have

10 any involvement in him being transported from the

11 scene of the traffic stop to the Old Lycoming Township

12 police station?

13     A     Yes.

14     Q     Could you tell us what that involvement was?

15     A     It was -- Josh and I transported him from the

16 scene to Old Lycoming.

17     Q     Okay.

18     A     It wasn't that far of a drive.

19     Q     Okay. Did you transport Mr. Barasky then

20 eventually from the Old Lycoming Township police

21 station to the Williamsport Bureau of Police as well?

22     A     I don't recall if I did.

23     Q     Do you recall if you drove Mr. Barasky to the

24 Lycoming County Prison that day?

25     A     Again, I don't recall.

29

```
 1    Q    So after Mr. Barasky was arrested and taken
 2  to the Old Lycoming Township police station on October
 3  2nd, did you have any involvement in the investigation
 4  or Mr. Barasky's case after that?
 5    A    No.
 6    Q    So you didn't have any involvement in the
 7  search of Mr. Barasky's vehicle?
 8    A    Not that I recall.
 9    Q    Would you agree with me that you knew that
10  there were no drugs found on Mr. Barasky's person when
11  he was arrested on October 2nd?
12    A    Yes.
13    Q    Were you informed that there were no drugs
14  found in Mr. Barasky's vehicle when it was ultimately
15  searched?
16    A    I don't recall at that time if I was.
17    Q    Were you present with Detective Dent or
18  Detective Havens when they were investigating the cell
19  phone taken off Mr. Barasky's person during the
20  arrest?
21    A    I don't believe so.
22    Q    As part of drug investigations, would you
23  agree with me that police officers often will observe
24  a drug transaction with a confidential informant and
25  then arrest the drug dealer at a later time?
```

30

```
 1    A    I'm sorry.  Could you say that one more time?
 2    Q    Absolutely.  As part of drug investigations
 3  you conduct, would you agree that police or yourself
 4  would oftentimes observe drug transactions between a
 5  confidential informant and a suspected drug dealer and
 6  then arrest the drug dealer at a later time?
 7    A    Yes.
 8    Q    Do you know why that option wasn't chosen for
 9  Anthony Barasky on October 2nd, 2020?
10    A    I do not.
11    Q    In your experience as a police officer, how
12  many arrests would you estimate you've made?
13    A    For drugs or like ever?
14    Q    Everything.
15    A    Oh, man.  Just in drugs alone, hundreds.  I
16  can't put a number --
17    Q    Okay.
18    A    Hundreds just in drugs.
19    Q    Hundreds just in drugs.  Okay.  My next
20  question was going to be how many drug crimes have you
21  made arrests for, so that answers that.
22          So are you familiar with the criminal use of
23  a communication facility charge under 18 PACS 7512
24  Subsection A of the Crimes Code?
25    A    Yes, sir.
```

31

```
 1    Q    Can you explain when you as a police officer
 2  would believe that charge should be filed against a
 3  person?
 4    A    If they're using some type of digital device,
 5  such as a phone, tablet, computer, just a couple
 6  examples, in furtherance of criminal activities, such
 7  as like drug dealing, human trafficking, and -- just a
 8  couple examples.
 9    Q    Okay.  In your career have you ever charged
10  someone with criminal use of a communication facility
11  and no other crime, excluding traffic offenses?
12    A    Not that I recall.
13    Q    Okay.  Have you ever charged someone with the
14  attempted delivery of a controlled substance in your
15  career?
16    A    I believe so.
17    Q    And you've used confidential informants
18  before during your career as a police officer, right?
19    A    Yes.
20    Q    What are you taught through your training and
21  experience that you must do to make sure an informant
22  is reliable in a drug case?
23    A    You vet their criminal history.  We had
24  several forms that we would use if we're signing them
25  up.  Ask questions such as, you know, are you
```

32

```
 1  currently using.  You know, in the past how much have
 2  you used.  What types of narcotics.  And then
 3  depending on criminal history, ask about those crimes.
 4  A big thing for me was, I mean, with a confidential
 5  informant, if I was looking to sign them up, depending
 6  on why they were there that day, like you got to own
 7  what you're there for kind of thing.
 8    Q    Now, you mentioned that you would review
 9  their criminal history.  What would their criminal
10  history tell you about whether an informant would be
11  reliable or not?
12    A    I'd look specifically -- big red flags for me
13  would be like false ID, perjury, like those types of
14  crimes.
15    Q    Would you include theft crimes in that?
16    A    It depends.  Most drug users -- I would say
17  in my experience, a lot of them of theft crimes on
18  their record, so it wouldn't necessarily exclude for
19  theft.
20    Q    You also mentioned you'd be asking the
21  informant if they're currently using drugs.  Is that
22  right?
23    A    Yes, sir.
24    Q    What would that inform you if they're
25  currently using drugs or not?
```

33

1  A    Honesty, because, I mean, if they're a drug
2  user and they're there, they're probably because
3  they're using drugs or trying to buy drugs.
4  Q    Okay. If somebody's actively under the
5  influence of a controlled substance, would that affect
6  your opinion on if they would be a reliable informant
7  or not?
8  A    As far as -- actively as far as --
9  Q    Let's say they used heroin the day you're
10 speaking with them.
11 A    It would depend when.
12 Q    Okay. So you would have to gauge their level
13 of impairment?
14 A    Yes.
15 Q    All right. Did there ever come a point in
16 your career when you were speaking with an informant
17 and you decided not to use them because they were too
18 impaired?
19 A    Not that I recall.
20 Q    In your experience, if an informant has never
21 provided you with accurate information before, is
22 there anything different you're supposed to do to
23 determine if that informant is reliable?
24 A    If they've never provided before, I would
25 look to build upon the credibility from that day.

34

1  That was why -- one of the big things I would look for
2  is why are you sitting here with me today. Like what
3  crime did you commit -- likely -- what likely crime
4  did you commit to be here to sign up as a confidential
5  informant.
6  Q    And you'd say you'd try to build their
7  credibility. How would you do that?
8  A    As far as what?
9  Q    What steps would you take as a police officer
10 to try to build their credibility so you know, you
11 know, they're possibly telling the truth?
12 A    Corroborate information. A lot of drug users
13 interact with similar dealers or other drug users, so
14 I would ask about what dealers do you know, what other
15 users do you know. You know, even as far as like
16 pricing and weights, what's their knowledge on that.
17 Are they honest with that. Street terms. Like I
18 said, with talking to them, why they're currently
19 sitting there. Like are they honest about that.
20 Q    Um-hum.
21 A    Especially if it's something that I
22 personally observed. Like if I observed them trying
23 to buy drugs and that's why they're sitting there --
24 Q    Um-hum.
25 A    -- like tell me about it.

35

1  Q    I'm going to ask you a hypothetical question.
2  Let me know if it doesn't make sense to you at any
3  point. So you have a confidential informant that has
4  never provided you with information before. He tells
5  you he can get someone to deliver drugs to him. He
6  sets up the drug transaction through text messages and
7  phone calls in your presence. The suspected dealer
8  arrives at the location, interacts with your informant
9  and then leaves. And then you find out from your
10 informant that the drug dealer had no drugs and no
11 delivery actually occurred. Would you still charge
12 that suspected drug dealer with criminal use of a
13 communication facility in that scenario?
14 A    It would depend on different -- more than
15 that, more than what I was just told.
16 Q    Okay. So you would have to look -- what
17 other things would you be looking for besides what you
18 were just told?
19 A    Was money owed. You know, ask him why there
20 wasn't a delivery that occurred. Go more into depth
21 of have they used that number in the past. Have they
22 seen that specific dealer in the past, because it --
23 it's not uncommon for dealers -- multiple dealers to
24 have the same number. Let me think.
25 Q    Would it be fair to say that's not an

36

1  exhaustive list?
2  A    No, it's not. Okay. Thank you.
3  Q    So you would be -- so you would be looking at
4  everything. You'd need the totality of the
5  circumstances?
6  A    Yes, sir.
7  Q    If another police officer tells you that they
8  need assistance with an arrest, are you trained to
9  seek any information from that police officer to make
10 sure they have probable cause to arrest?
11 A    Limited, yeah.
12 Q    And what do you mean by limited?
13 A    And -- sorry. And circumstantial.
14 Q    What do you mean by that?
15 A    So let's say a cop is saying shots fired,
16 like that's kind of obvious. So it's just
17 circumstantial to the case. Like what is occurring,
18 you know, how much time do we have, how many questions
19 can I ask.
20 Q    So, yeah, whether it would be an emergency or
21 not would be a big factor?
22 A    Yes.
23 Q    So if there's an emergency, you would just
24 act quicker without seeking more details. Is that
25 fair?

**37**

1     A   Yes.

2     Q   And if it's a non-emergent situation, you

3 have some time to ask questions, would it be fair to

4 say you would ask more questions?

5     A   Yes, sir.

6     Q   Okay.  Now, the NEU, I believe you stated

7 this, had different policies for operating with

8 confidential sources and informants.  Is that right?

9     A   Yeah.

10     Q   Okay.  And you would agree they had actual

11 written policies on how you were supposed to use

12 confidential informants during your investigations?

13     A   As far as the forms we fill out or --

14     Q   Let me show you.

15     A   Okay.

16        (Whereupon, a document was produced and

17 marked as Plaintiff's Exhibit No. 1 for

18 identification.)

19 BY MR. GRYSKEWICZ:

20     Q   This is marked as Plaintiff's Exhibit 1.

21 Take a look through it, let me know when you're done.

22     A   It's been a while since I've seen this.  Yes,

23 I have seen these forms before.

24     Q   Would you agree with me that that's a true

25 and accurate, albeit redacted copy of the NEU's

**38**

1 policies and regulations for informants?

2     A   Yes, sir.

3     Q   And were you told if Mr. Sumpter was a

4 confidential informant or a confidential source on

5 October 2nd?

6     A   I don't recall.

7     Q   Do you know, is there a difference between a

8 confidential source and a confidential informant?

9     A   Yes.

10     Q   Could you describe what that is?

11     A   So a confidential informant to me would be

12 someone who actually physically goes and participates

13 in a case, such as a controlled buy.  A confidential

14 source is someone who would be hands off, simply

15 providing information to further a case.

16     Q   Okay.  And you would agree that the policies

17 in front of you differentiate between a confidential

18 source and a confidential informant?

19     A   Informant as far as the information?  Yes.

20     Q   So these regulations would refer to a

21 confidential source as a source of information, or is

22 that incorrect?

23     A   Can I read it quick?  Sorry.

24     Q   Absolutely.  Take your time.

25     A   It's been a couple years since I had --

**39**

1 correct.  As you said, a source of information is

2 simply providing information.

3     Q   Okay.  Did you have any involvement in the

4 actual drafting and filing of the criminal charges

5 against Mr. Barasky?

6     A   I don't believe so.

7     Q   Did you have any involvement in Mr. Barasky's

8 case as it progressed through the Lycoming County

9 courts?

10     A   As far as the courts, like -- no.

11     Q   Did you speak with Detective Dent at all

12 regarding Mr. Barasky's case after Barasky was

13 arrested?

14     A   Not to my recollection.

15     Q   Did you speak with Tyson Havens at all

16 regarding Mr. Barasky's case after -- let's say after

17 October 2nd?

18     A   I don't recall, no.

19     Q   The same question for Officer Bell.  Did you

20 speak with Officer Bell about Mr. Barasky or his case

21 after October 2nd, 2020?

22     A   Yeah.  Sorry, I don't recall.

23     Q   Okay.  When Mr. Barasky was arrested on

24 October 2nd, 2020, what did you believe was the

25 probable cause to arrest him at that moment?

**40**

1     A   The day of the -- the day of the arrest?

2     Q   Yes.  So this would be when, you know, his

3 vehicle stops, you know, he's ordered to get out of

4 the car, what did you think the probable cause was to

5 arrest him at that point?

6     A   We were told that it was -- he was bringing

7 narcotics to conduct a purchase -- or a buy.  Sorry.

8 So, yeah.

9     Q   Now, after no narcotics were found on his

10 person, did you believe you still had probable cause

11 to continue Mr. Barasky's arrest?

12     A   That's not my call.

13     Q   Okay.  So you would have deferred to the

14 leading investigator at that point?

15     A   Yes, sir.

16     Q   And that would have been, I suppose,

17 Detective Dent?

18     A   Yes.

19     Q   Would that have also been Joshua Bell since

20 he was the supervisor?

21     A   I -- I don't know.

22     Q   Okay.  To the best of your knowledge, did you

23 have any conversations with people about whether, you

24 know, probable cause existed or not after Mr. Barasky

25 was in handcuffs?

41

```
1    A    I don't recall, no.
2    Q    Okay.  We previously discussed that your
3    employment with the NEU and Williamsport Bureau of
4    Police were kind of occurring at the same time.  Did
5    they write you separate paychecks or was it
6    Williamsport Bureau of Police paying you?
7    A    Williamsport police.
8    Q    Okay.  Was employment as a police officer
9    your only source of income in 2020?
10    A    Yes.
11    Q    What was your annual pay from employment as a
12    police officer in 2020?
13    A    Let me think.
14          MS. LAUGHLIN:  You can estimate, if you can.
15          THE WITNESS:  Okay.  I think it was the max
16    patrol rate, which I don't know.  I mean, can I give
17    like a broad estimation?
18    BY MR. GRYSKEWICZ:
19    Q    Yeah.  Just say it's an estimate if it's an
20    estimate.
21    A    70 to 80 a year.
22    Q    Okay.
23    A    I don't know what that would break down to
24    hourly.
25          MR. GRYSKEWICZ:  I don't have any other
```

42

```
1    questions.
2          THE WITNESS:  Yeah.
3          MS. LAUGHLIN:  The other attorneys may.
4                  CROSS-EXAMINATION
5    BY MR. KOZLOWSKI:
6    Q    So I'm going to make it very quick.
7    A    Okay.
8    Q    You have my word.  My name is Mark Kozlowski.
9    I represent the Old Lycoming Township Defendants in
10    this case.
11          I want to bring you back to the felony stop
12    conducted in this case on October 2, 2020, that you
13    talked about.  You -- you testified that Chief Hope
14    was the -- I'll call it the lead car in pulling over
15    Mr. Barasky.  Is that right?
16    A    Yes.
17    Q    Okay.  Once Mr. Barasky is stopped, who
18    actually removed Mr. Barasky from the vehicle?
19    A    I don't recall.
20    Q    Do you know specifically, as you sit here,
21    whether or not Chief Hope did that?
22    A    I don't.
23    Q    Do you recall, as you sit here, whether or
24    not Chief Hope exited his vehicle at all that day?
25    A    I do not.
```

43

```
1    Q    Do you know whether or not Chief Hope ever
2    drew his firearm to get Mr. Barasky to comply with
3    orders to exit the vehicle?
4    A    I do not.
5          MR. KOZLOWSKI:  Those are all the question I
6    have for you.  Thank you, sir.
7          MR. HARTLEY:  I have no questions.
8          MS. LAUGHLIN:  I don't have anything.
9          MR. GRYSKEWICZ:  I have no follow up.  Thank
10    you.
11          (Whereupon, the deposition was concluded at
12    10:40 a.m.)
13
14
15
16
17
18
19
20
21
22
23
24
25
```

44

```
1    COUNTY OF UNION              :
2    COMMONWEALTH OF PENNSYLVANIA
3
4          I, Ervin S. Blank, the undersigned Notary
5    Public, do hereby certify that personally appeared
6    before me, CLINTON GARDNER; the witness, being by me
7    first duly sworn to testify the truth, the whole truth
8    and nothing but the truth, in answer to the oral
9    questions propounded to him by the attorneys for the
10    respective parties, testified as set forth in the
11    foregoing deposition.
12          I further certify that before the taking of
13    said deposition, the above witness was duly sworn,
14    that the questions and answers were taken down
15    stenographically by the said Ervin S. Blank, Court
16    Reporter, Lewisburg, Pennsylvania, approved and agreed
17    to, and afterwards reduced to typewriting under the
18    direction of the said Reporter.
19          In testimony whereof, I have hereunto
20    subscribed my hand this 12th day of April, 2024.
21
22
23                          _____
                            Ervin S. Blank
24                          Reporter-Notary Public
                            My Commission Expires
25                          January 28, 2025
```

**- 0 -**

**06104-2903** [1] 2:6

**- 1 -**

**12th** [1] 44:20
**17701** [1] 2:3
**18507** [1] 2:10
**18701** [1] 1:24

**- 2 -**

**2020** [28] 5:17; 6:5, 17; 8:8, 15, 24; 9:2; 10:21; 11:20, 25; 12:2, 16, 22; 13:4, 18, 19, 23; 16:25; 17:6; 18:10; 19:21; 21:8; 30:9; 39:21, 24; 41:9, 12; 42:12
**2022** [2] 6:17, 21
**2023** [1] 6:3
**2024** [3] 1:16; 5:23; 44:20
**2025** [1] 44:25
**21-cv-02041** [1] 1:6
**24th** [11] 9:2, 25; 10:2, 21; 11:20, 25; 12:2, 11; 13:4, 8, 18
**2903** [1] 2:6

**- 3 -**

**3118** [1] 2:9

**- 7 -**

**7512** [1] 30:23

**- A -**

**a.m.** [2] 1:16; 43:12
**above** [1] 44:13
**absolutely** [2] 30:2; 38:24
**accurate** [2] 33:21; 37:25
**acting** [1] 8:8
**activated** [3] 20:8; 23:3; 24:19
**actively** [2] 33:4, 8
**activities** [1] 31:6
**actual** [2] 37:10; 39:4
**admitted** [1] 3:14
**affect** [1] 33:5
**affidavits** [1] 10:11
**affirmed** [1] 4:11
**afterwards** [1] 44:17
**again** [2] 26:4; 28:25
**against** [2] 31:2; 39:5
**agencies** [2] 18:6, 7
**agree** [15] 11:8; 21:5; 22:20; 23:12, 22; 24:20, 22, 25; 26:17; 29:9, 23; 30:3; 37:10, 24; 38:16
**agreed** [1] 44:16
**ahead** [2] 13:1; 20:8
**albeit** [1] 37:25

**allegedly** [1] 16:8
**alone** [1] 30:15
**along** [1] 27:17
**always** [1] 11:5
**annual** [1] 41:11
**answer** [3] 4:20; 15:14; 44:8
**answers** [2] 30:21; 44:14
**anthony** [5] 1:2; 12:17; 16:4; 21:7; 30:9
**appeared** [1] 44:5
**approached** [1] 7:12
**approved** [1] 44:16
**april** [3] 1:16; 8:24; 44:20
**area** [13] 19:13, 14, 20; 21:6, 17, 22; 22:6, 16, 17, 25; 23:13; 24:18
**arraigned** [1] 28:3
**arrest** [26] 10:15; 12:7, 10, 21; 13:20, 24; 14:2; 15:12, 23; 16:5, 13, 21; 17:3, 6; 18:3, 12, 17; 29:20, 25; 30:6; 36:8, 10; 39:25; 40:1, 5, 11
**arrested** [12] 9:25; 26:17, 23, 25; 27:3,

8; 28:9; 29:1, 11; 39:13, 23
**arrests** [2] 30:12, 21
**arrives** [1] 35:8
**assigned** [4] 7:20; 17:5, 13; 19:3
**assignment** [2] 7:9, 11
**assistance** [1] 36:8
**assisting** [1] 17:18
**associates** [1] 2:5
**assume** [1] 11:4
**attempted** [1] 31:14
**attention** [1] 9:1
**attorney** [1] 4:15
**attorneys** [2] 42:3; 44:9
**aware** [2] 10:5; 15:24

**- B -**

**barasky** [48] 1:2; 8:7; 12:7, 10, 17, 20; 13:8, 15, 21, 24; 14:2; 15:20; 16:8, 21; 18:3, 9, 17; 19:5, 13, 20; 21:7, 13; 23:6, 17, 23; 24:22; 25:18; 26:2, 17, 22; 27:5, 10; 28:3, 6, 9, 19, 23; 29:1; 30:9; 39:5, 12, 20, 23; 40:24;

42:15, 17, 18;
43:2
**barasky's** [21]
13:20;   15:23;
16:5, 11, 13;
17:3, 6;  18:12,
13;    19:24;
22:3;    25:1;
29:4, 7, 10, 14,
19;   39:7, 12,
16; 40:11
**based**    [2]
11:17; 17:12
**beforehand** [1]
14:25
**begin** [1] 4:25
**beginning** [1]
1:16
**bell** [12]  1:6;
2:7;      7:22;
10:22;     19:8,
13, 16;  21:13;
24:7;     39:19,
20; 40:19
**bend** [1] 23:5
**best** [4] 18:9;
20:7;    25:25;
40:22
**between**   [11]
4:2;      7:25;
12:1, 11, 13;
13:18;   17:17;
27:25;   30:4;
38:7, 17
**blank** [4] 1:15;
44:4, 15, 23
**blue** [1] 24:17
**break** [2] 4:21;
41:23
**brief** [2]  4:14;
10:13
**briefed**    [1]
9:19
**briefing**   [1]
14:25
**bring** [1] 42:11
**bringing**   [1]
40:6
**broad**     [1]
41:17

**brought**   [1]
23:7
**build**    [3]
33:25;  34:6, 10
**bureau** [7] 6:6,
9;   7:7;   8:9;
28:21; 41:3, 6
**burglary**  [2]
11:8, 11
**business**  [1]
21:16
**bust** [2] 14:23;
15:8

---

- C -

**c-l-i-n-t-o-n** [1]
5:4
**calls**    [2]
16:12; 35:7
**capacity**   [1]
8:13
**career**   [4]
31:9, 15, 18;
33:16
**cars** [2]  17:7,
10
**case** [19]  1:6;
14:5, 7;  15:8,
15;   17:23;
27:18,   24;
29:4;   31:22;
36:17;  38:13,
15;   39:8, 12,
16, 20;  42:10,
12
**casual**    [3]
27:14, 16, 19
**caught**    [1]
20:9
**cell** [3] 27:15;
28:6; 29:18
**certification**
[1] 4:4
**certify**   [2]
44:5, 12
**charge**   [3]
30:23;    31:2;
35:11

**charged**   [2]
31:9, 13
**charges**   [1]
39:4
**chief**   [18]
7:12, 21;  19:9,
10, 14, 15, 23;
20:2, 7;  21:21;
22:10;    24:7,
19, 23;  42:13,
21, 24;  43:1
**chosen**    [1]
30:8
**christopher** [2]
1:7;  2:11
**circle**    [1]
24:15
**circled**   [1]
21:16
**circles**   [1]
24:13
**circumstances**
[1] 36:5
**circumstantial**
[2] 36:13, 17
**city**  [7]  1:9;
2:7;   6:23, 24;
7:4, 5;  8:21
**clarify**   [2]
24:10; 26:25
**clear** [2]  6:4;
26:15
**clearing**   [4]
9:8, 9, 12
**clinton**    [7]
1:6, 13;   2:7;
3:2;  4:10;  5:4;
44:6
**close** [1] 21:23
**code** [1] 30:24
**collaborative**
[3]     14:20;
17:14, 16
**commands**  [1]
25:9
**commission** [1]
44:24
**commit**    [2]
34:3, 4

**commonwealth**
[1] 44:2
**communication**
[3]    30:23;
31:10; 35:13
**community** [1]
20:12
**comply**   [1]
43:2
**computer**  [1]
31:5
**concern**   [5]
11:5,   14;
18:20, 23, 25
**concerns**  [3]
10:25;   15:3;
18:16
**concluded** [1]
43:11
**conduct**   [3]
8:17;    30:3;
40:7
**conducted** [3]
25:3, 6;  42:12
**confidential**
[21]      8:17;
16:3,  4,  12;
29:24;    30:5;
31:17;    32:4;
34:4;    35:3;
37:8, 12;  38:4,
8,  11, 13, 17,
18, 21
**connecticut** [1]
2:6
**contacted**  [2]
13:24, 25
**continue**   [1]
40:11
**continued**  [1]
2:1
**controlled** [5]
8:17,    23;
31:14;    33:5;
38:13
**conversation**
[4]  27:13, 14,
16, 19

conversations
[2]          9:24;
40:23
conviction [1]
11:12
copy [1] 37:25
correct     [7]
6:18;     13:6;
14:18;     15:9;
17:15, 22; 39:1
corroborate [1]
34:12
counsel     [3]
1:22; 2:1; 4:3
county [7] 1:8;
6:9; 7:3; 28:7,
24; 39:8; 44:1
couple      [3]
31:5, 8; 38:25
course      [1]
4:22
court [2]   1:1;
44:15
courts      [2]
39:9, 10
created     [1]
16:20
creating    [1]
18:2
credibility [3]
33:25; 34:7, 10
crime [4] 11:9;
31:11; 34:3
crimes      [6]
30:20,     24;
32:3, 14, 15, 17
criminal   [16]
10:6;    11:12;
15:2, 7, 10, 24;
18:13;   30:22;
31:6, 10, 23;
32:3, 9; 35:12;
39:4
cross [1] 3:2
cross-examinat
ion [1] 42:4
culminated [1]
12:21

- D -

days [1] 13:21
dealer      [7]
29:25; 30:5, 6;
35:7, 10, 12, 22
dealers     [4]
34:13,     14;
35:23
dealing     [1]
31:7
decided     [2]
17:9; 33:17
defendants [5]
1:9; 2:4, 7, 10;
42:9
deferred    [1]
40:13
deliver     [1]
35:5
delivery    [3]
31:14;   35:11,
20
dennehey [1]
2:9
dent [13] 1:6;
2:4;       8:4;
10:10,     22;
11:21;   13:14;
14:8;    16:10;
18:11;   29:17;
39:11; 40:17
dent's      [1]
12:20
department [2]
5:13; 17:21
depend      [3]
15:15;   33:11;
35:14
depending [2]
32:3, 5
depiction   [1]
21:6
deposed     [1]
5:6
deposition [5]
1:13;      6:15;
43:11;   44:11,
13

depth       [1]
35:20
describe    [2]
20:5; 38:10
details     [2]
25:4; 36:24
detective  [16]
7:21, 23, 24;
8:4;    10:10;
11:20;   12:20;
13:14;    14:8;
16:10;   21:13;
29:17,     18;
39:11; 40:17
determine   [1]
33:23
developing [1]
12:9
development
[6]    23:9, 20,
21, 24; 24:2, 4
device [1] 31:4
difference  [3]
7:25;       8:2;
38:7
different   [6]
19:10;   25:12,
23;      33:22;
35:14; 37:7
differentiate
[1] 38:17
digital [1] 31:4
direct [3]  3:2;
4:12; 9:1
direction   [1]
44:18
discuss     [4]
14:5, 7;   15:7,
10
discussed   [2]
15:3; 41:2
district [2] 1:1
document    [2]
20:14; 37:16
doesn't     [1]
35:2
done [2]  7:14;
37:21

down [4]    5:5;
21:1;    41:23;
44:14
drafting    [1]
39:4
drawn      [3]
22:17; 26:2, 10
drew [1] 43:2
drive [1] 28:18
driver [1] 25:9
driver's    [1]
25:14
drove [2] 19:8;
28:23
drug [18] 7:14;
29:22, 24, 25;
30:2, 4, 5, 6,
20;   31:7, 22;
32:16;    33:1;
34:12,     13;
35:6, 10, 12
drugs      [13]
29:10,    13;
30:13, 15, 18,
19; 32:21, 25;
33:3;   34:23;
35:5, 10
duly [3]   4:11;
44:7, 13
during      [7]
6:15;    10:20;
18:17;    25:4;
29:19;   31:18;
37:12
duties [1]  8:14

- E -

early [2]  20:9;
23:3
eckard      [6]
20:22,    23;
21:3;     22:21,
23; 24:16
either      [4]
7:23;   9:9, 24;
27:25
emergency  [4]
22:11;   24:23;
36:20, 23

**employed** [4] 5:10, 11, 16; 7:3

**employer** [1] 8:12

**employment** [3] 41:3, 8, 11

**encompasses** [1] 24:16

**enforcement** [1] 6:9

**entered** [1] 24:4

**entering** [1] 23:9

**ervin** [4] 1:15; 44:4, 15, 23

**especially** [1] 34:21

**esquire** [4] 1:23; 2:2, 5, 8

**essentially** [1] 8:4

**estimate** [4] 30:12; 41:14, 19, 20

**estimation** [1] 41:17

**eventually** [1] 28:20

**everybody** [2] 7:22; 14:4

**exactly** [3] 13:25; 21:14, 24

**examination** [2] 3:3; 4:12

**examples** [2] 31:6, 8

**except** [1] 4:5

**exclude** [1] 32:18

**excluding** [1] 31:11

**execute** [1] 10:9

**executed** [1] 9:3

**executing** [2] 9:18; 11:12

**execution** [1] 10:6

**exhaustive** [1] 36:1

**exhibit** [6] 3:15, 16; 20:15, 19; 37:17, 20

**exhibits** [1] 3:13

**existed** [1] 40:24

**exit** [3] 25:10; 26:3; 43:3

**exited** [1] 42:24

**experience** [5] 11:17; 30:11; 31:21; 32:17; 33:20

**expires** [1] 44:24

**explain** [1] 31:1

— F —

**facility** [3] 30:23; 31:10; 35:13

**factor** [1] 36:21

**fair** [3] 35:25; 36:25; 37:3

**false** [1] 32:13

**familiar** [1] 30:22

**fashion** [2] 17:14, 16

**felony** [4] 25:3, 6, 8; 42:11

**ferren** [1] 2:5

**filed** [1] 31:2

**filing** [2] 4:4; 39:4

**fill** [1] 37:13

**fine** [1] 4:20

**firearm** [2] 26:10; 43:2

**firearms** [3] 25:8; 26:2, 5

**fired** [1] 36:15

**firm** [2] 1:17; 2:2

**first** [5] 7:20; 12:19; 13:23; 14:4; 44:7

**flags** [1] 32:12

**flee** [1] 24:23

**flight** [2] 18:17, 21

**follow** [1] 43:9

**follows** [1] 4:11

**foregoing** [1] 44:11

**form** [2] 4:5; 15:13

**forms** [3] 31:24; 37:13, 23

**forth** [1] 44:10

**found** [4] 11:11; 29:10, 14; 40:9

**fourth** [2] 1:18; 2:3

**frame** [1] 27:1

**free** [1] 6:14

**front** [3] 19:24; 20:3; 38:17

**full** [2] 6:16; 7:13

**furtherance** [1] 31:6

— G —

**g-a-r-d-n-e-r** [1] 5:5

**gardner** [8] 1:7, 13; 2:7; 3:2; 4:10, 14; 5:4; 44:6

**gauge** [1] 33:12

**general** [8] 19:20; 21:6,

15; 22:16, 17, 24; 23:13; 24:18

**generally** [1] 25:8

**given** [3] 4:16; 25:9; 26:2

**goes** [1] 38:12

**google** [1] 21:6

**gravel** [1] 21:20

**gryskewicz** [13] 1:23; 3:4; 4:13; 15:17; 20:17; 21:4; 24:12, 20, 21; 37:19; 41:18, 25; 43:9

**guys** [2] 24:1; 26:20

— H —

**hand** [1] 44:20

**handcuffs** [1] 40:25

**hands** [1] 38:14

**harass** [1] 26:12

**hartford** [1] 2:6

**hartley** [2] 2:2; 43:7

**havens** [6] 1:6; 2:4; 8:5; 10:22; 29:18; 39:15

**headquarters** [1] 15:19

**heightened** [1] 11:14

**hereby** [3] 4:2; 44:5

**hereunto** [1] 44:19

**heroin** [2] 16:8; 33:9

hierarchy [1] 7:19
higher [1] 7:25
histories [3] 15:2, 7, 10
history [5] 18:21; 31:23; 32:3, 9, 10
holding [1] 27:15
honest [2] 34:17, 19
honestly [1] 26:11
honesty [1] 33:1
hope [16] 1:7; 2:11; 19:9, 10, 14, 15; 20:2, 8; 21:21; 22:10; 24:7, 23; 42:13, 21, 24; 43:1
hope's [2] 19:23; 24:19
hourly [1] 41:24
house [12] 9:4, 12, 13, 14, 19; 10:7, 20; 11:1, 24; 13:5; 22:1; 23:13
human [1] 31:7
hundreds [3] 30:15, 18, 19
hypothetical [1] 35:1

- I -

identification [2] 20:16; 37:18
identify [1] 16:11
immediate [2] 25:19, 20
impaired [1] 33:18

impairment [1] 33:13
incident [1] 26:18
include [1] 32:15
income [1] 41:9
incorrect [1] 38:22
index [2] 3:1, 13
indicating [1] 21:15
individuals [1] 9:9
influence [1] 33:5
inform [2] 11:21; 32:24
informant [22] 15:11; 16:3, 13; 29:24; 30:5; 31:21; 32:5, 10, 21; 33:6, 16, 20, 23; 34:5; 35:3, 8, 10; 38:4, 8, 11, 18, 19
informants [5] 8:17; 31:17; 37:8, 12; 38:1
information [10] 11:22; 33:21; 34:12; 35:4; 36:9; 38:15, 19, 21; 39:1, 2
informed [3] 16:7, 10; 29:13
initiate [1] 19:4
initiated [4] 19:25; 20:10; 22:2, 11
initiating [2] 17:8, 10
inside [2] 9:12, 14

instance [1] 10:18
instructions [1] 4:15
insurance [2] 25:14, 18
intelligence [1] 6:22
intended [1] 15:12
interact [1] 34:13
interactions [2] 9:15; 12:17
interacts [1] 35:8
interdiction [1] 8:19
interested [1] 7:13
intersection [1] 21:3
investigating [1] 29:18
investigation [7] 9:20; 10:3; 12:1, 20; 13:21; 17:19; 29:3
investigations [5] 8:8; 17:21; 29:22; 30:2; 37:12
investigator [2] 18:8; 40:14
involve [1] 17:20
involved [4] 8:24; 9:2; 18:2, 4
involvement [14] 8:23; 9:6; 10:3; 11:25; 12:6, 11; 13:20; 28:5, 10, 14; 29:3, 6; 39:3, 7

- J -

january [2] 6:17; 44:25
joseph [2] 1:7; 2:11
josh [7] 7:22; 19:8, 13, 16; 21:2; 24:7; 28:15
joshua [3] 1:6; 2:7; 40:19
jurisdiction [1] 18:6

- K -

kevin [4] 1:6; 2:4; 8:4; 18:11
kind [5] 16:16; 23:4; 32:7; 36:16; 41:4
knew [1] 29:9
knowledge [3] 18:9; 34:16; 40:22
kozlowski [5] 2:8; 3:5; 42:5, 8; 43:5
kriner [2] 1:7; 2:11

- L -

lampman [1] 1:23
lantern [1] 5:12
last [2] 6:2; 16:8
laughlin [8] 2:5; 15:13; 20:24; 24:10, 13; 41:14; 42:3; 43:8
lead [2] 18:8; 42:14
leading [1] 40:14
learned [2] 12:19; 13:7

leave [1] 6:20
leaves [1] 35:9
leonard [1] 1:23
level [1] 33:12
lewisburg [1] 44:16
license [3] 25:14, 18, 24
lights [4] 20:9; 22:11; 24:18, 24
likely [2] 34:3
limited [2] 36:11, 12
line [1] 22:17
lines [1] 27:17
list [1] 36:1
lived [1] 20:13
lives [1] 23:9
loaned [1] 7:16
local [1] 17:21
location [1] 35:8
look [7] 20:20; 32:12; 33:25; 34:1; 35:16; 37:21
looking [5] 9:13; 27:1; 32:5; 35:17; 36:3
lycoming [20] 1:8; 2:10; 6:8; 7:3; 15:19; 16:19, 24; 17:24; 18:1; 19:9; 21:3; 28:6, 11, 16, 20, 24; 29:2; 39:8; 42:9

- M -

magistrate [1] 28:3
manner [1] 25:10
maps [1] 21:6

mark [3] 2:8; 21:12; 42:8
marked [5] 3:14; 20:15, 18; 37:17, 20
marker [1] 23:14
marshall [1] 2:9
matthew [3] 8:24; 9:3; 10:20
mccormick [2] 1:17; 2:2
mean [13] 6:24; 8:11; 9:8; 13:2; 14:12; 22:4; 25:7; 27:20; 32:4; 33:1; 36:12, 14; 41:16
meet [1] 14:4
meeting [2] 15:18; 16:19
member [2] 8:9, 12
members [1] 9:19
mentioned [2] 32:8, 20
messages [1] 35:6
middle [1] 1:1
might [3] 14:17; 18:17; 22:18
mike [1] 7:21
moment [1] 39:25
money [1] 35:19
montoursville [1] 5:12
moosic [1] 2:10
most [1] 32:16
multiple [1] 35:23
must [1] 31:21

- N -

name [4] 5:2; 20:11, 25; 42:8
narcotics [6] 6:9; 7:14; 8:18; 32:2; 40:7, 9
nature [1] 15:3
near [1] 21:2
necessarily [2] 11:19; 32:18
need [3] 4:21; 36:4
neu's [1] 37:25
never [3] 33:20, 24; 35:4
next [2] 22:17; 30:19
nine [1] 5:21
ninth [2] 5:21, 24
non-emergent [1] 37:2
nonprofit [1] 5:11
normal [3] 8:14; 15:6; 25:12
notary [1] 44:4
noted [1] 24:17
nothing [3] 27:17, 24; 44:8
notified [3] 18:5, 7; 19:19
november [4] 5:22, 23; 6:2, 3
number [3] 30:16; 35:21, 24

- O -

oath [1] 4:23
object [1] 15:13

objections [1] 4:5
observe [3] 10:14; 29:23; 30:4
observed [2] 34:22
obvious [1] 36:16
obviously [1] 19:16
occurred [7] 13:11, 16; 21:7; 23:2; 25:4; 35:11, 20
occurring [2] 36:17; 41:4
october [27] 5:16; 6:5; 12:2, 9, 12, 16, 21; 13:4, 19, 23; 14:1; 15:21, 23; 16:24; 17:6; 18:9, 12; 19:21; 21:8; 29:2, 11, 30:9; 38:5; 39:17, 21, 24; 42:12
offenses [1] 31:11
offered [1] 6:22
offering [1] 11:22
officer [22] 4:17; 5:19; 6:6, 22; 7:8, 18, 23, 24; 10:10; 11:5, 18; 15:16; 30:11; 31:1, 18; 34:9; 36:7, 9; 39:19, 20; 41:8, 12
officers [7] 10:19; 14:21; 17:17; 18:2; 24:6; 26:1; 29:23

**often** [2] 6:11; 29:23
**oftentimes** [1] 30:4
**once** [4] 5:9; 24:23; 27:15; 42:17
**onto** [1] 22:13
**operating** [2] 15:6; 37:7
**opinion** [2] 11:16; 33:6
**option** [1] 30:8
**oral** [1] 44:8
**order** [1] 20:19
**ordered** [1] 40:3
**orders** [6] 25:19, 20; 26:2, 5; 43:3
**ordinary** [2] 11:2, 4
**organization** [1] 6:11
**outside** [1] 9:13
**owed** [1] 35:19

- P -

**p.o.** [2] 2:6
**pacs** [1] 30:23
**part** [4] 5:12; 24:16; 29:22; 30:2
**participates** [1] 38:12
**particular** [1] 10:18
**parties** [2] 4:3; 44:10
**passengers** [1] 25:10
**past** [3] 32:1; 35:21, 22
**patrol** [3] 7:15; 8:20; 41:16
**pause** [1] 11:13

**paychecks** [1] 41:5
**paying** [1] 41:6
**pennsylvania** [7] 1:1, 18, 24; 2:3, 10; 44:2, 16
**people** [2] 9:13; 40:23
**perjury** [1] 32:13
**person** [4] 29:10, 19; 31:3; 40:10
**personal** [1] 11:16
**personally** [2] 34:22; 44:5
**phone** [4] 16:12; 29:19; 31:5; 35:7
**phrased** [1] 16:16
**physically** [1] 38:12
**place** [2] 1:17; 25:11
**placed** [1] 28:6
**plaintiff** [4] 1:3, 14, 25; 3:14
**plaintiff's** [6] 3:15, 16; 20:15, 19; 37:17, 20
**plan** [8] 12:10; 13:24; 14:1; 16:20; 18:2, 5; 23:23; 24:3
**point** [6] 4:22; 9:21; 33:15; 35:3; 40:5, 14
**police** [35] 4:16; 5:13, 18, 19; 6:6; 7:7; 8:10, 19; 10:19, 24; 11:5, 18; 16:20, 24; 17:21, 24;

18:1; 28:12, 20, 21; 29:2, 23; 30:3, 11; 31:1, 18; 34:9; 36:7, 9; 41:4, 6, 7, 8, 12
**policies** [5] 17:12; 37:7, 11; 38:1, 16
**position** [1] 6:23
**possibly** [1] 34:11
**presence** [1] 35:7
**present** [7] 1:22; 2:1; 10:19; 15:18; 16:23; 28:2; 29:17
**pretty** [2] 20:9; 23:3
**previously** [1] 41:2
**pricing** [1] 34:16
**primarily** [1] 22:8
**prison** [2] 28:7, 24
**probable** [5] 36:10; 39:25; 40:4, 10, 24
**procedure** [1] 15:6
**procedures** [1] 17:12
**process** [1] 14:20
**produced** [2] 20:14; 37:16
**progressed** [1] 39:8
**propounded** [1] 44:9
**provide** [1] 11:22
**provided** [3] 33:21, 24; 35:4

**providing** [2] 38:15; 39:2
**public** [4] 1:15, 24; 44:5, 24
**pulled** [2] 21:24; 23:4
**pulling** [2] 22:13; 42:14
**purchase** [5] 13:10, 13, 16; 40:7
**purchased** [1] 16:8
**purchases** [1] 8:18

- Q -

**questions** [9] 4:25; 31:25; 36:18; 37:3, 4; 42:1; 43:7; 44:9, 14
**quick** [2] 38:23; 42:6
**quicker** [1] 36:24
**quotations** [1] 14:24

- R -

**rank** [3] 7:17, 25; 8:3
**rate** [1] 41:16
**read** [1] 38:23
**recollection** [4] 23:17; 24:3; 25:25; 39:14
**record** [8] 5:3; 10:6; 11:12; 15:25; 18:14; 24:11; 26:16; 32:18
**recross** [1] 3:2
**redacted** [1] 37:25
**redirect** [1] 3:2

**reduced** [1] 44:17

**refer** [2] 6:14; 38:20

**referred** [1] 6:11

**regarding** [2] 39:12, 16

**registration** [1] 25:14

**regulations** [2] 38:1, 20

**relayed** [1] 19:1

**reliable** [4] 31:22; 32:11; 33:6, 23

**remember** [9] 4:19, 23; 10:23; 14:6, 11, 14, 15; 20:11; 25:4

**removed** [1] 42:18

**rephrase** [1] 4:18

**reporter** [2] 44:16, 18

**reporter-notary** [2] 1:15; 44:24

**represent** [3] 12:8; 20:23; 42:9

**rescue** [1] 5:12

**reserved** [1] 4:6

**residence** [1] 9:10

**residential** [2] 9:8, 12

**resist** [1] 26:20

**respective** [2] 4:3; 44:10

**response** [1] 4:19

**resume** [1] 6:16

**review** [1] 32:8

**reviewed** [1] 6:15

**right** [8] 11:6; 16:15; 22:19; 31:18; 32:22; 33:15; 37:8; 42:15

**risk** [1] 18:17

**river** [1] 24:17

**road** [10] 20:11, 22, 23; 22:13, 19, 21, 24; 23:8, 11; 24:16

**roan's** [2] 21:2; 24:14

**role** [2] 17:5; 26:6

**roles** [1] 8:14

- S -

**safety** [4] 10:25; 11:5, 14; 15:3

**scenario** [1] 35:13

**scene** [4] 27:4, 9; 28:11, 16

**sealing** [1] 4:4

**search** [16] 9:3, 18; 10:6, 9, 11, 12, 15, 20; 11:1, 6, 13, 14, 24; 12:3; 13:2; 29:7

**searched** [3] 9:10; 13:5; 29:15

**second** [1] 24:15

**secure** [1] 9:9

**seek** [1] 36:9

**seeking** [1] 36:24

**sense** [1] 35:2

**separate** [1] 41:5

**september** [13] 6:17, 20; 9:2, 25; 10:2, 21; 11:20, 25; 12:1, 11; 13:4, 8, 18

**serve** [1] 11:6

**serving** [1] 10:25

**sets** [1] 35:6

**several** [1] 31:24

**shawna** [1] 2:5

**shots** [1] 36:15

**show** [3] 18:13; 20:18; 37:14

**showed** [1] 10:11

**sign** [2] 32:5; 34:4

**signing** [2] 4:3; 31:24

**similar** [1] 34:13

**simpler** [1] 7:21

**simply** [2] 38:14; 39:2

**sitting** [3] 34:2, 19, 23

**situation** [1] 37:2

**slow** [1] 5:5

**small** [2] 27:22, 23

**someone** [5] 31:10, 13; 35:5; 38:12, 14

**sometime** [1] 17:13

**sometimes** [2] 6:4; 17:20

**sorry** [16] 5:5; 6:2; 12:13, 25; 14:24; 17:11; 18:6; 21:2; 22:8; 25:11; 26:25; 30:1;

**36**:13; 38:23; 39:22; 40:7

**source** [9] 16:4; 38:4, 8, 14, 18, 21; 39:1; 41:9

**sources** [1] 37:8

**speak** [4] 27:5; 39:11, 15, 20

**speaking** [2] 33:10, 16

**special** [2] 7:9, 10

**specific** [4] 25:10; 26:5; 27:13; 35:22

**specifically** [7] 7:3; 10:23; 14:9, 15; 15:4; 32:12; 42:20

**speculate** [1] 4:20

**spell** [1] 5:2

**spoke** [2] 26:22, 24

**square** [1] 1:24

**starting** [1] 5:21

**state** [1] 5:2

**states** [1] 1:1

**station** [5] 16:20, 24; 28:12, 21; 29:2

**stationed** [3] 19:12, 15; 24:6

**stay** [1] 25:11

**stenographical ly** [1] 44:15

**stephen** [1] 2:2

**steps** [1] 34:9

**still** [3] 8:20; 35:11; 40:10

**stipulated** [1] 4:2

**stipulation** [1] 4:1

stop        [28]
13:10,    15;
15:20;       17:8,
10,  14;    19:2,
5,  24;    20:6,
10;       21:7;
22:2, 20;   23:2,
7,  23;    24:4,
15;  25:3, 5, 6,
8,  13;  27:5, 9;
28:11;  42:11
stopped     [3]
23:18;       25:2;
42:17
stops [1] 40:3
straight    [2]
22:13;  23:4
strange     [1]
16:18
stream      [1]
24:17
street      [3]
1:18;        2:3;
34:17
stretch     [2]
22:13;  23:4
strike [1]  16:2
subscribed [1]
44:20
subsection  [1]
30:24
substance   [2]
31:14;  33:5
such [4]  31:5,
6, 25;  38:13
sumpter     [14]
8:7,  24;   9:16,
21,  24;   10:3;
11:21;      12:1,
11;    16:3,  7;
20:12;      23:9;
38:3
sumpter's  [11]
9:3,  19;   10:5,
20;   11:1,  24;
13:5;      15:24;
22:1;  23:13, 20
supervisor  [2]
7:22;   40:20

supporting  [1]
10:12
suppose     [1]
40:16
supposed    [2]
33:22;  37:11
surrounding [1]
15:8
suspect     [1]
15:11
suspected   [3]
30:5;  35:7,  12
suspects    [1]
9:9
sworn       [3]
4:11;  44:7, 13

- T -

tablet [1]  31:5
taking      [1]
44:12
taught      [1]
31:20
technically [1]
8:11
telling     [1]
34:11
tells [2]  35:4;
36:7
terms       [1]
34:17
testified   [4]
4:11,     16;
42:13;  44:10
testify [1]  44:7
testimony   [1]
44:19
text [1]  35:6
thank       [4]
21:11;     36:2;
43:6, 9
theft       [3]
32:15, 17, 19
they've     [1]
33:24
three [1]  10:22
through     [5]
7:9;     31:20;

35:6;     37:21;
39:8
times [1]  5:8
today [3]   5:14,
20;  34:2
together    [1]
14:1
totality    [1]
36:4
township   [11]
1:8;        2:10;
15:20;   16:20,
24;      17:24;
18:1;     28:11,
20;  29:2;  42:9
traffic     [14]
15:20;   17:14;
19:5, 24;  20:6;
21:7;  22:2, 20;
23:2;     25:13;
27:5;     28:11;
31:11
trafficking  [1]
31:7
trained     [1]
36:8
training    [2]
11:17;  31:20
transaction [2]
29:24;  35:6
transactions
[1]  30:4
transport   [2]
17:8;  28:19
transported [2]
28:10, 15
trial [1]  4:6
true [1] 37:24
truth       [4]
34:11;  44:7, 8
trying      [3]
26:12;    33:3;
34:22
turn [1]  24:1
turned      [2]
23:18;  24:23
type [1]  31:4
types [2]  32:2,
13

typewriting  [1]
44:17
typical     [1]
17:12
typically   [6]
10:13;    14:19,
22;       15:2;
18:5, 7
tyson [4]   1:6;
2:4;        8:4;
39:15

- U -

ultimately  [2]
12:21;  29:14
uncommon   [1]
35:23
under [4]  4:23;
30:23;    33:4;
44:17
undersigned
[1]  44:4
understand  [1]
4:17
union [1]  44:1
unit [1]  7:14
united [1]  1:1
unmarked    [1]
8:19
used [5]  14:24;
31:17;     32:2;
33:9;  35:21
user [1]  33:2
users       [4]
32:16;    34:12,
13, 15
using [5]  31:4;
32:1,  21,  25;
33:3
utilize [1]  8:16

- V -

vary [1]  8:16
vehicle    [21]
19:9,  10,  20,
25;   20:2,  3;
22:3;  23:7, 18;
24:14,  19,  24;

25:1, 10;  26:3;
29:7, 14;  40:3;
42:18, 24;  43:3
**vehicles**  [1]
19:4
**vicinity**  [1]
21:15
**violent**  [1]
11:9
**voice**  [2]
16:11;  18:16

**- W -**

**waiting**  [3]
19:12,  14;
21:13
**waived** [1]  4:4
**walk** [1]  25:13
**walking**  [1]
25:24
**warrant**  [13]
9:3;  10:7, 9,
11,  14,  15;
11:1, 6, 13, 15;
12:3;  13:3
**weights**  [1]
34:16
**west** [2]  1:18;
2:3
**whereof**  [1]
44:19
**whole** [2]  20:6;
44:7
**wilkes-barre**
[1]  1:24
**william** [1]  2:5
**williamsport**
[16]  1:9,  18;
2:3,  7;  5:18;
6:6, 25;  7:4, 5,
7;  8:9,  21;
28:21;  41:3, 6,
7
**williamsport's**
[1]  8:11
**window**  [1]
25:13
**within**  [2]
7:20;  8:1

**without**  [2]
26:18;  36:24
**witness**  [7]
4:10;  15:15;
21:1;  41:15;
42:2;  44:6, 13
**witnesses**  [1]
3:1
**word** [1]  42:8
**worked**  [2]
7:11;  14:20
**would've**  [1]
12:24
**write** [1]  41:5
**written**  [1]
37:11

**- Y -**

**year** [4]  5:22,
24;  6:2;  41:21
**years** [1]  38:25
**yours**  [1]
19:24
**yourself**  [2]
24:6;  30:3

ATTACHMENT H



PLAINTIFF'S
EXHIBIT
I
4/10/29   253

INFORMANTS AND SOURCES OF INFORMATION

PURPOSE

This regulation establishes policies and procedures which shall be followed by all Municipal Law Enforcement Agencies under the jurisdiction of the Lycoming County Office of the District Attorney when selecting, evaluating, documenting, supervising, and compensating informants and sources of information. These policies and procedures are designed to reduce the risks inherent in supervising the activities of informants, and to protect the interests of said Law Enforcement Agencies.

INTRODUCTION

General:  The District Attorney recognizes that informants and sources of information are valuable assets essential to the success of many investigations. However, motivations such as fear and revenge, or expectations of financial gain and prosecutorial consideration, make working with certain individuals precarious and at times dangerous. Members/enforcement officers must therefore exercise extreme caution in selecting, evaluating, supervising, and compensating informants.

DEFINITIONS

A.    Informant:  A private citizen, under the direct supervision of a law enforcement officer, who furnishes information about suspected criminals or criminal activity for consideration, either financial, prosecutorial, or judicial; or a person who actively participates in a criminal investigation or intelligence operation, under the direct supervision of a law enforcement officer, with or without compensation.

B.    Source of Information:  A private citizen, not under the direction of a law enforcement officer, who provides information in return for financial compensation, without becoming an active party to the investigation itself (e.g., a business firm furnishing information from its records; an employee of an organization who, through the normal course of his or her activities, obtains information of value to law enforcement. An individual shall not be categorized as a source of information, if any criminal charges are pending against that individual.

-1-

INFORMANT EVALUATION

A.    General:    Every law enforcement officer shall apply the following criteria when considering individuals as prospective informants:

    1.    The informant must be in a position to measurably benefit current investigations or intelligence operations, or provide sufficient information to initiate new investigations or intelligence operations.

    2.    The informant must be judged, to the extent reasonably possible, to be unlikely to compromise law enforcement interests, activities, or personnel.

    3.    The informant must be willing to accept the degree of supervision and direction required to effectively complete assignments during an investigation.

B.    Special Authorizations:    All law enforcement officers shall obtain special authorizations as indicated for prospective informants meeting the following criteria:

    1.    Juveniles


    2.    Individuals subject to future arrest, e.g., the member/enforcement officer has sufficient evidence to prosecute, may be used as informants only with the approval of the Lycoming County District Attorney and/or the Lycoming County Narcotics Enforcement Unit (NEU) Coordinator.

    3.    Any agreement with a prospective informant based on expectations of prosecutorial or judicial consideration, must be approved by the Lycoming County Assistant District Attorney prosecuting the case.

Dent and Havens Production 404

ATTACHMENT H

4.   Individuals previously declared unreliable, in accordance with this regulation, may be used as informants, only with the approval of the Lycoming County District Attorney and/or the Lycoming County NEU Coordinator.

5.   Individuals on state probation/parole

a.   The request shall include:



-3-

Dent and Havens Production 405



6.   Individuals on county probation or parole

7.   Individuals currently incarcerated

C.   Initial Interview:

    1.   A comprehensive initial interview by the lead law enforcement officer is essential to properly evaluate and determine a prospective informant's eligibility, motivations, and potential value. The degree of the informant's exposure to Lycoming County Narcotics Enforcement Unit activities and judicial proceedings shall be determined by a critical analysis of the informant's capabilities, veracity, and credibility.

    2.   While the nature and extent of initial interviews may vary with individual backgrounds and circumstances, a broad line of inquiry shall be developed to extract information on all criminals and criminal activity known to prospective informants. The law enforcement officer conducting the interview should document the findings using their departments reporting requirements.

D.   Dissemination:

    1. The documented information gathered from the initial interview shall be disseminated as per the established guidelines of the respective law enforcement agency. Any documented information shall also be provided to the Lycoming County NEU Coordinator in a timely manner.

    2.   Except under extraordinarily justifiable circumstances, information gained on serious criminal activities, i.e., felonies, shall be acted on immediately, or when

-4-

ATTACHMENT H

applicable, forwarded by the most expedient means practicable to the appropriate law enforcement personnel. Whenever possible, such information shall be forwarded to the applicable law enforcement officers or agencies without compromising sources or investigations.

E.   Informant History Report:   A detailed account of initial interviews and subsequent personal and administrative information regarding informants shall be reported on the Informant History Report.  (See Appendage C.)

G.   Criminal History Records and Fingerprints:

1.   Positive identification of prospective informants is an essential element in ensuring the safety of personnel. All prospective informants shall be queried for criminal history. Inquiries and responses shall be attached to all copies of the Informant History Report.

2.   Prospective informants, not identified by SID or FBI numbers, shall be fingerprinted for criminal inquiry.  A completed card indicating "Criminal Inquiry, shall be attached to the original copy of the Informant History Report.

EXCEPTION:   Those individuals acting solely as sources of information need not be fingerprinted or photographed, if their identities can be definitively established by other means of verification, e.g., driver's license or other photo identification. If after activation, a source of information begins to take an "active" part in an investigation or intelligence operation (e.g., wears a wire, participates in a controlled buy, personally introduces undercover personnel), the above requirement for photographing and fingerprinting shall apply. Approval to compensate a source of information must be received from the Lycoming County District Attorney.   The approval will be documented in the Informant History Report.

3.   Informants may be used on a limited and provisional basis pending positive identification. However, suitable precautions shall be taken to ensure absolute control over such individuals until identification is confirmed.

Dent and Havens Production 407

H.   Liability Issues:   There are many situations encountered in supervising informants, which exposes the Lycoming County Narcotics Enforcement Unit and/or other Police Agencies to possible liability. Therefore, the following conditions shall be addressed during all initial interviews. Prospective informants must freely and voluntarily agree to the following:

1.   Informants are not law enforcement officers nor police officers, and at no time shall they represent themselves as such.

2.   Informants shall not carry firearms or other weapons while cooperating with investigations.

3.   Informants shall not participate in criminal activities outside the scope of law enforcement supervised investigations.

4.   Informants shall follow the instructions of the supervising law enforcement officer while cooperating with investigations.

5.   Informants shall not engage in any activity which would persuade a person, who would not otherwise do so, to commit a crime.

6.   They shall remain available to the supervising law enforcement officer until all investigations with which they cooperated are closed.

7.   They shall not hold the Office of the District Attorney and/or any other Law Enforcement Agency and its officers liable for any injury suffered or sustained as a result of their cooperation with investigations.

8.   Compensation received for specific services rendered during their cooperation with investigations represents full and complete payment for such services. Cooperating individuals have no future claims against the Office of the District Attorney and/or any other Law Enforcement Agency for such services.   Participation does not make them an employee of any kind of the Office of the District Attorney and/or any other Law Enforcement Agency.

Dent and Havens Production 408

ATTACHMENT H

9.    Information they provide may result in a criminal proceeding. The Office of the District Attorney and/or any other Law Enforcement Agency will use all lawful means to protect their confidentiality, but <u>cannot</u> guarantee the informant's identity will not be disclosed.

I.    Informant Conditions Statement:  The informant or source of information shall indicate their agreement to the above conditions by signing an Informant Conditions Statement Form, (Appendage D) at the time of the initial interview. The Informant Conditions Statement will be witnessed by the supervising law enforcement officer and when practicable, another law enforcement officer. The Informant Conditions Statement shall then be attached to all copies of the Informant History Report.


DUTIES AND RESPONSIBILITIES

A.    Lycoming County NEU Coordinator and/or the Assistant Coordinator:

1.    Administer and securely maintain the NEU Informant History Files.

2.    Ensure the same individual is not activated as an informant by more than one law enforcement agency.

4.    Ensure individuals declared unreliable by one law enforcement agency have not been unknowingly reactivated by another.

5.    Ensure persons meeting the definition of informant or source of information are documented as such.

6.    Ensure initial interviews are comprehensive and that a signed and witnessed Informant Conditions Statement is attached to the Informant History Report.

7.    Ensure all Informant History Reports are complete and include criminal history documentation and an Informant Conditions Statement, as well as photographs, fingerprint cards, as required.

8.    Ensure special authorizations required by this regulation have been acquired.

Dent and Havens Production 409

9.    Ensure all prospective informants have been assigned for work with specific law enforcement officers.

10.   Ensure informant code numbers are assigned to each informant.

11.   Ensure informant compensation is commensurate with the service or information provided.

12.   Ensure the funds compensated are disbursed in accordance with established procedures.

13.   Ensure inactive or unreliable informants are deactivated by the supervising law enforcement officer.

14.   Ensure an annual review is conducted of all informants to ensure that all provisions of this regulation are being followed.

INFORMANT FILES

A.

B.

C.

Dent and Havens Production 410

ATTACHMENT H



SUPERVISING INFORMANTS

A.   Contacts:  (At least two law enforcement officers must be able to contact each informant.) Informant contacts shall be strictly professional and controlled to minimize exposure of NEU facilities, operations, activities, and personnel. Whenever practicable, two law enforcement officers shall be present at all in-person informant contacts. Extraneous business or social contacts with informants are prohibited.

B.   Opposite Sex Informants:  All personal contacts with informants of the opposite sex, or whose sexual preference may make an investigation more susceptible to compromise through alleged improprieties, shall be conducted by any combination of two law enforcement officers.

C.   Documentation:   All contacts with informants shall be documented on the appropriate investigative report.

D.   Searches:  Informants, who are exposed to Lycoming County NEU funds, controlled substances, or evidence of any kind, shall be thoroughly searched before and after undercover encounters and, kept under continuous observation between searches. All searches shall be conducted by law enforcement officers of the same sex as the informant.

E.   Juveniles:



Dent and Havens Production 411

F.   Polygraph Examinations:   Informant information is normally corroborated through comparison with known facts and investigative follow-up. In situations where these approaches are impractical or insufficient, and corroboration is essential to the investigation or prosecution, polygraph examinations by shall be considered.

G.   Criminal Activity:   Any law enforcement officer with knowledge of an informant's arrest or unsupervised involvement in criminal activity shall, as soon as practicable, notify the Lycoming County NEU Coordinator and/or the Assistant Coordinator. The NEU Coordinator shall ensure a review is conducted to determine the appropriate course of action to be followed.

H.   Reassignment:   Informants are valuable assets whose services and information must be managed wisely. Lycoming County NEU Coordinator and /or the assistant Coordinator, asserts the right to reassign informants in order to increase productivity or meet changing investigative needs.

I.   Transfer:   Informants may be transferred between outside Local, State and Federal Law Enforcement Agency to meet operational needs.

INFORMANT COMPENSATION

A.



B.

-10-

ATTACHMENT H

C.

INFORMANT DEACTIVATION

A.

B.



-11-

Dent and Havens Production 413

INFORMANT REACTIVATION



Dent and Havens Production 414

APPENDAGE D

## INFORMANT CONDITIONS STATEMENT

I, _____ freely and voluntarily agree to the following conditions while cooperating with the Lycoming County Narcotics Enforcement Unit.

I am not a law enforcement officer or a police officer and at no time shall I represent myself as such.

I shall not carry a firearm or any other weapon while cooperating with the Lycoming County Narcotics Enforcement Unit.

I shall not participate in criminal activity outside the scope of the Lycoming County Narcotics Enforcement Unit supervised investigations.

I will follow the instructions of the supervising law enforcement officer while cooperating with the Lycoming County Narcotics Enforcement Unit

I shall not engage in any activity which would persuade a person, who would not otherwise do so, to commit a crime.

I will remain available to the supervising member or enforcement officer until all investigations with which I cooperated are closed.

I, on behalf of myself, my heirs, executors, administrators, successors, and assigns, with the intention to be legally bound, hereby agree to forever release and discharge, indemnify and hold harmless the Lycoming County Narcotics Enforcement Unit, its officers, agents, employees, and all other persons, entities, and political subdivisions, from and against all suits, damages, claims or other liabilities of whatever kind or nature for personal injuries or death, loss of consortium, damage to or loss of property, or any other loss or damage of any kind and nature, known or unknown, foreseen or unforeseen, including attorney's fees, arising from my cooperation with investigations.

If I am to receive compensation for specific services rendered during my cooperation with investigations, it will represent full and complete payment for such services.  That I have no future claims against the Lycoming County Narcotics Enforcement Unit for such services.  Although I may accept some compensation, I understand I am not an employee of any kind of the Lycoming County Narcotics Enforcement Unit.

That the information I provide may result in a criminal proceeding.  The Lycoming County Narcotics Enforcement Unit will use all lawful means to protect my confidentiality but <u>cannot</u> guarantee my identity will not be disclosed.


_____          _____
            WITNESS                                  CI SIGNATURE


_____          _____
            WITNESS                              DATE              TIME

Dent and Havens Production 415

APPENDAGE C

| LYCOMING COUNTY DRUG TASK FORCE **INFORMANT HISTORY REPORT** | 1. DEPARTMENT | 2. INFORMANT NO. |
|---|---|---|

**3. PURPOSE**
☐ ACTIVATION   ☐ REACTIVATION   ☐ SUPPLEMENT   ☐ DECLARATION OF UNRELIABILITY   ☐ DEACTIVATION   ☐ SOURCE OF INFORMATION

**4. ATTACHMENTS**
☐ INFORMANT CONDITIONS STATEMENT   ☐ CRIMINAL HISTORY RECORD INQUIRIES   ☐ PHOTOGRAPH   ☐ FINGERPRINT CARD
☐ SPECIAL AUTHORIZATIONS   ☐ RECEIPT   ☐ DEBRIEFING QUESTIONNAIRE
☐ _____

| 5. NAME | | | | | 6. ALIAS/NICKNAME | | |
|---|---|---|---|---|---|---|---|

| 7. ADDRESS | | | | | | ZIP CODE | 8. TELEPHONE NO. |
|---|---|---|---|---|---|---|---|

| 9. RACE | 10. SEX | 11. AGE | 12. DOB | 13. HEIGHT | 14. WEIGHT | 15. HAIR | 16. EYES | 17. SCARS/MARKS/TATTOOS |
|---|---|---|---|---|---|---|---|---|

| 18. BIRTHPLACE (CITY, STATE) | 19. SSN | 20. OLN (STATE) | 21. SID | 22. FBI |
|---|---|---|---|---|

| 23. VEHICLE 1 | 24. VEHICLE 2 |
|---|---|

| 25. EMPLOYER/SCHOOL | 26. OCCUPATION |
|---|---|

| 27. ADDRESS | ZIP CODE | 28. TELEPHONE NO. |
|---|---|---|

**29. HOUSEHOLD MEMBERS**

| 30. POC FOR CI | ADDRESS | TELEPHONE NO. |
|---|---|---|

| 31. PAST/PRESENT AGENCY WORKING WITH CI | 32. DATES | 33. AGENCY CONTACT |
|---|---|---|

| 34. ALTERNATE LAW ENFORCEMENT OFFICER | BADGE NO. | 35. UNIT |
|---|---|---|

**36. NARRATIVE**   (1) INCLUDE ADDITIONAL INFORMATION WHICH WOULD HELP IDENTIFY OR LOCATE THE INFORMANT. (2) PROVIDE A DETAILED ACCOUNTING OF INFORMANT INTERVIEWS WITHOUT INCLUDING SPECIFIC INVESTIGATIVE INFORMATION RECORDED ELSEWHERE. (3) PRESENT JUSTIFICATION FOR ADMINISTRATIVE ACTION INDICATED IN BLOCK 3.

| 37. SIGNATURE | | 38. DATE OF REPORT | 39. DTF COORDINATOR |
|---|---|---|---|
| REPORTING OFFICER | BADGE NO. | | ☐ APPROVED ☐ DENIED<br><br>DATE: |

Dent and Havens Production 416

Google Maps

416 Brentwood Dr

Map data ©2024

500 ft

PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT
2